1  Dr. Jerroll Dolphin
   P.O. Box 941009
2  Los Angeles, CA 90064
   323-345-1230
3  In Pro Per

4

5

6



FILED
CLERK, U.S. DISTRICT COURT

AUG - 1 2011
2:42m

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

7              UNITED STATES DISTRICT COURT

8             CENTRAL DISTRICT OF CALIFORNIA

9   ST. LUKE SCHOOL OF MEDICINE-        Case No. THE  CV11-06322 PSG
10  GHANA, a Ghanain corporation, ST.                              (MANx)
    LUKE SCHOOL OF MEDICINE
11  -LIBERIA, a Liberian corporation, DR.    JURY TRIAL DEMANDED
    JERROLL B.R. DOLPHIN, on behalf of
12  himself, Robert Farmer, on behalf of a class    COMPLAINT FOR:
13  action
                                            • LIBEL
14           Plaintiff,                      • TRADE LIBEL
                                             • INTERFERENCE IN BUSINESS
15  vs.                                        ADVANTAGE
                                             • CONSPIRACY
16  REPUBLIC OF LIBERIA; MINISTRY OF         • TREATY VIOLATIONS
    HEALTH, a Liberian Governmental          • FRAUD
17  Agency; MINISTRY OF EDUCATION, a         • FALSE IMPRISONMENT
    Liberian Governmental Agency;            • HARASSMENT BY PUBLIC
18  LIBERIAN MEDICAL BOARD, a                  OFFICIALS
19  Liberian Governmental Agency;            • DEPRIVATION OF RIGHTS UNDER
    NATIONAL COMMISSION ON HIGHER             COLOR OF LAW
20  EDUCATION, a Liberian Governmental       • NEGLIGENCE
    Agency; NATIONAL TRANSITIONAL           • VIOLATIONS OF DUE PROCESS
21  LEGISLATIVE ASSEMBLY, a Liberian        • VIOLATIONS OF EQUAL
22  Governmental Agency; DR. ISAAC            PROTECTION
    ROLAND as official and individual;       • CONSPIRACY TO COMMIT CIVIL
23  MOHAMMED SHARIFF as official and           RIGHTS VIOLATIONS
    individual; DR. BENSON BARH as official  • CONVERSION
24  and individual; DR. GEORGE GOLLIN as     • INTENTIONAL INFLICTION OF
25  official and individual; DR. BRAD          EMOTIONAL DISTRESS
    SCHWARTZ as official and individual,     • NEGLIGENT INFLICTION OF
26  ALAN CONTRERAS as official and             EMOTIONAL DISTRESS
27  individual, UNIVERSITY OF ILLINOIS-      • THREATS AND EXTORTION
    URBANA CHAMPAIGN, an Illinois             AGAINST FOREIGN OFFICIALS
28  Institution of Higher Learning; STATE OF • MAIL FRAUD



| | |
|---|---|
| 1 | OREGON, Office of Degree Authorization, the NATIONAL ACCREDITATION |
| 2 | BOARD OF THE REPUBLIC OF GHANA, EDUCATIONAL |
| 3 | COMMISSION FOR FOREIGN MEDICAL GRADUATES, a Pennsylvania |
| 4 | non-profit corporation, FOUNDATION |
| 5 | FOR ADVANCEMENT OF MEDICAL EDUCATION AND RESEARCH, a |
| 6 | Pennsylvania non-profit corporation, |

- **INTERNET HACKING**
- **VIOLATION OF COPYRIGHT**
- **INVASION OF PRIVACY**
- **INTERNET STALKING**
- **CYBER STALKING**
- **LOSS OF CONSORTIUM**

**JURY TRIAL REQUESTED**

Defendants.

```
Court Name: U.S. District Court
Division: 2
Receipt Number: LA022218
Cashier ID: jacash
Transaction Date: 08/01/2011
Payer Name: DR. JERROLL DOPOPHIN
----------------------------------------
CIVIL FILING FEE
For: DR. JERROLL DOPOPHIN
Case/Party: D-CAC-2-11-CV-006322-001
Amount:          $350.00
----------------------------------------
CASH
  Amt Tendered:  $350.00
----------------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


No refunds without original
receipt. Returned checks will be
assessed a fee of $45.00.
```

# Table of Contents

I. JURISDICTION ....................................................................4

  1. FEDERAL QUESTION JURISDICTION............................................4

    A. FRIENDSHIP TREATY.........................................................4

    B.  ALIEN TORT CLAIMS ACT................................................5

    C.  FEDERAL STATUTES.......................................................6

    CONSTITUTIONAL QUESTIONS.............................................7

    D.  DIVERSITY JURISDICTION.............................................9

II. VENUE...........................................................................12

iII. PARTIES.......................................................................12

IV INTRODUCTION...................................................................17

V FACTS.............................................................................17

  GEORGE GOLLIN, THE UNIVERSITY OF ILLINOIS – URBANA CHAMPAIGN...............................................................54

  BRAD SCHWARTZ, THE UNIVERSITY OF ILLINOIS – COLLEGE OF MEDICINE.  ..................................................................59

  ALAN CONTRERAS AND THE STATE OF OREGON'S OFFICE OF DEGREE AUTHORIZATION...................................................59

Background of St. Luke School of Medicine-Liberia ....................61

VI. CAUSES OF ACTION.............................................................65

  1st CAUSE OF ACTION (LIBEL)..........................................65

  2nd CAUSE OF ACTION (TRADE LIBEL)..................................71

  3rd CAUSE OF ACTION - INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE and ECONOMIC INTERFERENCE (CAL CACI No. 2202 ECONOMIC INTERFERENCE) .................................................................................71

  4TH CAUSE OF ACTION – CONSPIRACY..................................73

5th CAUSE OF ACTION - TREATY VIOLATIONS.............................73

7th CAUSE OF ACTION - FALSE IMPRISONMENT..........................78

9th  CAUSE OF ACTION - DEPRIVATION OF RIGHTS UNDER COLOR OF LAW – TITLE 18, PART I, CHAPTER 13 § 242, Deprivation of rights under color of law. ...........................................................................79

10th  CAUSE OF ACTION - NEGLIGENCE........................................79

1th  CAUSE OF ACTION - DENIAL OF DUE PROCESS..................80

12th  CAUSE OF ACTION - DENIAL OF EQUAL PROTECTION.......81

13th  CAUSE OF ACTION - CONSPIRACY TO COMMIT CIVIL RIGHTS VIOLATIONS......................................................................................83

14th  CAUSE OF ACTION - CONVERSION.......................................85

15th  CAUSE OF ACTION - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.................................................................86

17th  CAUSE OF ACTION - THREATS AND EXTORTION AGAINST FOREIGN OFFICIALS, TITLE 18, PART I, CHAPTER 41 § 878. ......87

18th  CAUSE OF ACTION - MAIL FRAUD - TITLE 18, PART I, CHAPTER 41 § 876,  Mailing threatening communications...............87

19th  CAUSE OF ACTION - INTERNET STALKING..........................88

20th  CAUSE OF ACTION - INTERNET HACKING - COMPUTER INTRUSION (I.E. HACKING), CYBERTERRORISM, Title 47 USC § 223, Obscene or harassing telephone calls in the District of Columbia or in interstate or foreign communications; and, Title 47 USC.§ 230, Protection for private blocking and screening of offensive material. .................88

21st  CAUSE OF ACTION - VIOLATION OF COPYRIGHT, Title 17 USC § 501. Infringement of copyright..........................................................89

22nd  CAUSE OF ACTION - INVASION OF PRIVACY......................90

23rd  CAUSE OF ACTION - LOSS OF CONSORTIUM......................90

VII  PRAYER FOR RELIEF.................................................................90

LIST OF EXHIBITS.......................................................................94

I. JURISDICTION

1.      FEDERAL QUESTION JURISDICTION

A.      FRIENDSHIP TREATY

" Treaty of friendship, commerce and navigation. (Article I) Entered into force November 21, 1939. 54 Stat. 1739; TS 956; 9 Bevans 595; 201 LNTS 163. (hereinafter "Friendship Treaty").

(A).    ARTICLE I

1.      "The Nationals of each of the High Contracting Parties shall be permitted to enter, to travel and reside in the territories of the other; to exercise liberty of conscience and freedom of worship; to engage in professional, scientific, religious, philanthropic, manufacturing and commercial work of every kind without interference; to carry on every form of commercial activity which is not forbidden by the local law; to own, erect or lease and occupy appropriate buildings and to lease lands for residential, scientific, religious, philanthropic, manufacturing, commercial and monetary purposes; to employ agents of their choice, and generally to do anything incidental to or necessary for the enjoyment of any of the foregoing privileges upon the same terms as nationals of the State of residence or as nationals of the nation hereafter to be most favored by it, submitting themselves to all local laws and regulations duly established.

2.     The nationals of either High Contracting Party within the territories of the other shall not be subjected to the payment of any internal charges or taxes other or higher than those that are exacted of and paid by nationals of the State of residence.

3.     The nationals of each High Contracting Party shall enjoy freedom of access to the courts of justice of the other on conforming to the local laws, as well for the prosecution as for the defense of their rights, and in all degrees of jurisdiction established by law.

4.     The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law.  Their property shall not be taken without due process of law and without payment of just compensation.

**B.     ALIEN TORT CLAIMS ACT**

The Alien Tort Claims Act ("ATCA") of 1789 grants jurisdiction to US Federal Courts over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

**C.     FEDERAL STATUTES**

The following Federal statutes pertaining to the civil rights of the Plaintiff as well as criminal violations of defendants apply to this lawsuit.

| FEDERAL STATUTE | TITLE |
|---|---|
| Title 42, Chapter 21, Subchapter I, § 1981(a) | Damages in cases of intentional discrimination in employment |
| Title 42, Chapter 21, Subchapter I, § 1983 | Civil action for deprivation of rights under the color of law |
| Title 42, Chapter 21, Subchapter I, § 1985 | Conspiracy to interfere with civil rights |

| Title 42, Chapter 21, Subchapter I, § 1986. | Action for neglect to prevent (University of Illinois) |
| Title 42, Chapter 21, Subchapter I, § 1988(a). | Proceedings in vindication of civil rights |
| Title 42, Chapter 21, Subchapter VI § 2000e2 | Unlawful Employment Practices |
| Title 47 USC § 223 | Obscene or harassing telephone calls in the District of Columbia or in interstate or foreign communications |
| Title 47 USC.§ 230 : | Protection for private blocking and screening of offensive material |
| Title 18, Part I, CHAPTER 13, § 241. | Conspiracy against rights |
| Title 18, Part I, CHAPTER 13, § 242 | Deprivation of rights under color of law |
| Title 18, Part I, CHAPTER 13, § 242 | Hate crime acts |
| Title 18, Part I, CHAPTER 41 § 876 | Mailing threatening communications |
| Title 18, Part I, CHAPTER 41 § 878 | Threats and extortion against foreign officials, official guests, or internationally protected persons |
| Title 17 USC § 501. | Infringement of copyright |
| 18 USC § 245(b)(2) | 1964 Federal Civil Rights Law |

**CONSTITUTIONAL QUESTIONS**

**U.S. CONSTITUTION Sec. 1331.**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. The Federal court is asked to make rulings on the following questions of law and justice:

1. Can State employees use their positions as government employees to defame or deny business opportunity of citizens of the other states of the United States with impunity, and not subject to civil lawsuits in Federal District courts because of the 11th Amendment of the United States Constitution? The Plaintiff argues that those employees, agencies of the state, are not protected from Federal civil lawsuit for damages or equity. Plaintiff asserts that State employees who defame or deny business opportunities to citizens of other states of the United States are not protected by the 11th Amendment of the United States Constitution, and, they and the agencies that they work for are subject to civil lawsuits for damages.

2. Can States publish "lists" of unaccredited universities and institutions outside of their own states (that have not violated any laws of the United States) based on suspicion or personal prejudices of State employees. The Plaintiff asserts that those "lists" are unconstitutional and violate the due process of law provisions of the United States Constitution.

3. Oregon law ORS 348.615 (Appeal Procedure for Unaccredited Institutions)

"If the Oregon Student Assistance Commission refuses to grant approval to a school to confer degrees or revokes the approval to confer degrees, the refusal or revocation shall be subject to the right of review by an action brought in the circuit court of the county in which the school is located. Such review shall be tried as an action not triable by right to a jury. [1997 c.652 §14] ".

This law limits the jurisdiction of the Office of Degree Authorization to counties in Oregon. Therefore, the Office of Degree Authorization has no jurisdiction outside of the State of Oregon, and therefore no authority to place any educational institution located

outside of Oregon on its "diploma mill" list.  Currently the Office of Degree Authorization is working outside of its lawful jurisdiction.

4.  That these "lists" of unaccredited universities and institutions violate the civil rights of the students that attend or who have graduated from the universities and institutions on the lists.

5.  That those "lists" deny students and graduates of those universities, colleges and institutions of their rights to employment, rights to opportunity, rights of enjoyment, rights of congregation and assembly, without a trial or hearing  Those "lists" are, therefore, unconstitutional.

6.  Those "lists" are racially, socially, religiously, and age biased with preference towards government institutions that are not equally (or better) equipped or staffed than private institutions that teach the same curriculum  Those "lists" are, therefore, unconstitutional

7.  That students or graduates of those universities, colleges and institutions on those "lists" are equally qualified as other students or graduates if they have obtained the same qualifications for employment and opportunities; and are, therefore, unconstitutional

8.  Those "lists" disqualify for employment and opportunities with preferences for government supported universities, colleges and institutions, limitations of age, dates of graduation, or date of qualifications are biased towards age, gender, and ethnicity violate the civil rights of students and graduates of the universities, colleges and institutions on those lists who otherwise have qualified for employment and opportunities in civilian, State, and Federal employment.

9.  And, consequently, employment or opportunities with limitations of age, dates of graduation, or date of qualifications are biased towards age, gender, and ethnicity and are, therefore, unconstitutional

10. Can States publish and enforce criminal sanctions or civil sanctions against students and graduates of universities, colleges and institutions who have not otherwise violated any

federal or state law?  The Plaintiff asserts that those "lists" are unconstitutional and violate the due process of law provisions of the United States Constitution

11. States of the United States of America cannot be sued by individuals of other states of the United States of America in United States Federal Court, due to the 11th Amendment of the Constitution of the United States. State employees can hide behind the 11th Amendment of the United States Constitution, and commit illegal and uncivil acts, and not be sued.  This violates the general premise of law that people and institutions can "sue and be sued", and allows virtual unrestricted violation of the civil rights of law abiding people from the unscrupulous use of the power and authority of government.

12. If States of the United States of America cannot be sued by individuals of other states of the United States of America in United States Federal Court, due to the 11th Amendment of the Constitution of the United States, then government employees and laws individual states cannot apply jurisdiction outside of their own state in any matter of law, order, citizenship, or the rights of that state without the express written permission of any other state or country to any person, institution, or corporation outside of that state, and therefore violate the civil rights of any individual, institution, or corporation notwithstanding those rights of any state granted in the United States Constitution.

## D. DIVERSITY JURISDICTION

The Plaintiffs for their cause of action herein, state as follows

1. This Court enjoys subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) (1) because the Plaintiff and Defendants are citizens of different states and countries and the amount in controversy exceeds $75,000.

2. Diversity jurisdiction is established based on the diversity of the principals of this lawsuit.

3. Plaintiff Dr. Jerroll Dolphin is a natural person, at all times relevant hereto was a resident of California, and also resided in Liberia and Ghana.

4. St. Luke School of Medicine - Liberia, at all times relevant hereto was a Liberian educational corporation, with Dr. Jerroll Dolphin being the majority owner.

5. St. Luke School of Medicine-Ghana, at all times relevant hereto was a Ghanaian educational corporation, with Dr. Jerroll Dolphin being the majority owner.

6. Robert Farmer is a natural person and resident of Maryland. He is representative of and on behalf of a class-action of present and former St. Luke School of Medicine-Liberia students and graduates, all natural persons, who are resident of Maryland, Virginia, Illinois, Georgia, Florida, New York, Illinois, Tennessee, Mississippi, Michigan, Texas, California, Washington, Oregon, New Jersey,Pennsylvania, North Carolina, South Carolina, Kentucky, Indiana, Connecticut, Idaho, Canada, Mexico, Liberia, Ghana, Nigeria, Cameroon, South Africa, United Kingdom, France, India, South Africa, Vietnam, Saudi Arabia, and other countries

7. REPUBLIC OF LIBERIA; MINISTRY OF HEALTH, at all times relevant hereto was a Liberian Governmental Agency.

8. MINISTRY OF EDUCATION, at all times relevant hereto was a Liberian Governmental Agency, and employer to Dr. Benson Barh.

9. LIBERIAN MEDICAL BOARD, at all times relevant hereto was a Liberian Governmental Agency, and employer to Dr. Benson Barh and Dr. Horatius Browne.

10. NATIONAL COMMISSION ON HIGHER EDUCATION, at all times relevant hereto was a Liberian Governmental Agency.and employer to Dr. Isaac Roland.

11. NATIONAL TRANSITIONAL LEGISLATIVE ASSEMBLY, at all times relevant hereto was a Liberian Governmental Agency, and employer to Mohammed Shariff.

12. MOHAMMED SHARIFF, at all times relevant hereto was a Liberian government official, a member of the National Transitional Legislative Assembly, and chairman of the Health and Social Welfare Committee.

13. DR. ISAAC ROLAND, at all times relevant hereto was a Liberian government official, chairman of the National Commission on Higher Education.

14. DR. BENSON BARH,  at all times relevant hereto was a Liberian government official, Chief Medical Officer of the Ministry of Health, and Secretary of the Liberian Medical Board..

15. DR. GEORGE GOLLIN,  a resident of Illinois, at all times relevant hereto was a Professor of Physics at the University of Illinois, Urbana, consultant to the Republic of Liberia, Ministry of Education, and author of the State of Oregon's Office of Degree Authorization's "diploma mill" list.

16. DR. BRAD SCHWARTZ Illinois – a resident of Illinois, at all times relevant hereto was Dean  of University of Illinois College of Medicine..

17. ALAN CONTRERAS, a resident of Oregon, at all times relevant hereto was a resident of Oregon, Adminstrator of the State of Oregon Office of Degree Authorization, and publisher of Oregon's "diploma mill" list.

18. UNIVERSITY OF ILLINOIS-URBANA CHAMPAIGN, an Illinois Institution of Higher Learning, at all times relevant hereto was the employer of George Gollin and Brad Schwartz, a co-conspirator to them both, authorized the use of the name of the University of Illinois in their defamatory efforts against the Plaintiffs, and assisted all the Defendants with finances and resources to defame the Defendants.

19. STATE OF OREGON, OFFICE OF DEGREE AUTHORIZATION,  at all times relevant hereto was the employer of  Alan Contreras, a co-conspirator.  The Office of Degree Authorization authorized the use of the name of the the State of Oregon and its own name in Alan Contreras' defamatory efforts against the Plaintiffs, and assisted all the Defendants with finances and resources to defame the Defendants.

20. EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, at all times relevant hereto was a Pensylvania non-profit institution that  assesses the readiness of international medical medical graduates (IMG) by administering the United States Medical Licensing Examinations, and upon passage of those examinations, issues the IMG a ECFMG Certificate.

21. FOUNDATION FOR ADVANCEMENT OF MEDICAL EDUCATION AND
RESEARCH, at all times relevant hereto was a Pensylvania non-profit institution, a
subsidiary of the ECFMG, that publishes the International Medical Education Directory
(IMED). The IMED is a free web-based resource for accurate and up-to-date information
about international medical schools that are recognized by the appropriate government
agency in the countries where they are located.

## II. VENUE

The proper venue for this matter is the Western Division of the Central District of California,
United States District Court, as Dr. Jerroll B. R. Dolphin is a resident of Los Angeles, California
and wherein Dr. Jerroll Dolphin is the majority owner St. Luke School of Medicine-Liberia and
St. Luke School of Medicine-Ghana, and therefore has its place of business.

## III.          **PARTIES**

A.          St. Luke School of Medicine-Liberia, a Liberian educational institution, established in
2000 and incorporated, in 2001, and chartered in 2003.

B.          St. Luke School of Medicine-Ghana, a Ghanaian educational institution established
and incorporated in 1998, and, by judgment of the High Court of Ghana, accredited in
October 2009. The judgment was appealled by the Ghana National Accreditation Board,
NAB, in December of 2009, after the NAB received a 91-page document authored by George
Gollin (Last saved 11/11/2009 1:58:00 PM), and defamatory and threatening letters from the
Oregon Office of Degree Authorization, authored by Alan Contreras, and Dr. Brad Schwartz,
Dean, University of Illinois College of Medicine.

C.          St. Luke School of Medicine-Liberia former medical students and graduates (class-
action). From 1998 until 2001, St. Luke School of Medicine-Liberia only accepted medical
transfer students who had completed their first two years of medical school, medical basic
science. These students only had to complete their last two years of medical school, called

clinical sciences, at accredited hospitals where they would be trained by board certified physicians on real patients and equipment. St. Luke School of Medicine did not conduct classes in Liberia until 2001 because it was too soon after the end of the civil war.

D.      DR. JERROLL B.R. DOLPHIN. Plaintiff Dr. Jerroll B. R. Dolphin was, at all times relevant to the causes of action herein, and is co-founder and President of St. Luke School of Medicine since 1998. Dr. Dolphin is a graduate of San Jose State University with a Bachelor of Science in Physics, with a minor in Mathematics. Dr. Dolphin graduated with a Doctor of Medicine Degree from Spartan Health Sciences University, St. Lucia, West Indies.  Dr. Dolphin is also certified by the Education Commission for Foreign Medical Graduates (ECFMG) for USMLE Step 1 and Step 2.  Dr. Jerroll Dolphin is, and has always been the majority owner of St. Luke School of Medicine-Ghana and St. Luke School of Medicine-Liberia.  Dr. Dolphin resided in Ghana in the later part of 2004, and Liberia from November 2004 until May 2006.  He was resident in Ghana from May 2006 until July 2009, when he returned to the United States.

E.      FRANK TEAH. Frank Teah, a resident of Monrovia, Liberia, at was, at all times relevant to this Complaint, was a prominent Liberian businessman  He was introduced to Dr. Dolphin by the Liberian Ambassador to the United States.  Frank Teah was also the Superintendent of the Monrovia School District, the largest school district in the Republic of Liberia. Frank Teah was, and is, the Vice President of SLSOM and member of the Board.

F.      SENATOR BEATRICE SHERMAN. Sen. Beatrice Sherman, a resident of Monrovia, Liberia, at  was, at all times relevant to this Complaint, was a honorable member of the Senate of the Republic of Liberia until 2004 when the Senate was replace by the temporary National Transitional Legislative Assembly.  The Liberian Ambassador to the United States also introduced her to Dr. Dolphin.  Sen. Beatrice Sherman was, and is, the Secretary of SLSOM and member of the Board.

G.      DR. MEIMEI DUKULY. Dr. Meimei Dukuly, a resident of Monrovia, Liberia, at was, at all times relevant to this Complaint, was a consultant to the Ministry of Health of the

Senate of the Republic of Liberia.  He was introduced to Dr. Dolphin by the Minister of
Health of the Republic of Liberia.  Dr. Dukuly is the Treasurer of SLSOM and member of
the Board.

H.          MEDICAL STUDENTS.  For the sake of clarity and organization the list of Plaintiff
medical students are set forth in Exhibit "1 and are incorporated herein as if fully set forth
verbatim ("Medical Students").  At all times relevant herein, the Medical Students were
students or graduates of SLSOM and represent the Class members.

I.          REPUBLIC OF LIBERIA.  Defendant Republic of Liberia is a High Contracting
Party to the Friendship Treaty

J.          MINISTRY OF HEALTH.  At all times relevant to this Complaint, Defendant
Ministry of Health was the primary institution for health care delivery services in the
Republic of Liberia.  The Ministry of Health is responsible for providing health and social
welfare services to the citizens of Liberia.

K.          LIBERIAN MEDICAL BOARD. At all times relevant to this Complaint, Defendant
Liberian Medical Board was the primary institution for the licensing of medical doctors in
the Republic of Liberia.  It is a branch of the Ministry of Health of the Republic of Liberia.

L.          MINISTRY OF EDUCATION.  At all times relevant to this Complaint, Defendant
Ministry of Education was the education agency of the Republic of Liberia.

M.          NATIONAL COMMISSION ON HIGHER EDUCATION.  At all times relevant to
this Complaint, Defendant National Commission on Higher Education was the national
accrediting agency for the Ministry of Education of the Republic of Liberia ("NCHE").

N.          NATIONAL TRANSITIONAL LEGISLATIVE ASSEMBLY.  Defendant National
Transitional Legislative Assembly (NTLS) was the temporary legislative branch of the
National Transitional Government (NTG) of Liberia that operated in Liberia after President
Charles Taylor left Liberia, in 2004 until the inauguration of President Ellen Johnson-Sirleaf
in January 2006.

O.      DR. ISAAC ROLAND. A resident of Monrovia, Liberia, at all times relevant to this Complaint, Defendant Dr. Isaac Roland was the Director General of the NATIONAL COMMISSION ON HIGHER EDUCATION.

P.      MOHAMMED SHARIFF. A resident of Monrovia, Liberia, at all times relevant to this Complaint, Defendant Mohammed Shariff was a member of the National Transitional Legislative Assembly of the Republic of Liberia from 2004 to 2006. He was Chairman of the Health and Social Welfare Committee ("NTLA" or "NTLA-HSW") until June 2005, later becoming chairman of the NTLA's Executive Committee.

Q.      DR. BENSON BARH. A resident of Monrovia, Liberia, at all times relevant to this Complaint, Defendant Dr. Benson Barh in 2004 through June 2006, was Chief Medical Officer of Liberia and the Secretary of the Liberian Medical Board.

R.      DR. GEORGE GOLLIN. At all time relevant to this Complaint, Defendant George Gollin is a Professor of Physics at the University of Illinois, Champaign, Illinois, the aitjrpit of the infamous Office of Degree Authorization "diploma mill" list, http://www.osac.state.or.us/oda/unaccredited.aspx., purports to be a higher education expert in "diploma mills" and fraudulent colleges and universities. He also claims to be a consultant to the Republic of Liberia and its Ministry of Education.

S.      DR. BRADFORD S. SCHWARTZ. At all times relevant to this Complaint, Defendant Brad Schwartz is the Dean of the College of Medicine, University of Illinois Urbana-Champaign.

T.      ALAN CONTRERAS. Director of the State of Oregon, Office of Degree Authorization. Authorizes the publication of Oregon's infamous "diploma mill" list, http://www.osac.state.or.us/oda/unaccredited.aspx.

U.      EDUCATION COMMISSION FOR FOREIGN MEDICAL GRADUATES. At all times relevant to this Complaint, Defendant Education Commission for Foreign Medical Graduates ("ECFMG") administers the United States Medical Licensing Examination ("USMLE") to graduates of foreign medical education institutions. The USMLE is the

standard medical examination for all medical students foreign and domestic. ECFMG qualifies foreign medical graduates for residency in the United States by issuing an ECFMG certificate based upon successful completion of the USMLE Step 1 and Step 2.

V. FOUNDATION FOR ADVANCEMENT OF INTERNATIONAL EDUCATION AND RESEARCH. At all times relevant to this Complaint, Defendant Foundation for Advancement of International Education and Research ("FAIMER"), an ECFMG agency, maintained the International Medical Education Directory ("IMED"). The IMED is currently the sole source listing for qualified foreign medical schools in the United States.

W. STATE OF OREGON, OFFICE OF DEGREE AUTHORIZATION. At all times relevant to this Complaint, Defendant State of Oregon, Office of Degree Authorization purportedly provides for the protection of the citizens of Oregon and their post-secondary schools by ensuring the quality of higher education and preserving the integrity of an academic degree as a public credential. Alan Contreras is the director of the Office of Degree Authorization.

X. UNIVERSITY OF ILLINOIS – URBANA CHAMPAIGN. At all times relevant to this Complaint, the University of Illinois – Urbana Champaign was an Illinois Institution of Higher Learning. The University of Illinois is the employer of Dr. George Gollin, and Dr. Brad Schwartz.

## IV INTRODUCTION

1. In 2005, organized conspirators and government officials, who were angered because St. Luke School of Medicine ("SLSOM") refused to pay bribes, attacked SLSOM in the media and Internet. When Dr. Dolphin refused to pay the bribe demands, these same public officials began making false public statements to the media, and sending letters with false statements worldwide to principle agencies involved in the recognition and listing of medical degrees and medical licenses. Meanwhile, George Gollin of the University of Illinois-Urbana and Alan Contreras of the State of Oregon's Office of Degree Authorization conspired to destroy the name and

reputation of Dr. Jerroll Dolphin and St. Luke School of Medicine because of their racial and ethnic biases since 2003 until now..

**V      FACTS**

1. Dr. Jerroll Dolphin and Dr. Taliaferro Harris treated Liberian refu0gees in Ghana in September and October 1998 at the Bujumbura Refugee Camp, outside of Accra, Ghana.

2. Dr. Jerroll Dolphin was asked by Liberian officials to start a medical school in Liberia in 1999.

3. St. Luke School of Medicine-Liberia was organized, authorized, incorporated and approved by various governmental agencies of the Republic of Liberia from 2000 through 2004 as demonstrated in Exhibits 2,3 ,4 and 31.

4. Dr. Jerroll Dolphin went to Liberia in April 2001 to meet with Minister of Health, Dr. Coleman, Frank Teah, Dr. Benson Barh, and other influential people.

5. Dr. Dolphin brought with him 14 large boxes of medicine, mostly HIV/AIDS antiviral medicine, surgical equipment and supplies. During that visit, SLSOM, at the suggestion of Dr. Coleman, made arrangements to cooperate with A.M. Dogliotti School of Medicine, the University of Liberia's medical school. A.M. Dogliotti had come to a state of disrepair from neglect and lack of funds. Most professors at A.M. Dogliotti had not been paid for more than four years. The agreement to cooperate was signed in the early summer of 2001. SLSOM would pay A. M. Dogliotti's professors a minimum of $500 USD per month and up to $1500 USD per month or more. SLSOM started advertising for medical students, mainly in Nigeria.

6. During the one month of advertising, SLSOM had over 800 applications, to which approximately 200 students were accepted to the medical school. Most of the newly accepted students were new to medicine, however, about three-dozen students were transfer students for other medical schools, mostly in Nigeria.

7. Dr. Dolphin came back to Liberia in early August 2001 to make arrangements for the expected 150 students to come and study at SLSOM with regular A. M. Dogliotti students and because Dr. Benson Barh, the Dean of A. M. Dogliotti Medical School quit and there

1   was no named replacement as Dean.

2   8.  Without a person to discuss issues that might arise, Dr. Dolphin felt that enrollment at

3       SLSOM in Monrovia should be postponed until suitable arrangements could be made with

4       officials of A. M. Dogliotti. So, in early September 2001, he sent an email to all 200 of the

5       accepted students to postpone their travel to Liberia until further notice. However, a few

6       dozen of the students had already come to, or were in route to Liberia when the email notice

7       was sent.  Without an organized A. M. Dogliotti staff, and without anyone to discuss

8       enrollment, class scheduling, and many other complex issues such as payment to professors,

9       possession of classroom and building keys, responsibility of, and security of laboratory and

10      classroom equipment, SLSOM could not practically keep its arrangement to partner with

11      A.M. Dogliotti.

12  9.  Dr. Dolphin and SLSOM decided to start instruction without using A. M. Dogliotti.

13      Therefore, in order to accommodate the students who had already arrived in Monrovia,

14      SLSOM started classroom instruction at its offices in Monrovia in October 2001. The Online

15      curriculum was developed and used to supplement the instruction of the basic science

16      students in Monrovia.  Simultaneously, SLSOM applied to the National Commission on

17      Higher Education in October 2001 for approval as a tertiary institution.

18  10. Also during this time, Mr. Frank Teah and Senator Beatrice Sherman, Teah's wife, reported

19      to Dr. Dolphin, that Mohammed Shariff, then head of the J. R. Kennedy Hospital in

20      Monrovia, asked for a bribe of $6,000 USD a month to make SLSOM a "credible" institution

21      in Liberia. Frank Teah and Sen. Sherman did not reply to Shariff's request. They reported to

22      Dr. Dolphin that Shariff was a very ruthless individual and was not to be trusted.

23  11. In November 2001, or earlier, the United States Department of State requested that Dr.

24      Dolphin not send any additional U.S. medical students to Liberia, as the State Department

25      had received intelligence of increasing rebel activity in northern Liberia and that there was an

26      eminent threat of civil war there.  SLSOM had several clinical science students, American

27      and Canadian, at hospitals in greater Monrovia area.

28  12. When war did break out in February 2002, SLSOM students fled Monrovia, Liberia in

whatever and however they could. Some of the Nigerian students took refuge at 'Nigeria House', the Nigerian Embassy. Others took leave by boat, airplane, bus transport, and some even 'hitch-hiked' their way to Ghana. None could remove to the Ivory Coast because it also was beset with rebellion.

13. Dr. Dolphin visited Liberia again in June and August 2002. The SLSOM office and classrooms were completely wrecked. There were bullet holes in every wall along with shrapnel stuck in most of the walls of the campus. The roof was also in disrepair. The floors were covered with dirt and mud.

14. Dr. Dolphin and the SLSOM staff spent several thousand dollars to repair the facility. On September 17, 2002, the NCHE issued to SLSOM-Liberia a Temporary Permit to Operate St. Luke School of Medicine in the Republic of Liberia. See Exhibit "3.

15. On April 24, 2003, the National Legislature of the Republic of Liberia granted SLSOM a Charter, despite the threat of civil war. See Exhibit "31".

16. Frank Teah was called to Accra, Ghana to negotiate peace between the Liberian government and the warring Liberian factions. In the meantime, Sen. Beatrice Sherman carried on, personally carrying the Charter to President Taylor for his approval and signature while the fierce civil war was being fought for control of the city of Monrovia. On 7 August 2003, the President of Liberia signed into law "An act to incorporate St. Luke School of Medicine of the city of Monrovia, Montserrado County, Republic of Liberia, and grant SLSOM a Charter." See Exhibit "4".

17. On August 8, 2003, the Ministry of Foreign Affairs published "An act to incorporate St. Luke School of Medicine of the city of Monrovia, Monsterrado County, Republic of Liberia, and grant SLSOM a Charter", which, in part, states:

> ARTICLE 1
>
> SECTION 1:
>
> St. Luke School of Medicine was established August 1, 2000, and incorporated August 22nd 2001 in the City of Monrovia, Montserrado County, Republic of Liberia, is hereby

1  *established in the name of St. Luke School of Medicine Incorporated (SLSOM), by and*
2  *through its founders, Dr. Jerroll Dolphin, President.  Said school is hereby further*
3  *granted this charter, which endows it with all the rights, privileges and benefits existing*
4  *in similar institutions of higher learning within this Republic, and shall henceforth be*
5  *known by the name and title "St. Luke School of Medicine".*

6  *SECTION 2: LEGAL STATUS*

7  *The St. Luke School of Medicine (SLSOM) is hereby made a legal and corporate entity*
8  *with perpetual succession, and shall have the authority to contract, sue and be sued,*
9  *plead and be impleaded in any court of competent jurisdiction within the Republic; to*
10  *purchase or otherwise acquire and hold property, real and mixed up to the value of one*
11  *hundred and fifty million United States dollars (US$150,000,000); the said St. Luke*
12  *School of Medicine (SLSOM) shall be perpetually maintained in the Republic for medical*
13  *education of the people of this nation, people of the other countries and for who may*
14  *have the capacity to seek medical education.*

15  *"Article IX (page 6)  MISCELLANEOUS*
16  *SECTION*

17  1.  *This Charter may be amended by the Legislature of the Republic of Liberia upon*
18  *application to them by and through the Founder of the St. Luke School of Medicine*
19  *(SLSOM), passed by a two-third vote of the said Board of Trustees during a regular*
20  *meeting of the Board of Trustees.*

21  See Exhibit "31"

22

23

24  18. Five days later, after President Charles Taylor signed Act to Incorporate the 'Charter' into the law of the Republic of Liberia,
25  he resigned from the office of President and fled Liberia to Nigeria.

26  19. When Dr. Dolphin returned to Liberia in early September 2003, the SLSOM campus, on the
27  top floor of the Luke Building on Broad Street was, again, entirely destroyed. Dr. Dolphin and
28  SLSOM staff had conducted two complete renovations of the classrooms and offices on the top

floors of the Luke Building. Dr. Dolphin decided to move the campus to a new location as soon as possible because the Luke building, a tall noticible building, was located next to the channel bridge (one block), a strategic battle location and had been subjected to bullet, RPG, and mortar damages from the two previous wars in 2002 and 2003.

20. In November 2004, Dr. Dolphin found a suitable location to move the SLSOM campus in Gaye Town, a residential area on the bay side of Monrovia, with a 5-year lease. The new campus was formerly used as a primary and junior secondary school. Please see Exhibit "32".

21. SLSOM assembled finances, staff, and equipment for the new campus. In November 2004, Dr. Isaac Roland, Director General of Liberia's National Commission on Higher Education, became aware of SLSOM's relocation and improvement efforts. Dr. Roland witnessed the transition of the SLSOM campus from its deplorable condition when SLSOM first took possession of the property to its new refurbished condition. On January 18, 2005, the National Commission on Higher Education, through Dr. Roland, issued a letter to Madame Carole Bede of ECFMG:

> *"St. Luke School of Medicine has established an institution and is working hard towards providing the necessary physical facilities. As we speak there is large quantity of quality medical equipment including computers, modern books, microscopes, etc."* See Exhibit "6"

22. However, on January 20, 2005, Carole Bede issued a letter to Dr. Jerroll Dolphin, St. Luke School of Medicine, wherein she stated:

> *"ECFMG and FAIMER have received an **unsigned and undated statement** apparently issued from the National Commission on Higher Education, Liberia, stating the St. Luke School of Medicine is not registered or accredited as a medical school in Liberia."*
> *"Until such time as FAIMER receives confirmation that the government of Liberia recognizes St. Luke School of Medicine and that the school is authorized by the government to issue the Doctor of Medicine degree, students currently enrolled in, and*

*graduates of, St. Luke School of Medicine are no longer eligible to be registered for*

*USMLE examinations or for ECFMG certification."*

See Exhibit "5". ECFMG removed SLSOM from the IMED listing on January 20, 2005 based on an "unsigned and undated statement" from an unknown person.

23. On February 25, 2005, Mohammed Shariff asked Dr. Dolphin to come to the Capitol Building to meet with him. Dr. Dolphin met him at about 2 PM that same day. Shariff was immediately hostile, questioning Dr. Dolphin on the establishment of SLSOM, yelling incessantly all the while. Dr. Dolphin asked him to calm down. Shariff told Dr. Dolphin, "$6000 a month".

24. Dr. Dolphin, to avoid giving an answer, asked Shariff to come see the campus. Shariff agreed and asked if he could bring a few other 'officials' with him. Dr. Dolphin and Shariff agreed to limit the number to three persons. They would meet at 11 AM on the next Tuesday, March 1, 2005.

25. That Tuesday, March 1, 2005, when Dr. Dolphin arrived at the campus, Shariff had brought 15 newspaper and radio reporters. Dr. Dolphin reminded Shariff that they agreed to limit the number of people to three 'officials'. Shariff sneered, and loudly announced that he had a 'Press Release' that he distributed, however, he refused to give a copy to Dr. Dolphin. Shariff libeled Dr. Dolphin and SLSOM's reputation because of Dr. Dolphin's refusal to pay bribes.

26. Then Shariff loudly began to make a series of false accusations against Dr. Dolphin and SLSOM. Shariff accused SLSOM of committing criminal acts.   Shariff slandered Dr. Dolphin in the presence of newspaper reporters.

27. Then Shariff insisted that the press be allowed to tour the facilities. Shariff stated that if the press was not allowed to inspect the facilities Dr. Dolphin would be in violation of "Article 44 of the Constitution of Liberia". Not knowing exactly what Article 44 was, Dr. Dolphin reluctantly allowed the reporters to enter the campus, take pictures, and ask questions. Shariff violated Dr. Dolphin's civil rights under the color of law.

28. Dr. Dolphin explained to the reporters that the facility was not completed, and that it would be only a temporary campus until SLSOM's permanent campus was built. Nonetheless, most reporters were impressed with SLSOM's campus. They saw the dozen computers, new microscopes, new library books, Internet service, SLSOM's online curriculum, and new classroom tables and chairs. The paint on each wall was fresh. However, SLSOM had not yet bought the glass for the windows, and parts of the roof were unfinished. The reporters saw that all the rooms and laboratories were wired for electricity and all bathrooms were plumbed. Many commented that the facilities were much better than A. M. Dogliotti's facilities (the University of Liberia's medical school), which did not have microscopes or other laboratory equipment at all.

29. After 12 PM of the same day, Dr. Dolphin bade all the reporters to leave, and they all did. However, before Shariff left SLSOM, he asked Dr. Dolphin to come to the Capitol Building at 2:00 PM to meet with him, again mentioning the bribe of $6,000 US per month. Shariff attempted to extort money from Dr. Dolphin.

30. At 2 PM, Shariff called Dr. Dolphin on the telephone asking him where he was. Dr. Dolphin, knowing that Shariff was going to again ask him outright for a bribe, told Shariff that he was fearful of coming to the Capitol Building without the representation of a lawyer. He asked Shariff to write a summons so that he could have time to obtain adequate representation. Shariff became angry, telling Dr. Dolphin that he did not need a lawyer, and to "come now". Dr. Dolphin reminded Shariff that he had made some criminal allegations against Dr. Dolphin and SLSOM at the press conference at the campus, and that he (Dr. Dolphin) had the right to be suspicious and concerned if he would walk out of the Capitol Building in handcuffs or not.

31. Dr. Dolphin insisted on the summons, fearing that Shariff wanted a bribe, and that without the payment of a bribe, Shariff was going to make trouble for him and SLSOM. Shariff threatened Dr. Dolphin.

32. That evening several of the reporters who were at the SLSOM campus came over to discuss what happened earlier that morning. They told Dr. Dolphin about Shariff. If they didn't cooperate with him, he would have their National Press Passes revoked. That meant that they would be "out of work" in a country where work was a 'privilege' of the few. The unemployment rate of Liberia at that time was approximately 80 to 85 percent of the population.

33. On March 3, 2005, the National Commission on Higher Education issued a Statement of Attestation, attesting SLSOM's right to establish and operate a medical school. A copy of the Statement of Attestation was sent to ECFMG. See Exhibit "8".

34. On March 7, 2005, the Ministry of Health sent a letter to the Embassy of India in Liberia verifying that SLSOM Liberia was "…granted legislative permission to establish a college of medicine in Liberia in 2003." See Exhibit "34."

35. Confident of the quality of its campus, and not wanting to be outwitted by Shariff, SLSOM invited the Liberian Medical Board (LMB) to inspect its campus. Dr. Dolphin and SLSOM professor Dr. Dukuly, went to the office of Dr. Benson Barh on Tuesday, March 8, 2005, and presented SLSOM's documentation and all of its legal credentials to him. Dr. Barh appeared to be very upset and disturbed to see the documents shown to him. In fact, his face was flushed, turned red, and he shook his head slowly several times before he looked up to speak to Dr. Dukuly and Dr. Dolphin. Dr. Dukuly then presented SLSOM's Invitation for Inspection to Dr. Barh. See Exhibit "35" .

36. Barh told Dr. Dolphin, in front of Dr. Dukuly, that he wanted $3.000 a month. Barh attempted to bribe Dr. Dolphin. Barh asked when SLSOM expected to start classes. Dr. Dolphin answered saying "this September." To which Dr. Barh replied, "not if I can help it. Barh, thus, did threaten Dr. Dolphin. During the meeting, Barh mentioned to Dr. Dukuly that the Liberian Medical Board had never done an inspection of any medical school. A. M. Dogliotti, the University of Liberia's medical school, had never been inspected nor had it

ever been required for an inspection.  According to the National Commission on Higher Education, only the NCHE had the authority to accredit tertiary institutions.

37. On March 12, 2005, the National Commission on Higher Education issued a letter to the ECFMG, Madame Carole Bede, which, amongst other things, states:

*"St. Luke School of Medicine is recognized by the Government of Liberia to award Doctor of Medicine degrees."*

*"Recognition was granted from August 1, 2000 by the National Legislature of the Republic of Liberia"*

*"Liberia presently recognizes St. Luke School of Medicine."*

*"The government of Liberia previously recognized St. Luke School of Medicine."*

Italic emphasis is quotation from the text of the letter.  See Exhibit "9"

41. After receipt of the NCHE letter, ECFMG placed SLSOM back on the IMED listing on or around March 22, 2005.

42. On or about the night of Sunday, March 13, 2005, Dr. Dolphin's friends in Liberia started calling him, frantically telling him about a doctor who called himself Dr. Kpoto on the radio denouncing SLSOM. They said that Kpoto stated that SLSOM was giving hundreds of 'fake' degrees to Indians from the streets who came to Liberia to register as doctors. He also said that SLSOM taking thousands of US dollars for these fake degrees. Kpoto slandered Dr. Dolphin on the radio.  Kpoto was the Dean of A. M. Dogliotti Medical School, of the University of Liberia.

43. The National Security Agency, NSA, arrested and detained Dr. Dolphin at his room at the Metropolitan Hotel at 7 AM the morning of Tuesday March 15, 2005. The NSA agent asked Dr. Dolphin to pay for the taxi ride to the agency's headquarters in Mamba Point, not far from the US Embassy.  Dr. Dolphin was questioned by two NSA agents for more than 3 hours. Further detained, NSA Director released Dr. Dolphin.in the presence of his attorney and US Embassy Deputy C'harge de Affaires, David Kraehenbuehl after Cllr. Abdullai presented SLSOM's official documentation,  The documentation included the

1  Minister of Health's letter to the World Health Organization (August 2000), SLSOM's

2  Articles of Incorporation (August 2001), the NCHE's Permit to Operate (September

3  2002), the Act to Incorporate St. Luke School of Medicine approved by the Liberian

4  legislature (April 2003), the Bill signed by President Charles Taylor (August 2003), and

5  the Statement of Attestation (March 2005).   The documentation presented to Taylor was

6  already public record.

7  44. The following day, March 16, 2005, Mohammed Shariff and his conspirators caused the

8  following newspaper article to be published in Monrovia media, and on the internet.

9  Another <u>Degree Granting Medical College in Liberia, The Inquirer, Monrovia,</u>

10 <u>Liberia March 16, 2005.</u>

11 *"It has been gathered that an entity accredited by the Government of Liberia*

12 *to run as Medical College has already issued degrees to individuals without*

13 *running classes.*

14 *According to investigation, the St. Luke School of Medicine said to be located*

15 *in Gaye Town, Sinkor, was accredited by an Act of the National Legislature to*

16 *run as a medical college. But report said the school has not officially begun*

17 *classes, but has already gone go-ahead issuing diplomas to some so-called*

18 *graduates.*

19 *Investigation revealed that the existence of the school as a degree granting*

20 *institution came to light recently when some students in Asia called the India*

21 *Consul to verify the existence of the school, which has been issuing degrees.*

22 *The sources said the school was targeting students in Asia because most of*

23 *the people in that part of the world want to be doctors, but can not afford the cost*

24 *of acquiring such education and degree there, and have therefore decided to use*

25 *the on-line program to get their "documents" since they believed that the St. Luke*

26 *School of Medicine was operating in Liberia.*

27

28

1    *It was also said that the school has an affiliation with the University of*

2    *Liberia, but this was denied by Dr. Al Hasan Conteh, president of the university*

3    *when he was approached on the issue yesterday.*

4    *At the same time, some medical doctors contacted over the issue, expressed*

5    *concern about this latest development because they said it has the potential to*

6    *further damage the image of the country.*

7    *Assemblyman Dr. Mohammed Shariff, chairman of the house standing*

8    *committee on health, said the whole thing about the school is fake. He blamed*

9    *some people in government for this situation.*

10    *He said, he has received complaints from some graduates of the A. M.*

11    *Dogliotti College of Medicine of the University of Liberia, who said the issue of*

12    *St. Like was an embarrassment to them.*

13    *He said his committee is investigating the matter as this was serious and must*

14    *be dealt with accordingly. He said this was a scam that some individuals are*

15    *using to extort money from people desirous of getting in the medical profession.*

16    *He said these individuals went to other countries and were thrown out, but some*

17    *individuals in government are working with them to bring shame to this country.*

18    *Also, a statement of attestation issued by the National Commission on Higher*

19    *Education is said to be raising eyebrows. Investigation revealed that the*

20    *commission had gone ahead to grant rights and a statement to operate to the*

21    *institution without it meeting all the requirements, something the school is said to*

22    *be using.*

23    *Health Minister Dr. Peter Coleman who was contacted on the issue*

24    *yesterday, confirmed that the school has been accredited by an act of the national*

25    *legislature. He said the school was now preparing to operate as it has been also*

26    *accredited by the Commission of Higher Education.*

27

28

*Asked about the issuance of diplomas without classes, Dr. Coleman said the school also runs an "online program." But said he is not aware of the issuance of diplomas. He said the medical authorities in Liberia do not "recognize" such online program, which is said to be existing in Nigeria and Ghana.*

*Efforts to get a word from Education Minister, Dr. Evelyn Kandakai, the president and chief executive officer of the school, Mr. Jerroll Dolphin, MD, and the Indian Consul proved futile as their cell phones were switched off. "*

Italics are quotations from the newspaper article. Thus, officials of the government of Liberian did libel and slander Dr. Dolphin.

45. On Thursday, March 17, 2005, the Federal Bureau of Investigation (FBI) questioned Dr. Dolphin in the presence of his lawyer for 2 hours. Dr. Dolphin was questioned by the Director of the FBI. Dr. Dolphin was released after Dr. Dolphin's lawyer presented SLSOM's official documentation, The documentation included the Minister of Health's letter to the World Health Organization (August 2000), SLSOM's Articles of Incorporation (August 2001), the NCHE's Permit to Operate (September 2002), the Act to Incorporate St. Luke School of Medicine approved by the Liberian legislature (April 2003), the Bill signed by President Charles Taylor (August 2003), and the Statement of Attestation (March 2005).   The documentation presented to the Director of the FBI was already public record.

46. On Friday, March 18, 2005, after Dr. Dolphin paid the Liberian Medical Board $500, the LMB inspected the SLSOM campus in Gaye Town. See Exhibit 10.

47. During the inspection Barh said to Dolphin that if he "were in the United States, he would be paid at least $3,000 a month for what he was doing" (as a Dean of the medical school).

48. Dr. Dolphin reminded the inspection team that this was the best-equipped classroom and laboratories in all of Liberia and that A. M. Dogliotti's did not have the furniture, equipment, books, computers, Internet service, electricity, painting, and other facilities that SLSOM had at its campus. Dr. Barh did not want to look at SLSOM's curriculum, which was available online, and on every computer as well. See Exhibit "36." .

49. Officials from the United States Embassy called Dr. Dolphin telling him to meet them at SLSOM's campus the next Monday morning at 10 AM. On March 21, 2005, they arrived at the SLSOM campus in a United States Embassy truck. One younger man was an experienced teacher working at the United States Embassy, and the other middle-aged man was a nurse also working for the United States Embassy. They took pictures with a digital camera as they inspected the campus. The nurse noticed that the microscopes needed light sources to which Dr. Dolphin acknowledged the situation.  The nurse also said that it was a simple problem to fix and it was not significant. They told Dr. Dolphin that SLSOM was the best-equipped campus, medical or otherwise, in Liberia. They were impressed that SLSOM  had curriculum and studies online, and were also impressed with the quality and quantity of the CD-ROM's. Some of Dr. Dolphin's pictures of the SLSOM campus in March 2005 are displayed in Exhibit "33".

50. On Tuesday afternoon, March 22, 2005, Dr. Dukuly notified Dr. Dolphin that he had received word that the inspection report from the Liberian Medical Board was available and that they should collect it together. Dolphin and Dukuly were very disappointed to see the inspection report.  The LMB short report was replete with false information:  See Exhibit "10".

> (a) The building was not undergoing major renovation. One small portion of the roof was undergoing repair when the inspection was done. The LMB knew about the repair in advance.

> (b) The SLSOM Student Handbook had been online for more than five years. A copy was given to the LMB officials.

> (c) The library was set up. SLSOM had 400 library books and 100 interactive medical CD-ROM's SLSOM expected to have 15-30 students, maximum, at that campus. This represented  a book to student ratio of about 18:1.

> (d).SLSOM had two laboratory rooms.  Each laboratory room could accommodate 12 students, or 24 students if working in pairs. The microscopes were displayed in one laboratory, and the stethoscopes, sphygmomanometers, various blood testing

kits, centrifuges, stains, chemicals, and other lab equipment was displayed in the other laboratory.

Thus Liberian Medical Board did libel Dr. Dolphin and SLSOM, which Dr. Dolphin was the majority owner.

51  On Friday morning, March 25, 2005, Dr. Dolphin left Monrovia, traveling by taxi to Roberts International Airport, about 30 miles from downtown Monrovia, to catch an 11 AM flight to Accra, Ghana.  Just as he was about to board the airplane, several Immigration agents approached him, took him under arrest, took his passport, telephone, and boarding pass. They did not have a warrant, nor did they give him any reason for his arrest and detention. They escorted him to the Immigration and Naturalization Office at the airport. Despite his pleas to allow him to catch the flight to Ghana so that he could be with his wife for Easter Sunday, they ignored him.Thus Dr. Dolphin was falsely arrested and denied travel, a Friendship Treaty violation. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin.

52  Instead, the Immigration officials called Mohammed Shariff and the Minister of Justice, Kabinah Janeh, former leader of LURD (Liberians United for Reconciliation and Democracy), one of the rebel coalitions that fought the civil war in 2002 and 2003 in Liberia. Mohammed Shariff was also a known member of LURD.  Dr. Dolphin was falsely imprisoned in Liberia under the color of law.  His right to travel freely was also a violation of the Friendship Treaty. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin.

53  On Monday afternoon, March 28, 2005, Dr. Dolphin and his attorney then gave Deputy Minister of Justice Edward Gobah copies of St. Luke School of Medicine's legal documents. After carefully reading the documents, Deputy Minister Gobah went on to tell Dr. Dolphin's attorney and Dr. Dolphin that "there is no way that the Ministry of Justice would prosecute Dr. Dolphin or St. Luke School of Medicine....... We would lose. St. Luke is a legal entity and a legal university. You have all the required documents. You can teach whatever you choose and anyway you want to teach it." Dr. Dolphin asked "What about online?" Gobah replied saying

"Online instruction is not illegal in Liberia. Not even for medicine."Just as important is what Gobah said next. "This is really a fight between Mohammed Shariff and Peter Coleman. Shariff hates Coleman. They even had a fist fight once in Dr. Coleman's office." He went on to elucidate more about the bad blood between the two. Gobah added "The Ministry of Justice does not want to get involved in what is really a personal dispute that has spilled over into the public eye."

54. Deputy Minister Gobah, then called the Director of Immigration and Naturalization Service, and told him "You know about Dr. Dolphin?" We heard the Director say "yes". "Do you have his passport?" Back came the reply: "Yes." Gobah told him to be in his office in 10 minutes. When the INS Director arrived he told him to "give Dr. Dolphin his passport immediately" and to never take it again. The director asked Dr. Dolphin's attorney and Dr. Dolphin to come to his office Tuesday afternoon to collect the passport. To which Dr. Dolphin's attorney agreed.

55. On Tuesday morning, March 29, 2005, at 11 AM, another friend of Dr. Dolphin called to tell him that Dr. Benson Barh, the Chief Medical Officer of Liberia and the Secretary of the Liberian Medical Board had called a press conference and was blasting SLSOM in front of 3-dozen reporters at the Ministry of Health conference room. Dr. Dolphin called Dr. Dukuly to find out if it was true. Dr. Dukuly confirmed it saying "I told you to get here." Dr. Dolphin replied, "I couldn't get there any sooner." Benson Barh and Dr. Horatious Browne were conducting a press conference to which they were lying outright about SLSOM. United States Embassy in Liberia officials were also at the press conference. See Exhibit "37". At the conference, Dr. Barh began making false statements about SLSOM, screaming and condemning the school at the top of his voice. At the end of the press conference they called for the arrest of Dr. Dolphin, knowing by sight that Dr. Dolphin was in the conference room to which the reporters looked at Dr. Dolphin for his response, some taking pictures of Dr. Dolphin. Thus, again, the Liberian Medical Board did libel and slander Dr. Dolphin and SLSOM to which Dr. Dolphin is the majority owner. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin.

56. On the morning of Thursday, March 31, 2005, Dr. Dolphin read the bold front page newspaper headline **"Medical Board Threatens to Prosecute Founder of 'Fake' Medical**

1  **School"**. Mohammed Shariff and Dr. Benson Barh and their co-conspirators caused the

2  following newspaper article to be published in Monrovia media, and on the internet.  It read as

3  follows:

4      Medical Board Threatens to Prosecute Founder of 'Fake' Medical School,

5      Alloycious David, Monrovia, Liberia The News, March 31, 2005.

6          *Liberia Medical Board has threatened to turn over the founder of the*

7      *"fake" St. Luke Medical School and his collaborators to the Justice Ministry for*

8      *prosecution if they continue to "abuse and insult" the integrity and*

9      *professionalism" of the country's Medical Board.*

10         *The Board said it cannot and will not discuss application of any doctor*

11     *from the Medical School because there is no school in Liberia known as the St.*

12     *Luke Medical School.*

13         *The Board noted that unless the "illegal school" can be accredited, it*

14     *would not license any doctor that it has given diploma to.*

15         *Prof. S. Benson Barh, Chief Medical Officer of Liberia, told reporters*

16     *Tuesday that the 'counterfeit school' through Dr. Meimei Dukuly presented a list*

17     *of 19 doctors who reportedly completed studies at St. Luke Medical School for the*

18     *degree of Doctor of Medicine (MD).*

19

20         *Annoyed over dubious existence of the institution, Dr. Barh said it was*

21     *shameful to have learned that a list of reported trained doctors, who claimed to*

22     *have passed through the walls of the school, was presented to the Medical Board.*

23         *"We are not aware and have no knowledge of the medical school, but we*

24     *will rather warn representatives of the bogus school to legally and properly apply*

25     *to operate a medical institution in Liberia," he stressed.*

26         *He, amongst many other things noted, that the Medical Broad visited the*

27     *school's so- called campus and observed that what it saw does not even represent*

28     *a status of an elementary school's campus, adding in reality, the building is a*

*"run down" dwelling home under major renovation which lacks electricity,*
*laboratory, class rooms, running water among others basic requirements for a*
*representation of a medical institution...*

Italics are quotations from the newspaper article.

Thus Barh and other officials of the Liberian Medical Board did libel and slander SLSOM and Dr. Dolphin, the majority owner of SLSOM. Barh and LMB officials threatened Dr. Dolphin with malicious prosecution and false imprisonment under the color of authority, and violating the Friendship Treaty. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin.

57. Benson Barh lied. The previous year, 2004, Dr. Barh consulted for SLSOM to write a document on the equivalence of medical education in Liberia to medical education in the USA for a price of $3000 USD. SLSOM paid him in full, See Exhibit 38.

58. On Friday morning, April 1, 2005, Dr. Dolphin was served with another summons at 9 AM again, just as he was leaving the Metropolitan Hotel for the airport. The summons was for a hearing by the NTLA-Health and Social Welfare Committee, chaired by Mohammed Shariff the very same day at 2 PM. Dr. Dolphin told the server that he was not coming and to talk to his attorney, Dr. Dolphin's attorney.. Dr. Dolphin proceeded to the airport where he met the Colonel. The Colonel escorted him to the desk of the Customs Department, wherewith he gave Dr. Dolphin his passport and left. Thus, again, Liberian government officials harassed Dr. Dolphin, violating the Friendship Treaty. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin without due process of law.

59. Dr. Dolphin did not learn until a few weeks later that Mohammed Shariff still conducted the hearing regarding SLSOM despite the fact that no one on the SLSOM staff was present for questioning. Some reporters who were present at the hearing, at the demand of Mohammed Shariff, told Dr. Dolphin, later, that it was a "kangaroo court" where Shariff had a list of 'haters' with prepared statements, with similar statements, almost word-for-word, coming forth to speak

against SLSOM. The speakers did not have any facts to accuse SLSOM, only accusations such as "they are harming the people of Liberia", or " St. Luke is a 'fake' school", or " St. Luke School of Medicine does not exist in Liberia". Thus Dr. Dolphin and SLSOM were further libeled and slandered.  Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin without due process of law.

60. However, on Tuesday morning, April 5, 2005, Mohammed Shariff and his conspirators caused the following newspaper article to be published in Monrovia media, and on the internet.

Fake Medical College Boss Flees? Mensiegar Karnga, Monrovia, Liberia The Analyst, April 5, 2005.

> Dr. Jerroll Dolphin, the proprietor and founder [of] the mysterious St. Luke Medical College, has reportedly left the country for fear of being prosecuted.
>
> Informed sources say Dr. Dolphin has "surreptitiously" abandoned his Metropolitan hotel on Broad Street to return home in the United States of America.
>
> There has been intense controversy over the whereabouts of the medical college.
>
> The A. M. Dogliotti College of Medicine had denounced the existence of the alleged fake college in Liberia, even though the school was successful in granting medical degrees to Liberians and other foreign nationals most of whom were Nigerians and Indians.
>
> Defending the existence of St. Luke Medical College in Liberia, the country's Health Minister, Dr. Peter Coleman told reporter at a new conference that the school was not a fake one, added that it met the approval of the 57th national Legislative Assembly during the NPP regime.
>
> Dr. Coleman added that he was unaware whether the institution was registered with the committee on higher institution.

*It appeared that the Health Minister's statement further increases tension*
*with his professional colleagues at A. M. Dogliotti and the Chairman on Health*
*at the NTLA, Dr. Mohammed Shariff who decided to take legal action against Dr.*
*Dolphin [on behalf of] the medical profession.*

Italics are quotations from the newspaper article.

Thus, again, Dr. Dolphin and SLSOM were libeled and slandered by Liberian officials without due process of law. Dr. Dolphin was also threatened with malicious prosecution and false imprisonment under the color of law and authority, a violation of the Friendship Treaty. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin.

61. Dr. Dolphin left from Accra, Ghana, to Monrovia, Liberia, the next morning at 7 AM, April 6, 2005, and arrived in Monrovia at about 9 AM, and returned to the Metropolitan Hotel. Once, in Liberia, Dr. Dolphin's mother, Mrs. Ruth Dolphin, called him from Los Angeles to tell him there was an article in the Los Angeles Times newspaper stating that he had fled Liberia for fear of prosecution and was 'thought to be hiding' in Los Angeles. Thus, Dr. Dolphin and SLSOM was libeled and slandered by Liberian officials without due process of law.

62. On April 11, 2005 the National Commission on Higher Education issued a letter to Madame Carole Bede, which stated SLSOM "does not exist" and was a "computer school." Upon receipt of this letter, the ECFMG-IMED without corroboration of the evidence or claims stated in this letter immediately withdrew SLSOM from the IMED, and canceled the USMLE test results for all of its students and graduates, past and present. Exhibit 11. Thus, again, Dr. Dolphin and SLSOM was libeled and slandered by Liberian officials without due process of law.. The officials of the Republic of Liberia did commit trade libel and interference in business advantage of Dr. Dolphin. The Liberian officials also violated the Friendship Treaty. The ECFMG and IMED negligently violated the civil rights and business advantage of Dr. Dolphin. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin.

63. On April 12, 2005, at about 3 PM, Dr. Dolphin and Dr. Dolphin's attorney went to the Capitol Building to the office of Mohammed Shariff. The hearing started about 3:30 PM and it was a farce. After being called to order by Mohammed Shariff, a line of about a dozen people

came to speak to the so-called committee that consisted of Shariff and another LURD member of the NTLA, a friend of Shariff.

64. The first person to speak was Dr. Kpoto, whom Dr. Dolphin did not know personally. He accused Dr. Dolphin and SLSOM of fraudulently issuing medical diplomas to hundreds of Indians and Liberians 'off the streets', and that SLSOM "does not exist in Liberia." Kpoto offered no proof of his allegations.  Next to speak was Benson Barh who said SLSOM was a 'fake' school and that it "does not exist in Liberia." Several other Liberian doctors, most of whom Dr. Dolphin did not know at all, also came to speak. They all made similar false allegations about SLSOM harming the health and safety of Liberians and that "it does not exist in Liberia." Towards the end of the line was Dr. Isaac Roland, who was shaking. He ended his short speech again with "it does not exist in Liberia." Minister of Education. Dr. Evelyn Kondikai, came to the podium with a canned speech, which also ended with the phrase "it does not exist in Liberia." Thus, again, Dr. Dolphin and SLSOM was libeled and slandered by Liberian officials without due process of law.  Dr. Dolphin was also threatened with malicious prosecution and false imprisonment under the color of law and authority, violating his civil rights and violating the Friendship Treaty.  Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin.

65. In between Kpoto and Kondikai came several doctors that Dr. Dolphin did know, Dr. Dopoe, Dr. Nathanial Bartee, and Dr. J. J. Jones.  Each said they know Dr. Dolphin and they knew about SLSOM and that was all they knew and left the podium.

66. The next to last person to speak was the Minister of Health, Dr. Peter S. Coleman. Dr. Coleman spoke highly of St. Luke School of Medicine for several minutes then he stopped talking and held his head down. Mohammed Shariff prodded Coleman for a few moments to continue by say "and, Dr. Coleman...and Dr. Coleman..." several times. Dr. Coleman looked and Dr. Dolphin and nodded his head, then he looked at Mohammed Shariff. Mohammed Shariff said "and, Dr. Coleman", then Dr. Coleman said, "I was misled" and the room went quiet with

1   awe. Dr. Coleman went on to say that his advisers mislead him and he made mistakes in giving

2   SLSOM the support he had given it in the past.

3   67. Dr. Dolphin was shocked and knew that there would be more controversy. After Dr.

4   Coleman was dismissed from the podium, Dr. Dolphin was called to answer questions. Dr.

5   Dolphin's attorney objected to many questions. Mohammed Shariff started to yell at Abdullai

6   saying that he should not be representing Dr. Dolphin. Thus Shariff under the color of authority

7   tried to deny Dr. Dolphin his right to be represented by an attorney.  Thus, again, Liberian

8   officials did inflict emotional distress on Dr. Dolphin without due process of law.

9   68. Dr. Dolphin told Mohammed Shariff and the audience that the speakers made allegations

10  about SLSOM, most of them false allegations, and that they had no facts to prove anything about

11  what they were saying. Even Mohammed Shariff, with all of his allegations had no facts to

12  support his claims. Shariff was misusing his position in the temporary National Transitional

13  Legislative Assembly to abuse Dr. Dolphin and SLSOM.  Shariff started yelling, threatening to

14  jail Dr. Dolphin for contempt of the NTLA. Dr. Dolphin yelled back saying that he would go to

15  jail, and then to a court of law, and, in the court of law, he would put an end to these farce

16  hearings and this 'kangaroo court'.   Thus, again, Dr. Dolphin and SLSOM was libeled and

17  slandered by Liberian officials.  Dr. Dolphin was also threatened with malicious prosecution and

18  false imprisonment. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin

19  without due process of law.

20  69. Soon afterward, after 6:30, Mohammed Shariff adjourned the hearing and told Dr. Dolphin

21  that he must remain in the room because he was "held in contempt" of the NTLA. Abdullai had

22  to leave for another meeting but he reminded Dr. Dolphin of what to do. It was already dark, and

23  the Capitol Building was without electricity. Mohammed Shariff lit a few candles.  Thus, again,

24  Dr. Dolphin and SLSOM was libeled and slandered by Liberian officials.  Dr. Dolphin was also

25  falsely imprisoned by Shariff who was misusing his governmental authority.

26  70. Soon thereafter, Shariff and another hoodlum-looking fellow, wearing matching snake-skin

27  pants, vest and shoes, discussed matters amongst themselves for about 10 minutes. Then

Mohammed Shariff came to Dr. Dolphin and said he was going to take my passport. He took Dr. Dolphin's passport saying that he was going to copy it for NTLA purposes and use and left the room. Dr. Dolphin called the United States Embassy, when Shariff refused to return his passport, and an embassy official answered. Dr. Dolphin told him that he was at the Capitol Building for an NTLA hearing. The official said that he knew Dr. Dolphin and identified himself. Dr. Dolphin explained that he was at the Liberia Capitol building for a NTLA – HSW hearing on SLSOM and that Mohammed Shariff had taken his passport without his permission. The official asked if Shariff was available and that he wanted to talk to Shariff. Thus, again, Dr. Dolphin and SLSOM was harassed by Liberian officials. Dr. Dolphin was also threatened with malicious prosecution and false imprisonment. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin without due process of law.

71. Shariff returned to Dr. Dolphin his passport. Then Shariff asked Dr. Dolphin if he could use his telephone to explain something to the US Embassy official, to which Dr. Dolphin refused. After another 30 minutes waiting for Shariff and his hoodlum-looking friend conversing, Shariff told Dr. Dolphin that he could leave because he did not want to make Dr. Dolphin a martyr, however, he could not leave Liberia and he would be stopped if he tried. Thus, again, Dr. Dolphin and SLSOM was harassed by Liberian officials. Dr. Dolphin was falsely imprisoned in Liberia under the color of law and denied travel. Dr. Dolphin was also threatened with malicious prosecution. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin without due process of law.

72. On April 16, 2005, two of Dr. Dolphin's in-laws from Ghana, Benjamin Ofori-Atta and Fugah Benoni, came to assist the campus upgrade. They arrived in Liberia on Saturday, April 16, 2005. Their background was in construction and drafting.

73. On or about Tuesday April 19, 2005, Dr. Dolphin's two in-laws from Ghana were arrested by INS agents in the "Red Light" District of Monrovia while shopping for food. They were taken for questioning to INS Headquarters in downtown Monrovia when they mentioned that they were in Liberia to work at SLSOM. Dr. Dolphin's attorney was called to get the two men out of

1   INS detention. Dr. Dolphin went to the Ghana High Commission (Embassy) and asked the

2   Ambassador to intervene, to which he did. The INS agents were looking for Dr. Dolphin's in-

3   laws because the immigration records from the airport stated that they traveled to Liberia for

4   SLSOM business. They were released from INS headquarters in the early night. Their passports

5   were seized and they were told, that they would not get their passports back until they proved

6   that they had return tickets to Ghana. **Thus, again, Liberian officials did inflict emotional**

7   **distress on Dr. Dolphin without due process of law.**

8   74. On Friday April 22, 2005, Frank Teah, Sen. Sherman, Dr. Dukuly and Dr. Dolphin, all,

9   received summonses from the NTLA-HSW Committee to appear on Tuesday August 26, 2005

10  for another hearing. SLSOM was supposed to provide documentation on several topics to which

11  Dr. Dolphin said he would refuse to do so.

12  75. Mohammed Shariff and his conspirators caused the following newspaper article to be

13  published in Monrovia media, and on the internet.

14  <u>Health Minister Confesses; Says "My Advisers Misled Me", The Analyst, Monrovia, Liberia April 22, 2005.</u>

15              *After fiercely defending the existence of a purported medical college*

16          *which his professional colleagues had rowdily denounced, Health Minister Peter*

17          *S. Coleman now appears to have realized that he was being "misled" by his*

18          *"expert advisers."*

19              *Leading members of the Liberia Medical Board had challenged*

20          *Coleman's claim that the school exists and threatened to "prosecute those*

21          *attempting to insult the integrity and professionalism of the board."*

22              *Two of the board members, Dr. Benson Barh and Dr. Horatius Brown,*

23          *told reporters at the Health Ministry that the board "has no knowledge of the*

24          *existence of a medical school named "St. Luke Medical School" in Liberia.*

25          *The fiasco about the existence of the college hit the news last January when the*

26          *Dean of the A. M. Dogliotti College of Medicine, University of Liberia, Dr.*

*Robert Kpoto, who is also a proprietor of the Med-Link Clinic in Monrovia, investigated the entire episode.*

*After a careful research, Kpoto discovered that the non-existing medical school was "clandestinely issuing diplomas and medical degrees to Liberians and other foreign nationals to form part of the medical labor force..."*

*[Health Minister Coleman] declared his intention to "suspend all interactions with St. Luke Medical School effective immediately pending the results of the various inquiries currently underway."*

*Coleman also said the ministry will conduct an independent inquiry "to ensure that the procedures and vetting mechanism by which expert advice is preferred for the Minister of Health is beyond reproach and that another St. Luke fiasco is never again allowed occurring.*

*Observers say the Health Minister's latest concession that the St. Luke Medical College does not actually exist seems to have ended the intense controversy over doubts about the school's presence in Liberia.*

*Thus officials of the Liberian government, again, threatened Dr. Dolphin with malicious prosecution and imprisonment. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin.*

Italics are quotations from the newspaper article.

76. At no time before, during, or after these announcements did anyone from the Ministry of Health, the NTLA-HSW committee, or from A. M. Dogliotti School of Medicine interview or question any staff member or executive of SLSOM. No one other than Dr. Isaac Roland knew or even asked anything about SLSOM's curriculum, students, or graduates. Nor was any written report about any investigation of SLSOM ever seen by anyone other than, if he did, Mohammed Shariff. No agency or

person who has publicly stated to have investigated SLSOM has ever produced any evidence to newspaper reporters or to a court of law.

77. The hearing got started around 2 PM on Tuesday, April 26, 2005. The hearing was held in Mohammed Shariff's office at the Capitol Building. The room was full of reporters, many with cameras, and a few 'witnesses' that Mohammed Shariff had brought to impress the reporters. This time everyone was sworn-in by someone holding a Bible. Then there was a prayer ceremony. Dr. Dolphin, Frank Teah, Sen. Sherman, and Dr. Dukuly were in attendance, as were Dr. Dolphin's in-laws, Benjamin Ofori-Atta and Fugah Benoni, both Ghanians appearing as witnesses for SLSOM. A representative of the United States Embassy was also present during the hearing, at Dr. Dolphin's request.

78. After the prayer Mohammed Shariff began his 'inquiry' by introducing the Consul General of India. He accused SLSOM of being a 'diploma mill' that sold medical diplomas to more than 700 Indians off of the streets. He offered no proof. Shariff then called Dr. Dukuly. He questioned the authenticity of Dukuly 's credentials, forgetting that Dr. Dukuly was once the Minister of Health of Liberia. Dukuly informed Shariff that he was a graduate of Temple University, Philadelphia, Pennsylvania, medical school in 1966.

79. Then Shariff turned his attention to the Hon. Frank Teah who answered all questions with authority and facts. Frank Teah was questioned about the each of SLSOM's authorizing legal documents. He gave detailed facts about how each document was approved. Mohammed Shariff backed off questioning Frank Teah because Shariff saw the mood of the crowd, and more importantly the mood of the reporters, change to the favor of SLSOM during Teah's questioning.

80. Then he called Dr. Dolphin's in-laws, who stood up in a corner of the room. He accused them of coming to teach medicine at SLSOM. When they replied that they were construction workers

who had come only to help Dr. Dolphin finish the landscaping and fencing for the SLSOM campus in Gaye Town, the audience laughed loudly. Mohammed Shariff was very embarrassed.

81. Then Shariff called Senator Beatrice Sherman to testify. She told how she met Dr. Dolphin and how she, the Hon. Frank Teah, Health Minister Dr. Peter Coleman, and Dr. Dukuly and others worked hard to get the SLSOM charter passed in the congress and senate of Liberia. Then she told of how she carried the Act and Bill to then President Charles Taylor, personally, risking her life due to the heavy fighting in Monrovia during the last days of the civil war in August 2003. She was at Taylor's home when he signed the documents. Then she carried them back to the Capitol Building where the Act and Bill were put into the Congressional and Senatorial records, and then the documents were also officially recorded in the Presidential records and the Ministry of Foreign Affairs.

82. Mohammed Shariff could not continue to question Sen. Sherman because now the mood had shifted even further and the audience turned against Shariff. Shariff said loudly "the Act is a fake". Then Sen. Sherman broke a 'bombshell'. She turned to Shariff and very loudly said, "You are a fake. You asked us for a bribe of $6,000 United States Dollars a month."

83. The Hon. Frank Teah immediately contributed, yelling, " St. Luke School of Medicine did not want you to be a part of this school. We knew your reputation as a troublemaker. Why would we pay you $6000 a month? Who are you?" The audience went crazy, some reporters accused Shariff of a vendetta. Dukuly added, "You are the fake. You are not a real doctor. You are only trying to get back at Minister Coleman". Dr. Dolphin yelled "You wanted a $6000 a month bribe from me, and Benson Barh wanted a bribe, too."

84. The entire room was abuzz. Cameras were flashing. Reporters were running over to Sen. Sherman and Frank Teah for more comments, ignoring Mohammed Shariff 's call to come to

'order' He immediately called the meeting to adjourn. Dr. Dolphin, Frank Teah, Sen. Sherman, Dr. Dukuly all stepped outside into the hallway to a circus of reporters wanting more information. Mohammed Shariff walked quickly away to the stairway with a few reporters following him asking questions on the allegations made by Sen. Sherman, Frank Teah, Dr. Dolphin, and Dr. Dukuly.

85 On 27 April 2005, Carole Bede issued a letter to St. Luke School of Medicine, which states:

*"On April 25, 2005, FAIMER received a letter dated April 11, 2005 from Isaac Roland, Ed. D. Director General, National Commission on Higher Education, Ministry of Education, Liberia. In his letter, Dr. Roland stated that although the Commission had issued a "letter of attestation to St. Luke School of Medicine," after investigation, it has been determined that St. Luke School of Medicine does not exist in the Republic of Liberia and that "the Secretariat of the National Commission therefore revokes the attestation effective immediately." A copy of this letter is enclosed."*

*"Therefore, although previously listed in IMED, St. Luke School of Medicine-Liberia is no longer listed in IMED and students and graduates of the school are not eligible for the USMLE or ECFMG certification."*

Italic emphasis is quotation from the letter. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin. Thus, again the ECFMG-FAIMER-IMED did negligently damage the reputation and business opportunities of Dr. Dolphin and SLSOM.

86. Completely discrediting the documentation ECFMG-FAIMER-IMED received from trustworthy Liberian government officials prior to 2005, ECFMG, with bias removed St. Luke School of Medicine-Liberia from the IMED on April 27, 2005. ECFMG did not bother to

corroborate SLSOM's removal with the NCHE, or verify the authenticity of the letter, the only letter concerning SLSOM sent to ECFMG from the NCHE using a typewriter instead of it being a word-processed document..

87. Several days later Dr. Dolphin received the document that NCHE mailed to the Educational Commission for Foreign Medical Graduates that the ECFMG received on April 25, 2005. The National Commission on Higher Education never sent a copy of this letter to St. Luke School of Medicine, as required by law. See Exhibit "11".

88. Dr. Dolphin was scheduled to leave Liberia Tuesday morning, May 10, 2005. At 6:30 AM. Frank Teah called Dr. Dolphin telling him that he could not leave Liberia. He asked Dr. Dolphin to turn on the radio and listen to any station. Dr. Dolphin did only to hear that the NTLA had ordered the closure of SLSOM and that all property of SLSOM would be seized immediately, and that all officers of SLSOM would be arrested and prosecuted, Friendship Treaty violations. The radio broadcast went on to say that Dr. Dolphin was prohibited from leaving Liberia and that his passport would be seized and Dr. Dolphin will be arrested at Roberts International Airport. Thus, Liberian officials did slander Dr. Dolphin and SLSOM, as well as threaten harm and malicious prosecution to Dr. Dolphin. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin.

89. Dr. Dolphin told one of his staff members to run and buy a newspaper about St. Luke School of Medicine. When the staff member returned Dr. Dolphin saw the headlines:

> NTLA Orders 'Bogus' St. Luke University Closed. James West. Liberian Observer. Monrovia. Liberia May 10. 2005.
>
> *Lawmaking body of Liberia says it has established that the school of medicine is a fake medicine institute, has endangered the health of Liberians.*

> *Following several weeks of investigation into its operations in Liberia, the National Transitional Legislative Assembly (NTLA) says the management of St. Luke School of Medicine has endangered the health of the public and should be turned over to the Justice Ministry for prosecution.*
>
> *The transitional assembly said it has been established that St. Luke School of Medicine is a fake medical institute and is not a legal establishment.*
>
> *The NTLA's Joint Committee on Health and Education which conducted the probe recommended to plenary that the purported medical school be closed down immediately and all banks be instructed to freeze their assets pending the conclusion of the Justice Ministry's inquiry.*

Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin without due process of law..

90 About noon, Frank Teah and Sen. Sherman, again, called Dr. Dolphin to tell him that the NTLA did vote in favor of a reconsideration of the Act, and that the Act was tabled and would not be reconsidered for at least 30 days. As it turned out the act was never reconsidered and Shariff was removed as Chairman of the NTLA-Health and Social Welfare Committee in June 2005. From then, he served as Chairman of the NTLA Executive Committee that interfaced with the National Transitional Government President Gyude Bryant.

91 Dr. Dolphin, nor SLSOM, nor any of its officials were ever investigated or charged for any crime by the Justice Ministry, however, because of the threats of Mohammed Shariff, Benson Barh, and other Liberian government officials, Dr. Dolphin had lived in fear, and still lives in fear. Thus, Dr. Dolphin, St. Luke School of Medicine, its students and graduates were harrassed, defamed, and persecuted by Liberia government officials under the color of law, a Friendship Treaty violation. Thus, again, Liberian officials did inflict emotional distress on Dr. Dolphin.

92 On or around June 2005, Mohammed Shariff announced the formation of a "5-member

Executive Committee" to study St. Luke School of Medicine. The five-members included:

- Soko V. Sackor, LURD, NTLA Assemblyman

- Kabinah Janneh, LURD, Minister of Justice

- Vamba Kanneh , LURD, Minister of Transportation

- Dr. Evelyn Kondikai, Minister of Education

- Dr. Peter Coleman, Minister of Healthcare

93. Dr. Dolphin was forbidden to leave Liberia, constantly under threat, public and private by Mohammed Shariff. Thus, again,

Liberian officials did violate the Friendship Treaty and inflict emotional distress on Dr. Dolphin.

94. On Friday, July 15, 2005, through the Ministry of Information, Mohammed Shariff and his

conspirators caused the announcement below was broadcast on radio and television throughout

Liberia. It was also published in the newspapers on Tuesday, July 19, 2005:

> Gov't Finally Closes St. Luke, Monrovia, Liberia The Inquirer, July 19, 2005.
>
> *The Government of Liberia has ordered the immediate closure of the St.*
>
> *Luke School of Medicine for illegally operating in the country.*
>
> *According to an Information Ministry release issued over the weekend,*
>
> *the government's decision is based on the findings and recommendations of a*
>
> *five-member committee constituted last March to probe the existence of St. Luke.*
>
> *A full criminal investigation is to be conducted against the proprietor of the*
>
> *school and others who may have knowingly aided the process of opening the*
>
> *school.*
>
> *All medical degrees issued by St. Luke School of Medicine are nullified*
>
> *and the school pronounced non-existent in Liberia, in keeping with the*
>
> *committee's recommendations approved by the Chairman of the National*

*Transitional Government of Liberia, His Excellency Charles Gyude Bryant.*

*The committee had observed that an Act to Incorporate St. Luke was*

*approved in 2003, but was never enacted by the legislature in session.*

*The cabinet committee further observed that the St. Luke School issued medical*

*degrees in December 2001, January 2002, June 2002, August 2002, February*

*2003 and June 2003 when Monrovia was under attack.*

*The Cabinet Committee chaired by Justice Minister Kabinah Ja'neh,*

*included Education Minister Evelyn Kandakai, Transport Minister Vamba*

*Kanneh, Health Minister Peter Coleman and the Director General of the Cabinet,*

*Soko V. Sackor.*

The italic emphasis is quotation from the newspaper article. Thus, again, Liberian
officials did libel and slander Dr. Dolphin and SLSOM. Again Liberian officials did
threaten Dr. Dolphin and SLSOM with malicious prosecution and harm, violations of the
Friendship Treaty.. Thus, again, Liberian officials did inflict emotional distress on Dr.
Dolphin.

96. On July 21, 2005, SLSOM filed a "Writ of Prohibition" in Liberia's Supreme Court against the Liberian Government
seeking redress against the false claims made by Liberian government officials that SLSOM "does not exist" and prohibit further
actions against SLSOM by the government. The defendants named were the Minister of Justice, the Minister of Education, The
Five-Member Committee chaired by the Justice Minister, and any other Liberian agency. See Exhibit "12"

97. On the same day, July 21, 2005, simultaneously to SLSOM filing a "Writ of Prohibition" in
Liberia's Supreme Court against the Liberian Government, the Minister of Justice, the Minister
of Information, and Mr. Mohammed Shariff accompanied by more than 2-dozen members of the
Liberia National Police illegally raided the SLSOM campus, declared "non-existent" by select
Liberian government officials, and arrested an innocent SLSOM employee, Jessie Sackie, who

was held illegally for 24 hours. Thus, again, Liberian officials did threaten Dr. Dolphin with harm. Liberian officials under the color of law and authority did attempt to falsely imprison Dr. Dolphin. These are Friendship Treaty violations.

98. They were looking to arrest and detain Dr. Dolphin, who was filing at the Supreme Court of Liberia. Note that the Minister of Justice and the Minister of Information were members or the Five-member committee, members of LURD, and friends of Mohammed Shariff. They did not present a warrant to enter and search the SLSOM premises, nor to arrest Jessie Sackie or Dr. Dolphin.

99. Dr. Dolphin went into hiding. With the aid of a friend, Dr. Dolphin hid for the next two days outside of Monrovia until July 23, 2005, venturing into Monrovia to conduct SLSOM's business hidden under a cloth in a friend's car. Thus, again, Liberian officials did violate the Friendship Treaty and inflict emotional distress on Dr. Dolphin.

100.    On July 22, 2005, the Supreme Court issued an Order to Show Cause that prohibited the Liberian government from taking action against SLSOM. The 'show cause' hearing was scheduled for Monday, July 24, 2005. A Supreme Court justice ordered the Minister of Justice by telephone to release the SLSOM employee, Jessie Sackie. See Exhibit "14"

101.    On July 24, 2005, only SLSOM attorneys and officials showed for the 'show cause' hearing. The order to 'prohibit Liberian government action against SLSOM was extended. Another hearing on the "Writ of Prohibition" was scheduled for August 4, 2005.

102.    On August 4, 2005, only SLSOM attorneys and officials showed for the 'Writ of Prohibition' hearing. The order to 'prohibit Liberian government action against St. Luke School of Medicine was extended, and another hearing on the "Writ of Prohibition" was scheduled for

August 10, 2005 to which all defendants were duly served notices to appear by the Colonel

Amos Dixon of the Court Marshall's Office. See Exhibit "15".

103.    On August 10, 2005, only SLSOM attorneys and officials showed for the 'Writ of

Prohibition' hearing. The Supreme Court granted relief to SLSOM, ordering all agencies of the

Liberian government to restore SLSOM to "status quo ante", that being an accredited medical

school, complete with a charter, and an attestation. Additionally, the Supreme Court permanently

ordered to "prohibit Liberian government action against SLSOM". A final Supreme Court

hearing was scheduled on August 20, 2005 to which all defendants were duly served notices to

appear by the Colonel Amos Dixon of the Court Marshall's Office.. An original copy of this

order was sent to Madame Carole Bede at ECFMG, which was ignored. See Exhibit "16"

104.    On August 20, 2005, only St. Luke School of Medicine attorneys and officials showed

for the 'Writ of Prohibition' hearings. On August 22, 2005, the Supreme Court granted SLSOM a

"Clerk's Certificate", a default certificate indicating that Liberian government failed to respond

or petition against SLSOM's "Writ of Prohibition." See Exhibit "17". All of the defendants were

duly served copies of the "Clerk's Certificate" by the General Amos Dixon of the Court

Marshall's Office on two occasions.

105.    Madame Carole Bede at ECFMG, told Dr. Dolphin both by telephone and by e-mail that

she would not comply with the Supreme Court order in September 2005.  ECFMG would change

SLSOM's status on the IMED only if it received instructions from the NCHE.  Dr. Dolphin

objected stating that it was the very same organization that sent the false documentation in the

first place.

106.    [Reserved]

107.   On October 3, 2005, the National Commission on Higher Education for Liberia sent a letter to ECFMG:

> "Based upon the ruling of the Supreme Court of the Republic of Liberia regarding St. Luke School of Medicine, the court has ordered the medical school reinstated to its previous status it was during the accreditation process."

> "Abiding by the Supreme Court Order, the National Commission on Higher Education hereby revokes the letter, dated April 11, 2005 (paragraph 12), which denied the existence of St. Luke School of Medicine and further advises that it should continue its existence" ………

> "We also request that the St. Luke School of Medicine be included in the International Medical Education Directory as it was previously."

The Italic emphasis is the quotation fro the letter.  See Exhibit "18"

108.   ECFMG completely disregarded the NCHE letter. SLSOM was not listed on the IMED as it was previously, and has not been since.

109.   [Reserved]

110.   After staying only six days in Los Angeles, he returned to Ghana, where his wife insisted that he recover from the trauma he experienced in Liberia before returning. He returned to Liberia the third Tuesday of November 2005.

111.   On December 7 2005, the National Commission on Higher Education for Liberia sent another letter to ECFMG:

> "that a campus of the St. Luke School of Medicine has been formally established in Gaye Town, Monrovia. The National Commission on Higher Education has inspected the campus before, and re-inspected it recently, and found it to be satisfactory and ready to operate."

The italic emphasis is a quotation from the letter. See Exhibit "19"

112.    On 26 January 2006, Carole Bede representing Foundation for Advancement of International Medical Education and Research, Philadelphia, PA, issued a letter to Dr. Isaac Roland, National Commission on Higher Education, Republic of Liberia, which stated:

> 1.    *"What is the status of medical degrees awarded by St. Luke School of Medicine for the years 2000 to 2005? Are holders of degrees issued during those years recognized as physicians by the government of Liberia, and are they eligible to apply for medical licensure in Liberia?*
>
> 2.    *Are graduates of St. Luke School of Medicine who receive their medical degrees beginning January 2006 eligible for medical licensure in Liberia? If so, as of what date are (or will) these graduates be eligible for medical licensure in Liberia?*
>
> 3.    *Please confirm that instruction has begun at the campus of St. Luke School of Medicine in Gaye Town, Monrovia, and the date on which instruction began.*

The italic emphasis is a quotation from the letter. Exhibit 6.

113. The National Commission on Higher Education, NCHE, has NEVER replied to, or answered this inquiry from Madame Carole Bede, of the Foundation for Advancement of International Education and Research, FAIMER, an ECFMG foundation. Similar questions about SLSOM's accreditation and campus were answered in a March 12, 2005, letter to ECFMG. See Exhibit "13"

114.    In February 2006, SLSOM bought two acres of land along the highway between Monrovia and Roberts Intentional Airport. It is across the highway from the military base and the new campus of the Methodist University.

115.    In March 2006, Dr. Dolphin filed for a building permit on the SLSOM land for a 15,000 sq. ft. building for basic sciences. The Department of Public Works would not give SLSOM the

building permit because the Director knew of the SLSOM controversy. SLSOM did not obtain the building permit until July 2007.

116. In June 2006, the Liberian President Ellen Johnson-Sirleaf dismissed several government officials for "acts of impropriety." One of the officials dismissed, Dr. Benson Barh, Chief Medical Officer and Executive Secretary of the Liberian Medical Board, was a primary government official involved with misrepresenting SLSOM's Liberia Accreditation and Charter status worldwide. See Exhibit "20"

117. On September 18, 2006, St. Luke School of Medicine filed a lawsuit against the Republic of Liberia in Liberia Civil Court, in Monseratto County, Liberia, at the Temple of Justice in Monrovia. The lawsuit named the Ministry of Education, the Ministry of Health, and all those working under the scope and authority of the Republic of Liberia. See Exhibit "21"

118. Also see the following Exhibits regarding SLSOM's "Damages for Wrong" lawsuit in Liberia:

    a. Exhibit "22 "

    b. Exhibit "23"

    c. Exhibit "24"

    d. Exhibit "25"

    e. Exhibit "26"

    f. Exhibit "27"

    g. Exhibit "28"

    h. Exhibit "29"

    i. Exhibit "30"

119. On October 30, 2006, SLSOM obtained a "Default Certificate" against the Republic of Liberia. See Exhibit "30" Dr. Dolphin and SLSOM are informed and believe that neither the Ministry of Education nor the Ministry of Health, the Liberian

Medical Board, the National Commission on Higher Education, the National Transitional Legislative Assembly or any of the following individuals answered SLSOM's last motion for fear of facing criminal conspiracy charges: Dr. Isaac Roland, Dr. Benson Bahr, Dr. Kpoto, Mohammed Shariff, Dr. Horatius Browne, and Dr. Evelyn Kandikai.

120.    Cllr. Ignatius Weah, SLSOM's attorney attempted to set hearings for both Default Certificates, so that both could be converted into an executable judgment. No Liberian court would allow him to set a hearing. Further, Dr. Dolphin was told that he must take the Default Certificates to Claims Court. However, then and up to the time of this writing, no such Claims Court exists in Liberia, in violation of Liberia's own constitution.

121.    Cllr. Weah tried on numerous occasions to obtain an 'assignment' at Liberia Supreme Court for a final judgment on its "Writ of Prohibition", its civil court damage suit for $120,000,000 USD, and its civil court judgment against its campus landlord, Rebecca J. Moore. Now, the former National Transitional Government's Minister of Justice, Kabinah Janeh, was appointed an Associate Justice of the Supreme Court. The very same Minister of Justice who along with Mohammed Shariff raided the SLSOM campus in 2005. He scheduled all cases that came before the Supreme Court. He would not schedule St. Luke School of Medicine vs. The Republic of Liberia. Nor would Associate Justice Kabinah Janeh recuse himself from the case.

122.    Until now, SLSOM's lawyers have been unsuccessful in obtaining a date for the Supreme Court hearing.


## GEORGE GOLLIN, THE UNIVERSITY OF ILLINOIS – URBANA CHAMPAIGN

123. Dr. George Gollin is a physics professor at the University of Illinois-Urbana Champaign ("Gollin"). Gollin has been publishing defamatory information against Dr. Dolphin, SLSOM and its students and graduates on his website at the University of Illinois since 2003. Gollin has admitted that he is a consultant to the Republic of Liberia and Liberia's Ministry of Education. In this manner, Gollin played a significant role in assisting Shariff, Bahr and Roland in sending false information to ECFMG, ultimately resulting in SLSOM's removal from the IMED, and played a significant role in the extortion and "shake down" of

SLSOM and Dr. Dolphin.  Gollin ignored official government documentation concerning St. Luke School of Medicine authenticity.  Gollin "invents" and "fabricates" stories from false information he gets from the Internet about Dr. Dolphin and St. Luke School of Medicine.  Therefore, George Gollin is a fraud.  He has no personal knowledge or experience of Dr. Dolphin, St. Luke School of Medicine, or its students and graduates.

124.    Gollin's published statements on his University of Illinois website, http://web.hep.uiuc.edu/home/g-gollin/ , have been used and referenced on at least 36 different websites in the United States alone. Some of the false statements published on Gollin's University of Illinois site are presented here:

a.      Gollin lists SLSOM as a "diploma mill" on his University of Illinois website. On his site, Gollin defines a  "diploma mill" as an "organization or individual that produces and sells diplomas, degrees transcripts, or other academic records that are meant to give the impression of academic achievement, but really represent little or no study."

b.      On his site, Gollin published that "St. Regis University even operated St. Luke's School – they put MDs out there on the street. These were medical degrees that were not just to hang on the wall, they were going to use them."

c.      On his site, Gollin published that "David Karam, one of the apparent owners of SLSOM, organized a company manufacturing products described as curing skin cancer and offering potential treatments for diabetes and hepatitis. As 'Executive Vice President and Chief Medical Officer' his fake M.D. lent an air of legitimacy that helped convince a pair of investors to buy \$400,000 of stock in "Bio-Life Labs, Inc.," shortly before its officers abandoned the company."

d.      "St. Luke is a diploma mill."

e.      "A U.S. State Department official says it's fake."

f.      "Liberia says it's illegal."

g.      "A Ghananian official said it's bogus."

h.      "Liberia says St. Luke is a fake."

I.      "St. Luke School of Medicine: www.stluke.edu, an entirely fake medical school run from TX, KY, CA."

j.      "Another unaccredited entity is the "St. Luke School of Medicine" with domain http://stluke.edu' St. Luke was declared illegal by Liberia in 2004 but continues to operate, using various U.S. addresses. At least three of its American "graduates" have served prison terms for attempting to treat patients."

k.      "Do recall that a number of customers of "St. Luke School of Medicine" have been incarcerated for their activities, but that the (American) operators of this supposedly Liberian, Ghanaian, California, Texan, and Kentuckian monstrosity are out and about, selling patient medicines, issuing degrees, and selling stock in a company that claimed to market a cure for skin cancer."

l.      "It could be quackery. It could be criminal. The American Medical Association needs to get involved."

m.      "The American owners of the "St. Luke School of Medicine" took advantage of the catastrophic civil war in Liberia to claim, without governmental challenge, to be training medical students in Monrovia. (They weren't.)

n.      In 2005 U.S. Embassy personnel in Liberia visited St. Luke and found 'no evidence of anything resembling a functioning medical school."

o.      "Even the vile St. Luke Medicine retains its .edu domain."

p.      Gollin threatened to put SLSOM "out of business."

q.      and, many more libelous statements against Dr. Jerroll Dolphin and St. Luke School of Medicine too numerous to included in this petition.


However, Dr. Jerroll Dolphin reserves the right to introduce other false statements made by the Defendant George Gollin and others.

125.    Gollin also holds himself out as an expert in "diploma mills" and how they operate: *"How do diploma mills operate? An extensive description of how certain well-known diploma mills work through the Internet and the Web while obscuring their owners' true identities. Based on research for [State of Oregon's Office of Degree Authorization] by Dr. George Gollin."*

*"How can I [Gollin] tell whether an institution is a degree mill? Most degree mills have certain characteristics. A good overview of these is available from University of Illinois."*

126.    The University of Illinois – Urbana Champaign and the State of Oregon's Degree Authorization has taken responsibility for Gollin's defamatory statements. On October 9, 2003, the University of Illinois ordered Gollin to remove the defamatory statements, with Chancellor Robin Kaler stating that "We were trying to help [Gollin] find a more appropriate place for his website" because a website on diploma mills should be "housed in a place that deals with accreditation."

127.    Additionally, Kaler admitted that Gollin's statements were defamatory "personal attacks."

128.    To date, Gollin's website at the University of Illinois – Urbana Champaign still contains many of the defamatory statements listed above. Gollin, attempting to avert attention from the University of Illinois, shipped his entire website with all its contents to the State of Oregon's Office of Degree Authorization's website, where it is now currently housed.

129.    All of Gollin's statements listed above were patently false when made.

130.    Gollin, the University of Illinois – Urbana Champaign, and the State of Oregon's Office of Degree Authorization continue to defame SLSOM by publishing and hosting Gollin's unsubstantiated "research."

131.    Gollin, the University of Illinois – Urbana Champaign, and the State of Oregon's Office of Degree Authorization, by publishing defamatory statements against SLSOM, harmed and continue to harm SLSOM's reputation worldwide, their actions ultimately playing a major role in ECFMG's removing SLSOM from the IMED.

132.    Gollin, the University of Illinois – Urbana Champaign and the State of Oregon's Office of Degree Authorization have refused to remove the defamatory material when asked to do so by SLSOM.

133.    The University of Illinois – Urbana Champaign is complicit in its support of George Gollin, who uses University of Illinois letterhead and insignia to lend credibility to his misinformation. The University of Illinois has permitted Gollin to use its computers and servers

in Gollin's campaign against SLSOM.  Additionally, Gollin has slandered and libeled SLSOM in more than two dozen speaking engagements, as listed on his University of Illinois website: http://web.hep.uiuc.edu/home/g-gollin/ . Gollin's University of Illinois website contains seven direct links full of false and misleading information about SLSOM.

134.    Gollin's defamatory comments have adversely affected Dr. Dolphin's professional medical and business career. Where Gollin discusses SLSOM, as set forth above, he invariably mentions Dr. Dolphin as SLSOM's president. By mentioning Dr. Dolphin by name in connection with Gollin's false statements, Gollin, the University of Illinois – Urbana Champaign and the State of Oregon's Office of Degree Authorization defamed Dr. Dolphin, the school's president, founder, and majority owner.

135.    Gollin's false statements are so numerous on the Internet, that it has impacted Dr. Dolphin's credit report, wherein it states that Dr. Dolphin is under investigation for fraud - a completely false statement.

136.    Gollin's false statements have impacted Dr. Dolphin's business opportunities. Dr. Dolphin was prevented from an opportunity to purchase stock and options from OptionsXpress because OptionsXpress believed him to be a fraud based on Gollin's false internet statements, and sited Dr. Dolphin's credit report and information regarding fraudulent activities in Liberia and Ghana.

137.    Gollin recently presented a 91-page document, Exhibit 42, to the Ghana National Accreditation Board full of false, libelous, and slanderous statements about Dr. Dolphin, Dr. Dolphin's wife, Susanna Mitchell, and SLSOM.  The document was submitted to the Ghana Court of Appeals by the National Accreditation Board to appeal a judgment in favor of St. Luke School of Medicine-Ghana (not the same institution as St. Luke School of Medicine-Liberia). Virtually all of the document, yes, all is unsubstantiated hearsay from Internet-based news articles.  It is indeed outrageous to assume that the reliability of undocumented and unscrupulous reporters has the same reliability or reputation as the Associated Press, United Press, or Reuters news services.

138.    The Ghana National Accreditation Board submitted Gollin's, Contreras', and Schwartz's documents, Exhibit 42, 43, 49, 50, and 51, to cast doubt on the credibility of Dr. Dolphin and SLSOM because SLSOM-Ghana won accreditation in Ghana through a decision of the Ghana High Court in October 2009.

139.    In Gollin's document, he alludes to Dr. Dolphin being a fraudulent criminal, despite the fact that Dr. Dolphin was never arrested in Liberia or sued for fraud by anyone from Liberia, or anywhere else in the world including the United States before, during, or after SLSOM's crisis in Liberia in 2005. Gollin accused Dr. Dolphin of being a fraud.  Furthermore, he accused Dr. Dolphin's wife of embezzlement without any proof, only naked assertions that cause her name and reputation to be publicly disparaged in Ghana.

## BRAD SCHWARTZ, THE UNIVERSITY OF ILLINOIS – COLLEGE OF MEDICINE.

140.    Brad Schwartz is a co-conspirator of George Gollin and Alan Contreras (see below). Until May 2010, Dr. Jerroll Dolphin had never heard of him.  However, Brad Schwartz did conspire with George Gollin and Alan Contreras to deny the civil rights of, interfer with the business opportunities of, and libel and defame Dr. Dolphin, St. Luke School of Medicine and its students and graduates when he submitted a letter to the Republic of Ghana along with George Gollin and Alan Contreras in November 2009. Exhibit 51 and 54.

## ALAN CONTRERAS AND THE STATE OF OREGON'S OFFICE OF DEGREE AUTHORIZATION

141. ALAN CONTRERAS, is the Adminstrator of the State of Oregon Office of Degree Authorization, and publisher of Oregon's "diploma mill" list, authored by George Gollin and the University of Illinois.  St. Luke School of Medicine has been on the "diploma mill" list since 2003. Alan Contreras and the Office of Degree Authorization never donducted a hearing as required by ORS § 348.594. Furthermore the Office of Degree Authorization has no jurisdiction outside of the state of Oregon, § 348.597[1] Applicability of ORS 348.594 to 348.615.

142. Alan Contreras has already been declared to be a civil rights violator (see BENTON v. OREGON STUDENT ASSISTANCE COMMISSION, Nos. 03-35975, 03-36002, Argued and Submitted May 4, 2005. -- August 25, 2005). "The district court's reasoning .... that defendant Contreras violated Plaintiff's (Benton's) constitutional rights ..... " "Specifically, the district court concluded that defendant "Contreras' application of the regulations to plaintiff's degrees resulted not from an intent to achieve the goals of the regulations, but because of bias toward the institution from which they were received."   That finding is not challenged on appeal."

143. Alan Contreras has racial bias against Dr. Dolphin, St. Luke School of Medicine, and its students and graduates. His racial bias is clearly displayed in this letters to the Republic of Ghana, Exhibit 49 and Exhibit 53. Alan Contreras and the Office of Degree Authorization in those letters seek extortion against the Republic of Ghana, and clearly violate the civil rights of, interfere with the business opportunities of, and libel and defame Dr. Dolphin, St. Luke School of Medicine and its students and graduates.

140. Gollin, Schwartz, and Contreras, no not one, prior to sending the 91-page document and their libelous letters have been to Liberia or Ghana. Therefore, they, themselves, have no personal knowledge of what they claim to be facts concerning Dr. Jerroll Dolphin,  St. Luke School of Medicine, or the operation of St. Luke School of Medicine. Consequently, all of their statements are fraudulent because they have no personal knowledge of whatever they are stating, and furthermore it is mostly fantasy designed to fit their racial prejudices against, Dr. Dolphin, negroes, and negroid nations (African).

141. Gollin, Schwartz, and Contreras, the University of Illinois and the Office of Degree Authorization, each and all, being public employees, officials and agencies, have the responsibility to verify, with due diligence, each and every statement they make concerning any citizen of the United States of America.

142. The Plaintiffs present a detailed list of false, libelous, and threatening statements of the 91-page document authored by George Gollin and the University of Illinois (Exhibits 42 & 43), in Exhibit 52

143.   The Plaintiffs present a detailed list of false, libelous, and threatening statements authored by Alan Contreras and the Office of Degree Authorization (Exhibits 49 and 50), in Exhibit 53.

144.   The Plaintiffs present a detailed list of false, libelous, and threatening statements of the 91-page document authored by Brad Schwartz and the University of Illinois (Exhibit 51) in Exhibit 54.

## BACKGROUND OF ST. LUKE SCHOOL OF MEDICINE-LIBERIA

145.   The online curriculum created by Dr. Dolphin for SLSOM was the first of its kind in the world. The online curriculum mirrored the curriculum offered in Liberia on the SLSOM campus. It was created to supplement the medical students study. The curriculum was and is based on the exam topics listed in the USMLE Annual Step 1 Bulletin for basic sciences, the first two years of medical school. See Exhibit "36".

146.   No student has ever graduated from St. Luke School of Medicine using its online curriculum, alone. It is too difficult and too extensive. In fact, of St. Luke School of Medicine-Liberia's 36 graduates, only two has ever used its online curriculum. All other 34 graduates are completely unfamiliar with it. They are transfer students to SLSOM from other accredited medical schools, from various parts of the world. Therefore, they only had their last two years of full-time training at accredited hospitals and clinics to complete.

147.   SLSOM records each and every examination score in the medical student's record, which is recorded in the student's transcript, which is then averaged for each course for the course final grade. A SLSOM medical student is not allowed to fail any examination in any course. A student has four chances to pass any examination, otherwise that medical student must retake the entire course and cannot progress until that course is passed. The transcripts of all SLSOM students and graduates will clearly demonstrate SLSOM's diligent record keeping.

148.   Accurate financial records were kept for each and every student enrolled in SLSOM. At no time were hundreds of Indian or Liberian students ever enrolled at SLSOM. Liberian students were not even charged tuition at SLSOM. However, the Liberian campuses were

1  destroyed from civil war on two occasions and closed as a result of governmental extortion,

2  interference and misconduct from 2005 until the present day.

3  149.    During the first eight years of SLSOM's existence, 1998 through 2006, SLSOM

4  graduated 36 doctors.  This represents an average of 4.5 doctors a year.  This does not fit the

5  definition of a "diploma mill".

6  150.    SLSOM has never accepted a "fee" for a "degree".  All SLSOM graduates must pass a

7  comprehensive 3-part, 400 question Clinical Science Comprehensive Examination, called a

8  "qualifying examination."

9  151.    It is impossible for a medical student to graduate with a Doctorate of Medicine degree

10  with courses completed online.  Even if a student completes SLSOM's online curriculum for

11  basic sciences, which only 6 medical students did during SLSOM's operation in Liberia until

12  2006, the medical student would have to complete at least 80 weeks of clinical rotations at an

13  accredited hospital to graduate, aside from other requirements needed for graduation.

14  152.    SLSOM medical students must complete at least 2200 hours of basic science instruction

15  and 3200 hours of clinical clerkships, along with passing SLSOM's 3-part Clinical Science

16  Comprehensive Examination and perform 100 hours of community service.  This information

17  has been on SLSOM's Internet website since 2001 and is well documented.  In fact, SLSOM

18  students starting in basic medical science must complete approximately 106 examinations and

19  quizzes.  Additionally, the SLSOM medical students must complete more than 14 essays on

20  medical subjects and complete

21  153.    SLSOM's  students had accomplished much before its crisis with the government of

22  Liberia in 2005.  This includes the following:

23

| Country or Region | Agency | Accomplishments* |
|---|---|---|
| United States | Educational Commission for Foreign Medical | 80% + pass rate on the United States Medical Licensing Examinations |

| Country or Region | Agency | Accomplishments* |
|---|---|---|
| | Graduates (ECFMG) | (USMLE). 14 attempts, 12 passes |
| Nigeria | Medical and Dental Council | 100% pass rate on Nigerian medical licensing examinations. 3 attempts, 3 passes |
| Ghana | Medical and Dental Council | 75% pass rate on Ghanaian medical licensing examinations. 4 attempts, 3 passes. SLSOM graduates were the top scorers, 1-2-3, on the February 2004 examination. |
| Kenya | Medical and Dental Council | 100% pass rate. 1 attempt, 1 pass. SLSOM graduate is a licensed surgeon in Kenya |
| India | All India Medical Council | 100% pass rate. 1 attempt, 1 pass |
| Canada | General Medical Council | 100% pass rate. 1 attempt, 1 pass |
| Mexico | | 100% pass rate. 1 |

| Country or Region | Agency | Accomplishments* |
|---|---|---|
| | | attempt, 1 pass |
| Worldwide | | 88% pass rate. 25 attempts, 22 passes |

The above figures are reliable estimates based on known results by Dr. Dolphin of Medical Students' accomplishments during and after they left SLSOM.

154.    The best evaluation of the rigor and effectiveness of St. Luke School of Medicine's online and clinical science curriculum is the pass rate for national and international medical licensing examinations.    SLSOM's worldwide medical licensing examination pass rate of 88% is exceptional. If the scores from medical students forced to transfer to other medical schools due to the IMED removal and subsequent fallout were included in this calculation, SLSOM's worldwide medical licensing examination pass rate would rise to 96%.

155.    Because there is no central foreign medical school accrediting body, a foreign medical school's listing on the IMED essentially acts as a de-facto accreditation. The hallmark used by ECFMG in assessing foreign medical programs is student passage rates on the USMLE.

156.    ECFMG and FAIMER removed SLSOM from IMED, surprisingly, among other things, without taking note of SLSOM students high USMLE pass rate. This meant that SLSOM graduates and degrees will not recognized worldwide. World Health Organization's Worldwide Directory of Medical Schools will no longer be updated.

## VI.        CAUSES OF ACTION

### 1ˢᵗ CAUSE OF ACTION (LIBEL)

157.    Plaintiff incorporate paragraphs 1 through  herein. Defendants, each all, made many false public statements concerning SLSOM and its owner Dr. Jerroll Dolphin.

158.    On January 20, 2005, Carole Bede received an unnamed and unsigned letter on NCHE letterhead that stated: "St. Luke School of Medicine is not registered or accredited as a medical school in Liberia."

159.    On March 16, 2005, in "The Inquirer", Monrovia, Liberia, Assemblyman Mohammed Shariff stated that, "the whole thing about the school is fake." and made false and threatening statements against Dr. Dolphin.

160.    On March 22, 2005, in a letter addressed to SLSOM regarding a recent "inspection" Dr Horatius Browne of the Liberian Medical Board stated that SLSOM had no library, books, handbook or laboratories.  Dr. Browne also stated in his letter that SLSOM was not "representative of a Medical College."

161.    On March 31, 2005, the Inquirer reported that the Liberian Medical Board, at a NCHE hearing called by Shariff, stated, "there is no school in Liberia known as the St. Luke School of Medicine", that it was "illegal", and "counterfeit." Dr. Benson Barh, Chief Medical Officer of Liberia, stated "we are not aware and have no knowledge of *the* medical school."  All the statements made by the Liberian Medical Board were patently false.

162.    On that same day, Dr. Barh stated that the building where SLSOM was located was "a run down dwelling home under major renovation which lacks electricity, laboratory, class rooms, running water."

163.    On April 11, 2005, the NCHE issued a letter to ECFMG that stated SLSOM "does not exist" and was a "computer school."

164.    On April 12, 2005, Dr. Isaac Roland (NCHE) and Dr. Kondikai (Minister of Education) both stated at an NTLA hearing that SLSOM "does not exist in Liberia."

165.   On May 10, 2005, the NTLA declared that SLSOM was "a fake medical institute and is not a legal establishment" and had endangered "the health of the public and should be turned over to the Justice Ministry for prosecution."

166.   BARH sent a letter to the W.H.O. Representative in Monrovia stating that St. Luke School of Medicine "Does not exist in Liberia" after he and the LMB inspected SLSOM's facilities. This is an obviously false and fraudulent statement.

167.   Barh also sent a copy of the same letter to the National Accreditation Board of Ghana as well as to the Medical and Dental Council of the Republic of Ghana in an effort to defame Dr. Dolphin and St. Luke School of Medicine.. EXHIBIT 44 (reserved)..

168.   Gollin has been publishing defamatory information against SLSOM on his website at the University of Illinois since 2003. Gollin has admitted that he is a consultant to the Republic of Liberia and Liberia's Ministry of Education. In this manner, Gollin played a significant role in assisting Shariff, Bahr and Roland in sending false information to ECFMG, ultimately resulting in SLSOM's removal from the IMED, and played a significant role in the extortion and "shake down" of SLSOM and Dr. Dolphin. Gollin's published statements on his University of Illinois website have been used and referenced on at least 36 different websites in the United States alone. Some of the false statements published on Gollin's University of Illinois site are presented here:

169.   Gollin lists SLSOM as a "diploma mill" on his University of Illinois website. On his site, Gollin defines a "diploma mill" as an "organization or individual that produces and sells diplomas, degrees transcripts, or other academic records that are meant to give the impression of academic achievement, but really represent little or no study."

170.   On his site, Gollin published that "St. Regis University even operated St. Luke's School – they put MDs out there on the street. These were medical degrees That were not just to hang on the wall, they were going to use them."

171.   On his site, Gollin published that "David Karam, one of the apparent owners of SLSOM, organized a company manufacturing products described as curing skin cancer and offering potential treatments for diabetes and hepatitis. As 'Executive Vice President and Chief Medical

Officer' his fake M.D. lent an air of legitimacy that helped convince a pair of investors to buy $400,000 of stock in "Bio-Life Labs, Inc.," shortly before its officers abandoned the company."

      a.    "St. Luke is a diploma mill."

      b.    "A U.S. State Department official says it's fake."

      c.    "Liberia says it's illegal."

      d.    "A Ghananian official said it's bogus."

      e.    "Liberia says St. Luke is a fake."

      f.    "St. Luke School of Medicine: www.stluke.edu, an entirely fake medical school run from TX, KY, CA."

      g.    "Another unaccredited entity is the "St. Luke School of Medicine" with domain http://stluke.edu' St. Luke was declared illegal by Liberia in 2004 but continues to operate, using various U.S. addresses. At least three of its American "graduates" have served prison terms for attempting to treat patients."

      h.    "Do recall that a number of customers of "St. Luke School of Medicine" have been incarcerated for their activities, but that the (American) operators of this supposedly Liberian, Ghanaian, California, Texan, and Kentuckian monstrosity are out and about, selling patient medicines, issuing degrees, and selling stock in a company that claimed to market a cure for skin cancer."

      i.    "It could be quackery. It could be criminal. The American Medical Association needs to get involved."

      j.    "The American owners of the "St. Luke School of Medicine" took advantage of the catastrophic civil war in Liberia to claim, without governmental challenge, to be training medical students in Monrovia. (They weren't). In 2005 U.S. Embassy personnel in Liberia visited St. Luke and found 'no evidence of anything resembling a functioning medical school."

      k.    "Even the vile St. Luke Medicine retains its .edu domain."

      l.    Gollin also holds himself out as an expert in "diploma mills" and how they operate: "How do diploma mills operate? An extensive description of how certain well-

1  known diploma mills work through the Internet and the Web while obscuring their

2  owners' true identities. Based on research for [State of Oregon's Office of Degree

3  Authorization] by Dr. George Gollin." "How can I [Gollin] tell whether an institution is

4  a degree mill? Most degree mills have certain characteristics. A good overview of these is

5  available from University of Illinois."

6  m.      Gollin threatened to put SLSOM "out of business."

7  n.      Gollin has published the entire 91-page document that he sent to the National

8  Accreditation Board of the Republic of Ghana on his University of Illinois website,

9  http://www.hep.uiuc.edu/home/g-

10  gollin/pigeons/SLSOM/pacer_document_1_modified_version_electronic_exhibit_41.pdf, which is packed with

11  blatently false, fraudulent, magical, and contrived statements about Dr. Dolphin, St. Luke

12  School of Medicine – Liberia, St. Luke School of Medicine - Ghana, SLSOM graduates,

13  and others. He claims that this document is public domain because it was presented in

14  court. The statement is blatently false because Dr. Dolphin only presented the first 5

15  pages of the document to the court in federal lawsuit, 10-CV-01791-RGK (SHx). Exhibit

16  40.

17  o.      The defendants Gollin and the University of Illinois believe that they can modify

18  evidence in lawsuit and then claim that it is public domain in a lawsuit. This represents

19  internet defamation by Gollin and the University of Illinois. Because the number of

20  defamatory statements are too numerous in the 91-page document authored by George

21  Gollin. For the sake of brevity and for the sake of privacy of those named in the 91-page

22  document authored by George Gollin, The Plaintiffs incorporate Exhibit 52 (a list of

23  fraudulent, false, and threatening statements of George Gollin in the 91-page document)

24  172. Brad Schwartz and the University of Illinois College of Medicine did libel the Plaintiffs with the document they sent to the

25  National Accreditation Board of the Republic of Ghana. Exhibit 51. The Plaintiffs incorporate Exhibit 54 (a list of fraudulent,

26  false, and threatening statements of Brad Schwartz and the University of Illinois).

27  173.    Alan Contreras and the Office of Degree Authorization did libel the Plaintiffs with the

28  documents they sent to the National Accreditation Board of the Republic of Ghana. Exhibit 49

and 50.  The Plaintiffs incorporate Exhibit 53 (a list of fraudulent, false, and threatening statements of Alan Contreras and the Office of Degree Authorization).

174.    The Ghana National Accreditation Board did submit the fraudulent, libelous, and threatening documents to appeal the judgment of the Ghana High Court in favor of St. Luke School of Medicine-Ghana in December 2009 in an effort to publicly libel and slander the Plaintiffs. Exhibit 42.

175.    As specified below, the Plaintiffs, each and all, were injured by the publishing and distribution of the letters, documents, and media articles, and the radio broadcast of the false statements..

176.    The Defendants, each and all, knew the statements to be false and acted intentionally causing the statements to be published in the media and on the internet.

177.    The Defendants, each and all, were negligent or acted recklessly in failing to determine whether the statements contained in the ad were true before publishing the false statements.

178.    the Defendant Officials of the Republic of Liberia acted in lawless disregard continuously making false, libelous, and threatening statesments to Dr. Dolphin, officials of SLSOM and its students and graduates. Defendants, each and all, knew the statements the made to be false and acted intentionally in causing the documents and statements to be published and distributed

179.    Defendant Dr. Isaac Roland and the National Commission on Higher Education and the Ministry of Education sent a fraudulent, defamatory and libelous letter (Exhibit 11) to the Educational Commission for Foreign Medical Graduates in March 2005. Defendant Roland knew the statements to be false and acted intentionally in causing the documents and statements to be published and distributed.

180.    Defendants Educational Commission for Foreign Medical Graduates and Foundation for Advancement of Medical Education and Research were complicit in the libel, who without question removed St. Luke School of Medicine-Liberia from the International Medical Education Directory "ECFMG and FAIMER have received an unsigned and undated statement apparently issued from the National Commission on Higher Education, Liberia, stating the St. Luke School

1  of Medicine is not registered or accredited as a medical school in Liberia." in January 2005, and

2  the infamous "computer school" letter in March 2005 (Exhibit 6).

3  181.   Professor George Gollin knew all of his alleged statements to be false and acted

4  intentionally in causing the documents and statements to be published and distributed.

5  182.   Dr. Brad Schwartz knew all of his alleged statements to be false and acted intentionally

6  in causing the documents and statements to be published and distributed.

7  183.   Alan Contreras knew all of his alleged the statements to be false and acted intentionally

8  in causing the documents and statements to be published and distributed.

9  184.   The University of Illinois actions were negligent or acted recklessly in providing George

10  Gollin a website, letterhead, permission and authority in which to make false statements

11  concerning St. Luke School of Medicine-Ghana, St. Luke School of Medicine-Liberia, Dr.

12  Dolphin, and the students and graduates of St. Luke School of Medicine.

13  185.   the University of Illinois actions were negligent or acted recklessly in providing Brad

14  Schwartz, letterhead, permission and authority in which to make false statements concerning St.

15  Luke School of Medicine-Ghana, St. Luke School of Medicine-Liberia, Dr. Dolphin, and the

16  students and graduates of St. Luke School of Medicine.

17  186.   the State of Oregon Office of Degree Authorization actions were negligent or acted

18  recklessly in providing Alan Contreras with website, unrestricted unlawful permission to publish

19  the "diploma mill" list http://www.osac.state.or.us/oda/unaccredited.aspx, letterhead, permission and

20  authority in which to make false statements concerning St. Luke School of Medicine-Ghana, St.

21  Luke School of Medicine-Liberia, Dr. Dolphin, and the students and graduates of St. Luke

22  School of Medicine.

23  187.   As specified below, the St. Luke School of Medicine-Liberia and St. Luke School of

24  Medicine-Ghana , each and all, were injured by the publishing and distribution of the letters,

25  documents, and media articles, and the radio broadcast of the false statements made by the

26  Defendants. The name and reputation of St. Luke School of Medicine was besmirched by the

27  Defendants, each and all. Additionally, the Republic of Liberia and its conspirators caused the

28  disruption of St. Luke School of Medicine and even though the Supreme Court issued an order to

restore SLSOM to its previous status, Exhibit 14, it was ignored and SLSOM was
uncompensated for damages, Exhibit 21 – Exhibit 30.

## 2nd CAUSE OF ACTION (TRADE LIBEL).

188.   The allegations contained in paragraphs 1- , above, are repeated as if fully rewritten
herein.  The allegations in the 1st Cause of Action are repeated as if fully rewritten herein.

189.   As specified below, the St. Luke School of Medicine-Liberia and St. Luke School of
Medicine-Ghana , each and all, were injured by the publishing and distribution of the letters,
documents, and media articles, and the radio broadcast of the false statements made by the
Defendants. The name and reputation of St. Luke School of Medicine was besmirched by the
Defendants, each and all.  The name and reputation of Dr. Jerroll Dolphin was besmirched by the
Defendants, each and all.  The name and reputation of students and graduates were besmirched
by the Defendants, each and all.  The Plaintiffs should be compensated.

## 3rd CAUSE OF ACTION - INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE and ECONOMIC INTERFERENCE (CAL CACI No. 2202 ECONOMIC INTERFERENCE)

190.   Plaintiff incorporate paragraphs 1 through  herein as if it were written herein. SLSOM
owned a Charter and an Act of Legislature, making SLSOM a legal and corporate entity with
perpetual succession, having the authority to contract, sue and be sued, plead and be impleaded
in any court of competent jurisdiction within the Republic; to purchase or otherwise acquire and
hold property, real and mixed up to the value of one hundred and fifty million United States
dollars (US$150,000,000); making St. Luke School of Medicine (SLSOM) to be perpetually
maintained in the Republic of Liberia for medical education of the people of the Liberian nation,
people of the other countries and for those who may otherwise have the capacity to seek medical
education.

191. Defendants, and each of them, were aware of SLSOM's economic relationship with the Republic of Liberia, ECFMG,
potential medical students worldwide, and the World Health Organization, by virtue of the enabling documents: the Act, Charter,

and Statement of Attestation. Defendants were aware of SLSOM's legitimate status, and SLSOM's profit making potential and actuality. Defendants False Public and Private Statements were designed to disrupt SLSOM's worldwide economic relationships. Defendants False Public Statements caused ECFMG to permanently remove SLSOM from the IMED, even after a Liberian Supreme Court order and several subsequent NCHE letters requested that SLSOM be reinstated. As a consequence of SLSOM's removal from the IMED, Medical Students lost jobs, residencies, and positions. Additionally, Medical Students had legitimately earned licenses revoked and properly earned degrees invalidated. The actions of the Defendants, each and all of them, ruined the reputation of Dr. Jerroll Dolphin, and resulted in the loss of .business opportunities for Dr. Jerroll Dolphin in Liberia, Ghana, and the United States of America.

192. Plaintiff incorporate paragraphs 1 through 211 herein, above.. SLSOM owned a Charter and an Act of Legislature, making SLSOM a legal and corporate entity with perpetual succession, having the authority to contract, sue and be sued, plead and be impleaded in any court of competent jurisdiction within the Republic; to purchase or otherwise acquire and hold property, real and mixed up to the value of one hundred and fifty million United States dollars (US$150,000,000); making St. Luke School of Medicine (SLSOM) to be perpetually maintained in the Republic of Liberia for medical education of the people of the Liberian nation, people of the other countries and for those who may otherwise have the capacity to seek medical education.

193    Defendants False Public Statements caused ECFMG to permanently remove SLSOM from the IMED, even after a Liberian Supreme Court order and several subsequent NCHE letters requested that SLSOM be reinstated. As a consequence of SLSOM's removal from the IMED, Medical Students lost jobs, residencies, and positions. Additionally, Medical Students had legitimately earned licenses revoked and properly earned degrees invalidated. The actions of the Defendants, each and all of them, ruined the reputation of Dr. Jerroll Dolphin, and resulted in the loss of .business opportunities for Dr. Jerroll Dolphin in Liberia, Ghana, and the United States of America.

194    The Defendants National Accreditation Board, George Gollin and Brad Schwartz of the University of Illinois, Alan Contreras and Oregon Office of Degree Authorization' fraudulent and false Public Statements were meant to discredit St. Luke School of Medicine-Ghana in the United States and the Republic of Ghana government agencies and personnel. Defendant George Gollin and the University of Illinois furthermore posted the 91-page document authored by George Gollin on his University of Illinois website from September 2010 until March or April

2011 with modified and fraudulent documents from the previous lawsuit, in an effort to further defame and discredit Dr. Dolphin, St. Luke School of Medicine, and its students and graduates.

## 4TH CAUSE OF ACTION – CONSPIRACY

195.    Plaintiff incorporate paragraphs 1 through  herein as if it were written herein. That the Defendants, each and all, did conspire to defame Dr. Dolphin, St. Luke School of Medicine-Liberia and its students and graduates, and St. Luke School of Medicine-Ghana since 2003.

## 5th CAUSE OF ACTION - TREATY VIOLATIONS

196.    Plaintiff incorporate paragraphs 1 through  herein as if it were written herein. All Liberian Defendants, did violate the rights of St. Luke School of Medicine and its students and graduates, and Dr. Dolphin accorded to them in the Friendship Treaty from 2004 until the present. They with wanton disregard of the rights of due process, demanded bribes, ignored the laws and the Supreme Court of Liberia, harassed, defammed and defrauded St. Luke School of Medicine, its students and graduates, and Dr. Dolphin

## 6th CAUSE OF ACTION - FRAUD

197.    Plaintiff incorporate paragraphs 1 through  herein as if it were written herein.

198.    Gollin has published his own false version of "Exhibit 1 – List of Students and Graduates" on his University of Illinois website, claiming that it was part of the lawsuit CV-01791-RGK (Exhibit 45). It is not true. The true Exhibit 1 from CV-01791-RGK is produced here as Exhibit 44. This is defamatory to not only Dr. Jerroll Dolphin, but to the list of students and graduates of St. Luke School of Medicine, to which numerous false claims are made. This represents internet defamation by Gollin and the University of Illinois. Because the number of defamatory statements are too numerous in the false Exhibit 1, authored by George Gollin. For the sake of brevity, and privacy of those named in the false "Exhibit 1".

199.

200.    Gollin, Dr. Brad Schwartz, and Alan Contreras by sending these defamatory documents and letters ruined the business opportunities of Dr. Dolphin in Ghana.  Dr. Dolphin's name and business are ruined in Ghana by  these documents and letters which were published and circulated to numerous governmental ministries and agencies by the National Accreditation Board of Ghana in an effort to defame Dr. Dolphin and St. Luke School of Medicine-Ghana. This action by the Defendants represent interference in business opportunity, trade libel, defamation and internet defamation against Dr. Jerroll Dolphin and the owners of St. Luke School of Medicine by Gollin, Schwartz, and Contreras, the University of Illinois and the Office of Degree Authorization and the National Accreditation Board.

201.    The National Accreditation Board of the Republic of Ghana conspired with Gollin, Dr. Brad Schwartz, and Alan Contreras to violate the civil rights of Dr. Dolphin and SLSOM-Ghana. It is obvious that Gollin, Dr. Brad Schwartz, Alan Contreras and the National Accreditation Board planned to ruin the name and reputation of Dr. Dolphin in Ghana.  Thus the defendants the National Accreditation Board of Ghana, Gollin, Schwartz, Contreras, the University of Illinois, and the Oregon Office of Degree Authorization conspired to violate the civil rights of Dr. Dolphin and the owners of St. Luke School of Medicine.

202.    The National Accreditation Board did not investigate the background of Gollin before asking him to produce the libelous documents against Dr. Dolphin and St. Luke School of Medicine.  They were in such a haste to have something to libel Dr. Dolphin and St. Luke School of Medicine, to present in an appeal of the Ghana High Court decision in favor of SLSOM's accreditation.  The National Accreditation Board might have well asked the Grand Wizard of the Ku Klux Klan to create the defamatory documents as well as Gollin, Schwartz, and Contreras.. Thus, the National Accreditation Board, University of Illinois, and Office of Degree Authorization did not perform due diligence and ignored their responsibilities as governmental agencies.

203.    Gollin, Schwartz, and Contreras are racists, using their positions as employees of the State of Illinois and the State of Oregon as covers to hide their biases and prejudices.  By painting universities and colleges as "unaccredited" or "unapproved" they continue on the

1 "diploma-mill" lists they use the color of law and the color of authority to enslave and punish

2 innocent people, and further violate their civil rights protected by the United States Constitution

3 and laws. Therefore, the University of Illinois and the Office of Degree Authorization support

4 the racial and ethical bias of Gollin, Schwartz, and Contreras and are co-conspirators in their

5 violations of civil rights by openly supporting and encouraging the racism and biases of Gollin,

6 Schwartz, and Contreras.

7 204. The University of Illinois – Urbana Champaign and the State of Oregon's Degree

8 Authorization has taken responsibility for Gollin's defamatory statements. On October 9, 2003,

9 the University of Illinois ordered Gollin to remove the defamatory statements, with Chancellor

10 Robin Kaler stating that "We were trying to help [Gollin] find a more appropriate place for his

11 website" because a website on diploma mills should be "housed in a place that deals with

12 accreditation." Additionally, Kaler admitted that Gollin's statements were defamatory "personal

13 attacks." To date, Gollin's website at the University of Illinois – Urbana Champaign still

14 contains many of the defamatory statements listed above. Gollin, attempting to avert attention

15 from the University of Illinois, shipped his entire website with all its contents to the State of

16 Oregon's Office of Degree Authorization's website, where it is now currently housed. Thus the

17 University of Illinois and the Office of Degree Authorization knowing support the suppression of

18 the civil rights of law-abiding American citizens.

19 205. Gollin's defamatory comments have also adversely affected Dr. Dolphin's professional

20 medical and business careers. Where Gollin discusses SLSOM, as set forth above, he invariably

21 mentions Dr. Dolphin as SLSOM's president. By mentioning Dr. Dolphin by name in connection

22 with Gollin's false statements, Gollin, the University of Illinois – Urbana Champaign and the

23 State of Oregon's Office of Degree Authorization defamed and continue to defame Dr. Dolphin,

24 the school's president and founder.

25 206. Gollin's false statements have impacted Dr. Dolphin's credit report, wherein it states that

26 Dr. Dolphin is under investigation for fraud - a completely false statement. Gollin's false

27 statements have impacted Dr. Dolphin's business opportunities as well. Dr. Dolphin was

28 prevented from an opportunity to purchase stock and options from OptionsXpress because

1  OptionsXpress believed him to be a fraud, based on Gollin's numerous false internet statements.

2  Evidence will be provided in trial.

3  207.   All of Gollin's statements listed above were patently false when made.

4  208.   Gollin, Schwartz, Contreras, the University of Illinois – Urbana Champaign, and the State

5  of Oregon's Office of Degree Authorization continue to defame SLSOM by publishing,

6  supporting, and hosting Gollin's unsubstantiated "research." The State of Illinois, the University

7  of Illinois and the State of Oregon support the institutional racism and ethnic biases of Gollin,

8  Schwartz, and Contreras. Contreras has also be sited in another federal lawsuit as a civil rights

9  violator.

10  209.   Gollin, the University of Illinois – Urbana Champaign, and Contreras and the State of

11  Oregon's Office of Degree Authorization, by publishing defamatory statements against SLSOM,

12  harmed and continue to harm Dr. Dolphin's and SLSOM's reputation worldwide, their actions

13  ultimately playing a major role in ECFMG's removing SLSOM from the IMED.

14  210.   Gollin, the University of Illinois – Urbana Champaign and the State of Oregon's Office

15  of Degree Authorization have refused to remove the defamatory material when asked to do so by

16  Dr. Dolphin and SLSOM (paragraphs 193 through 195 collectively "Public Statements").

17  211.   Defendants, all, knew of the lawful status of St. Luke School of Medicine through

18  verifiable public documents and statements prior to the Shariff and Barh's bribery attempt;

19        a.   SLSOM was accredited in August 1, 2000. See Exhibit "12".

20        b.   SLSOM was incorporated on August 22, 2001. See Exhibit "31".

21        c.   NCHE granted SLSOM a Temporary Permit to Operate on September 17, 2002.

22             See Exhibit "3".

23        d.   The National Legislature of the Republic of Liberia granted SLSOM a Charter

24             through an Act of the Legislature on April 24, 2003. See Exhibit "31".

25        e.   The "Charter" was signed by then President Charles Taylor on August 7, 2003.

26             See Exhibit "4".

27        f.   The Ministry of Foreign Affairs published the Act and the Charter on August 8,

28             2003. See Exhibit "4".

g.   The NCHE issued a Statement of Attestation on March 2005. Exhibit "8".

h.   SLSOM was equipped with running water, electricity, computers, books, CD-ROMs, microscopes and other laboratory equipment, a rigorous curriculum, qualified instructors, and diligent students. See Exhibits 1 through 41 (paragraphs 193 through 196 collectively "False Public Statements").

212.   Defendants' False Public Statements were published and continue to be published on the Internet, and so, defamed the reputation of Dr. Dolphin, and disparaged the quality of SLSOM's services that despite SLSOM's extraordinarily high medical licensing examination pass rate (96%), ECFMG removed SLSOM from the IMED twice, with the second removal continuing to the present time.

213.   Defendants', each and all, statements have also caused others to consequently disparage Dr. Dolphin's and SLSOM's name, property and services.

214.   Dr. George Gollin. Schwartz and Contreras, and the University of Illinois – Urbana Champaign and the Office of Degree Authorization have and continue to disparage Dr. Dolphin and SLSOM services, students, diplomas and degrees based on information gleaned solely from the aforementioned sources and from Gollin's consulting relationship with the Republic of Liberia.

215.   Defendants knew or should have known that their False Public Statements were likely to cause pecuniary harm or loss. Defendants, and each of them, were well aware of the existence of SLSOM from 2000 and beyond. Dr. Peter Coleman, Dr. Isaac Roland, Dr. Barh, and Mohammed Shariff, as representatives of Ministry of Health, National Commission on Higher Education, and the Liberia Medical Board, and National Transitional Legislative Assembly, each had intimate awareness and played integral roles in the development of SLSOM, as set forth above.

216.   George Gollin, in 2007, even published copyrighted  SLSOM documents, written by Dr. Dolphin, on one of his websites, that stated that SLSOM, represented by Dr. Dolphin did obtain relief from the Liberian Supreme Court, verifying its legitimacy and reinstating its status.  Thus defendants, all, made maliciously false statements concerning Dr. Dolphin and St. Luke School of Medicine.

217.    Defendant George Gollin and Brad Schwartz of the University of Illinois, and Alan Contreras and the Office of Degree Authorization knew that their numerous and insinuous accusations against the Plaintiffs were false and baseless. Secondly, not ever traveling to Monrovia, Liberia or Accra, Ghana, they had no first-hand knowledge of St. Luke School of Medicine-Liberia or St. Luke School of Medicine-Ghana., and knowing that their accusations were at best mere hearsay, they fraudulently forged documents to present to the National Accreditation Board as if they had first-hand knowledge of SLSOM.

## 7th CAUSE OF ACTION - FALSE IMPRISONMENT

218.    Plaintiff   incorporates paragraphs 1 through  herein.

219.    Defendants, Republic of Liberia,  without lawful privilege and without filing criminal charges, confined Dr. Dolphin against his will, and preventing him from traveling freely and thereby confining him as is set forth in paragraphs 1 through 193, on multiple occasions.

## 8th  CAUSE OF ACTION - HARASSMENT BY PUBLIC OFFICIALS - 1964 Federal Civil Rights Law, 18 USC §245(b)(2)

220. Plaintiff incorporate paragraphs 1 through  herein as if it were written herein.

221.    Defendants Gollin, Schwartz, and Contreras, University of Illinois, Office of Degree Authorization, and the National Accreditation Board of the Republic of Ghana, each and all, did conspire to violate the civil rights of Dr. Dolphin and students and graduates of St. Luke School of Medicine, by denying them the opportunities of education and the benefits of their education, and denying equal employment opportunities under the color of law and authority. Imagine government officials spending state and federal funds, using official state letterhead, with governmental mailing rights, harassing law-abiding  citizens in the United States of America and foreign citizens, and foreign states.

9th CAUSE OF ACTION - DEPRIVATION OF RIGHTS UNDER COLOR OF LAW –

**9th CAUSE OF ACTION - DEPRIVATION OF RIGHTS UNDER COLOR OF LAW –**

**TITLE 18, PART I, CHAPTER 13 § 242, Deprivation of rights under color of law.**

222.   Plaintiff incorporate paragraphs 1 through  herein as if it were written herein.

223.   "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both ....... ". Gollin, Schwartz, and Contreras, the University of Illinois and the Office of Degree Authorization, ALL, have used their positions of employment or entities of state governments to deprived Dr. Dolphin, St. Luke School of Medicine, its students and graduates their rights protected by the Constitution and laws of the United States.

**10th CAUSE OF ACTION - NEGLIGENCE**

224.   Plaintiff incorporates paragraphs 1 through  as if it were written herein.

225.   Defendants, all, owed a duty to Plaintiff to ensure that Plaintiff not be deprived of life, liberty, or property, without due process of law.  Defendants, by failing to present any meaningful evidence to support the accusations against Plaintiff, breached their duty to provide Plaintiff with due process of law.  Defendants' breach caused SLSOM to be removed from IMED, effectively nullifying Medical Students' degrees and medical licensing examination scores.  As a result, Dr. Dolphin and SLSOM Medical Students have lost jobs, residencies and other benefits; SLSOM has been virtually shut down, unable to provide the services guaranteed by its Charter.  Dr. Jerroll Dolphin has lost his source of income.

**1th CAUSE OF ACTION - DENIAL OF DUE PROCESS**

226.   Plaintiff incorporates paragraphs 1 through  as if it were written herein.

227.    "No person shall...be deprived of life, liberty, or property, without due process of law."
"The nationals of each High Contracting Party shall receive within the territories of the other,
upon submitting to conditions imposed upon its nationals, the most constant protection and
security for their person and property, and shall enjoy in this respect that degree of protection
that is required by international law."

228.    As used in ORS 348.594 (Definitions for ORS 348.594 to 348.615) to 348.615 (Appeal
procedure) 348.594 (Definitions for ORS 348.594 to 348.615) to 348.615 (Appeal procedure): (a) "Diploma mill"
means: (A) A school against which a court or public body, as defined in ORS 174.109("Public
body" defined), has issued a ruling or finding, after due process procedures, that the school has
engaged in dishonest, fraudulent or deceptive practices related to the award of degrees, academic
standards or student learning requirements;

229.    The Educational Commission for Foreign Medical Graduates denied Dr. Dolphin and St.
Luke School of Medicine due process by removing St. Luke School of Medicine from the IMED
without a hearing or inquiry.  The ECFMG and IMED did subject Dr. Dolphin and SLSOM to
substantial inquiry, however, when Liberia attempted to get SLSOM's IMED listing reinstated in
late 2005. Exhibit 13.

230.    Defendants owed a duty to Plaintiff to ensure that Plaintiff not be deprived of life, liberty,
or property, business opportunity, education, reputation, and economic advantage without due
process of law.  Defendants, all of them, by failing to present at any hearing any meaningful
evidence to support their accusations against Plaintiff before illegally dismantling SLSOM,
breached its duty to provide

231.    Plaintiffs Ministry of Education, Ministry of Health, Liberian Medical Board, National
Commission on Higher Education, Dr. Isaac Roland, ECFMG and FAIMER with due process of
law, treated Plaintiff differently than A.M. Dogliotti, a similarly situated medical school that
suffered none of the harms to which SLSOM was subjected.  Defendants' breach caused SLSOM
to be removed from IMED, effectively nullifying Medical Students' degrees and medical
licensing examination scores. As a result, Dr. Dolphin, SLSOM Medical Students and graduates
have lost jobs, residencies and other benefits.

232.   Gollin, Schwartz, Contreras, the University of Illinois and the Office of Degree Authorization, by supporting the "diploma mill list" violated the right of law-abiding United States citizens to due process by precluding them from jobs, education, opportunity, happiness, and other rights guaranteed by the United States Constitution and other laws of the United States with less evidence of criminal wrong-doing than it takes to issue a traffic ticket. The "diploma mill list" created by the defendants is arbitrary and without standards, it is racially and ethnically biased based on the creators' personal suspicions, preferences, and prejudices. Dr. Dolphin's personal livelihood has been drastically diminished, his reputation has been ruined without cause, due process of law by public officials and employees.

## 12th CAUSE OF ACTION - DENIAL OF EQUAL PROTECTION

233.   Plaintiff incorporate paragraphs 1 through  herein as if it were written herein. "no state shall ... deny to any person within its jurisdiction the equal protection of the laws" "The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law." Liberia – United States of America Friendship Treaty.

234.   Plaintiff incorporates paragraphs 1 through 203  herein. Defendants, each and all, owed a duty to the Plaintiff to ensure that Plaintiff not be deprived of life, liberty, or property, without due process of law. Defendants, by failing to present at any hearing any meaningful evidence to support their accusations against Plaintiff before illegally dismantling SLSOM, breached its duty to provide Plaintiff with due process of law, and treated Plaintiff and SLSOM differently than A.M. Dogliotti, a similarly situated medical school that suffered none of the harms to which SLSOM was subjected. Defendants' breach caused SLSOM to be removed from IMED, effectively nullifying Medical Students' degrees and medical licensing examination scores. As a result, Dr. Dolphin and SLSOM medical students and graduates have lost jobs, residencies, livelihoods and other benefits.

235.    Gollin, Schwartz, Contreras, the University of Illinois and the Office of Degree Authorization, by supporting the "diploma mill list" violated the right of law-abiding United States citizens by precluding them from jobs, education, opportunity, happiness, and other rights guaranteed by the United States Constitution and other laws of the United States with less evidence of criminal wrong-doing than it takes to issue a traffic ticket. The "diploma mill list" created by the defendants is arbitrary and without standards, it is racially and ethnically biased based on the creators' personal suspicions, preferences, and prejudices.   Dr. Dolphin's personal livelihood has been drastically diminished, his reputation has been ruined without cause and denied equal protection.

236.    There is no Illinois law that permits its governmental employees to defame private citizens of other states or countries with immunity to which George Gollin and Brad Schwartz are employees of the state of Illinois. The Illinois Local Immunity Act excludes the University of Illinois (745 ILCS 10/1-206) (from Ch. 85, par. 1-206). (Source: P.A. 84-1431.) Illinois Immunity Act excludes willful and wanton conduct. (745 ILCS 10).

237.    Defendant Alan Contreras, the Office of Degree Authorization, George Gollin, Brad Schwartz, and the University of Illinois knowingly  denied Dr. Jerroll Dolphin due protection by attempting to extend the jurisdiction of their respective states, Oregon and Illinois, outside of their own states, and outside the sphere of their personal knowledge. Oregon law ORS 348.615 (Appeal Procedure)

> "If the Oregon Student Assistance Commission refuses to grant approval to a school to confer degrees or revokes the approval to confer degrees, the refusal or revocation shall be subject to the right of review by an action brought in the circuit court of the county in which the school is located. Such review shall be tried as an action not triable by right to a jury. [1997 c.652 §14]"

This law limits the jurisdiction of the Office of Degree Authorization to counties in Oregon.  Therefore, the Office of Degree Authorization has no jurisdiction outside of the State of Oregon, and therefore no authority to place any educational institution located outside of Oregon on its "diploma mill" list.  Currently the Office of Degree Authorization is working outside of its lawful jurisdiction.

## 13th CAUSE OF ACTION - CONSPIRACY TO COMMIT CIVIL RIGHTS VIOLATIONS

238.    Plaintiff incorporate paragraphs 1 through   Defendant Dr. Isaac Roland, Mohammed Shariff, Dr. Evelyn Kondakai, Dr. Horatius Browne and Dr. Benson Barh each conspired with one another to denigrate SLSOM's reputation in an effort to secure bribes, as set forth above. Mohammed Shariff used his position at the National Transitional Legislative Assembly to conduct malicious hearings solely to denigrate and discredit SLSOM in the public eye. Mohammed Shariff used political and other pressures to secure the participation and cooperation of Dr. Isaac Roland. Drs. Barh and Browne used their position in the Liberian Medical Board to denigrate SLSOM in the public eye at the same hearings conducted by Shariff, as well as at the Press Conference of March 29, 2005, and the issuance of the false letter to WHO and the Republic of Ghana agencies. The National Commission on Higher Education and Isaac Roland conspired with the above Defendants to mail the false "computer school" letter to the ECFMG, and therefore have St. Luke School of Medicine removed from the IMED through false circumstances.

239.    All Defendants were aware of SLSOM's legitimate status and sought to discredit SLSOM to secure monthly bribes.

240.    Gollin, Dr. Brad Schwartz, and Alan Contreras conspired to violate the Civil Rights of Dr. Dolphin and others by sending the 91-page document to the National Accreditation Board of the Republic of Ghana in November and December 2009, within weeks after St. Luke School of Medicine-Ghana obtained accreditation through the High Court of Ghana in a lawsuit..  see Exhibit 47, Exhibit 48, Exhibit 49, and Exhibit 50.

241. The actions of George Gollin, Brad Schwartz, and Alan Contreras are violations of Federal Code

    1. Title 42, Chapter 21, Subchapter I, § 1983, Civil action for deprivation of rights under the color of law;

    2. Title 42, Chapter 21, Subchapter I, § 1985, Conspiracy to interfere with civil rights;

    3. Title 42, Chapter 21, Subchapter I, § 1986. , Action for neglect to prevent (University of Illinois).

242. These actions also are defined in federal criminal codes

    1. Title 18, Part I, CHAPTER 13, § 241, Conspiracy against civil rights;

    2. Title 18, Part I, CHAPTER 13, § 242, Deprivation of rights under color of law;

    3. Title 18, Part I, CHAPTER 13, § 242, Hate crime acts.

243. Gollin, Dr. Brad Schwartz, and Alan Contreras violated the provisions of the United States Constitution, Articles 1 Section 8;

    1. threatening foreign officials and foreign nations as well as violating federal criminal codes Title 18, Part I, Chapter 13, and

    2. Title 18, Part I, Chapter 41 § 878 and 876.

244. See Exhibit 43, Exhibit 47, Exhibit 48, Exhibit 49, Exhibit 50, and Exhibit 51..

245. The National Accreditation Board, Gollin, Schwartz, and Contreras, the University of Illinois and the Office of Degree Authorization, each and all, conspired to violate the civil rights of Dr. Dolphin as demonstrated in the 91-page document authored by George Gollin, a defamatory fax letter and the same letter written by Alan Contreras and the Office of Degree Authorization, and a defamatory letter by Brad Schwartz , Dean of the University of Illinois College of Medicine, and the accompanying letters of agencies of the Republic of Ghana filed in the Ghana Court of Appeals by the National Accreditation Board.

246. **Title** 42 U. S. C. § 1985(3) (1976 ed., Supp. V) "If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or

laws of the United States, or because of his having so exercised the same; or If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured". Defendants Gollin, Schwartz, and Contreras, the University of Illinois and the Office of Degree Authorization, each and all, conspired to violate the civil rights of Dr. Dolphin, to deny him business opportunities, negate his business advantage, to deny him happiness, liberty, and reputation. Exhibit 43, Exhibit 47, Exhibit 48, Exhibit 49, Exhibit 50, and Exhibit 51.

## 14th CAUSE OF ACTION - CONVERSION

247.   Plaintiff incorporate paragraphs 1 through  herein as if it were written herein.

248.   The Friendship Treaty states "Their property shall not be taken without due process of law and without payment of just compensation." "The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law." The Republic of Liberia has so defamed and actively interfered in the lawful business operation of St. Luke School of Medicine to destroy the institution and the livelihood of Dr. Jerroll Dolphin.

249.   Defendants through its arbitrary hearings and decision-making effectively converted Plaintiff property, in that SLSOM has been unable to operate since 2005. Defendants' acts, all of them, prevented and continues to prevent SLSOM from using its campus, equipment and materials, thus depriving Dr. Dolphin of livelihood. The Defendants, each and all, conspired to disrupt, dismantle, destroy, and convert the property of Dr. Jerroll Dolphin.

## 15th CAUSE OF ACTION - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

250.   Plaintiff incorporate paragraphs 1 through  herein.

251.   Defendant Republic of Liberia inclusive of its Immigration and Naturalization Service (INS) and Mohammed Shariff intentionally took Dr. Dolphin's passport and prevented him from traveling on two separate occasions to visit his wife and family, as set forth above. Additionally,

1  Defendants' outright lies and fabrications regarding the integrity of SLSOM had a profound

2  effect on Dr. Dolphin's psyche and emotional makeup.  Defendants actions, each and all,

3  dramatically affected his marriage, as his wife has filed for divorce.  Moreover, Dr. Dolphin was

4  subjected to farcical hearings, was randomly and arbitrarily summonsed and held for questioning

5  at odd hours of the night in unkempt places in Liberia.  Because of his ordeal, Dr. Dolphin

6  became gaunt, sickly, depressed, and in need of medical care.  As a consequence of the the

7  Defendants infliction of emotional distress, Dr. Dolphin's personal livelihood and personal

8  happiness has been drastically diminished.

9  252.   Defendants National Accreditation Board, Gollin Schwartz, and Contreras, each and all,

10  knew that the publication and presentation of their defamatory documents would cause emotional

11  distress to Dr. Dolphin and his wife.  It was their intention to disrupt the relationship of Dr.

12  Dolphin and his wife by libeling and slandering her in the documents.

13

14  **16ᵗʰ CAUSE OF ACTION - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

15  253.   Plaintiff incorporates paragraphs 1 through  herein. Defendants intentionally took Dr.

16  Dolphin's passport and prevented him from traveling on two separate occasions to visit his wife

17  and family, as set forth above.  Additionally, Defendants' outright lies and fabrications regarding

18  the integrity of SLSOM had a profound effect on Dr. Dolphin's psyche and emotional makeup

19  and dramatically affected his marriage, as his wife has filed for divorce. Moreover, Dr. Dolphin

20  was subjected to farcical hearings, was randomly and arbitrarily summonsed, and held for

21  questioning at odd hours of the night in unkempt places. Because of his ordeal, Dr. Dolphin

22  became gaunt, sickly and in need of medical care.

23

24  **17ᵗʰ CAUSE OF ACTION - THREATS AND EXTORTION AGAINST FOREIGN**

25  **OFFICIALS, TITLE 18, PART I, CHAPTER 41 § 878.**

26  254.   Plaintiff incorporates paragraphs 1 through  herein.

27  255. Threats and extortion against foreign officials, official guests, or internationally protected persons.

28

1.  Whoever knowingly and willfully threatens to violate section 112, 1116, or 1201 shall be fined under this title or imprisoned not more than five years, or both, except that imprisonment for a threatened assault shall not exceed three years.

2.  Whoever in connection with any violation of subsection (a) or actual violation of section 112, 1116, or 1201 makes any extortionate demand shall be fined under this title or imprisoned not more than twenty years, or both.

256.   Gollin, Schwartz, and Contreras, the University of Illinois and the Office of Degree Authorization, each and all of them, sent letters to foreign officials with threats of extortion if St. Luke School of Medicine was accredited in Ghana in October to December 2009. . Exhibit 44, Exhibit 45, Exhibit 46, and Exhibit 47.   As a result of the attempted extortion, Dr. Jerroll Dolphin, St. Luke School of Medicine have suffered loss of reputation and have been subjected to unwarranted scrutiny and prejudice.

## 18th CAUSE OF ACTION - MAIL FRAUD - TITLE 18, PART I, CHAPTER 41 § 876, Mailing threatening communications

257.   Using the privileges of free postal fees, Defendants Gollin, Schwartz, and Contreras, the University of Illinois, and the Office of Degree Authorization, all, used the United States Postal Service to physically transmit their fraudulent documentation while violating the civil rights of Dr. Dolphin, St. Luke School of Medicine, and its students and graduates, since 2003, until the present.

## 19th CAUSE OF ACTION - INTERNET STALKING.

258.   Plaintiff incorporates paragraphs 1 through  herein.

259.   Gollin in the 91-page document that he sent to the Ghana National Accreditation Board clearly  demonstrates the crime of Internet Stalking.  George Gollin's 91-page document clearly shows that he has obtained one of Dr. Dolphin's private pictures from FaceBook.com. Obviously George Gollin is no friend of Dr. Dolphin, and, Dr. Dolphin certainlydid not approve of George

Gollin as a facebook friend. So, Gollin obtained the picture through fraud and deception on the internet. This is a violation of California state law, as well as federal law. Besides the magical, imaginary and fantastic claims he makes in the document against Dr. Dolphin and SLSOM, all information he has obtained is from the Internet and otherwise completely unsubstantiated and hearsay. George Gollin has stalked Dr. Jerroll Dolphin, SLSOM, its students and graduates since, at least, 2003.

**20ᵗʰ CAUSE OF ACTION - INTERNET HACKING - COMPUTER INTRUSION (I.E. HACKING), CYBERTERRORISM, Title 47 USC § 223, Obscene or harassing telephone calls in the District of Columbia or in interstate or foreign communications; and, Title 47 USC.§ 230, Protection for private blocking and screening of offensive material.**

260. Plaintiff incorporates paragraphs 1 through  herein.

261. Gollin has hacked into SLSOM's website to obtain password protected information and published it on his University of Illinois-Urbana website, falsely stating that it is also in public domain, http://www.hep.uiuc.edu/home/g-gollin/pigeons/SLSOM/pacer_document_1_modified_version_electronic_w_exhibits.pdf . However, court records from federal lawsuit 10-CV-01791-RGK (SHx) Exhibit 1 shows that this is also a lie presented to the public by Gollin. This is Gollin's attempt at blackmailing Plaintiff and harassing witnesses and victims of his crimes against Dr. Dolphin, SLSOM and its students and graduates, and others. Hacking is a violation of Federal and State laws. Again this represents internet defamation by defendants Gollin and the University of Illinois. This represents internet hacking and violation of privacy by public officials.

262.    Gollin has published documents on his University of Illinois website that he illegally obtained from Dr. Jerroll Dolphin by internet hacking. Exhibit 45. He claims that it was presented in the lawsuit CV-01791-RGK, however, a perusal of the court documents will clearly show that it is a lie. Also, Gollin has taken the liberty to alter the "court documents" he presents on that website http://www.hep.uiuc.edu/home/g-gollin/pigeons/SLSOM/, as he chooses, in an

effort to make himself look good in the public eye. He altered the documents to make it seem that he, George Gollin, was being victimized by Dr. Jerroll Dolphin and St. Luke School of Medicine. He uses these documents to terrorize the people listed on Exhibit 45. Dr. Jerroll Dolphin will clearly demonstrate George Gollin's method of cyberterrorism and harassment. It is shameful that government employees like Gollin, Schwartz, and Contreras are paid to terrorize law abiding citizens. If Gollin, Schwartz, and Contreras, the University of Illinois and the Office of Degree Authorization have the right to violate the civil rights of USA citizens, defame, harass, stalk and terrorize individuals and corporations because he is benefits from employment of a state agency, then God help us all. Any person employed by any state agency, anywhere in the United States can commit the same civil and criminal acts against law-abiding citizens with impunity.

## 21ˢᵗ CAUSE OF ACTION - VIOLATION OF COPYRIGHT, Title 17 USC § 501. Infringement of copyright

263. Plaintiff incorporates paragraphs 1 through  herein.

264.    Defendant Gollin on numerous occasions has taken SLSOM publications, written by Dr. Dolphin, and posted them on his University of Illinois website and other websites without permission of Dr. Dolphin or SLSOM.

## 22ⁿᵈ CAUSE OF ACTION - INVASION OF PRIVACY

265. Plaintiff incorporates paragraphs 1 through  herein.

266. In violation of the 1ˢᵗ Amendment of the United States Constitution, Defendants Gollin, Schwartz, and Contreras, the University of Illinois, and Office of Degree Authorization, each and all conspired to invade the privacy of Dr. Dolphin, SLSOM, and its students and graduates. The entire 91-page document written by George Gollin clearly demonstrates a gross invasion of the privacy of Dr. Jerroll Dolphin and others. Gollin, Schwartz, Contreras, the University of Illinois, and the Office of Degree Authorization invaded the privacy of St. Luke School of Medicine, and

interfering with the business of St. Luke School of Medicine in Ghana.

## 23rd CAUSE OF ACTION - LOSS OF CONSORTIUM

267. Plaintiff incorporate paragraphs 1 through 202 herein. Defendants National Accreditation Board, Gollin, Schwartz, and Contreras, the University of Illinois and the Office of Degree Authorization, each and all, knew that the publication and presentation of their defamatory documents would cause emotional distress to Dr. Dolphin and his wife, Susana. and it was their intention to disrupt the relationship of Dr. Dolphin and his wife by libeling and slandering her in the documents. Because of Defendants continued defamation, 'Trade Libel, and Negligence, above, Dr. Dolphin's wife, Susanna Mitchell, has abandoned him. As a result, Dr. Dolphin has lost the affection, support and love of his wife.

## VII       PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for judgment against Defendants, and each of them, jointly and severally, as follows and appropriate to the particular Causes of Action:

1. For monetary relief as requested in the Causes of Action as appropriate for the particular Causes of Action, in the amount of $130,000,000 against the Republic of Liberia,

2. For monetary relief as requested in the Causes of Action as appropriate for the particular Causes of Action, in the amount of $14,000,000 against the National Accreditation Board of the Republic of Ghana.

3. For monetary relief as requested in the Causes of Action against ECFMG and FAIMER in the amount of $1,000,0000, to be proven at trial;

4. For monetary relief as requested in the Causes of action against George Gollin in the amount of $153,000,000

5. For monetary relief as requested in the Causes of Action against Brad Schwartz in the amount of $12,000,000.

6. For monetary relief as requested in the Causes of Action against the University of Illinois in the amount of $22,000,000.

7. For Monetary relief as requested in the Causes of Action against Alan Contreras in the amount of $35,000,000.

8. For Monetary relief as requested in the Causes of Action against the Office of Degree Authorization in the amount of $22,000,000.

9. For pre- and post-judgment interest;

10. For Punitive damages;

11. For restoration of St. Luke School of Medicine-Liberia on the International Medical Education Directory;

12. For removal of St. Luke School of Medicine from the State of Oregon "diploma mill" list;

13. For removal of St. Luke School of Medicine from the "diploma mill" list of other states and territories that use the State of Oregon's "Diploma Mill" list/;

14. An Equitable ruling on the Constitutionality of "diploma mill" lists and similar other restrictive lists that preclude educational and employment rights and opportunities for law-abiding citizens who have otherwise acquired the education, training, and examination qualifications for employment;

15. An Equitable ruling on the Constitutionality that employees of the Oregon state governments, specifically, the Oregon Office of Degree Authorization, cannot apply laws and regulations outside of their own state in any matter of law, order, citizenship, or rights of that state not expressly written in the Constitution of the United States without express written permission of any other state or country to any person, institution, or corporations outside of that state, and therefore cannot violate the civil rights of any individual, institution, or corporation outside of their own states.

16. For attorneys' fees and costs of suit pursuant to, inter alia, the common fund and private Attorney General doctrines, California Code of Civil Procedure section 1021.5 and/or the statutory Causes of Action asserted herein, as may be appropriate;

1   17. and, for such other and further relief as this Court may deem just and proper.

2   ////

3   ////

4   ////

5   ////

6   ////

7

8   ## DEMAND FOR JURY TRIAL

9   Plaintiff demands a trial by jury on all claims so triable and an advisory jury for a factual

10  determination on all equitable claims.

11

12  Respectfully Submitted

13

14  Jerroll B. R. Dolphin

15  In pro per

1
2                                    **VERIFICATION**
3          I have read the foregoing and certify, under the penalty of perjury under the laws of the
4    State of California that the foregoing is true and correct and was executed in Los Angeles,
5    California.
6
     Dated: July 26, 2011
7
                                                    Jerroll B.R. Dolphin
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LIST OF EXHIBITS**

(Page numbers are separate from the complaint)

Exhibit 1 – W.H.O. Letter from Ministry of Health, August 2000...................................4

Exhibit 2 - PERMIT TO OPERATE ISSUED SEPTEMBER 2002 ...............................5

Exhibit 3 - PRESIDENT SIGNS SLSOM CHARTER ACT AUGUST 2003..................6

Exhibit 4 - LIBERIA EMBASSY WEBSITE DISCLAIMER...........................................7

Exhibit 5 - 18 Jan 2005 NCHE letter to Madame Carole Bede, ECFMG.....................9

Exhibit 6 - Adverse Letter from Madame Carole Bede, ECFMG................................12

Exhibit 7 - ATTESTATION FROM NCHE, March 2005.............................................15

Exhibit 8 - 12 March 2005 NCHE Letter to Madame Carole Bede............................16

Exhibit 9 – Receipt for Payment of LMB's Inspection Fee........................................19

Exhibit 10 – Liberian Medical Board Assessment of SLSOM Campus.....................20

Exhibit 11 – NCHE "Computer School" Letter to ECFMG.........................................22

Exhibit 12 - TEXT OF SLSOM "WRIT OF PROHIBITION" PETITION.......................27

Exhibit 13 - Madame Carole Bede's Denial of NCHE Request to Restore SLSOM's

    IMED Listing.........................................................................................................33

Exhibit 14 - Liberia Supreme Court 'Stay Order' and Hearing Issued July 22, 2005..35

    35

Exhibit 15 - Liberia Supreme Court 'Conference' Scheduled on Aug 4, for Aug 10,

    2005.....................................................................................................................36

Exhibit 16 - Liberia Supreme Court Restores SLSOM's Accreditation on Aug 10,

    2005 Order............................................................................................................37

Exhibit 17 - Liberia Government Defaults-Liberia Supreme Court Issues Default

    Certificate to SLSOM............................................................................................38

Exhibit 18 - NCHE Requests ECFMG-IMED to Restore SLSOM's Previous Status in

    IMED.....................................................................................................................39

Exhibit 19 - NCHE Second Request for ECFMG-IMED to Restore SLSOM's Previous

    Status in IMED......................................................................................................40

Exhibit 20  - Benson Barh Fired by President Sirleaf for Corruption..........................41

Exhibit 21 - SLSOM's Civil Law Court Petition.............................................................44

Exhibit 22 - Ministry of Health & Social Welfare Answer to SLSOM's "Damages for
Wrong" Complaint....................................................................................................48

Exhibit 23 - Ministry of Education Answer to SLSOM's "Damages for Wrong"
Complaint..................................................................................................................53

Exhibit 24 - SLSOM's REPLY TO CO-DEFENDANT MINISTRY OF EDUCATION
ANSWER...................................................................................................................56

Exhibit 25 - SLSOM FILES RESPONDENT'S RESISTANCE....................................61

Exhibit 26 - SLSOM FILES REQUEST FOR SUMMARY JUDGMENT......................66

Exhibit 27 - MINISTRY OF EDUCATION WITHDRAWAL..........................................69

Exhibit 28 - SLSOM REQUEST FOR CLERK'S CERTIFICATE" (Default Certificate)
.................................................................................................................................70

Exhibit 29 - SLSOM FILES MOTION FOR BARE DENIAL........................................72

Exhibit 30 - Liberia Government Defaults-Liberia Civil Law Court Issues Default
Certificate to SLSOM...............................................................................................76

Exhibit 31  - LEGISLATIVE ENACTMENT................................................................77

Exhibit 32 - Pictures of the SLSOM Gaye Town Campus before Renovation,
November 2004.......................................................................................................82

Exhibit 33 - Pictures of SLSOM Gaye Town Campus after Renovation, Circa March
2005.........................................................................................................................88

Exhibit 34 - Partial Transcript of Ministry of Health Letter to India Consulate General
.................................................................................................................................92

Exhibit 35 – SLSOM Invitation to the LMB for Inspection of its Campus...................93

Exhibit 36 – SLSOM Curriculum.................................................................................94

Exhibit 37 – LMB Press Release, March 2005.........................................................107

Exhibit 38 – Benson Barh Contract with SLSOM from 2004 (reserved)...................112

Exhibit 39 – Benson Barh Receipt of Payment from 2004 (reserved)......................113

Exhibit 40 - "Secret Letter" sent by Benson Barh to W.H.O., the National
   Accreditation Board, and Medical and Dental Council of Ghana (reserved)......114

Exhibit 41 – George Gollin's Power Point Presentation that is Linked at Least 7
   Times On the Internet (reserved)........................................................................115

Exhibit 42 – The First 5 Pages of the 91-page Document George Gollin Sent to the
   Ghana National Accreditation Board  (reserved)...............................................116

Exhibit 43 – The 91-page Document George Gollin Published on his University of
   Illinois Website.................................................................................................117

Exhibit 44 – "Exhibit 1" from the Previous Lawsuit CV-01791-RGK  (reserved)......118

Exhibit 45 – "Exhibit 1" George Gollin Published on his University of Illinois Website
   (reserved).......................................................................................................119

Exhibit 46 – Not Used.................................................................................................120

Exhibit 47 – Letter from National Accreditation Board to the Attorney General of
   Republic of Ghana submitted to Court of Appeal...............................................121

Exhibit 48 – Caution Letter from Ministry of Foreign Affairs, Republic of Ghana as a
   Result of Office of Degree Authorization Letter,  submitted to Court of Appeal.123

Exhibit 49 – Defamation Letter from Alan Contreras to Republic of Ghana (faxed
   version) Submitted to Ghana Court of Appeals..................................................125

Exhibit 50 – Defamation Letter from Alan Contreras to Republic of Ghana (mail
   version) Submitted to Ghana Court of Appeals..................................................127

Exhibit 51 – Defamation Letter from Brad Schwartz to Republic of Ghana (mail
   version) Submitted to Ghana Court of Appeals..................................................129

Exhibit 52 – False, Defamatory, and Threatening Statements in the 91-page
   document authored by George Gollin and the University of Illinois - Urbana....132

Exhibit 53 – False, Defamatory, and Threatening Statements in the document
   authored by Alan Contreras and the Office of Degree Authorization.................133

Exhibit 54 – False, Defamatory, and Threatening Statements in the document authored by
   Brad Schwartz and the University of Illinois College of Medicine.................134

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBITS

## Table of Contents

EXHIBITS..............................................................................................................................1

Exhibit 1 – W.H.O. Letter from Ministry of Health, August 2000......................................................4

Exhibit 2 - PERMIT TO OPERATE ISSUED SEPTEMBER 2002 ...................................................5

Exhibit 3 - PRESIDENT SIGNS SLSOM CHARTER ACT AUGUST 2003...................................6

Exhibit 4 - LIBERIA EMBASSY WEBSITE DISCLAIMER............................................................7

Exhibit 5 - 18 Jan 2005 NCHE letter to Madame Carole Bede, ECFMG..........................................9

Exhibit 6 - Adverse Letter from Madame Carole Bede, ECFMG.....................................................12

Exhibit 7 - ATTESTATION FROM NCHE, March 2005................................................................15

Exhibit 8 - 12 March 2005 NCHE Letter to Madame Carole Bede..................................................16

Exhibit 9 – Receipt for Payment of LMB's Inspection Fee.............................................................19

Exhibit 10 – Liberian Medical Board Assessment of SLSOM Campus............................................20

Exhibit 12 - TEXT OF SLSOM "WRIT OF PROHIBITION" PETITION......................................27

Exhibit 13 - Madame Carole Bede's Denial of NCHE Request to Restore SLSOM's IMED Listing
...........................................................................................................................................33

Exhibit 14 - Liberia Supreme Court 'Stay Order' and Hearing Issued July 22, 2005......................35

...........................................................................................................................................35

Exhibit 15 - Liberia Supreme Court 'Conference' Scheduled on Aug 4, for Aug 10, 2005.............36

Exhibit 16 - Liberia Supreme Court Restores SLSOM's Accreditation on Aug 10, 2005 Order.....37

Exhibit 17 - Liberia Government Defaults-Liberia Supreme Court Issues Default Certificate to
SLSOM..................................................................................................................................38

Exhibit 18 - NCHE Requests ECFMG-IMED to Restore SLSOM's Previous Status in IMED......39

Exhibit 19 - NCHE Second Request for ECFMG-IMED to Restore SLSOM's Previous Status in
IMED.....................................................................................................................................40

Exhibit 20  - Benson Barh Fired by President Sirleaf for Corruption...............................................41

Exhibit 21 - SLSOM's Civil Law Court Petition..............................................................................44

Exhibit 22 - Ministry of Health & Social Welfare Answer to SLSOM's "Damages for Wrong" Complaint.................................................................................................................................48

Exhibit 23 - Ministry of Education Answer to SLSOM's "Damages for Wrong" Complaint..........53

Exhibit 24 - SLSOM's REPLY TO CO-DEFENDANT MINISTRY OF EDUCATION ANSWER 56

Exhibit 25 - SLSOM FILES RESPONDENT'S RESISTANCE......................................................61

Exhibit 26 - SLSOM FILES REQUEST FOR SUMMARY JUDGMENT......................................66

Exhibit 27 - MINISTRY OF EDUCATION WITHDRAWAL.........................................................69

Exhibit 28 - SLSOM REQUEST FOR CLERK'S CERTIFICATE" (Default Certificate)...............70

Exhibit 29 - SLSOM FILES MOTION FOR BARE DENIAL.........................................................72

Exhibit 30 - Liberia Government Defaults-Liberia Civil Law Court Issues Default Certificate to SLSOM........................................................................................................................................76

Exhibit 31  - LEGISLATIVE ENACTMENT.................................................................................77

Exhibit 32 - Pictures of the SLSOM Gaye Town Campus before Renovation, November 2004.....82

Exhibit 33 - Pictures of SLSOM Gaye Town Campus after Renovation, Circa March 2005...........88

Exhibit 34 - Partial Transcript of Ministry of Health Letter to India Consulate General.................92

Exhibit 35 – SLSOM Invitation to the LMB for Inspection of its Campus.....................................93

Exhibit 36 – SLSOM Curriculum...................................................................................................94

Exhibit 37 – LMB Press Release, March 2005..............................................................................107

Exhibit 38 – Benson Barh Contract with SLSOM from 2004 (reserved)......................................110

Exhibit 39 – Benson Barh Receipt of Payment from 2004 (reserved)...........................................111

Exhibit 40 - "Secret Letter" sent by Benson Barh to W.H.O., the National Accreditation Board, and Medical and Dental Council of Ghana (reserved)........................................................................112

Exhibit 41 – George Gollin's Power Point Presentation that is Linked at Least 7 Times On the Internet (reserved)......................................................................................................................113

Exhibit 42 – The First 5 Pages of the 91-page Document George Gollin Sent to the Ghana National Accreditation Board  (reserved)..................................................................................................114

Exhibit 43 – The 91-page Document George Gollin Published on his University of Illinois Website (reserved)...................................................................................................................................115

Exhibit 44 – "Exhibit 1" from the Previous Lawsuit CV-01791-RGK  (reserved)..........................116

Exhibit 45 – "Exhibit 1" George Gollin Published on his University of Illinois Website (reserved)
.................................................................................................................................................117

Exhibit 46 – List of False Statements made in the 91-page document authored by George Gollin
(reserved)..................................................................................................................................118

Exhibit 47 – Letter from National Accreditation Board to the Attorney General of Republic of
Ghana submitted to Court of Appeal............................................................................................119

Exhibit 48 – Caution Letter from Ministry of Foreign Affairs, Republic of Ghana as a Result of
Office of Degree Authorization Letter,  submitted to Court of Appeal.........................................121

Exhibit 49 – Defamation Letter from Alan Contreras to Republic of Ghana (faxed version)
Submitted to Ghana Court of Appeals...........................................................................................123

Exhibit 50 – Defamation Letter from Alan Contreras to Republic of Ghana (mail version)
Submitted to Ghana Court of Appeals...........................................................................................125

Exhibit 51 – Defamation Letter from Brad Schwartz to Republic of Ghana (mail version)
Submitted to Ghana Court of Appeals...........................................................................................127

Exhibit 52 – False, Defamatory, and Threatening Statements in the 91-page document authored by
George Gollin and the University of Illinois - Urbana....................................................................130

Exhibit 53 – False, Defamatory, and Threatening Statements in the document authored by Alan
Contreras and the Office of Degree Authorization.........................................................................131

Exhibit 54 – False, Defamatory, and Threatening Statements in the document authored by Brad
Schwartz and the University of Illinois College of Medicine.........................................................132

# Exhibit 1 – W.H.O. Letter from Ministry of Health, August 2000

FROM : LIBTELCO MONROVIA          PHONE NO. : 231 227 839          AUG. 19 2000 11:05AM P1



## REPUBLIC OF LIBERIA
## MINISTRY OF HEALTH & SOCIAL WELFARE
P.O. BOX 10-9009
1000 MONROVIA, 10 LIBERIA
WEST AFRICA

OFFICE OF THE MINISTER

MH&SW/GOL/PSC-M/1255/00/RL                                    August 15, 2000

Ms. Sandra Durmaski
HDP ASU/HQ
World Health Organization
CH-1211, Geneva 07
Switzerland

Dear Madam:

This is to certify that the Government of Liberia has accredited the St. Luke School of Medicine to operate within the Republic of Liberia. This Medical School will grant four-year Doctor of Medicine (MD) and is regulated through the Ministry of Health.

The date of accreditation is effective August 1, 2000.

It is our hope that this information will be useful and that all necessary courtesies will be accorded the above mentioned medical school.

Kind regards.

Sincerely,

Peter A. Coleman, MD, MS, FWACS
MINISTER

# Exhibit 2 - PERMIT TO OPERATE ISSUED SEPTEMBER 2002

: ST _UKE SCHOOL OF MEDICINE     PHONE NO. : 1 310 419 3904     Ap:. 07 200:

FROM : LTC TRAFFIC DEP1     PHONE NO. : 231 227 614     OCT. 24 2002 09:51



**Republic of Liberia**
**NATIONAL COMMISSION OF HIGHER EDUCATION**
P. O. Box 9014;Tel: 225480
Monrovia, Liberia, West Africa

FFICE OF THE EXECUTIVE DIRECTOR

September 17, 2002

### TEMPORARY PERMIT TO OPERATE
### ST. LUKE SCHOOL OF MEDICINE IN THE
### REPUBLIC OF LIBERIA

Having met the Minimum Criteria set for by the National Commission of Higher Education to operate a higher education institution in the Republic of Liberia, the St. Luke School of Medicine is hereby granted this Temporary permit to operate in the City of Monrovia, Montserrado County, in the Republic of Liberia.

This Temporary Permit of operation is valid for a period of two calendar years (September 2002 – September 2004).

Renewable September 17, 2004

Approved: _____
Lawrence S. Bestman, Ph. D.
**EXECUTIVE DIRECTOR**

Motto: Promotion Quality and Equal Higher Educational Opportunities

# Exhibit 3 - PRESIDENT SIGNS SLSOM CHARTER ACT AUGUST 2003

Please note the "Act to Incorporate SLSOM" is on the same bill that includes the raw diamond, "blood diamond", legislation that lifted United Nations sanctions from Liberia in August 2003.



# REPUBLIC OF LIBERIA

OFFICE OF THE PRESIDENT

August 7, 2003

The Honorable
The Liberian Senate(IN-SESSION)
Capitol Building
Monrovia

Ladies and Gentlemen,

I have the honor to inform that the following Acts of Legislature entitled

"AN ACT AMENDING THE NEW MINERALS AND MINING LAW PART I, ENTITLED 23, LCR, BY ADDING THERETO A NEW CHAPTER 40 PROVIDING FOR CONTROL ON THE EXPORT AND IMPORT AND TRANSIT OF ROUGH DIAMOND",

"AN ACT CREATING THE CITY OF FOYA WITHIN FOYA ADMINISTRATIVE DISTRICT, LOFA COUNTY, R L",

"AN ACT TO INCORPORATE ST LUKE SCHOOL OF MEDICINE(SLSOM) OF TE OF THE CITY OF MONROVIA, MONTSERRADO COUNTY, REPUBLIC OF LIBERIA, AND TO GRANT SLSOM A CHARTER",

"AN ACT CREATING MBOO STATUTORY DISTRICT WITHIN MARGIBI COUNTY WHICH CONTAINS THREE COUNTY DISTRICTS, MAMBAHN, FAAMINGTON, KARBAI AND FIVE CHIEFDOMS RESPECTIVELY WITH A PROVISIONAL MONTHLY AND PROBATE COURT MAJESTERIAL AREA AND PROVIDING FOR SAME",

have today received Executive Approval.

Cordially,



# Exhibit 4 - LIBERIA EMBASSY WEBSITE DISCLAIMER

**REPUBLIC OF LIBERIA**

**NATIONAL COMMISSION OF HIGH EDUCATION**

**Fourth Floor, Room 407**

**MINISTRY OF EDUCATION**

**P. O. Box 9014**

**Monrovia , Liberia , West Africa**

URGENT DISCLAIMER ON THE ILLEGAL ESTABLISHMENT AND RECOGNITION OF HIGHER EDUCATION INSTITUTIONS IN THE REPUBLIC OF LIBERIA

In order to establish a Higher Education Institution in Liberia , there are two sets of requirements: One set of requirements relates to obtaining a charter to operate from the National Legislature. The other set of requirements has to do with conformity to policies as set by the National Commission on High Education. One stipulation in these policies is that institutions seeking to be established in Liberia must meet the requirements as set out in the policy, prior to obtaining charters from the National Legislature. The policy clearly provides guidelines regarding the establishment and operation of high education institutions in the Republic of Liberia . These policy guidelines are currently available at the Commission's Secretariat.

On the contrary, the National Commission on High Education has observed with dismay that some colleges or universities have been established without going through the proper channels. For one thing charters have been granted institutions without prior clearance from the National Commission on High Education. In other cases, several institutions appear to have obtained operational permits or statements of recognition to establish and operate in the country. However, some of these documents were exclusively signed by the former Executive Director of the past administration without the approval of the Commission. Hence, the Permit signed without the approval of the Chairperson is considered invalid, and any institution in possession of such permit is not recognized by the appropriate authorities of the Commission.

Particular references are made to the St. Regis University and St. Luke Medical College that fall in this category. The St. Regis University has publicly made known to the World that it has a legal status to operate in Liberia through the permission of the Commission on High Education. This is not true. Evidence suggests that whatever documents the University claims to have obtained from the Commission were never approved by the Commission and do not bear the signature of the Chairperson. Further, these two institutions are considered Distance Education Institutions and according to the Commission's policy:

*Institutions that are distance education-related and that have approached the National Commission on Higher Education for the operation in Liberia are being processed. Since this is a new area of exploration for the Commission, the public is advised that any decisions already reached reference these Institutions are tentative and that the Commission is continuing its deliberations on these Institutions to final conclusions vis-à-vis their place in the Liberian Higher*

*Education System.*

Accordingly, the National Commission on Higher Education, Republic of Liberia , hereby declares **null** and **void** whatever documents St. Regis University may claim to possess emanating from the Commission until at such time when authorities of the Institution can go through the proper procedures for accreditation.

As regards the St. Luke Medical College, evidence also shows that no such college exists in Liberia ; therefore, it cannot claim to have obtained accreditation from the Commission. The Commission also nullifies the existence of such an institution in Liberia , until such time as all pertinent requirements as noted above are met. It therefore goes without saying that similar notice is being sent our to all institutions which are making claims similar to St. Regis and St. Luke that have not met the requirements as herein noted.

Signed: Isaac Roland, Ed,D. (**DIRECTOR GENERAL**)

Approved: D. Evelyn S. Kandakai, Ed,D. (**CHAIRPERSON**)

Feedback | © 2004 Embassy of Liberia, Washington DC

# Exhibit 5 - 18 Jan 2005 NCHE letter to Madame Carole Bede, ECFMG



**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION OF HIGHER EDUCATION**
Fourth Floor, Room 407
MINISTRY OF EDUCATION
P.O. Box 9014
Monrovia, Liberia, West Africa



OFFICE OF THE EXECUTIVE DIRECTOR

January 18, 2005

Madame Carole Bede

Senior Research Analyst

International Medical Education Directory

Foundation of Advancement of International Medical Education and Research

3634 Market Street, 4th Floor, Philadelphia, PA 19104-2685

Re:   St. Luke School of Medicine

Dear Madam Bede:

This will acknowledge receipt of your letter of inquiry dated October 26, 2004, concerning the above institution.

We regret the delay in responding to this inquiry. Meanwhile, we are pleased to provide the following information in relation to the request asked.

Although St. Luke School of Medicine did apply to the National Commission on Higher Education for recognition by government through accreditation, the Permit to operate, issued previously, only bore the signature of the former Executive Director, instead of two signatories, especially the signature of the Chairperson of the National Commission in keeping with the ACT, which created it. The lack of two signatures made the permit inappropriate.

However, the authorities of St. Luke have now realized that they were unaware of any problem with the previous permit. They have decided to remedy the problem by completing the process of accreditation to be granted by the National Commission.

Thus, the process of accreditation and subsequent official recognition had begun with the following preliminary steps in keeping with the National Policy on Higher Education in the Republic of Liberia.

> • "An individual, a group of individuals, or any entity wishing to operate a higher education institution in Liberia must apply to the National Commission on Higher Education."
>
> St. Luke School of Medicine had applied and their application has been received and is being processed.

MOTTO: Promoting Quality and Equal Higher Educational Opportunities.

- It is also stipulated in the policy that "There shall be adequate physical facilities-classrooms, laboratories tools, instruments, equipment and provision for updating the facilities, and provide expendable supplies to give students proper learning experiences essential to achieving the education philosophy and objectives of the programs."

The St. Luke School of Medicine has established an institution and is working hard towards providing the necessary physical facilities. As we speak there is large quantity of quality medical equipment including computers, modern books, microscopes, etc, most of which had already arrived in Liberia, for classroom and other purposes, to promote learning

"The Commission shall recommend institutions that meet the requirements to the National Legislature to be chartered; and only institutions qualified by the Commission and chartered by the National Legislature shall be issued a **TEMPORARY OPERATIONAL PERMIT PENDING THEIR ACCREDITATION.'**

To conclude, The National Commission has observed that the previous attempt aimed at seeking accreditation was not done in a proper manner in that the temporary permit to operate possessed only one signature, and does not fault St. Luke authorities for this omission

Thank you for your cooperation.

Sincerely yours,

Isaac Roland, Ed.D

**DIRECTOR GENERAL**

# Exhibit 6 - Adverse Letter from Madame Carole Bede, ECFMG

**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION OF HIGH EDUCATION**
Fourth Floor, Room 407



**MINISTRY OF EDUCATION**

**P. O. Box 9014**

**Monrovia , Liberia , West Africa**

URGENT DISCLAIMER ON THE ILLEGAL ESTABLISHMENT AND RECOGNITION OF HIGHER EDUCATION INSTITUTIONS IN THE REPUBLIC OF LIBERIA

In order to establish a Higher Education Institution in Liberia , there are two sets of requirements. One set of requirements relates to obtaining a charter to operate from the National Legislature. The other set of requirements has to do with conformity to policies as set by the National Commission on High Education. One stipulation in these policies is that institutions seeking to be established in Liberia must meet the requirements as set out in the policy, prior to obtaining charters from the National Legislature. The policy clearly provides guidelines regarding the establishment and operation of high education institutions in the Republic of Liberia . These policy guidelines are currently available at the Commission's Secretariat.

On the contrary, the National Commission on High Education has observed with dismay that some colleges or universities have been established without going through the proper channels. For one thing charters have been granted institutions without prior clearance from the National Commission on High Education. In other cases, several institutions appear to have obtained operational permits or statements of recognition to establish and operate in the country. However, some of these documents were exclusively signed by the former Executive Director of the past administration without the approval of the Commission. Hence, the Permit signed without the approval of the Chairperson is considered invalid, and any institution in possession of such permit is not recognized by the appropriate authorities of the Commission.

Particular references are made to the St. Regis University and St. Luke Medical College that fall in this category. The St. Regis University has publicly made known to the World that it has a legal status to operate in Liberia through the permission of the Commission on High Education. This is not true. Evidence suggests that whatever documents the University claims to have obtained from the Commission were never approved by the Commission and do not bear the signature of the Chairperson. Further, these two institutions are considered Distance Education Institutions and according to the Commission's policy:

*Institutions that are distance education-related and that have approached the National Commission on Higher Education for the operation in Liberia are being processed. Since this is a new area of exploration for the Commission, the public is advised that any decisions already reached reference these institutions are tentative and that the Commission is continuing its deliberations on these institutions to final conclusions vis-à-vis their place in the Liberian Higher Education System.*

Accordingly, the National Commission on Higher Education, Republic of Liberia , hereby declares null and void whatever documents St. Regis University may claim to possess

emanating from the Commission until at such time when authorities of the Institution can go through the proper procedures for accreditation. .

As regards the St. Luke Medical College, evidence also shows that no such college exists in Liberia ; therefore, it cannot claim to have obtained accreditation from the Commission. The Commission also nullifies the existence of such an institution in Liberia , until such time as all pertinent requirements as noted above are met. It therefore goes without saying that similar notice is being sent our to all institutions which are making claims similar to St. Regis and St. Luke that have not met the requirements as herein noted.

Signed: Isaac Roland, Ed.D. (DIRECTOR GENERAL)

Approved: D. Evelyn S. Kandakai, Ed.D. (CHAIRPERSON)

# Exhibit 7 - ATTESTATION FROM NCHE, March 2005



**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION ON HIGHER EDUCATION**
Fourth Floor, Room 407
MINISTRY OF EDUCATION
P.O. Box 9014
Monrovia, Liberia, West Africa



March 3, 2005

## STATEMENT OF ATTESTATION

This is to attest that the **St. Luke School of Medicine** has met some acceptable requirements for the establishment and operation of Post-Secondary institution in the Republic of Liberia. The National Commission on Higher Education hereby issues this statement of recognition to operate a higher learning institution in Liberia pending the complete processing of the **Permit of Operation.**

Thank you.

Signed: *Isaac Roland*
Dr. Isaac Roland
**Director-General/NCHE**

# Exhibit 8 - 12 March 2005 NCHE Letter to Madame Carole Bede



**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION OF HIGHER EDUCATION**
Fourth Floor, Room 407
**MINISTRY OF EDUCATION**
P.O. Box 9014
Monrovia, Liberia, West Africa



OFFICE OF THE DIRECTOR GENERAL

March 12, 2005

Madame Carole Bede
Senior Research Analyst
International Medical Education Directory
Foundation of Advancement of International Medical Education and Research
3634 Market Street, 4th Floor
Philadelphia, PA 19104-2685

Re:   St. Luke School of Medicine

Dear Madam Bede:

This letter acknowledges receipt of your letter of inquiry dated January 11, 2005, concerning the above institution.

Again, we regret the delay in responding to this inquiry. We are pleased to provide the following information in relation to the questions posed.

1.   Is the St. Luke School of Medicine currently recognized by the government of Liberia for award of the Doctor of Medicine degree?

    Yes. St. Luke School of Medicine is recognized by the government of Liberia to award Doctor of Medicine degrees. The process of reaccredidation is ongoing. St. Luke School of Medicine has been issued an ATTESTATION, and is waiting for the new PERMIT TO OPERATE.

2.   On what date was recognition granted?

    Recognition was granted from August 1, 2000 by the National Legislature of the Republic of Liberia.

3. If the St. Luke School of Medicine is not presently recognized by the government of Liberia for award of the Doctor of Medicine degree was the school previously granted recognition that has since been withdrawn? If so, please state the effective dates of the period of previous recognition.

Liberia presently recognizes St. Luke School of Medicine.

4. If St. Luke School of Medicine was never granted any form of recognition by the government of Liberia for award of the Doctor of Medicine degree, what was the reason for the request to the World Health Organization to list the school in their publications?

The government of Liberia previously recognized St. Luke School of Medicine.

I thank you for your inquiry and your cooperation.

Sincerely yours,

Isaac Roland, Ed.D.

DIRECTOR GENERAL

# Exhibit 9 – Receipt for Payment of LMB's Inspection Fee

# Exhibit 10 – Liberian Medical Board Assessment of SLSOM Campus



**REPUBLIC OF LIBERIA**
# LIBERIA  MEDICAL BOARD
**MINISTRY OF HEALTH & SOCIAL WELFARE**
**P. O. BOX 10-9009**
**1000 MONROVIA 10, LIBERIA**

Tel

Ref

March 22, 2005

Dr. Jerroll Dolphin
President
St. Luke School of Medicine
Monrovia, Liberia

Dear Dr. Dolphin:

## RE: <u>ASSESSMENT OF ST. LUKE SCHOOL OF MEDICINE</u>

In response to your letter of invitation, dated March 8, 2005, I am pleased to inform you that having assessed the premises of the proposed "St. Luke School of Medicine", we observed that the building for the school is still undergoing major renovation. There is no document on the school (hand book, curriculum; etc.), library and laboratories are not set up. The site is not representative of a Medical School, list of faculty and staff, etc, etc. When these concerns are addressed, the Board shall re-visit the site to determine if the school can be granted permit to start the admission process.

With regards.

Sincerely yours,

Horatius C. Browne, MD, MS, FWACS
CHAIRMAN, LIBERIA MEDICAL BOARD

# Exhibit 11 - NCHE "Computer School" Letter to ECFMG

04/27/2005 13:30 152300021 24

APR. 27. 2005 8:40AM ECFMG 215 387 9963 NO. 590 P. 1

**FAIMER**

**Foundation for Advancement of International Medical Education and Research**

3624 Market Street
4th Floor
Philadelphia, PA 19104-2685
USA

215-823-2206
215-386-9767 (FAX)
www.faimer.org

**FAX TRANSMISSION**
*INTERNATIONAL MEDICAL EDUCATION DIRECTORY*
*(IMED)*
**FAX NUMBER  215-386-9767**

**PRESIDENT**
John J. Norcini, Ph.D.

**CHAIR**
James A. Hallock, M.D.

**VICE CHAIR**
Donald O. Nutter, M.D.

**SECRETARY**
Sharon Wood-Dauphinee, Ph.D.

**TREASURER**
Dennis M. Donohue, C.P.A.

**BOARD OF DIRECTORS**
Bushand Ahmad, M.D., F.A.C.S
Ms. Suzanne T. Anderson
Sandra T. Barnes, M.D.
Joel A. DeLisa, M.D., M.S.
Richard R. Baldin, Ph.D.
Lynn O. Fletcher, Ph.D., J.D.
James A. Hallock, M.D.
Arthur Kaufman, M.D.
Ira D. Kawitz, M.D.
John J. Norcini, Ph.D.
Donald O. Nutter, M.D.
Richard J. Schwald
Jamshaar Takli, M.B., B.B.
Douglas W. Vott, M.D.
Sharon Wood-Dauphinee, Ph.D.

**Date:**        April 27, 2005

**To:**        St. Luke School of Medicine

**From:**     **Carole Bede**
          **Senior Research Analyst**
          *International Medical Education Directory*

**Subject:**     National Commission of Higher Education
              Liberia

**Total Number of Pages:**     **4**

**Message:**

RECEIVED

BY: .....................

*FAIMER is a non-profit foundation of the Educational Commission for Foreign Medical Graduates that is committed to advancing international medical education.*

04/27/2005 13:58   13235652724                        SLUSUM

APR. 27. 2005  8:40AM   ECFMG 215 387 9963                      NO. :90   P. 2

 **EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**
3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

April 27, 2005

St. Luke School of Medicine
6516 11th Avenue, 2nd Floor
Inglewood Ca 90305

Dear Sir or Madam:

In December, 2004, ECFMG and FAIMER received information that St. Luke School of Medicine might not be recognized by the National Commission of Higher Education and the government of Liberia. FAIMER subsequently wrote to the National Commission of Higher Education of Liberia for additional information

On March 18, 2005 FAIMER received re-confirmation from the National Commission of Higher Education, Ministry of Education, Liberia, that St. Luke School of Medicine was granted recognition by the National Legislature of Liberia from August 1, 2000. St. Luke School of Medicine Liberia continued to be listed in IMED with "current" graduation years.

However, on April 25, 2005, FAIMER received a letter dated April 11, 2005, from Isaac Roland, Ed.D., Director-General, National Commission of Higher Education, Ministry of Education, Liberia. In his letter, Dr. Roland stated that although the Commission had issued a 'letter of attestation to St. Luke School of Medicine," after investigation, it has been determined that St. Luke School of Medicine does not exist in the Republic of Liberia and that "the Secretariat of the National Commission therefore revokes the attestation effective immediately." A copy of this letter is enclosed.

Therefore, although previously listed in IMED, St. Luke School of Medicine. Liberia is no longer listed in IMED and students and graduates of the school are not eligible for the USMLE or for ECFMG certification.

Sincerely,

Carole Bede

Carole Bede
Senior Research Analyst
Registration and Credential Services

*ECFMG® is an organization committed to promoting excellence in international medical education.*

04/27/2005  13:58   13235652724                    SLUSUM

APR. 27. 2005  8:40AM    ECFMG 215 387 9963                                    NO. : 90    P. 3





**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION OF HIGHER EDUCATION**
Fourth Floor, Room 407
MINISTRY OF EDUCATION
P.O. Box 9014
Monrovia, Liberia, West Africa

OFFICE OF THE DIRECTOR GENERAL

April 11, 2005

Madam Carcie Bede
Senior Research Analyst
International Medical Education Directory.
Foundation for Advancement of
International Medical Education and Research
3824, Market Street
4th Floor
Philadelphia, PA 19104 - 2685
U. S. A.

RECEIVED

APR 25 2005

CREDENTIALS

Dear Madam Bede:

Recent investigation by the National Transitional Legislative
Assembly Joint Standing Committees on Health & Social Welfare and
Education regarding the existence of the St. Like School of
Medicine, substantiated by valid documentary evidence has revealed,
beyond all reasonable doubts, that such school does not exist in
the Republic of Liberia.

Although the National Commission on Higher Education had previously
issued and urgent disclaimer notice to the St. Luke School of
Medicine to stop awarding level degrees through distance education,
the authorities however later appealed to the Commission to operate
a Computer School. The Commission then issued a letter of attest-
ation to St. Luke School of Medicine instead of St. Luke School...
The NTLA Committees observed that the Secretatiate of the Commission
made an error by issuing the attestation. In fact, the Commission
has never issued any Official Temporary Operational Permit to St.
Luke School of Medicine to operate in Liberia.

In view of the foregoing anomally, the Commission is in full agree-
ment with the NTLA Committees that the so-called St. Luke School
of Medicine or "College" or "University" does not exist in
the Republic of Liberia. The Secretariat of the National Comm-
ission therefore revokes the attestation effectively immediately.

Thank your very much.

Sincerely yours,

Isaac Roland

Isaac Roland, Ed.D.
DIRECTOR - GENERAL

CC:   The Chairman, NTLA Joint Committees On Health
      And Education

      The Chairperson,
      National Commission on Higher Education
      MOTTO: Promoting Quality and Equal Higher Educational Opportunities .

04/27/2005  13:58     13235652724                    SLUSOM                              NO.:90    P. 4
APR. 27. 2005  8:41AM     ECFMG 215 387 9963

.. 2 . .

The Dean
A. M. Dogliotti  College of Medicine
University of Liberia

# Exhibit 12 - TEXT OF SLSOM "WRIT OF PROHIBITION" PETITION

IN THE SUPREME COURT OF THE REPUBLIC OF LIBERIA
SITTING IN IT'S A.D. 2005 MARCH TERM.

CHAMBERS...........................CAMPBELL...............JUSTICE

| | |
|---|---|
| St. Luke School of Medicine by & thru ) | |
| Its President, Dr. Jerroll B.R. Dolphin, ) | |
| M.D., of the City of Monrovia, R.L... ) | |
| ......................PETITIONER ) | |
| ) | |
| VERSUS ) | |
| ) **PETITION FOR A WRIT** | |
| The Government of Liberia by & thru ) **OF** | |
| The Ministry of Justice & the Ministry ) **PROHIBITION** | |
| Of Education & the 5 – man Committee ) | |
| Represented by its Chairman of the City ) | |
| Of Monrovia, R.L.....RESPONDENTS ) | |

PETITIONER'S PETITION

Petitioner most respectfully petitioning of and against Respondents showeth reasons therefor, to wit:

- That Petitioner, by Legislative Enactment approved April 24, 2003, and published on August 8, 2003, is a duly accredited legal entity existing under such Act (Law) with all rights and privileges to exist and operate a medical school within the Republic of Liberia, as will evidentially appear from photocopies of said Act hereto annexed and marked exhibit "A" and formal approval letter signed by the Chief Executive of Liberia, marked exhibit "B " hereof.

EXHIBITS        PAGE 27 OF 132

- That following its incorporation it was duly recognized and accredited by the various appropriate authorized functionaries of Government including the Ministry of Health and Social Welfare by & thru Minister Peter Coleman, MD, through a communication bearing date August 15, 2000, relevant excerpt of which reads verbatim:

*REPUBLIC OF LIBERIA*

*MINISTRY OF HEALTH & SOCIAL WELFARE*
*P.O. BOX 10-0000*
*1000 – MONROVIA, 10 – LIBERIA*
*WEST AFRICA*

*AUGUST 15, 2005*

*OFFICE OF THE MINISTER*
*MH&SW/GOL/PSC – M/1255/"00/RL*

*Mr. Sandra Dumont*
*HDP ASU/HQ*
*World Health Organization*
*CH – 1211, Geneva 27, Switzerland*

*Dear Madam:*

*This is to certify that the government of Liberia has accredited the St. Luke School of Medicine to operate within the Republic of Liberia. This Medical School will grant four-year Doctor of Medicine (MD) and is regulated through the Ministry of Health.*

*The date of accreditation is effective August 1, 2000.*

It is our hope that this information will be useful and that all necessary courtesies will be accorded the above mentioned Medical School.

Kind regards.

Sincerely yours,

Peter Coleman, MD, MS/FWAC
Minister

EXHIBITS        PAGE 28 OF 132

And attached hereto as exhibit "C" hereof.

Also, Statement of Attestation dated March 3, 2005 duly issued and signed by Dr. Isaac Roland, Director General of NCHE, for and behalf of the said National Commission on Higher Education and a Permit issued on September 17, 2002 by the National Commission on Higher Education, hereto attached and marked exhibits "D" & "E" respectively.

- That subsequent to the foregoing, Petitioner was duly granted a Charter by the Legislative Enactment proffered supra, thus authorizing it to exist and operate in Liberia as an educational Institution and/or medical school..

- That having been granted the right to operate as a school of medicine, Petitioner opened an office and began to identify a commodious and conducive space befitting of such an Institution, having already imported valuable medical pieces of equipment, as will evidentially appear from photocopies of an Articles of Incorporation and Lease Agreement hereto attached as exhibits "F" & "G" respectively.

- That Respondent being the second Branch of Government divested of the constitutional mandate and authority to annul, abrogate, invalidate and declare any Act or Law null and void ab initio, has arrogated unto itself the sole power of publicly declaring a Legislative Act null and void, by which it has grossly usurped the function of the Judiciary by unconstitutionally nullifying the Act creating Petitioner and granting it charter to exist and operate as a legal entity, without due process of law. Quoted hereunder verbatim is the unconstitutional Executive Decision of Respondent:

*"REPUBLIC OF LIBERIA*
*PUBLIC AFFAIRS*

*MINISTRY OF INFORMATION, CULTURE AND TOURISM*
*P.O. BOX 10-9021 – CAPITOL HILL*
*1000 MONROVIA, 10 LIBERIA*

*Office Of The Director Of Public Affairs*

**PRESS RELEASE**

**MICAT/MONROVIA/JULY 15 2005:** *- The Government of Liberia*
*Has ordered the immediate closure of the St. Luke School of Medicine*
*for illegally operating in the Country.*

EXHIBITS          PAGE 29 OF 132

*According to an information Ministry release issued today. The Government's decision is based on the findings and recommendations of a five – member committee constituted last March to probe the existence of St. Luke.*

*A full criminal investigation is to be conducted against the proprietor of the school and others who may have knowingly aided the process of opening the school.*

*All medical degrees issued by St. Luke School of Medicine are nullified and the school pronounced non – existent in Liberia, in keeping with the committee's recommendations approved by the Chairman of the National Transitional Government of Liberia. His Excellency Charles Gyude Bryant.*

*The committee had observed that an Act to Incorporate St. Luke was approved in 2003, but was never enacted by the legislature in session.*

*The cabinet committee further observed that the St. Luke School issued medical degrees in December 2001, January 2002, June 2002, August 2002, February 2003 and June 2003 when Monrovia was under attack.*

*The Cabinet Committee chaired by Justice Minister Kabineh Ja'neh, included Education Minister Evelyn Kandakai, Transport Minister Vamba Kanneh, Health Minister Peter Coleman and the Director – General of the Cabinet, Hon. Soko V. Sackor.*

*Signed:  Director of Public Affairs"*

Also attached hereto as exhibit "H" is photocopy of said decision.

- That by operation of Law and under the doctrine of Separation of power, the Executive Branch of Government wantonly lacks the authority to abrogate any Act of the Legislature or to say the least to investigate and invalidate any Law, however odious it be, except the Judicial Branch which shall do so through judicial review. Hence, the Respondent utterly violated the constitution of Liberia when it declared the subject Act fraudulent and subsequently ordered the closure of the office of Petitioner, even without due process of Law.

- That in furtherance of Respondent's unconstitutional act, it has ordered the arrest and incarceration of Petitioner's officers without recourse to judicial proceeding through due process of law.

EXHIBITS          PAGE 30 OF 132

Wherefore, Petitioner prays that this Honorable Court will prohibit Respondent from invalidating, nullifying and declaring null and void its legal charter or Legislative Enactment and to further prohibit Respondent from closing down its offices and to undo those acts done by Respondent appertaining thereto, without jurisdiction; and to further grant unto Petitioner such relief justice and right may demand in the premises.

Dated this 21 day of                                            Respectfully submitted
July, A.D. 2005                                                 Petitioner by & thru its
                                                               Legal Counsel:


                                                               _____

                                                               Francis Y.S. Garlawolu
                                                               **COUNSELLOR-AT-LAW**


$5.00 Revenue Stamp affixed hereto on the original.
REPUBLIC OF LIBERIA    )  IN THE OFFICE OF THE JUSTICE OF THE PEACE
MONTSERRADO COUNTY)   FOR MONTSERRADO COUNTY, R.L.


| | |
|---|---|
| St. Luke School of Medicine by & thru ) | |
| Its President, Dr. Jerroll B.R. Dolphin, ) | |
| M.D., of the City of Monrovia, R.L… ) | |
| …………………PETITIONER ) | |
| ) | |
| **V E R S U S** ) | |
| ) | **PETITION FOR A WRIT** |
| The Government of Liberia by & thru ) | **OF** |
| The Ministry of Justice & the Ministry ) | **PROHIBITION** |
| Of Education & the 5 – man Committee ) | |
| Represented by its Chairman of the City ) | |
| Of Monrovia, R.L…..RESPONDENTS ) | |


EXHIBITS        PAGE 31 OF 132

**PETITIONER'S AFFIDAVIT**

**PERSONALLY APPEARED BEFORE ME**, a duly qualified and commissioned Justice of the Peace for the City of Monrovia, Montserrado County, Republic of Liberia, Jerroll B.R. Dolphin, M.D, Petitioner in the above entitled cause of action and made oath according to law and facts that every and singular the allegation as contained in the annexed PETITIONER'S PETITION are true and correct to the best of his knowledge and belief and as to those matters of information received he verily believes them to be true and correct.

Sworn and subscribed to before me
This 21st day of July A.D. 2005

_____
Justice of the Peace for Montserrado
County, Republic of Liberia

_____
Jerroll B.R. Dolphin, M.D
PETITIONER

$5.00 Revenue Stamp affixed hereto on the original.

EXHIBITS        PAGE 32 OF 132

# Exhibit 13 - Madame Carole Bede's Denial of NCHE Request to Restore SLSOM's IMED Listing

January 24, 2006

Isaac Roland, Ed.D.
Director General
National Commission of Higher Education
Broad Street, 4th Floor, Room 407
Monrovia
Liberia

Re: St. Luke School of Medicine

Dear Dr. Roland:

Thank you for your letter of December 7, 2005 concerning the status of St. Luke School of Medicine.

In your letter, you stated that after inspection of the medical school's campus by the National Commission on Higher Education, a Temporary Permit to Operate would be issued for resumption of instruction at the medical school in January 2006.

According to information previously received by FAIMER, the first permit to operate was granted to St. Luke School of Medicine by the government of Liberia in 2000. The permit to operate was revoked in April 2005 and reinstated in October 2005. Consequently, we are writing to ask that you or a member of your staff write to FAIMER as soon as possible to provide the following information:

2. What is the status of medical degrees awarded by St. Luke School of Medicine for the years 2000 to 2005? Are holders of degrees issued during those years recognized as physicians by the government of Liberia, and are they eligible to apply for medical licensure in Liberia?

3. Are graduates of St. Luke School of Medicine who receive their medical degrees beginning January 2006 eligible for medical licensure in Liberia? If so, as of what date are (or will) these graduates be eligible for medical licensure in Liberia?

EXHIBITS          PAGE 33 OF 132

4. Please confirm that instruction has begun at the campus of St. Luke School of Medicine in Gaye Town, Monrovia, and the date on which instruction began.

5.

Your assistance is greatly appreciated. If possible, please reply by fax to +215-386-9767.

Sincerely,

Carole Bede
Senior Research Analyst
*International Medical Education Directory*

# Exhibit 14 - Liberia Supreme Court 'Stay Order' and Hearing Issued July 22, 2005

OFFICE OF THE CLERK
SUPREME COURT OF LIBERIA
TEMPLE OF JUSTICE
MONROVIA, LIBERIA

July 22, 2005

The Honourable Minister
Minister of Education
Ministry of Education
Monrovia, Liberia

Dear Madam Minister:

By directive of His Honour Ishmael P. Campbell, Associate Justice presiding in Chambers, you are hereby cited to a conference with his Honour on Monday, July 25, 2005, at the hour of 4:00 p.m., in connection with the case:

St. Luke School of Medicine by & thru
its President, Dr. Jerrell M.A.
Dolphin, M.D., of the City of
Monrovia, R.L................PETITIONER

PETITION FOR
A WRIT OF
PROHIBITION

versus

The Government of Liberia by & thru
the Ministry of Justice & the Ministry
of Education & the 5 – man Committee
represented by its Chairman of the
City of Monrovia, R.L.....,RESPONDENTS

Meanwhile, you are hereby ordered to stay further action in this matter pending the outcome of the conference.

Kind regards,

Very truly yours,

CLERK, SUPREME COURT OF LIBERIA

S E A L:

MGB/mjs

# Exhibit 15 - Liberia Supreme Court 'Conference' Scheduled on Aug 4, for Aug 10, 2005

OFFICE OF THE CLERK
SUPREME COURT OF LIBERIA
TEMPLE OF JUSTICE
MONROVIA, LIBERIA

August 4, 2005

The Honourable Minister
Minister of Justice
Ministry of Justice
Monrovia, Liberia

Dear Mr. Minister

IN RE:  St. Luke School of Medicine by &     )  PETITION FOR
        thru its President, Dr. Jerroll        )  A WRIT OF
        B.R. Dolphin, M.D., of the City of     )  PROHIBITION
        Monrovia, R.L...........PETITIONER    )

                        Versus                 )

        The Government of Liberia &            )
        thru the Ministry of Justice & the     )
        Ministry of Education & the 5 - man    )
        Committee represented by its Chair-    )
        man of the City of Monrovia, R.L.      )
        .....................RESPONDENTS      )

    By directive of His Honour Ishmael P. Campbell, Associate
Justice presiding in Chambers, you are hereby cited to a con-
ference with His Honour on Wednesday, August 10, 2005, at the
hour of 1:00 p.m., in connection with the above captioned case.

    Kind regards.

                                Very truly yours,

                                Martha G. Bryant
                                CLERK, SUPREME COURT OF LIBERIA

S E A L:

MGB/sjp

# Exhibit 16 - Liberia Supreme Court Restores SLSOM's Accreditation on Aug 10, 2005 Order

IN THE HONOURABLE SUPREME COURT OF THE REPUBLIC OF LIBERIA
MARCH TERM, A.D. 2005

CHAMBERS                    JUSTICE                    CAMPBELL

St. Luke School of Medicine by & thru its President, Dr.
Jerrell B.R. Dolphin, M.D., of the City of Monrovia,
Liberia,................................................PETITIONER

Versus

The Government of Liberia by & thru the Ministry of Justice
& the Ministry of Education & the 9 — man Committee repre-
sented by its Chairman of the City of Monrovia, R.L.
.................................................RESPONDENTS

REPUBLIC OF LIBERIA
TO: BRIG./GENERAL AMOS B. KROMAH DICKSON, SR.
MARSHAL, SUPREME COURT OF LIBERIA, OR HIS DEPUTY
MONROVIA

G R E E T I N G S:

YOU ARE HEREBY COMMANDED to notify the Government of Liberia by and thru
the Ministry of Justice, the Ministry of Education and the Five (5) man Com-
mittee represented by its Chairman, Monrovia, Liberia, RESPONDENTS in the
above entitled cause of action to appear before His Honour Ishmael P. Campbell,
Associate Justice of the Republic of Liberia, presiding in Chambers at the
Supreme Court Room, Temple of Justice, on the 20th Day of August, A.D. 2005,
at the hour of 9:00 a.m., to show cause why PETITIONER'S PETITION as prayed
for should not be granted; and to require the RESPONDENTS herein above to
send up to the Chambers of the Supreme Court a full and complete copy of the
proceedings at issue; and

YOU ARE FURTHER COMMANDED to instruct the RESPONDENTS herein to file
their RETURNS to this Writ in the Office of the Clerk of this Honourable
Court on or before the said 20th Day of August, A.D. 2005; and stay all
further proceedings until otherwise ordered and the Petitioner is to remain
in Status Quo Ante.

To read to them the original and leave a copy of the Writ together with
a copy of the PETITION with the RESPONDENTS each; and

As to when and how you shall have served this Writ, you will make known
by filing your RETURNS officially thereto on the back of the original Writ
in the Office of the Clerk of this Honourable Court on or before the said
20th Day of August, A.D. 2005.

AND FOR SO DOING, THIS SHALL CONSTITUTE YOUR LEGAL AND SUFFICIENT
AUTHORITY.

GIVEN UNDER MY HAND AND SEAL
OF THE HONOURABLE SUPREME
COURT THIS 10TH DAY OF AUGUST,
A.D. 2005.

S E A L:

CLERK, SUPREME COURT OF LIBERIA

MEB/ajp

# Exhibit 17 - Liberia Government Defaults-Liberia Supreme Court Issues Default Certificate to SLSOM

## CLERK'S CERTIFICATE

| | |
|---|---|
| IN RE:  St. Luke School of Medicine by & thru its President, Dr. Jerrell B.R. Delphin, M.D., of the City of Monrovia, Liberia...........PETITIONER | )PETITION FOR<br>) A WRIT OF<br>)PROHIBITION<br>)<br>) |
| Versus | )<br>) |
| The Government of Liberia by & thru the Ministry of Justice & the Ministry of Education & the 5 - man Committee represented by its Chairman of the City of Monrovia, R. L. ...................RESPONDENTS | )<br>)<br>)<br>)<br>)<br>)<br>) |

A careful perusal of the records in the above entitled cause of action, reveals that there are no RETURNS filed by the Respondents up to the issuance of this Certificate.

Hence, this Certificate.

GIVEN UNDER MY HAND AND
SEAL OF THE HONOURABLE
SUPREME COURT THIS 22ND
DAY OF AUGUST, A.D. 2005.

S E A L:

Martha G. Bryant
CLERK, SUPREME COURT OF LIBERIA

# Exhibit 18 - NCHE Requests ECFMG-IMED to Restore SLSOM's Previous Status in IMED



**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION OF HIGHER EDUCATION**
Fourth Floor, Room 407
MINISTRY OF EDUCATION
P.O. Box 9014
Monrovia, Liberia, West Africa



OFFICE OF THE DIRECTOR GENERAL

October 3, 2005

Madame Carole Bede
Senior Research Analyst
International Medical Education Directory
Foundation for Advancement of International Education and Research
3824 Market Street, 4th Floor
Philadelphia, PA 19104-2685
U.S.A.

Dear Madame Bede:

Based upon the ruling of the Supreme Court of the Republic of Liberia regarding the St. Luke School of Medicine, the court has ordered the medical school reinstated to its previous status it was during the accreditation process.

Abiding by the Supreme Court order, the National Commission on Higher Education hereby revokes the letter, dated April 11, 2005, which denied the existence of St. Luke School of Medicine and further advises that it should continue its existence.

We also request that the St. Luke School of Medicine be included in the International Medical Education Directory as it was previously.

Thank you very much for your cooperation.

Isaac Roland, Ed.D.
Executive Director
National Commission on Higher Education
Republic of Liberia

MOTTO: Promoting Quality and Equal Higher Educational Opportunities.

# Exhibit 19 - NCHE Second Request for ECFMG-IMED to Restore SLSOM's Previous Status in IMED



**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION OF HIGHER EDUCATION**
Fourth Floor, Room 407
MINISTRY OF EDUCATION
P.O. Box 9014
Monrovia, Liberia, West Africa



OFFICE OF THE DIRECTOR GENERAL

December 7, 2005

Madame Carole Bede
Senior Research Analyst
International Medical Education Directory
Foundation for Advancement of International Medical Education and Research
3624 Market Street, 4th Floor
Philadelphia, PA 19104-2685
U.S.A.

Dear Madame Bede,

This letter acknowledges receipt of your letter dated October 19, 2005, requesting our advice on the current status of St. Luke School of Medicine and its presence in Liberia.

I, therefore, write to inform you that a campus of the St. Luke School of Medicine has been formally established in Gaye Town, Monrovia. The National Commission on Higher Education has inspected the campus before, and re-inspected it recently, and found it to be satisfactory and ready to operate.

Meanwhile, a Temporary Permit to Operate will be issued by the Commission for resumption of instruction in January 2006.

Thank you very much for your kind cooperation.

Sincerely yours,

Isaac Roland, Ed.D.
Director General
National Commission on Higher Education
Republic of Liberia

MOTTO: Promoting Quality and Equal Higher Educational Opportunities.

# Exhibit 20 - Benson Barh Fired by President Sirleaf for Corruption

Monday, June 12, 2006

## ELLEN'S AXE FALLS!

**Swoops Upon Commerce, Health, Transport, and Finance Ministries**

**26 In Anti-Corruption, Administration Dragnets**

From campaign trails across the country to inauguration on to the onset of her administration, President Ellen Johnson Sirleaf remained undaunted about stabbing corruption in back.

Notwithstanding the level to which the political commitment raised the expectation of the Liberian people who know very well the effect of corruption on the growth and development of the nation, no one has seen much action in that direction, prompting murmuring and gossips amongst government critics, good governance crusaders, and international monitors about business remaining as usual.

But just before these groups started to adapt their suspicions as the truth, the Sirleaf Administration has lurched for its seemingly active slumber, taking some 28 alleged malefactors into a dragnet for corruption and presumably inefficiency.

"But will that alone help rid the government of these individuals?" **The Analyst Staff Writer** has been probing into the dismissals and transfers vis-à-vis pages from the past.

President Ellen Johnson-Sirleaf has dismissed three senior officials of government,  endorsed the dismissal of five civil servants, approved the transfer of 18, and ordered legal action against several yet-to-be-identified others.

The presidential press release which announced the multiple actions, yesterday, said those dismissed were Assistant Minister for Commerce for, Ministry of Commerce and Industry, Aaron Mathies; **Deputy Minister and Chief Medical Officer, Ministry of Health & Social Welfare, Dr. Benson Barh,** and the  Chairman of Civil Aviation Authority, Ministry of Transport.

These senior officials of government were dismissed, according to the presidential release, for acts of impropriety that the President said were not consistent with the principles of their offices.

The release gave no further details, but observers said the President has held fiscal transparency, accountability, respect for human rights, the avoidance of corruption and corrupt practices including misfeasance, and prudent management of state resources as proprieties that must serve as the guiding principles of every agency of government.

They therefore hold that those dismissed may have contravened one, two, or all of these principles with corruption and the siphoning of public property being amongst the highest possibilities.

In addition to the direct dismissals, the President also endorsed the request of Finance Minister, Antoinette Sayeh, to dismiss Joemagaria Teld who is the senior collector of the Ganta Collector and his two deputies Joseph Gbollie and Wille A. Kaibay.

Also endorsed for dismissal supposedly from the Bureau of Excise at the Ministry of Finance were senior economist/MFU, Jesse Mulbah, Sr., and the supervisor of foreign travel, Stanley T. Beh.

The release was silent on exactly what necessitated the dismissal of the revenue collectors all of who came from the Ganta Collectorate in Nimba. The Ganta Collectorate, which collects revenue from the border point with neighboring Guinea, is said to be the busiest dealing with several trans-border traders daily.

The collectorate was in the news recently for the mismanagement and misappropriation of large volume of revenue collected in excise, immigration, and other revenue collection activities.

Beside the Ganta Collectorate dismissals, President Sirleaf approved Minister Sayeh's request to transfer eight personnel from the Freeport of Monrovia amongst them Maliki Dukuly who served as chief examiner, Mary Wilson who served as director of liquidation, Varney Conneh who served as deputy collector for operations, and Tarnue Gowolo who served as chief ministerial.

Others were Akoi Gawolo who served as chief wharfinger, Alvin Gaye who served as deputy chief wharfinger for administration, Richard N. Gaye who served as chief boarding officer, Flomo Johnson who served as deputy chief examiner for administration, and David Meanyean who served

as senior examiner for BIVAC Warehouse.

In the President's first ever swoop on corruption; she also approved the transfer from the head office of Mulbah Gouyou who served as deputy comptroller, Mulbah Kpassaquoi who served as deputy director of the Bureau of General Audit (BGA), Mayabah S. Bayour who served as special project officer, and Mohammed S. Saysay who served as executive assistant.

Others approved for transfer were Musa M. Sheriff who served as computer operator, Sekou Saysay who served as driver, and Matalie Kanneh, Catherine Saysay, and Ismail Jabateh all of who served as office assistants.

The release said the dismissals and transfers were not ends in themselves but part of the larger and far-reaching plan by President Sirleaf to fulfill the pledge to fight corruption in government.

As further manifestation of the attempt to fulfill that pledge, the release said, President Sirleaf has begun the publication of several audit reports for the public.

The first of these reports concerned the audit of the Ministry of Finance and government's procurement arm, the General Services Agency (GSA), which revealed that 132 vehicles paid for by the government of Liberia were unidentifiable for lack of transaction records and cooperation from suspected vehicle dealers.

It is not clear which audit report or group of audit reports would come next, but the release said the President would not be content with the mere publication of the reports. It said she has already instructed the Ministry of Justice to conclude actions on several of these audit reports and identify for prosecution individuals who have committed grave abuse of the public trust.

The release made no reference to timetable for these activities, which many believe would add significance to the dismissals and transfers being announced. But it noted, "The President once again reiterates her pledge to the Liberia people that she will fight corruption in government and will separate the officials who abuse the public trust."

Even though the President's action, whatever the gravity of the prompter, appears swift, timely, and in tune with the administration's pledge to rid public offices of debilitating corruption, observers say it was too early to jubilate.

"The reason is," Jubah Tamba of Sinkor Old Road said using a popular Liberian adage, "when you praise white chicken for being spotless while it is still hanging around a bowl of red oil, it may become egoistic, careless, and most likely to fall into the palm oil and turn red."

He said the government has only being in power for six months and that while most of these months were characterized by news of corruption on the level of the previous administration, it was only now that the government was taking what he called "low-key" action.

On a more serious note, according to Jeremiah V. Taryee, it was too early to praise the government because in his view, such actions were taken by past regimes without necessarily producing the desired effects.

"We saw individuals dismissed for corruption and incompetence. But what invariably followed these dismissals from administration to administration dating back to the Tolbert administration is that no sooner were these public servants dismissed than they were reemployed in higher positions," he said.

He said whether or not similar actions taken, then, were prompted by lack of qualified personnel to replace the dismissed, post-dismissal probe results that exonerated the dismissed officials, or presidential change of heart propelled by inner circle politics that ran deep into the social fabric of society is not clear.

But one thing that was clear, according to him, was the dismissed officials came back into government without explanation to the public bringing with them the stigma of corruption, vengeance for being unjustly dismissed, and feelings of vulnerability, and therefore prepared to grab as much as possible before the next dismissal is announced at the behest of the chief executive.

"This is the backbone of corruption: the job insecurity amongst political appointees who were dismissed as scapegoats or shifted around in circles to show that the president was doing something about corruption and inefficiency when the idea was to prove who is in charge and who is the only rooster in town," said Taryee.

It was once said during the Tolbert administration that individuals who were sacked for lateness in the morning were candidates for appointment by the afternoon hours to the extent that the president lost track of those dismissed.

Former presidents Doe and Taylor were also not freed of appointment and dismissals that were ends in themselves and therefore left the impression that they were political jockeys' rather serious attempts to address the problems of government.

"You know the government is like a football game with several competent persons on the bench. You have to make substitution," former President Charles Taylor once told journalists during one of his tête-à-têtes at the Executive Mansion.

What has never followed these presidential dismissals for which some hold them as witch-hunting and dismissals to give opportunities to supporters and partisans, according to observers, was prosecution in a court of competent jurisdiction to establish guilt and prescribe the appropriate legal remedy.

Now that President has taken the first step along those lines, analysts say, the distinguishing mark would be whether or not she follows through with the announcement ordering the Justice Ministry to prepare legal action for individuals that will be in the wrong.

The announcement made specific reference to those charged with wrongdoing in the audit reports, but whether that precludes those being dismissed for corruption is not clear.

Observers however believe that that will be made clear in the next few weeks when the actions announced are taken up. "But will the cycle of transfers and dismissals and reappointment with promotion ever be broken?" is the million-dollar question.

Copyright © 2006 - The Analyst Newspaper - All rights reserved

# Exhibit 21 - SLSOM's Civil Law Court Petition

St. Luke School of Medicine                                    )
Represented by and thru its President, Jerroll                 )
Dolphin and all of its officials/ authorized Agent             )
                   PLAINTIFF  )

            VERSUS                                )    ACTION  DAMAGES FOR WRONG

                                  )

The Ministry of Health & Social Welfare.                       )
Represented by and thru its Minister and The                   )
Ministry of Education, represented by and thru                 )
It's Minister and all of their principal Deputies,             )
And all of those working under the scope of                    )
Authority, Republic of Liberia.                                )
            DEFENDANTS            )

*Filed sept. 13, 2006, at 3:38 pm (&?) Clerk of court*

## PLAINTIFF'S COMPLAINT

Plaintiff in the above-entitled cause of Action, complains against the within named Defendants for reason legally showth unto Your Honor, to wit: -

1  That Plaintiff is a registered business and medical school entity/ Institution operating under the Liberia Business Association Laws, Photo copies of the Articles of Incorporation plus letters of accreditation from the Ministry of Health and Social Welfare are hereto attach and marked as exhibit P/1 in bulk to form part of this Complaint.

2  Plaintiff further says and submits that to authenticate the credibility of Plaintiff, a Legislation was past, sign into law by the than Liberian President and subsequently printed into hand Bill. Photo copies of said instruments are herewith attached, and marked P/2 in bulk to form part of this Complaint.

3  Plaintiff says and submits that since its accreditation by the relevant authorized authorities and Agencies of Government coupled with the Legislative Enactment none of which stated herein had been withdrawn or nullify by the Government of Liberia in keeping with the due process of law thus creating the atmosphere for Plaintiff to operate her school semesters and years and to put forth graduates while other students being enrolled. Plaintiff gives notice to Court to produce additional living and documentary evidence at the Trial in connection with the herein case.

4  Plaintiff contends and says that to her greatest dismay and surprise, the Defendants under an organized unlawful and illegal scheme prompt and subjected Plaintiff to public ridicule, degradization, hardship and damage the face of said Institution, and ignored all of the instruments and accreditation Plaintiff have, and without any

regards for or to the law controlling, denounced the credibility of Plaintiff eventhough, the Legislative Enactment of St. Luke School of Medicine remains unratified and the accreditation along with the Articles of Incorporation unrevoked since then upto and including the filing of this complaint, as in keeping with the laws of the Republic of Liberia

5. Plaintiff says and contends that as a result of Defendant's direct conduct, the credibility of Plaintiff has been questioned in some quarter and rejected in other quarters both within and out of Liberia thereby causing students who are presently been enrolled to abscorn the Institution/ University demanding US$ 500, 000.00 United States Dollars as refund for expenses incurred at the Plaintiff's University plus LD$ 1, 500, 000.00 Liberian dollars for the inconveniences suffered as a result of the abrupt closure of said University which amount Plaintiff seeks to recover from the Defendants. Plaintiff gives notice to prove same during trial.

WHEREFORE, and in view of the foregoing, Plaintiff brings this Action of Damages for Wrong against the within named Defendants, praying Your Honor to hold Defendants to pay unto Plaintiff the amount of US$ 500,000.00 United States Dollars plus LD$ 1, 500,000.00 Liberian dollars as special damages plus US$ 115,000,000.00 United States dollars as general damage and grant unto Plaintiff any and all further relief as the end of justice demand.

RESPECTFULLY SUBMITTED:
The above named Plaintiff
By and thru Her Legal Counsel
WEAH AND ASSOCIATES LAW OFFICES
109 ASHMUN STREET, MONROVIA, LIBERIA

ATTORNEYS AND COUNSELLORS-AT-LAW

Dated this 4th day of

September , A.D. 2006

$ 4.00 Revenue stamp affixed on
the original copy

REPUBLIC OF LIBERIA    )
MONTSERRADO COUNTY)

IN THE OFFICE OF THE JUSTICE OF PEACE FOR
MONTSERRADO COUNTY, CITY OF MONROVIA,
LIBERIA.

St. Luke School of Medicine                              )
Represented by and thru its President, Jerroll          )
Dolphin and all of its officials/ authorized Agent     )
............................ ................PLAINTIFF   )
                                                        )
              VERSUS                                     )        ACTION: DAMAGES FOR WRONG
                                                        )
The Ministry of Health & Social Welfare,               )
Represented by and thru its Minister and The           )
Ministry of Education, represented by and thru         )
It's Minister and all of their principal Deputies,     )
And all of those working under the scope of            )
Authority, Republic of Liberia,                         )
............. ........ .......................DEFENDANTS )

## PLAINTIFF'S AFFIDAVIT

PRESONALLY APPEARED BEFORE ME, the undersigned, a duly qualified Justice of the Peace

for Montserrado County, at my office in the City of Monrovia, Liberia Counsellor Ignatius N. Weah,

one of counsel of PLAINTIFF in the above entitled cause of action and made Oath according to the

law and facts as set forth and contained in the annexed PLAINTIFF'S COMPLAINT, are true and

correct to the best of his knowledge and belief, and as these matters of information received, he

verify believes them to be true and correct.

                                        SWORN AND SUBSCRIBED TO BEFORE ME
                                        THIS 4th DAY OF September, A.D. 2006


                                        JUSTICE OF THE PEACE MONT. CO. RL.



CLLR. IGNATIUS N. WEAH ONE OF
COUNSEL FOR PLAINTIFF / DEPONENT


L$ 5.00 Revenue stamp affixed on the original

BEFORE HIS HONOR EMERY S PAYE        ASSIGNED CIRCUIT JUDGE

*filed Sept. 13, 2006,*
*at 3:38 pm.*
*(EH) Clerk of Court*

St Luke School of Medicine            )
Represented by and thru its President, Jerroll  )
Dolphin and all of its officials/ authorized Agent )
                       PLAINTIFF  )
                             )

        VERSUS            )    ACTION DAMAGES FOR WRONG
                             )

The Ministry of Health & Social Welfare    )
Represented by and thru its Minister and The   )
Ministry of Education, represented by and thru  )
It s Minister and all of their principal Deputies, )
And all of those working under the scope of   )
Authority Republic of Liberia.            )
                 DEFENDANTS  )

## PLAINTIFF'S WRITTEN DIRECTION

The Clerk of Court
Sixth Judicial Circuit
Civil Law Court
Montserrado County
Republic of Liberia

Madam Clerk of Court

    Upon the receipt of Plaintiff's Complaint, Affidavit and other relevant documents along with your usual filing fees, you will docket the said cause of action in the September Term A D 2006 of the Civil Law Court Sixth Judicial Circuit, Montserrado County, same being the 18th day of September, A D 2006

    You will also issue a writ of summons directed to the Sheriff of this Honorable Court to summons the within named Defendants to appear and / or file their Answers to Plaintiff's Complaint on the 14th day of September, A D 2006 That failure on the part of the Defendants to appear and / or Answer JUDGMENT BY DEFULT SHALL BE rendered against them

    You will also insert a clause in the said writ of summons commanding the Sheriff to make her final returns endorsed on the back of said writ of summons as to the form and manner of service on or before the said 14th day of September, A D 2006

    AND FOR SO DOING, THIS SHALL CONSTITUTE YOUR LEGAL AND SUFFICIENT AUTHORITY

                          RESPECTFULLY SUBMITTED
                          St Luke School of Medicine
                          Represented by and thru its President
                          Jerroll Dolphin and all of its Officials / Authorized
                          Agents, PLAINTIFF, BY AND THRU THE
                          WEAH AND ASSOCIATES LAW OFFICE

Dated 4th day of
September, A D 2006

                          COUNSELLORS & ATTORNEYS AT-LAW

# Exhibit 22 - Ministry of Health & Social Welfare Answer to SLSOM's "Damages for Wrong" Complaint

REPUBLIC OF LIBERIA)    IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY)     MONTSERRADO COUNTY, SITTING IN ITS SEPT. TERM, A.D. 2006

BEFORE HIS HONOUR:   EMERY S. PAYE ....ASSIGNED CIRCUIT JUDGE

IN RE:      St. Luke School of Medicine...........)
            Represented by and thru its           )
            President, Jerroll Dolphin and        )
            all of its officials authorized Agents )
            all of the City of Monrovia,           )
            Liberia......................PLAINTIFF )
                                                   )
            VERSUS                                 )     ACTION OF DAMAGES FOR WRONG
                                                   )
            The Ministry of Health & Social        )
            Welfare, represented by and thru       )
            its Minister and the Minister of       )
            Education thru its Minister and all    )
            those working under the scope of       )
            authority, RL.........DEFENDANTS)

## CO-DEFENDANT HEALTH MINISTRY'S ANSWER

CO-DEFENDANT, MINISTRY OF HEALTH AND SOCIAL WELFARE, R.L., in the above entitled cause of Action answers the Plaintiff in the manner and form showeth as follows, to wit:

1.    That because as to the entire complaint of the Plaintiff, Co-Defendant, Ministry of Health & Social Welfare submits and contends that same is patently evasive, inconsistent and contradictory, and therefore does not present a clear-cut friable issue. Wherefore Co-Defendant prays court that the complaint, being thus evasive and self-contradictory, be dismissed and Plaintiff made to pay the costs of these proceedings.

2.    That because further above, Co-Defendant submits and contends that it is against public policy that people who are duly appointed and commissioned to serve the public would plan, connive and engage in the most wanton dangerous enterprise and moral decadency by supporting, misrepresenting, misleading and fraudulently creating the atmosphere that leads the public to commit general suicide by the use of their knowledge in the medical profession and through the issuance of medical degree to non-qualified individuals purporting to be graduates of a medical school that does not in fact exist at all

3.    That also because as to counts one (1) and (2) of the complaint, Co-Defendant submits and contends that said counts of the complaint are also fatally defective and bad in that Exhibits "P/1" and "P/2", the foundation stone of the entire Action of Damages for Wrong, is irreceivable in any court of justice in this Republic; for said Exhibits "P/1" & "P/2" which purport to be an alleged articles of incorporation and Hand Bill of legislative enactment constitute all fundamental elements of fraud and misrepresentation both in law and facts. Co-Defendant submits that said Exhibits not having met the requirements of law for their validity cannot and will not be an exhibit in support of any pleading in law and equity, for they are null and void ab initio. Hence, Co-Defendant prays Your Honour to dismiss Plaintiff's complaint in its entirety.

4.    That also because as to the entire five(5) counts complaint, Co-Defendant submits and contends that the Complainant in the instant case lacks legal capacity to institute this Action of Damages for Wrong because, the non-existence of the so-called St. Luke School of Medicine both de facto and de jure within the Republic of Liberia, the alleged articles of incorporation and legislative enactment not being in line with law, Plaintiff's complaint must crumble as a matter of law because, the both documents have been denounced to be false documents by NTLA and the Ministry of Foreign Affairs of the Republic of Liberia. Attached hereto is a copy of the House Committee report which conducted investigation on the alleged establishment of St. Luke School of Medicine, marked as Exhibit "A" to form a material and cogent part of this Answer.

5.    That also because as to the five (5) counts complaint of the Plaintiff, Co-Defendant submits and contends that the so-called incorporators of the Articles of Incorporation of St. Luke School of Medicine, including Dr. Jerroll Dolphin, Dr. Meimei Dukuly and Mr. Frank E. Teah, Jr. and Dr. Peter S. Coleman, are all 419 gang of four in the medical field

of Liberia who are ready and prepared to mortgage the health and well-being of the people of this country in order to promote their own individual selfish gains at the expense of the medical profession

6      That because also as to the entire complaint of the Plaintiff, Co-defendant submits and contends that she will apply to the law that the so-called Plaintiff and all of its officers be charged with a criminal offense for falsification of government documents, with specific reference to the Articles of Incorporation of St Luke School of Medicine and the alleged legislative enactment to establish St. Luke School of Medicine, and that the so-called incorporators being more dangerous than the war-lords in the Liberian civil war, be arrested and turned over to the special tribunal in Sierra Leone for their attempt to commit, and plan genocide through the use of medical knowledge against the people of Liberia

7      That also because as to counts four (4) and five (5) of Plaintiff's complaint, Co-Defendant submit and contends that said counts of the complaint are fatally defective and bad for pleading negative pregnant in that, while the burden of the complaint is non-existence of the so-called St. Luke School of Medicine, yet, and still in the prayer of complaint the Plaintiff is claiming the amount of US$500,000.00 and L$1,500,000.00 and as special damages plus US$115,000,000.00 as general damages in favor of an organization that does not exist de jure and de facto Co-Defendant therefore submits and prays that the complaint being thus dismissably defective and bad, be ruled out of court and Plaintiff made to pay the costs of these proceedings.

8      That because further above, Co-Defendant Ministry of Health & Social Welfare says that the entire complaint is merely public relations exercise on the part of St Luke School of Medicine Incorporators to gain sympathy from the general public for the heinous medical offense or wrong doing they have committed against the people of this country

9      And that also because as to counts three (3) and four(4), and therefore the entire complaint, are irreconcilably inconsistent, self-contradictory and repugnant one to the other, in that, whereas the Plaintiff is alleging that the students at the so-called institution/university have absconded and are demanding a refund of US$500,000.00 and L$1,500,000.00 for inconveniences suffered as a result of the abrupt closure of said university, yet, in the prayer of the complaint the Plaintiff is demanding US$500,000.00 plus L$1,500,000.00 and US$115,000,000.00 shamelessly for what reasons only God knows  Because of this unorthodox mode of pleading, born of a crafty design to extort public funds, Co-Defendant prays that the entire complaint be dismissed and the Plaintiff made to pay the costs of these proceedings

10     That because further to the above, Co-Defendant submits and contends that the only legal agency authorized by law to publish acts passed by the Legislature of Liberia is the Foreign Ministry of the Republic of Liberia. Former Senator Beatrice Sherman has no legal authority to publish any act on behalf of the Government of Liberia, as was the case involving the so-called St Luke School of Medicine legislative enactment of April 24, 2003

11     That also because CO-Defendant further submits and contends that it was impossible during August 7, 2003 for former President Charles Taylor of Liberia who signed any act passed by the Legislature at that time when in fact the Legislature was completely out and the former President under the greatest international pressure which led to his departure on August 11, 2003  Between August 7, 2003 to August 11, 2003 former President Taylor was no longer in charge of things in Liberia. As such it was impossible for him to even contemplate signing an act to establish a school when his own future in Liberia was no longer certain  Who there see Former President Taylor between August 7 and August 11, 2003?

12     That because further to the entire complaint of the Plaintiff, Co-Defendant submits and contends that the President of the so-called St. Luke School of Medicine, Dr. Jerroll Dolphin, who was in the country without work permit, Resident Permit and license to practice medicine within the Republic of Liberia, could not have established any legal institution without being legally qualified to do so.  In the absence of the required documents mentioned supra, Dr. Dolphin is without legal capacity and authority to establish any institution in Liberia as an alien

- 3 -

13.  That also because further to the above, Co-Defendant submits and contends that it is unfortunate and highly regrettable that Liberians like Dr. Peter Coleman, Dr. Mennen Dukuly and Mr. Frank Teah would heartlessly and shamelessly abuse the medical profession by issuing medical degrees to individuals as graduates of a medical school that does not exist. More besides, how could St. Luke School of Medicine award medical degrees to graduates of said school in 2001, 2002, 2003, for a school that was allegedly established in 2000? Can anybody with a sound mind award a graduate a medical degree to a graduate who has studied for one (1) year only? Co-Defendant gives notice that at the trial she will produce more documentary evidence in support of this Answer.

14.  Co-Defendant hereby denies all and singular the averments as contained in the Plaintiff's complaint that is not specifically traversed in this Answer.

WHEREFORE, AND IN VIEW OF THE FOREGOING, Co-Defendant Ministry of Health and Social Welfare, R.L. prays Your Honour to deny and dismiss Plaintiff's complaint in its entirety, rule costs of these proceedings against the Plaintiff and grant unto Co-Defendant all further relief as Your Honour my deem just, legal and equitable in the instant

Respectfully submitted,
Co Defendant Ministry of Health & Social Welfare,
By and thru its Legal Counsel,
TULAY AND ASSOCIATES

 



Fomba O. Sherif
COUNSELLOR-AT-LAW

Dated this 20th day of September, A.D. 2006

$5.00 Revenue Stamps Affixed on the Original



## CO-DEFENDANT'S AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, a duly qualified Justice of the Peace for and in Montserrado County, Republic of Liberia, at my Office in the City of Monrovia, Liberia, Fomba O ......... Co-Defendant ... Ministry of Health & Social Welfare and made Oath According to Law that all and singular the allegations of facts and law as are seth forth and contained in the foregoing and annexed CO-DEFENDANT'S ANSWER are true and correct to the best of his knowledge and belief, and as to those matters of information thereto relating as relied upon, he verily believes them to be true and correct

  

SWORN AND SUBSCRIBED TO BEFORE ME AT MY IN THE CITY OF MONROVIA, LIBERIA THIS 20th DAY OF ............... A.D 2006

JUSTICE OF THE PEACE MONTSERRADO, CO., R.L.

Fomba O. Sherif
COUNSELLOR-AT-LAW & ONE OF COUNSEL
FOR CO-DEFENDANT   DEPONENT/AFFIANT

$5.00 Revenue Stamps affixed on the original

REPUBLIC OF LIBERIA) IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY) MONTSERRADO COUNTY, SITTING IN ITS SEPT. TERM, A.D. 2006

## BEFORE HIS HONOUR: EMERY S. PAYE, ....ASSIGNED CIRCUIT JUDGE

The Ministry of Health & Social )
Welfare, represented by & thru )
its Minister. . . . . . ...MOVANT)
)
      **VERSUS**      )     **MOTION TO DISMISS**
)
)
St. Luke School of Medicine, )
represented by & thru its President, )
Jerroll Dolphin and all of its officials )
authorized Agents, all of the City of )
Monrovia, )
Liberia .     **RESPONDENTS** )

## GROWING OUT OF THE CASE:

St. Luke School of Medicine )
Represented by & thru its )
President, Jerroll Dolphin and all of )
its officials authorized Agents, all of )
the City of Monrovia, )
Liberia . .      **PLAINTIFF** )
)
      **VERSUS**      )     **ACTION OF DAMAGES FOR WRONG**
)
The Ministry of Health & Social )
Welfare, represented by and thru )
its Minister and the Minister of )
Education thru its Minister and all )
those working under the scope of )
authority, )
R.L. . . ....... . .....DEFENDANTS)

## MOVANT'S MOTION

MOVANT IN THE ABOVE ENTITLED CAUSE OF ACTION, most respectfully moves this Honourable Court for a dismissal of Respondent/Plaintiff's Action of Damages for Wrong and for the factual and legal reasons showeth as follows

1     That because Movant submits and contends that the Respondent St. Luke School of Medicine lacks legal capacity to institute any action in this Republic, said institute not being a lawful and legal entity operating under the laws of Liberia, and that the laws of Liberia cannot and will not condone, sanction support and ratify any illegality and nobody can benefit from its own illegal acts.     •

2     That the Respondent/Plaintiff being and having been falsely created by its 419 incorporators in persons of Dr Jerroll Dolphin, Dr Meimei Dukuly, Mr. Frank E. Teah as well as their PROVOST Dr. Peter Coleman, under the most dubious criminal circumstances, said institution cannot benefit from its own illegal acts, fraud and misrepresentation.

3     That because only the ministry of Foreign Affairs of the Republic of Liberia is authorized by law to publish all legislative enactments in HANDBILL and to approve articles of incorporation to establish legal entities under the Association Laws of Liberia; both the House of Representatives (NTLA) and the Foreign Ministry of Liberia having denied the legal existence of the so-called St. Luke School of Medicine within the Republic of Liberia, said bogus St. Luke School of Medicine cannot now benefit from its own illegality because, for what is not done legally is not done at all, and that Respondent is 419 institution/university organized by the gang of four fraud sters including Peter s. Coleman, Meimei Dukuly, Jerroll Dolphin and Frank E. Teah; must be arrested for planning a time bomb to exterminate the entire population of Liberia by means of spreading medical virus as graduates of medical school or doctors.

4.  That because Movant further prays court to order and declared null and void the articles of incorporation as well as the alleged legislative enactment which was never the end product of NTLA's as alleged by Respondent/Plaintiff in its complaint. Movant gives notice that at trial he will produce copy of take medical degree issued to the so-called graduates of St. Luke School of Medicine, even though, the school does not exist de jure and de facto. See attached copy of NTLA Report.

WHEREFORE, AND IN VIEW OF THE FOREGOING, MOVANT most respectfully prays court to deny and dismiss Respondent/Plaintiff's complaint in its entirety, rule costs of these proceedings against the Respondent, order the so-called St. Luke School of Medicine Closed, and grant unto Movant all further relief as Your Honour may deem just, legal, transparent and equitable in the instant.

 

Respectfully submitted.
The above named MOVANT,
By & thru its Legal Counsel,
TULAY & ASSOCIATES

Fomba O. Sherif
COUNSEL-AT-LAW

Dated this 20th day of September AD 2000

$5.00 Revenue Stamps affixed on the Original.

## MOVANT'S AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, a duly qualified Justice of the Peace for and in Montserrado County, Republic of Liberia, at my office in the City of Monrovia, Liberia, Fomba O. Sherif, COUNSELLOR-AT-LAW and one of Counsel for MOVANT in the above entitled cause of Action and Made Oath according to law that all and singular the allegations of facts and law as are setforth and contained in the foregoing and annexed MOVANT'S MOTION TO DISMISS are true and correct to the best of his knowledge and belief, and as to those matters of information thereto relating as relied upon, he verily believes them to be true and correct.



SWORN AND SUBSCRIBED TO BEFORE ME AT THE OFFICE IN THE CITY OF MONROVIA, LIBERIA THIS 28th DAY OF SEPTEMBER 20___

JUSTICE ___ MONT.CO., R.L.

Fomba O. Sherif
COUNSELLOR-AT-LAW & ONE OF COUNSEL
FOR MOVANT.. DEPONENT/AFFIANT

$5.00 Revenue Stamps affixed on the Original.

# Exhibit 23 - Ministry of Education Answer to SLSOM's "Damages for Wrong" Complaint

| | |
|---|---|
| REPUBLIC OF LIBERIA    )<br>MONTSERRADO COUNTY) | IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT<br>MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER<br>TERM A. D. 2006. |

BEFORE HIS HONOR:    EMERY S. PAYE ............................ASSIGNED CIRCUIT JUDGE

| | | | |
|---|---|---|---|
| St. Luke School of Medicine | ) | | |
| Represented by and thru its President, Jerroll | ) | | |
| Dolphin and all of its officials/ authorized Agent | ) | | |
| ............................................PLANTIFF | ) | | |
| | ) | ACTION: | DAMAGES FOR WRONG |
| **VERSUS** | ) | | |
| The Ministry of Health & Social Welfare | ) | | |
| Represented by and thru its Minister and The | ) | | |
| Ministry of Education, represented by and thru | ) | | |
| it's Minister and all of their principal Deputies, | ) | | |
| and all of those working under the cope of | ) | | |
| authority, Republic of Liberia, | ) | | |
| ............................................DEFENDANTS | ) | | |

## DEFENDANT'S ANSWER

Defendant, Ministry of Education, in the above captioned cause of action denies the legal sufficiency of plaintiff's complaint and therefore requests this honorable Court to dismiss and over rule said complaint for reasons, both factual and legal, as shown below to wit:

1. That as to count one of plaintiff's complaint, defendant says that the school was incorporated under the laws of the Republic of Liberia but Article III of said articles has been violated for the fact that the school did engage in an unlawful act by issuing Fake Degrees to Students. This defendant stands ready to prove at trial.

2. That the acts of the school rely upon was enacted in violation of the rule or policy of the National Commission on Higher Education; this defendant stand ready to proof at trial.

3. That the Temporary Permit to operate St. Luke School of Medicine in the Republic of Liberia was obtained through fraud; This defendant stands ready to prove during trial by producing both living and documentary evidences.

4. That Section One of the act of St. Luke admits that the School was established on the first of August 2000 and incorporated August 22, 2001; meaning; the school was illegally operating before it was enacted on August 8, 2003 by the Legislature which was approved April 24, 2003.

5. That the School claimed to have campus at Gaye Town in 2005, but issued degrees before 2005 and attached a Lease Agreement for a building on Broad Street known and called Luke Building. This defendant stands ready to prove at trial by producing both living, oral and documentary evidences.



6. That the school St. Luke is operating without a campus as claimed, a requirement for the operating of medical school, contrary to information for Accreditation – Part 1 St. Like school of Medicine, Liberia 2004. Defendant will proof at trial.

7. That further to Plaintiff's complaint, defendant says indeed and in true, there exist and Articles of Incorporation and an Act of St. Luke School of Medicine plus the letter from the MOH but the purpose for which the act, the letter and the Articles of Incorporation was sought was defeated by the fraudulent action of the school. Hencefore, the action of damages can not lie. This defendant is ready to proof all of these during trial by producing oral, living and documentary evidences..

8. Defendants says that Plaintiff defeated the intent and credibility it sought through Legislation by engaging itself into illegal activities. This defendant stands ready to prove during trial.

9. Defendant says further that all legal documents can be nullified by the holder through the engagement of the holder into illegal act(s). That is, whatever that is not legally done, is not done at all. This defendant is ready to proof during trial.

10. Defendant further says that, every action of the Incorporation of the Institution relating to the provision of Higher Education in Liberia was violated by St. Luke School of Medicine. Defendant gives notice to Court that it shall produce living and documentary evidence to prove it case during trial.

11. Additionally, defendant says that Plaintiff has lost nothing since indeed and infact all of its actions were illegally done to claim damages from the Ministry of Education or any other Institution.

12. Finally, defendant says that Plaintiff has failed to state any instant or act/action of defendant, Ministry of Education contrary to law that damaged the school. Hencefore claim of damages cannot lie.

Wherefore, and in view of the foregoing, defendant prays this Honorable Court to dismiss Plaintiff's complaint in its entirely and rule costs against Plaintiff and grant unto defendant any and all further relief that this Court might deem just and legal.

Respectfully submitted.

Defendant By and thru its Legal
Counsel Viama J. Blama & NELAL

$5.00 Revenue Stamp
Affixed to original.

REPUBLIC OF LIBERIA )  IN THE OFFICE OF THE JUSTICE OF THE PEACE
MONTSERRADO COUNTY)  FOR AND IN MONTSERRADO COUNTY, LIBERIA

St. Luke School of Medicine                              )
Represented by and thru its president, Jerrol            )
Dolphin and all of its officials/authorized Agent        )
.........................................PLAINTIFF )

                    **VERSUS**                    ) ACTION: **DAMAGES FOR WRONG**
                                                         )
The Ministry of health & Social Welfare,                 )
Represented by and thru its Minister and The             )
Ministry of Education, represented by and thru           )
It's Minister and all of their principal Deputies,       )
And all of those working under the scope of              )
authority, Republic of Liberia.                          )
.........................................DEFENDANTS )

## <u>DEFENDANT'S AFFIDAVIT</u>

PERSONALLY APPEARED BEFORE ME, a duly qualified Justice of the Peace for and it Montserrado County, at my Office in the City of Monrovia, Liberia, Atty. Viama J. Blama, one of Counsels for Defendant in the above entitled cause of Action and make Oath according to law that all and singular the allegations of facts as are set forth and contained in the Defendant's Answer, are true and correct to the best of his knowledge and belief, as to those matters of information, he verily believes them to the true and correct.

Sworn and subscribed to before me,

This _27_ day of _Septbr_ A.D. 2006.

Viama J. Blama
ATTORNEY-AT-LAW

JUSTICE OF THE PEACE MONT. CO. R/L

# Exhibit 24 - SLSOM's REPLY TO CO-DEFENDANT MINISTRY OF EDUCATION ANSWER



then, said institution would not have given accreditation to Plaintiff, hence. said averment is repugnant and pregnant with deception, merely intended to mislead this Honorable Court. Count (2) of the Co- Defendant's Ministry of Education Answer would therefore be dismissed.

That as to count (3) of the Co- Defendant's Ministry of Education Answer, Plaintiff vehemently opposed and reject said averment on grounds that under our law one who alleges has the burden of prove but in the instant case, the Co-Defendant's Ministry of Education has failed, refused and neglected to authenticate the alleged fraud as such, count (3) is misleading and lacks legal basis. Count (3) of the Answer should therefore be dismissed.

That as to count (4) of the Co- Defendant's Ministry of Education Answer, Plaintiff says and submits that granted and not admitting said Institution was established August 1, 2000, and incorporated August 22, 2001, same does not in any way suggest that said school in operation or running a school semester. Plaintiff says that she is law abiding and that is why she obtained the necessary required documents in consonance with the Liberian Business Association Laws and as such, would not have done any thing contrary to law as alleged by co- Defendant Ministry of Education. Count (4) of the Answer should therefore be dismissed.

That as to count (5) and (6) of the Co- Defendant's Ministry of Education Answer, Plaintiff says and submits that said averments are ambiguous and incomprehensible because Plaintiff was granted letter of accreditation when all of its facilities had been inspected, as such, said accusation is muted and saturated with falsehood. Count ( 5) and (6) of the Answer should therefore be dismissed.

8   That as to count (7) and (8) of the Co- Defendant's Ministry of Education Answer, Plaintiff maintains and says that the intent and purpose of the Legislation has not been breached by Plaintiff nor has there been any point in time, Plaintiff had ever perpetrated fraud but instead, Plaintiff had met the pre-requisites as required and challenge Co- Defendant's Ministry of Education to authenticate by evidence said allegation. Plaintiff says the entire Co-Defendant's Ministry of Education Answer is saturated with falsehood and misrepresentation needless to say count(7) and (8) thereof, as such, same should be dismissed

That as to count (9) and (10) of Co- Defendant's Ministry of Education Answer, Plaintiff maintains and says that the relief sought for her complaint is germane and in consonance with the laws of the Republic of Liberia and therefore same should not be disturbed Further, Plaintiff contends and says that not gone contrary to any principles as may be required by Plaintiff to warrant the nullification of said Plaintiff's Articles of Incorporation, Letters of Accreditations and Legislative Enactment, especially without due process, Plaintiff challenges the legal validity of Co- Defendant's Ministry of Education as well as Co- Defendant's Ministry of Health and Social Welfare act denounce the existence of said Institution and the authenticate of Plaintiff's credentials which qualified Plaintiff to operate Medical school in Liberia. Count (9) and (10) of the Answer should therefore be dismissed.

0 That as to count (11) and (12) of the Co- Defendant's Ministry of Education Answer, Plaintiff says further that she maintains and re- confirms the entire Complaint that Co- Defendant's Ministry of Education along with Co- Defendant's Ministry of Health & Social Welfare should be held liable for the malicious and calculated plan perpetrated against Plaintiff to damage, defame and subject Plaintiff to public ridicule especially, without due process when indeed and intruth, Plaintiff met the pre- requisite to operation as an institution. Count (11) and (12) of the Answer should therefore be dismissed.

11. Plaintiff denies all and singular the allegation of both law and fact as are set forth and contained in Co- Defendant's Ministry of Education Answer count (1) thru (12) which have been made subject of special traverse.

WHEREOF, and in view of the foregoing, Plaintiff prays Your Honor and this Honorable Court to dismiss and deny Co- Defendant's Ministry of Education answer in its entirety, rule the cost against Co- Defendant and grant unto Plaintiff any and all further relief as the end of justice demand.

RECPECTFULLY SUBMITTED
The above named PLAINTIFF
By & thru her legal counsel
WEAH & ASSOCIATES LAW OFFICES
109 ASHMUN STREET, OPPOSITE TELECOM

Dated this 6th day of
October, A.D. 2006

ATTORNEYS AND COUNSELLOR-AT LAW

$4.00 Revenue stamp affixed
on the original copy.

REPUBLIC OF LIBERIA )
MONTSERRADO COUNTY)

IN THE OFFICE OF THE JUSTICE OF PEACE FOR
MONTSERRADO COUNTY, CITY OF MONROVIA,
LIBERIA

St. Luke School of Medicine )
Represented by and thru its President, Jerroll )
Dolphin and all of its officials/ authorized Agent )
     **PLAINTIFF** )
         )
   **VERSUS** )
         )
The Ministry of Health & Social Welfare, )
Represented by and thru its Minister and The )
Ministry of Education represented by and thru )
It's Minister and all of their principal Deputies, )
And all of those working under the scope of )
Authority Republic of Liberia. )
     **DEFENDANTS** )

**ACTION: DAMAGES FOR WRONG**

### PLAINTIFF'S AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, the undersigned, a duly qualified Justice of the Peace

for Montserrado County at my office in the City of Monrovia, Liberia Counsellor Ignatius N. Weah,

one of counsel of PLAINTIFF in the above entitled cause of action and made Oath according to the

law and facts as set forth and contained in the annexed **PLAINTIFF'S REPLY**, are true and

correct to the best of his knowledge and belief, and as these matters of information received, he

verify believes them to be true and correct

SWORN AND SUBSCRIBED TO BEFORE ME
THIS 6th DAY OF 6 Oct A D 2006

JUSTICE OF THE PEACE MONT CO. RL

CLLR. IGNATIUS N. WEAH ONE OF
COUNSEL FOR PLAINTIFF / DEPONENT

1 $ 3 00 Revenue stamp affixed on the original

# Exhibit 25 - SLSOM FILES RESPONDENT'S RESISTANCE

REPUBLIC OF LIBERIA)  IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY)  MONTSERRADO COUNTY, SITTING IN ITS SEPT. TERM, A.D. 2006

**BEFORE HIS HONOUR: EMERY S. PAYE, ....ASSIGNED CIRCUIT JUDGE**

| | |
|---|---|
| The Ministry of Health & Social )<br>Welfare, represented by & thru )<br>its Minister        MOVANT) | |
| **VERSUS** | **MOTION TO DISMISS** |
| St. Luke School of Medicine, )<br>represented by & thru its President, )<br>Jerroll Dolphin and all of its officials )<br>authorized Agents, all of the City of )<br>Monrovia, )<br>Liberia     **RESPONDENTS** ) | |

**GROWING OUT OF THE CASE:**

| | |
|---|---|
| St. Luke School of Medicine )<br>Represented by & thru its )<br>President. Jerroll Dolphin and all of )<br>its officials authorized Agents, all of )<br>the City of Monrovia, )<br>Liberia      **PLAINTIFF**) | |
| **VERSUS** | **ACTION OF DAMAGES FOR WRONG** |
| The Ministry of Health & Social )<br>Welfare, represented by and thru )<br>its Minister and the Minister of )<br>Education thru its Minister and all )<br>those working under the scope of )<br>authority. )<br>R.L      **DEFENDANTS**) | |

## MOVANT'S MOTION

MOVANT IN THE ABOVE ENTITLED CAUSE OF ACTION, most respectfully moves this Honourable Court for a dismissal of Respondent/Plaintiff's Action of Damages for Wrong and for the factual and legal reasons showeth as follows:

1.     That because Movant submits and contends that the Respondent St. Luke School of Medicine lacks legal capacity to institute any action in this Republic, said institute not being a lawful and legal entity operating under the laws of Liberia, and that the laws of Liberia cannot and will not condone, sanction support and ratify any illegality and nobody can benefit from its own illegal acts

2.     That the Respondent/Plaintiff being and having been falsely created by its 419 incorporators in persons of Dr. Jerroll Dolphin, Dr. Meinei Dukuly, Mr. Frank F. Teah as well as their PROVOST Dr. Peter Coleman, under the most dubious criminal circumstances, said institution cannot benefit from its own illegal acts, fraud and misrepresentation

3.     That because only the ministry of Foreign Affairs of the Republic of Liberia is authorized by law to publish all legislative enactments in HANDBILL and to approve articles of incorporation to establish legal entities under the Association Laws of Liberia; both the House of Representatives (NTLA) and the Foreign Ministry of Liberia having denied the legal existence of the so-called St. Luke School of Medicine within the Republic of Liberia, said bogus St. Luke School of Medicine cannot now benefit from its own illegality because, for what is not done legally is not done at all, and that Respondent in 419 institution/university organized by the gang of four fraud stars including Peter's Coleman, Meinei Dukuly, Jerroll Dolphin and Frank F. Teah, must be arrested for planning a time bomb to exterminate the entire population of Liberia by means of spreading medical virus as graduates of medical school or doctors.

4    That because Movant further prays court to order and declared null and void the articles of incorporation as well as the alleged legislative enactment which was never the end product of NTLA as alleged by Respondent/Plaintiff in its complaint. Movant gives notice that at trial he will produce copy of fake medical degree issued to the so-called graduates of St. Luke School of Medicine, even though, the school does not exist de jure and de facto. See attached copy of NTLA Report.

WHEREFORE, AND IN VIEW OF THE FOREGOING, MOVANT most respectfully prays court to deny and dismiss Respondent/Plaintiff's complaint in its entirety, rule costs of these proceedings against the Respondent, order the so-called St. Luke School of Medicine Closed, and grant unto Movant all further relief as Your Honour may deem just, legal, transparent and equitable in the instant.

 

Respectfully submitted,
The above named MOVANT,
By & thru its Legal Counsel,
TULAY & ASSOCIATES

_____
Fomba O. Sherif
COUNSEL-AT-LAW

Dated this 20th day of September AD 2006

$5.00 Revenue Stamps affixed on the Original.

## MOVANT'S AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, a duly qualified Justice of the Peace for and in Montserrado County, Republic of Liberia, at my office in the City of Monrovia, Liberia, Fomba O. Sherif, COUNSELLOR-AT-LAW and one of Counsel for MOVANT in the above entitled cause of Action and Made Oath according to law that all and singular the allegations of facts and law as are setforth and contained in the foregoing and annexed MOVANT'S MOTION TO DISMISS are true and correct to the best of his knowledge and belief, and as to those matters of information thereto relating as relied upon, he verily believes them to be true and correct.



_____
Fomba O. Sherif
COUNSELLOR-AT-LAW & ONE OF COUNSEL
FOR MOVANT. .DEPONENT/AFFIANT

SWORN AND SUBSCRIBED TO BEFORE ME AT THE OFFICE IN THE CITY OF MONROVIA, LIBERIA THIS 20th DAY OF SEPTEMBER AD 20

JUSTICE ................ MONT CO., R.L.

$5.00 Revenue Stamps affixed on the Original.

...**/ 2**

Movant Ministry of Health & Social Welfare to question the credibility and status of Plaintiff/ Respondent's Incorporators thus referred to them as criminals. Respondent/ Plaintiff contends and says that count (2) of the Motion being far from the truth and the crux of Plaintiff's Complaint should therefore be dismissed.

4. That as to count (3) and (4) of the Movant's Ministry of Health & Social Welfare Motion, Respondent/ Plaintiff frowns and contends at said averment and says that same should therefore be dismissed because said averment is a complete admission since indeed and intruth Movant has established that Plaintiff/ Respondent's Articles of Incorporation as well as the Legislative Enactment have not been revoked nor declared null and void by any courts of competent jurisdiction within the Republic of Liberia, since Movant now praying court to declare Plaintiff/ Respondent's Articles of Incorporation and the Legislative Enactment null and void. Count (3) and (4) of the Motion should therefore be dismissed.

5. Plaintiff/ Respondent denies all and singular the allegation of Movant's Motion counts (1) thru (4) which have not been made subject of special travers.

WHEREFORE, and in view of the foregoing, Respondent/ Plaintiff prays Your Honor to dismiss and deny Movant/ Defendant's Motion in its entirety and rule the cost of these proceedings against Movant/ Defendant and grant unto Respondent any and all further relief as the end of justice demand.

REPECTFULLY SUBMITTED;
The above named PLAINTIFF/ RESPONDENT
By and thru her Legal Counsel
WEAH AND ASSOCIATES LAW OFFICES
109 ASHMUN STREET, OPPOSITE TELECOM
MONROIA, LIBERIA.

**ATTORNEYS AND COUNSELLORS-AT-LAW**

Dated September 30, 2006.

$ 4.00 Revenue Stamp affixed to the
original copy.

REPUBLIC OF LIBERIA    )    IN THE OFFICE OF THE JUSTICE OF PEACE FOR
MONTSERRADO COUNTY)    MONTSERRADO COUNTY, CITY OF MONROVIA,
LIBERIA.

The Ministry of Health & Social Welfare,    )
Represented by and thru its Minister............)
................................................MOVANT )

**VERSUS**

St. Luke School of Medicine, represented by    )
and thru its President, Jerroll Dolphin and all    )
of its officials authorized Agent, all of the city)
of Monrovia, Liberia........RESPONDENTS  )

**MOTION TO DISMISS**

**GROWING OUT OT THE CASE:**

St. Luke School of Medicine    )
Represented by and thru its President, Jerroll    )
Dolphin and all of its officials/ authorized Agent    )
................................................PLAINTIFF  )

**VERSUS**

**ACTION: DAMAGES FOR WRONG**

The Ministry of Health & Social Welfare,    )
Represented by and thru its Minister and The    )
Ministry of Education, represented by and thru    )
It's Minister and all of their principal Deputies,    )
And all of those working under the scope of    )
Authority, Republic of Liberia,    )
................................................DEFENDANTS  )

**RESPONDENT'S AFFIDAVIT**

PRESONALLY APPEARED BEFORE ME, the undersigned, a duly qualified Justice of the Peace

for Montserrado County, at my office in the City of Monrovia, Liberia Counsellor Ignatius N. Weah,

one of counsel of RESPONDENT in the above entitled cause of action and made Oath according to the

law and facts as set forth and contained in the annexed RESPONDENT'S RESISTANCE, are true and

correct to the best of his knowledge and belief, and as these matters of information received, he

verify believes them to be true and correct.

SWORN AND SUBSCRIBED TO BEFORE ME
THIS ____ DAY OF ____ A.D. 2006

JUSTICE OF THE PEACE MONT. CO, RL

CLLR. IGNATIUS N. WEAH ONE OF
COUNSEL FOR RESPONDENT / DEPONENT

L $ 1.00 Revenue stamp affixed on the original

# Exhibit 26 - SLSOM FILES REQUEST FOR SUMMARY JUDGMENT

REPUBLIC OF LIBERIA)       IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY)   MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER
                                          TERM A.D. 2006.

BEFORE HIS HONOR, EMERY S. PAYE,  . . . . . . . .  ASSIGNED CIRCUIT JUDGE

St. Luke School of Medicine                     )
Represented by and thru its President, Jerroll  )
Dolphin and all of its officials/ authorized Agent )
Of the City of Monrovia, Liberia      MOVANT  )
                                                )   ACTION  MOTION FOR SUMMARY
            VERSUS                               )                  JUDGMENT
                                                )
The Ministry of Health & Social Welfare,         )
Represented by and thru its Minister and The    )
Ministry of Education, represented by and thru   )
It's Minister and all of those working under the )
scope of Authority,. . . . . . . . . . RESPONDENTS )

**GROWING OUT OT THE CASE:**

St. Luke School of Medicine                     )
Represented by and thru its President, Jerroll  )
Dolphin and all of its officials/ authorized Agent )
 . . . . .  . . . . . . . . . . . ..PLAINTIFF  )
                                                )   ACTION:  DAMAGES FOR WRONG
            VERSUS                               )
                                                )
The Ministry of Health & Social Welfare,         )
Represented by and thru its Minister and The    )
Ministry of Education, represented by and thru   )
It's Minister and all of their principal Deputies, )
And all of those working under the scope of      )
Authority, Republic of Liberia.                  )
 . . . . . . . . . . . . . . .  DEFENDANTS  )

## MOVANT'S MOTION

Movant in the above entitled cause of action, most respectfully moves this Honorable
Court in manner and form as follow, to wit: -

1. Movant is Plaintiff in an Action of Damages for Wrong which is pending before
   this Honorable Court undetermined. Movant request Your Honor to take judicial
   notice of records in the case file.

2. Movant says and avers that Summary Judgment will lie since indeed and intruth
   Respondent herein are government institution which ought to be concise on the
   subject proceedings, but because Co- Respondent Ministry of Education admitted
   and agreed that indeed Movant/ Plaintiff met the pre- requisite to operate Medical
   School since indeed Movant secured her Articles of Incorporation, Letters of
   Accreditations from the appropriate government agencies and a Legislative
   Enactment which Co- Respondent Ministry of Education did not deny while Co-
   Respondent Ministry of Health & Social Welfare conceded that due process has
   not been accorded Movant/ Plaintiff and therefore same suggests that it was
   erroneous and illegal to declare Movant/ Plaintiff's Institution bogus and closed
   same down without due process, especially in the face of all those relevant
   documents

3. Further above, Movant/ Plaintiff says and submits that summary judgment will lie because Co- Respondent Ministry of Education failed, refused and neglected to traverse on any of the counts in Plaintiff's Complaint nor made a general denial but instead made a naked and empty statement as though she was the complainant while Co- Respondent Ministry of Health & Social Welfare admitted that even though President Taylor signed said Enactment empowering Plaintiff to operate a medical school but did so under international pressure, as such, in-as-much President Taylor was in power what ever function was exercised by him during his tendency, same was legal and genuine, therefore, the Act empowering Plaintiff to operate cannot be questioned.

4. Movant/ Plaintiff says and submits the averments put forth in Defendants/ Respondents ought to be collaborative and concise but same is the contrary, in that, at one point of time Co- Respondent Ministry of Education admitting to the authenticity of Movant/ Plaintiff's credentials but argued that because Plaintiff does not have school yard while Co- Respondent Ministry of Health & Social Welfare agrees in principal that indeed President Taylor did signed or approved said Bill Enacting Plaintiff's institution to operate as medical school but claim same was done under international pressure, and also agreed that those who duly accredited Movant/ Plaintiff was authorized to do so but did same under a organized scheme. The question is granted and not admitting that same is true, were is the findings that established that those who accredited Movant/ Plaintiff did so clandestinely? Where are the records to show that indeed Movant/ Plaintiff was accorded due process as made and provided by operation of law, that is, which court of competent jurisdiction has adjudged Plaintiff/ Movant liable or guilty for such a bogus and misleading allegation? The failure on the part of Defendants/ Respondents to so do, same constitutes an admission and therefore Summary Judgment will lie.

5. Movant/ Plaintiff says this Motion is filed in good fate and not to baffle speedy trial.

WHEREFORE, and in view of the foregoing, Movant/ Plaintiff request Your Honor to grant her Motion of Summary Judgment against Co- Respondent/ Co- Defendant herein and hold her liable to Plaintiff and grant unto Movant/ Plaintiff any and all further relief as the end of justice demand.

RESPECTFULLY SUBMITTED
The above named PLAINTIFF
By & thru her legal counsel
WEAH & ASSOCIATES LAW OFFICES
109 ASHMUN STREET, OPPOSITE TELECOM.

Dated this 10th day of
October A D 2006

ATTORNEYS AND COUNSELLOR-AT-LAW

$4.00 Revenue stamp affixed
on the original copy.



REPUBLIC OF LIBERIA          )          IN THE OFFICE OF THE JUSTICE OF PEACE FOR
MONTSERRADO COUNTY)                    MONTSERRADO COUNTY CITY OF MONROVIA
                                       LIBERIA

St. Luke School of Medicine                    )
Represented by and thru its President, Jerroll )
Dolphin and all of its officials/ authorized Agent )
Of the City of Monrovia, Liberia      MOVANT  )
                                               )
            VERSUS                             )     ACTION:  MOTION FOR SUMMARY
                                               )              JUDGMENT
                                               )
The Ministry of Health & Social Welfare,       )
Represented by and thru its Minister and The   )
Ministry of Education, represented by and thru )
It's Minister and all of those working under the )
scope of Authority,.....     RESPONDENTS       )

**GROWING OUT OT THE CASE:**

St. Luke School of Medicine                    )
Represented by and thru its President, Jerroll )
Dolphin and all of its officials/ authorized Agent )
. . . . . . . . . . . .     . . . .   MOVANT  )
                                               )
            VERSUS                             )     ACTION:  DAMAGES FOR WRONG
                                               )
The Ministry of Health & Social Welfare,       )
Represented by and thru its Minister and The   )
Ministry of Education, represented by and thru )
It's Minister and all of their principal Deputies, )
And all of those working under the scope of    )
Authority  Republic of Liberia,                )
                             DEFENDANTS        )
. . .   . .

## MOVANT'S AFFIDAVIT

PRESONALLY APPEARED BEFORE ME, the undersigned, a duly qualified Justice of the Peace

for Montserrado County, at my office in the City of Monrovia, Liberia Counsellor Ignatius N. Weah,

one of counsel for MOVANT in the above entitled cause of action and made Oath according to the

law and facts as set forth and contained in the annexed MOVANT'S MOTION, are true and

correct to the best of his knowledge and belief, and as these matters of information received, he

verify believes them to be true and correct

SWORN AND SUBSCRIBED BEFORE ME
THIS _____ DAY _____ A.D. 2006

JUSTICE OF THE PEACE MONT. CO. RL.

CLLR. IGNATIUS N WEAH ONE OF
COUNSEL FOR MOVANT / DEPONENT

L.$ 3.00 Revenue stamp affixed on the original

# Exhibit 27 - MINISTRY OF EDUCATION WITHDRAWAL

REPUBLIC OF LIBERIA        IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT
MONTSERRADO COUNTY ;     MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER
                         TERM A. D. 2006

BEFOR HIS HONOR _____ EMERY'S PAYE____ _____ASSIGNED CIRCUIT JUDGE

| | | |
|---|---|---|
| The Ministry of Health & Social | ) | |
| Welfare, represented by & thru | ) | |
| its Minister          **MOVANT** | ) | |
| | ) | |
| VERSUS | ; | **ACTION: ___ DAMAGES FOR WRONG** |
| | ) | |
| St. Luke School of Medicine, | ) | |
| Represented by and thru its President | ) | |
| Jerrold Dolphine and all of its officials | ) | |
| Authorized Agents, all of the City of | ) | |
| Monrovia, | ) | |
| Republic of Liberia _ _     **RESPONDENTS** ) | | |

## CO DEFENDANT NOTICE OF WITHDRAWAL

The Clerk of Court
Sixth Judicial Circuit
Montserrado County
Temple of Justice Building
Monrovia, Liberia

Dear Madam Clerk

Upon the receipt of these our Notice of Withdrawal, you will please spread upon records of this
Honorable Court that the within named Co Defendant Ministry of Education have withdrawn their
answer with the reservation to re file

**BY SO DOING,** this shall constitute your legal and sufficient authority

Respectfully submitted,
The within named Co-Defendant
By and thru it Legal Counsel and NEALA and
this _____ ___ ___ day of October A. D. 2006

Vianna J. Blama
**ATTORNEY  AT - LAW**

# Exhibit 28 - SLSOM REQUEST FOR CLERK'S CERTIFICATE"
## (Default Certificate)

REPUBLIC OF LIBERIA ) IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT, MONTSERRADO
MONTSERRADO COUNTY ) COUNTY, SITTING IN ITS SEPTEMBER TERM A. D. 2006.

BEFORE HIS HONOUR: EMERY S. PAYE,..........................ASSIGNED CIRCUIT JUDGE:

St. Luke School of Medicine
Represented by and thru its President,
Jerroll Delphin and all of its officials
/authorized Agent...................PLAINTIFF )

            Versus                           )      ACTION:   DAMAGES FOR WRONG
                                             )
The Ministry of Health & Social Welfare,     )
Represented by and thru its Minister and     )
the Ministry of Education, represented       )
by and thru its Minister and all of their    )
principal Deputies, and all of those         )
working under their aegis of authority       )
...............................DEFENDANTS )

### REQUEST FOR CLERK'S CERTIFICATE

The Clerk of Court
Civil Law Court
Sixth Judicial Circuit
Montserrado County
Liberia

Madam Clerk of Court:

    You will please take due and timely notice of the above captioned case
and spread upon the records of this Honourable Court that eventhough the Co-
Defendant, Ministry of Education, had filed an Amended Answer but refused,
failed and neglected to file an withdrawal of previous Answer and from careful
perusal of the case file, there is no Withdrawal therein in support of said
Amended Answer.

    Hence, our request for Clerk Certificate.

    AND FOR SO DOING, THIS SHALL CONSTITUTEGM YOUR LEGAL AND SUFFICIENT
AUTHORITY.

                        RESPECTFULLY SUBMITTED:
                        The above named PLAINTIFF
                        By & Thru her Legal Counsel
                        WEAH AND ASSOCIATES LAW OFFICES
                        109 ASHMUN STREET, OPPOSITE TELECOM.
                        MONROVIA, LIBERIA.


                        _____
                        ATTORNEYS AND COUNSELLOWS-AT-LAW

REPUBLIC OF LIBERIA      )    IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT
MONTSERRADO COUNTY )    MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER
                                        TERM A.D. 2006.

BEFOR HIS HONOR:    EMERY'S PAYE................ASSIGNED CIRCUIT JUDGE

The Ministry of Health & Social          )
Welfare, represented by & thru           )
Its Minister....................MOVANT    )
                                          )
         VERSUS                           )    **ACTION:    DAMAGES FOR WRONG**
                                          )
St. Luke School of Medicine,              )
Represented by and thru its President,    )
Jerroll Dolphine and all of its officials )
Authorized Agents, all of the City of*    )
Monrovia,                                 )
Republic of Liberia............**RESPONDENTS** )

## CO-DEFENDANT NOTICE OF WITHDRAWAL

The Clerk of Court
Sixth Judicial Circuit
Montserrado County
Temple of Justice Building
Monrovia, Liberia

Dear Madam Clerk:

Upon the receipt of these our Notice of Withdrawal, you will please spread upon records of this
Honorable Court that the within named Co-Defendant, Ministry of Education have withdrawn their
Answer with the reservation to re-file.

**BY SO DOING,** this shall constitute your legal and sufficient authority

Respectfully submitted,
The within named Co-Defendant
By and thru it Legal Counsel and NEALA and
This _____ day of October, A.D. 2006

Viama J. Blama
**ATTORNEY - AT - LAW**

# Exhibit 29 - SLSOM FILES MOTION FOR BARE DENIAL

REPUBLIC OF LIBERIA)      IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY)      MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER
                          TERM A. D. 2006.

BEFORE HIS HONOR, EMERY S. PAYE                    ........ ASSIGNED CIRCUIT JUDGE

St. Luke School of Medicine                              )
Represented by and thru its President, Jerroll           )
Dolphin and all of its officials/ authorized Agent       )
Of the City of Monrovia, Liberia ....  .MOVANT           )
                                                         )
                VERSUS                                   )    ACTION.  MOTION FOR BARE DENIAL
                                                         )
                                                         )
The Ministry of Health & Social Welfare,                 )
Represented by and thru its Minister and all of its      )
Principal Deputies, and all of those working under       )
the scope of Authority, Republic of Liberia              )
....................... .......   RESPONDENT             )

GROWING OUT OT THE CASE:

St. Luke School of Medicine                              )
Represented by and thru its President, Jerroll           )
Dolphin and all of its officials/ authorized Agent       )
..... .... ..... ............ .PLAINTIFF                 )
                                                         )
                VERSUS                                   )    ACTION.  DAMAGES FOR WRONG
                                                         )
The Ministry of Health & Social Welfare,                 )
Represented by and thru its Minister and The             )
Ministry of Education, represented by and thru           )
It's Minister and all of their principal Deputies,       )
And all of those working under the scope of              )
Authority, Republic of Liberia,                          )
.... ...... ........ .. .. ......DEFENDANTS              )

## MOVANT'S MOTION

Movant, St. Luke School of Medicine, in the above entitled proceedings moves this Honorable court to rule Respondent Ministry of Health & Social Welfare to bare denial in manner and form as follow, to wit: -

1  Movant is Plaintiff in an action of Damages for Wrong, which was filed on the 15th day of September A. D. 2006 which Complaint is still pending before this Honorable court undetermined. Movant request Your Honor to take judicial notice of the case file.

2. Movant says and submits that on the 18th day of October A. D. 2006, she received copy of a notice of withdrawal from the Respondent Ministry of Health & Social Welfare by and thru one of counsels for Ministry of Education who also served other documents on the same date on Movant and was duly receipted, Since both institutions are principal Defendants and Government Institutions. Photo copy of the notice of withdrawal from the Ministry of Health & Social Welfare is herewith attached, marked exhibit P/1 to form part of this Motion.

3  Movant contends and says that since the filing of said Notice of Withdrawal, same being over ten (10) days as required by law for Respondent Ministry of Health &

Social Welfare to file her Amended Answer but since then, she has refused, failed and neglected to file same, as such, Movant obtained a Clerk Certificate to that effect, and since then upto- date, Respondent has not filed any Amended Answer. Photo copy of the Clerk Certificate is herewith attached, marked exhibit M/ 2 to form part of this Motion.

4. Movant says that this Motion is filed in good fate and not to baffle speedy trial

WHEREFORE, and in view of the foregoing, Movant prays Your Honor to rule Respondent Ministry of Health & Social Welfare to bare denial and grant unto Movant any and all further relief as the end of justice demand.

RESPECTFULLY SUBMITTED
The above named PLAINTIFF
By & thru her legal counsel
WEAH & ASSOCIATES LAW OFFICES
109 ASHMUN STREET, OPPOSITE TELECOM.

Dated this _____ day of
October A D 2006

ATTORNEYS AND COUNSELLOR-AT-LAW

$4.00 Revenue stamp affixed
on the original copy.

REPUBLIC OF LIBERIA)     IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY)    MONTSERRADO COUNTY SITTING IN ITS SEPTEMBER
                             TERM A. D 2006

BEFORE HIS HONOR, EMERY S. PAYE .............. ASSIGNED CIRCUIT JUDGE

| | | |
|---|---|---|
| The Ministry of Health & Social Welfare | ) | |
| Represented by and thru its Minister | ) | |
|          **MOVANT** | ) | |
| | ) | **MOTION TO DISMISS** |
| **VERSUS** | ) | |
| | ) | |
| St. Luke School of Medicine | ) | |
| Represented by and thru its President, Jerroll | ) | |
| Dolphin and all of its officials/ authorized Agent | ) | |
| Of the City of Monrovia, Liberia . RESPONDENTS | ) | |

## GROWING OUT OF THE CASE :
•

| | | |
|---|---|---|
| St. Luke School of Medicine | ) | |
| Represented by and thru its President, Jerroll | ) | |
| Dolphin and all of its officials/ authorized Agent | ) | |
| Of the City of Monrovia, Liberia . ...PLAINTIFF | ) | |
| | ) | |
| **VERSUS** | ) | **ACTION DAMAGES FOR WRONG** |
| | ) | |
| The Ministry of Health & Social Welfare, | ) | |
| Represented by and thru its Minister and The | ) | |
| Ministry of Education, represented by and thru | ) | |
| It's Minister and all of their principal Deputies, | ) | |
| And all of those working under the scope of | ) | |
| Authority, Republic of Liberia, | ) | |
|          .....DEFENDANTS | ) | |

## RESPONDENT'S RESISTANCE

Respondent in the above entitled proceedings most respectfully resists, Movant's
Ministry of Health & Social Welfare Motion in manner and form as follow, to wit: -

1. That as to the entire Movant's Ministry of Health & Social Welfare Motion,
Respondents says same should crumble and fall, in that, under our law, a Motion must
emanate from a main suit but Respondents have observed that since the withdrawal of
Movant's Ministry of Health & Social Welfare Answer from the court, same been
over ten (10) days as made and provided by statute, she has failed, refused and
neglected to file any Amended Answer since then upto and including the filing of this
Motion. Respondents request Your Honor to take judicial notice of the case file.

2. Further above, Respondents says that by virtue of Movant's Ministry of Health &
Social Welfare withdrawal of her Answer, but subsequently failed to file an Amended
Answer since then upto and including the filing of this Motion, same suggests that
there is no Answer before Court since the Respondent's/ Plaintiff's Complaint was
filed, that is, in favor of Co- Defendant's/ Movant's Ministry of Health & Social
Welfare, of course, Movant is subject to bare denial, and as such, cannot raise law
issues. Hence, the so- called Motion to dismiss should be dismissed.

3. Further above, Respondents says that said Motion cannot stand as stated above and in addition hereto, said Motion does not have a covering Affidavit as can be seen from the case file, as such, the entire Motion must be dismissed

4. That as to count (1), (2), (3) and (4) of Movant's Ministry of Health & Social Welfare Motion, Respondent says said counts are misleading and misrepresentation of the facts, something far from reality, and therefore, the entire Motion Should be dismissed; needless to say, count (1), (2), (3) and (4) thereof; hence, Respondents/ Plaintiff maintains and reconfirms counts (1) thru (5) of her complaint and says same should not be disturbed.

5. Respondents deny all and singular the allegation contained in Movant's Ministry of Health & Social Welfare Motion, in that, count (1) thru (4) which have not been made subject of special traverse.

WHEREFORE, and in view of the foregoing, Respondent pray Your Honor to dismiss Movant's Ministry of Health &-Social Welfare Motion, in its entirety and rule the cost therefrom against Movant and grant unto Respondents all further relief as the end of justice demand.

RESPECTFULLY SUBMITTED
The above named PLAINTIFF
By & thru her legal counsel
WEAH & ASSOCIATES LAW OFFICES
109 ASHMUN STREET, OPPOSITE TELECOM.

Dated this 30ᴿ day of
October A D 2006

ATTORNEYS AND COUNSELLOR-AT-LAW

$4 00 Revenue stamp affixed
on the original copy.

# Exhibit 30 - Liberia Government Defaults-Liberia Civil Law Court Issues Default Certificate to SLSOM

REPUBLIC OF LIBERIA )IN THE SIXTH JUDICIA L CIRCUIT, CIVIL LAW COURT FOR
MONTSERRADO COUNTY )MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER TERM,
)A.D. 2006.

BEFORE HIS HONOUR: EMERY S. PAYE..............ASSIGNED CIRCUIT JUDGE

IN RE: St. Luke School of Medicine, represented          ACTION:
by and thru its President, Jerrell Dolphin
and all of its officials/authorised Agent
of the City of Monrovia, Liberia...PLAINTIFF       )
VERSUS                                             ) DAMAGES FOR
                                                   ) WRONG.
The Ministry of Health & Social Welfare, re-       )
presented by and thru its Minister and the Min-    )
istry of Education, represented by and thru its    )
Minister and all of their Deputies, a nd all of    )
those working under the scope of authority, Re-    )
public of Liberia .....................DEFENDANTS  )

## CLERK'S CERTIFICATE

AN INSPECTION OF THE CASE FILE IN THE ABOVE CAPTIONED CAUSE OF ACTION
REVEALS THAT THE NOTICE OF WITHDRAWAL CARRIES THE MINISTRY OF HEALTH
& SOCIAL WELFARE EXCLUSIVELY/AS MOVANT, WHILE THE AVERMENT CARRIES THE MINISTRY
OF EDUCATION AS CO-DEFENDANT, UP TO AND INCLUDING THE ISSUANCE OF THIS
CLERK'S CERTIFICATE.

HENCE, THIS CLERK'S CERTIFICATE.

GIVEN UNDER OUR HANDS AND SEAL OF COURT,
THIS 30TH DAY OF OCTOBER, A.D. 2006.

COURT'S SEAL:

Victor G. Gailor, ASST. CLERK, SIXTH JUDICIAL
CIRCUIT, CIVIL LAW COURT, MONT. CO., R. L.

ATTESTED:

Nancy Washington, Clerk, Files & Records, Civil Law Court,

Margaret Browne, Asst. Clerk, Files & Records, Civil Law Court.

# Exhibit 31 - LEGISLATIVE ENACTMENT

AN ACT

TO

INCORPORATE

ST. LUKE SCHOOL OF MEDICINE (SLSOM)

OF

THE CITY OF MONROVIA

MONTSERRADO COUNTY
REPUBLIC OF LIBERIA

AND TO GRANT IT A CHARTER

BY
THE NATIONAL LEGISLATURE
OF THE
REPUBLIC OF LIBERIA

APPROVED APRIL 24, 2003

PUBLISHED BY AUTHORITY
MINISTRY OF FOREIGN AFFAIRS
August 8, 2003

WELCOME TO ST. LUKE
SCHOOL OF MEDICINE (SLSOM)

# AN ACT TO INCORPORATE

## ST. LUKE SCHOOL OF MEDICINE (SLSOM)

OF

### THE CITY OF MONROVIA

MONTSERRADO COUNTY
REPUBLIC OF LIBERIA

AND TO GRANT (SLSOM) A CHARTER
IT IS ENACTED BY THE NATIONAL LEGISLATURE
OF THE
REPUBLIC OF LIBERIA, IN LEGISLATURE ASSEMBLED

**SECTION 1:**          **ARTICLE  I**

ST. LUKE SCHOOL OF MEDICINE WAS ESTABLISHED AUGUST 1, 2000, AND INCORPORATED AUGUST 22nd , 2001 IN THE CITY OF MONROVIA, MONTSERRADO COUNTY, REPUBLIC OF LIBERIA, IS HEREBY ESTABLISHED IN THE NAME OF ST. LUKE SCHOOL OF MEDICINE INCORPORATED (SLSOM), BY AND THROUGH ITS FOUNDERS, DR. JERROLL DOLPHIN, PRESIDENT, BON. FRANK E. TEAH JR., VICE PRESIDENT, AND DR. MEDAEI DUKULY, DEAN OF ACADEMIC AFFAIRS. SAID SCHOOL IS HEREBY FURTHER GRANTED THIS CHARTER, WHICH ENDOWS IT WITH ALL THE RIGHTS, PRIVILEGES AND BENEFITS EXISTING IN SIMILAR INSTITUTIONS OF HIGHER LEARNING WITHIN THIS REPUBLIC, AND SHALL HENCEFORTH BE KNOWN BY THE NAME AND TITLE "ST. LUKE SCHOOL OF MEDICINE"

**SECTION 2: LEGAL STATUS**

THE ST. LUKE SCHOOL OF MEDICINE (SLSOM) IS HEREBY MADE A LEGAL AND CORPORATE ENTITY WITH PERPETUAL SUCCESSION, AND SHALL HAVE THE AUTHORITY TO CONTACT, SUE AND BE SUED, PLEAD AND BE IMPLEADED IN ANY COURT OF COMPETENT JURISDICTION WITHIN THE REPUBLIC, TO PURCHASE OR OTHERWISE ACQUIRE AND HOLD PROPERTY, REAL AND MIXED UP TO THE VALUE OF ONE HUNDRED AND FIFTY MILLION UNITED STATES DOLLARS (US\$150,000,000; THE SAID ST. LUKE SCHOOL OF MEDICINE (SLSOM) SHALL BE PERPETUALLY MAINTAINED IN THE REPUBLIC FOR MEDICAL EDUCATION OF THE PEOPLE OF THIS NATION, PEOPLE OF THE OTHER COUNTRIES AND FOR WHO MAY HAVE THE CAPACITY TO SEEK MEDICAL EDUCATION.

-1-

# ARTICLE III
## TRUSTEE BOARD

### SECTION I

The governance of St. Luke School of medicine (SLSOM) shall be vested in the trustee board, which is hereby made a corporate body under the name and style of the trustees of St. Luke School of Medicine (SLSOM) with perpetual succession of members to be chosen and appointed as herein provided in this charter.

### SECTION II
### COMPOSITION OF THE BOARD

The board shall be composed of members appointed by the founders of St. Luke School of Medicine (SLSOM). The members appointed shall be seven(7) and they shall serve for the period of four(4) years. The minister of Health of the Republic of Liberia shall serve as provost.

### SECTION III
### QUORUM

A quorum shall consist of five(5) Board Members, including the Chairman.

### SECTION IV
### POWERS AND DUTIES OF THE TRUSTEES BOARD

The Trustees Board of St. Luke School of Medicine(SLSOM) shall exercise the following powers and perform the following duties in accordance with the objectives of St. Luke School of Medicine(SLSOM).

• to make and use a common seal and to alter same at its pleasure.

• To provide a faculty, establish procedures and standard control regulations and control the functioning of St. Luke School of Medicine(SLSOM). To grant degrees appropriate for St. Luke School of Medicine.

To take gift, grant, devise purchase or otherwise acquire real property and hold same or to sell, let, invest and re-vest or in any lawful manner manage such property for the benefit of St. Luke School of Medicine(SLSOM). Income therefrom to be applied to the endowment and support of the ST. LUKE School Of Medicine (SLSOM) and in such manner, as shall most effectively promote the interest of the St. Luke school of medicine (SLSOM), the growth of the St Luke School of Medicine (SLSOM) and improvement of its faculty and student body.

-3-

# ARTICLE II

## MEDICAL EDUCATION MISSION STATEMENT

### SECTION I

St. Luke School of Medicine has two major goals for its graduates; that they broadly and liberally educated men and women, and that they view medicine as a socially responsible human service profession.

St. Luke School of Medicine seeks students, who regard medicine as a noble profession rather than a trade to be learned, as a humanitarian pursuit, as well as a scholarly discipline, and as a unique lifetime experience. St. Luke School of Medicine, graduates must be well-rounded, scientifically grounded, but also capable of approaching problems from a variety of perspectives, drawing upon the renfmed of analysis of the humanities, the social scientist and the behavioral scientist. St. Luke School of Medicine intend that our students follow in the tradition of medicine, placing the welfare of their patients and society above self-interest. St. Luke School of Medicine teaches its students to prepare to meet the technologic innovations of the present and future.

St. Luke School of Medicine ensures that it's M.D. recipients are exposed to a wide, sensitizing view of the human condition from both historical and contemporary perspectives. The result is a "liberal" medical supported by the entire faculty of a great instruction which does honor to the great disciple from the Medical School derives its name. This is our education mission.

To these aims we do strive.
June, 1998

-2-

- To inter into and execute and contracts and agreement, to mortgage real and personal property and, in pursuance thereof air debts, bills of sale or other instruments in writing sealed with the common seal of the Board of trustees of the St. Luke School of medicine and signed by its order shall be considered in law as the act of the said Board of Trustees, when made in its corporate name.

- To sue and be sued, to plead and be impleaded against in all action and to prosecute the same as necessary to final judgement and executive in the name of the St. Luke School of Medicine (SLSOM).

- To approve the appointment of the Deans and Directors of various departments and other members of the faculty and staff upon nomination by the President of the St. Luke School of Medicine (SLSOM).

- To make such by-laws, rules and regulations as may be necessary for itself and for the efficient governance of the St. Luke School of Medicine.

- To confer the usual academic honor and degrees granted to similar institutions upon recommendation of the faculty through the President of St. Luke School of Medicine (SLSOM) and to confer honorary degrees upon the recommendation of the President of the St. Luke School of Medicine (SLSOM) and approve by the Board of Trustees

- To do all other things laid within its by-laws and constitutions not inconsistent with this Charter and the Constitutions of the Republic of Liberia and to do all other acts necessary and expedient for the administration of the affairs and attainment of the purposes of the St. Luke School of Medicine(SLSOM) or similar non-profit making organizations.

- To elect its officers and members and to establish its standing and special committee.

To approve the annual budget of the St. Luke School of Medicine(SLSOM) as prepared and submitted by the President of St. Luke School of Medicine.

## SECTION 11

The Board of Trustees of St. Luke School of medicine may acquire public funds in the various counties and districts of the Republic of Liberia when necessary, as land grants, from the government of the Republic of Liberia, free of all charges and assessments for the furtherance of the objectives of the St. Luke School of Medicine (SLSOM) and its various departments.

## ARTICLE IV

## DUTIES OF THE PRESIDENT

SECTION 1.

1. The president of the St. Luke School of Medicine(SLSOM) shall be nominated by the Founders and be confirmed by the Board of Trustees.

2. The president shall, in consultation with and upon the advice of the Founder, have authority. The affairs of the St. Luke School of Medicine(SLSOM) within the framework of the charter, by-laws, regulations, and establish policies of St. Luke School of Medicine(SLSOM). He shall submit to the board of Trustees through the Founders, and Annual Report covering the activities of the St. Luke School of Medicine(SLSOM).

3. The president of the St. Luke School of Medicine(SLSOM), after consultation with and upon prior approval of the Founders, shall nominate to the Board of Trustees such members of the faculty as may be required to carry out the work of the St. Luke School of Medicine. Vice President, Deans and/or Directors of the Various departments and other members of the Faculty for their consideration and approval.

4. The President of the St. Luke School of Medicine, in consultation with the founders, shall prepare and submit an Annual Budget, covering the expenditure of all institutional operations, to the Board of Trustees for their consideration and approval

# ARTICLE VII

## COMPOSITION OF THE ST. LUKE SCHOOL OF MEDICINE

The following Divisions and Departments shall constitute the instructional program of St. Luke School of Medicine.

a) Academic Affairs (Basic Science and Clinical Science)

b) Administrative Affairs (Management and Control)

c) Financial Affairs (Fund Raising)

d) Research and Development (General/ Community Health)

## ARTICLE VIII

## EXEMPTION FROM TAXATION

All properties acquired by and given or donated to the St. Luke School of Medicine, including merchandise, furniture, fixtures, building materials and equipments of all kind, as well as all kinds of books and literature and real estate purchased by the institution or donated to it, shall be tax exempt at all times.

## ARTICLE IX

## MISCELLANEOUS

### SECTION:

1. This Charter may be amended by the Legislature of the Republic of Liberia upon application to them by and through the Founder of the St. Luke School of Medicine(SLSOM), passed by a two-third vote of the said Board of Trustees during a regular meeting of the Board of Trustees.

2. If any provision of this Charter conflicts with any provision of the Constitution of Liberia then said Charter provision shall be declared null and void and be unenforceable without impairing the validity of the remaining provisions.

3. This Act shall take effect immediately upon publication in hand bills.

### Any Law To The Contrary Notwithstanding

-5-

Exhibit 32 - Pictures of the SLSOM Gaye Town Campus before Renovation, November 2004



















Exhibit 33 - Pictures of SLSOM Gaye Town Campus after Renovation, Circa March 2005







# Exhibit 34 - Partial Transcript of Ministry of Health Letter to India Consulate General

March 16, 2005

Consul General of the Republic of India

Dear Consulate:

We are in receipt of your letter dated ............  This is our answer to the question posed.

St. Luke Medical College does not exist; however, St. Luke School of Medicine does exist.

St. Luke School of Medicine filed for a temporary permit to operate in 2001.  St. Luke School of Medicine was granted a temporary permit to operate a University from the Ministry of Education, National Commission on Higher Education.  St Luke School of Medicine also received an enactment from the Liberian legislature to operate a university. The school is also recognized by the World Health Organization.

Presently, St. Luke is recognized by the government of Liberia.  Moreover, St. Luke School of Medicine is going through the process of reaccredidation.  The National Commission on Higher Education has issued an attestation to the school.  St. Luke School of Medicine is now waiting to receive a new permit to operate.

I thank you for your inquiry.

Sincerely yours,

# Exhibit 35 – SLSOM Invitation to the LMB for Inspection of its Campus

March 8, 2005

Horatius Brown, M.D.
Chairman, Liberian Medical Board
Ministry of Health and Social Welfare
Capital Bypass
Monrovia, Liberia

### INSPECTION INVITATION

Dear Dr. Brown,

On behalf of the Board of Trustees and administrators of St. Luke School of Medicine (SLSOM), I invite the Liberian Medical Board to inspect the SLSOM campus in Monrovia for accreditation. This campus is located at Gaytown, Sinkor, Old Road, behind the University of Liberia Professor's Housing Quarters.

SLSOM will limit the number of students on the campus to 50 until the second half of the building, which has four (4) more classrooms, is renovated. At which time, SLSOM will ask the Liberian Medical Board to allow it to increase its enrollment to 100 students. The expected date of completion of the final phase of renovation is in April 2005.

SLSOM will continue to build its modern library and computer facilities. SLSOM has over 500 new volumes of medical and nursing books, CD-ROMS, and software. SLSOM has eight (8) computers, ten (10) new 1500X microscopes, with stains, solvents, solutions, and other equipment. SLSOM's CD-ROM collection includes some 22 approved courses of interactive learning at the university and graduate levels. SLSOM expects to have approximately 700 new volumes of medical and nursing literature by April 2005.

St. Luke School of Medicine wishes to be a working partner in higher education for the advancement of Liberia. It is with great pleasure that the administrators of the School of Medicine of St. Luke School of Medicine invite the Liberian Medical Board to inspect its facilities at its first opportunity to do so.

Detailed arrangements for this inspection can be made with myself at 05-670125, or Ms. Grace Dorbor, B.Sc., R.N., the Nursing Program Manager. Her telephone number is 540318.

This invitation is duly submitted and ratified, signified by the St. Luke School of Medicine insignia, below.




Jerroll B. R. Dolphin, M.D., M.Sc.
President, St. Luke School of Medicine

Exhibits in Complaint for Damages for Wrong

# Exhibit 36 – SLSOM Curriculum

**SLSOM Online Curriculum**

The St. Luke School of Medicine online curriculum began in April 2001 by Dr. Jerroll Dolphin from his own medical school notes. Its creation was a solution to the idea that medical students in both basic science and clinical clerkship may need supplemental instruction in state of the art medicine and science. The first courses online were the 1st Trimester courses: Human Anatomy, Physiology, Histology, Embryology, and Biostatistics. Over the next year and a half, the 2nd, 3rd, and 4th Trimester courses were added. At that time, the end of 2002, St. Luke School of Medicine was the first medical school worldwide with a curriculum completely online.

Many organizations objected to learning medicine online, saying that medicine cannot and should not be be taught online. St. Luke School of Medicine's philosophy supporting the development and use of online medical curriculum is that:

1. SLSOM's medical students are intelligent and bright;
2. An online curriculum supplements classroom instruction;
3. An online curriculum reduces the time and effort of student note taking;
4. An online curriculum helps the medical student focus on learning in class and increases memory retention;
5. An online curriculum lesson can be repeated as many times as necessary to assist the medical student's learning;
6. Online demonstrations, laboratory experiments, and interactive learning increase the medical students' learning efficiency;
7. Online information is ever increasing and developing as well as being easily assessable;
8. The need for classroom instruction is reduced;
9. The number of professors required to teach is reduce;
10. Laboratory sessions can be more intensive in training when routine fundamental experiments can be performed or simulated online, repeatedly.

Since St. Luke School of Medicine's posted its online curriculum in 2001, many medical schools have developed an online curriculum such as the University of California, University of Utah, Harvard University, Stanford University, Duke University, the University of Glascow, and many others. However, they refer their online curriculum as 'independent study'.

Many states, medical licensing agencies, etc., in many countries have stated that they will not accept or disqualify applications for licensing if doctors have received any training as

distance learning or online. Those 'name' medical schools make classroom attendance "optional" and not a requirement for learning. However, the licensing agencies the other way when it comes to licensing graduates of 'name' medical schools. The trend in modern medical education, however, is not to reduce online instruction, but to increase the number of courses available for online instruction and improve its quality and content.

St. Luke School of Medicine's examinations are also online. In the beginning, the examinations were written in Microsoft Word. They were 'paper' exams. The medical student would take the examination and send it to SLSOM's office for grading. With experience, SLSOM MS Word examinations became 'paperless' and the medical student would return the examinations to SLSOM's Exam Coordinator by e-mail for grading. In 2004, St. Luke School of Medicine started converting all of its examinations to completely online system where each exam is taken online. When the medical student finishes the examination, it is automatically scored, graded and the results are sent to the SLSOM Exam Coordinator. The Exam Coordinator would only enter the score for the examination in the medical student's transcripts.

St. Luke School of Medicine has 104 automated examinations in virtually every course. These standardized exams assure that St. Luke School of Medicine medical students are adequately trained to its standard of learning. SLSOM has an additional 160 other graded quizes, essays, and term projects for its medical students to complete in basic science, many of which are also automatically graded.

As a consequence of SLSOM's instructional and examination methods, no St. Luke School of Medicine medical can be 'black-balled' or mistreated by an instructor regarding grading. Instructors only have the option of changing examination content, with departmental approval and the approval of SLSOM's Educational Coordinator. A SLSOM instructor, generally, only grades essays, and never by himself. Essays require two reviewers for grading. This assures each SLSOM medical student of fair assessments.

A St. Luke School of Medicine transcript for its medical student is only based on the medical students grade, and likewise, honors and graduation are only determined by his academic achievement.

St. Luke School of Medicine only accepts advance students into its Independent Studies Program. To be admitted into the Independent Studies Program, an applicant must have a graduate degree, M.Sc or PhD, in a medically related field or a Bsc and at least 10 years experience as a medical professional.

Exhibits in Complaint for Damages for Wrong

St. Luke School of Medicine's students entering clinical clerkships have been said to be amongst the 'best trained' medical students at hospitals. Many SLSOM students have letters from their proctors who have stated that they were the "best" medical student they have ever had the opportunity to train.

## Medicine Curriculum - Basic Science

BASIC SCIENCES

The first four trimesters are called the basic sciences; each trimester is approximately 16 weeks.   The basic science curriculum provides the scientific basis for medical understanding, diagnosis, and treatment.  It emphasizes the principles and mechanisms of health, disease and modes of therapy.  As stated by the USMLE, St. Luke's goal as a medical school is to ensure mastery of not only the basic medical sciences undergirding the safe practice of medicine, but to also present the scientific principles required for maintenance through lifelong learning.   St. Luke's curriculum for basic science is centered on the Content Description for USMLE Step 1. All Students will provided with our written basic science curriculum, as well as the Instructors.   All lectures, examinations, homework, and the final examinations emphasize the requirements of the content descriptions of the USMLE Step 1.  The curriculum is revised annually to reflect the latest developments in medical science and to match the requirements for the USMLE Step 1.

Basic science specialists will teach the first two trimesters.  Doctors will teach the second two trimesters of basic sciences primary from the Liberia and United States.  Some courses will require laboratory work as well as lecture attendance Computeraided learning is also provided for most subjects.

**Basic Science Courses - Year 1**

TRIMESTER 1 (540 hours)
Human Anatomy (200 hours)
Human Neuroanatomy (80 hours)
Histology & Embryology (80 hours)
Human Physiology (160 hours)
 Biostatistics & Medical Writing (40 hours) - PH1
Ethics & Legal Medicine (20 hours)

TRIMESTER 2 (540 hours)
Medical Biochemistry (160 hours)
Medical Genetics (60 hours)
Microbiology and Immunology (100 hours)
Parasitology &Tropical Medicine (80 hours)
Public Health Policy & Practice (40 hours) - PH2
Nutrition (40 hours)
General Pathology (100 hours)

**Basic Science Courses - Year 2**

TRIMESTER 3 (580 hours)
Systemic Pathology 1 (100 hours)
Pharmacology (160 hours)
Behavioral Science (120 hours)
Child/Drug Abuse/Human Sexuality (40 hours)
Occupational and Rehabilitation (40 hours)
Community Medicine (20) - PH3
Molecular Biology (60 hours)

TRIMESTER 4 (640 hours)
Systemic Pathology 2 (160 hours)
Epidemiology & Preventive Medicine (80 hours)
Physical Diagnosis (80 hrs)
Medical Diagnosis (40 hrs)
Intro to Patient Care & Treatment (120 hours)
Intro to Clinical Medicine (80 hours)
USMLE Review (80 hours)

Preparation for the Basic Science Comprehensive Examination as well as the USMLE Part 1, Seminars will be held routinely throughout the Basic Science period at minimal cost to students, if any. All basic science graduates are require to take the USMLE Step I or its equivalent (as defined in each students country of origin), or St. Luke School of Medicine's Comprehensive Basic Science Examination.

Continuation into clerkship (clinical rotations), however is not dependent on passing USMLE Part 1, however, all students must pass the St. Luke Basic Science Comprehensive Examination with a score of 75% or higher. The Basic Science comprehensive examination is a one-day, 400-question examination, given in four parts. Each student is allowed 150 minutes to complete each part.

Students are encouraged to pass their countries licensing examinations before their graduation for many reasons. The examinations may also show a student subjects where more study and learning are needed.

BASIC SCIENCE COURSE DESCRIPTIONS

HUMAN ANATOMY (160 hours) This course consists of daily lectures and laboratory on human anatomy and function. The students will dissect and identify the bones, muscles, organs, nerves, blood vessels, Connective tissues, and cavities of the human body. This will include a discussions on nomenclature and orientation, anatomic terms, direction and movement, classification of joints, surface and gross anatomy, blood flow and nervous system control of the head and neck, back, upper extremity, thorax,

Exhibits in Complaint for Damages for Wrong

abdomen, pelvis and lower extremity. Radiographic images will also be studied from x-ray, computerized assisted tomography (CAT), magnetic resonant images (MRI) angiographs, and sonographs.

HUMAN NEUROANATOMY (80 hours) Human Neuroanatomy will consist of lectures and laboratory of surface and internal neuroanatomy. In this course students will learn about brain structure, neurons, neuroglia membrane potential and nerve impulse (action potential), receptors, nervous system development; detailed neuroanatomy of the brain and spinal cord including the cerebral cortex, medulla, pons, midbrain, and diencephalon, reticular formation cerebellum, peduncles, thalamus, hypothalamus, epithalamus and subthalamus, basal ganglia limbic system, cerebral hemispheres, cerebral cortex, pain and pain inhibitions pathways; pathways; cranial nerves: the viscera nervous system including parasympathetic and sympathetic division; and support system of the central nervous system including blood supply venous drainage dural sinuses, meninges, ventricles, cerebrospinal fluid, and spinal cord blood circulation. Radiological images will also be studied from x-rays, computerized assisted tomography (CAT), magnetic resonant images (MRI), angiographs, and sonographs.

HISTOLOGY & EMBRYOLOGY (80 hours)  Consists of two courses conducted simultaneously.  Histology is a lecture and laboratory courses, will cover the detail of cellular structure and function of all the different types of cells in the human body including skin, hair and nails, nervous tissue and eyes, striated and smooth muscle, cardiac muscle, connective tissue, bones, blood vessels, endocrine organs, lungs, gastrointestinal organs, reproductive organs and kidneys.  Embryology will cover embryonic staging, early development including fertilization, implantation, primitive streak, notochord, neural plate, tube and crest, coelon, somites, head and tail folds; placenta and fetal membranes (germ layers, yolk sac and allantois, chorion circulation, multiple pregnancy); cardiovascular system (blood and lymph formation, aortic arches, heart development, fetal blood flow and changes at birth, congenital malformations), nervous system development (early neurulation, alar and basal plates, spinal nerves, brain development), branchial apparatus, coelon, respiratory system, digestive system, urogenital system, bone development, muscles, limbs, integumentary system, and parturition.

HUMAN PHYSIOLOGY (160 hours) Chemical and physical properties of physiology: cell Chemistry; cell metabolism; homeostasis; neural and endocrine control mechanisms; membrane transport; actions potentials, neural signals; brain function; somatosensory controls; special senses; skeletal, cardiac smooth muscle: somatic and automatic motor systems; cardiac function; blood and vascular system; cardiovascular regulation; respiratory dynamics; gas exchange and transport; respiratory regulation, renal and function and function, body fluid, electrolyte, and acid-base balance control,

gastrointestinal organization, secretion, motility and control, absorption and digestion; endocrine control of metabolism and growth; reproduction, pregnancy, birth and location; introduction to the physiology of the immune system.

MEDICAL BIOCHEMISTRY (120 hours) Lecture and laboratory studies of proteins, enzymes, lipids, biological membranes and membrane transport, carbohydrate structure, glycolysis, pentose phosphate pathway, glycogen metabolism and gluconeogenesis, citric acid cycle, oxidative phosphorylation, lipid metabolism, amino acid, metabolism, biosynthesis of purine and pyrimidine nucleotide, signal transduction pathways and harmony action, nucleic acid structure, replication, transcription, purine and pyrimidine nucleotides, signal transduction pathways and harmony action, nucleic acid structure, replication, transcription, protein synthesis, techniques in molecular biology including restriction fragment length polymorphism (RFLP) and polymerase chain reaction (PCR). Also included in the biochemistry curriculum is a clinical review of enzyme deficiencies and their metabolic consequences, vitamin and mineral deficiencies and excesses, and selected drug interactions.

MEDICAL GENETICS (60 hours) - A lecture based course which includes DNA, genes, and chromosomes; restriction fragment length polymorphism (RFLP), polymerase chain answer (PCR) gene mutations; chromosome studies including banding, abnormalities, translocations, deletions and insertions karyotype nomenclature; cell division (mitosis, meiosis): loci, alleles and segregation, dominant and recessive inheritance new mutation, penetrance, and gene expression, gene maps and linkage: chromosome disorders, frequency, down, syndrome, sex chromosome abnormalities (Klinefelter's XYY males, Turner's syndrome 47-XXX females, cancer chromosome breakage): single gene disorders including aminoacidopathies, transport disorders, storage disorders, connective tissue disorders: multifactorial disorders; management of genetic disorders and genetic counseling,

MICROBIOLOGY AND IMMUNOLOGY (100 HOURS) - Lecture and laboratory including the study of infectious agents, normal flora, biology of infectious agents, bacterial genetics and action, constitutive and inducted defenses of the body, bacteria toxins, infectious agents, grain positive and gram negative bacteria, acid fast bacteria, spirochetes; viruses; fungi; virions: systemic. The pathophysiology of infectious diseases, immunocompromised patients. AIDS, congenital and neonatal infections, zoonoses, fever of unknown origin, nosocomial, and iatrogenic infections will also be studied. Immunology portion will study immunity, the cellular basis of the immune response, antibodies, humoral immunity cell-mediated immunity, major histocompatibility complexes and transplantation. complement, antigen-antibody reactions, hypersensitivity and allergy, tolerance and autoimmune diseases, tumor immunity, and immunodeficiency.

PARASITOLOGY & TROPICAL MEDICINE (80 hours) - This is a lecture and laboratory course. The parasitology portion of the will consist of the study of an introduction to Parasitology including blood and tissue protozoa, intestinal and vaginal protozoa, intestinal helminths, tissue and blood helminths, ectoparasites (scabies, lice, etc.). Tropical medicine portion will emphasize the presentation, diagnosis treatment and maintenance of tropical diseases. It will also include community and preventive measure that can be used to combat spread of tropical diseases.

GENERAL PATHOLOGY (100 hours) - A lecture and laboratory class studying general pathology including diagnosis autopsies characteristics classification and incidence of disease, disorders of growth, differentiation and morphogenesis, responses to cellular injury, inflammation, healing, metabolic and degenerative disorders, thrombosis, circulatory embolism and infarction, immunology and immunopathology, carcinogenesis, benign and malignant tumors.

BIOSTATISTICS AND MEDICAL WRITING (40 hours) - This course is a lecture to train students in biostatistics and medical writing. Students will learn about probability theory, regression, tables and graphs, descriptive statistics, skewing, probability distributions, sampling, confidence interval hypothesis testing, analysis of variance, correlation chi square tests, descriptive studies, analytic studies, and intervention studies, etc. Medical writing will include report preparation and history taking.

SYSTEMIC PATHOLOGY 1 (160 hours) - The systemic portion of this course will consist of the study of the pathology and pathophysiology of the cardiovascular system, central and peripheral nervous system, respiratory tract, alimentary system including the mouth, teeth, esophagus, stomach and digestive tract, liver, biliary system and exocrine pancreas.

PHARMACOLOGY (160 hours) - This course is a lecture series which include drug regulations and governmental controls, the principles of pharmacology, drug administration, pharmacokinetics, drug actions, interactions, tolerance dependence and withdrawal; drugs of the peripheral nervous system and special senses; central nervous system drugs; cardiovascular drugs; respiratory drugs; gastrointestinal agents; antibiotics; antifungals; antivirals; antiparasitic drugs; anticancer drugs; anti-inflammatory, autacoids, NSAIDs, and agents for arthritis and gout; and immunomodulating drugs; drugs affecting the system, sexual affectious drugs, oxytocic drugs and uterine relaxants, anti-migraine drugs, vitamins and minerals, food additives, toxicology, and newly introduced drugs. Contraindications to use of drugs and drug classes will also be discussed.

BEHAVIORAL SCIENCE (120 hours)  This is a lecture course consisting of the study of psychoanalytic theory, conditioning, child development, gender related psychology, electroencephalograms and imaging, psychological testing, sleep, sex, psychopathology, genetic influences drug abuse, suicide and homicide, etiology, memory, neuropsychology and behavioral neurology emotions and hypothalamic functioning, behavioral neurochemistry neurotransmitters medical ethics.  The course will also include detailed lectures in psychiatry and psychiatric treatment of the following disorders: infant, childhood and adolescent disorders; delirium, dementia, amnestic and cognitive disorders; mental disorders due to medical conditions; substance related disorders; schizophrenia and other psychotic disorders; mood disorders; anxiety disorders; somatoform disorders; factitious disorders; dissociative disorders; sexual and gender identity disorders; eating disorders; sleep disorders; impulse control disorders not elsewhere classified; adjustment disorders; and personality disorders.

CHILD & DRUG ABUSE, HUMAN SEXUALITY (40 HOURS) This is a lecture class that includes the psychology and patterns of child abuse; physicians responsibility in suspected child and elder abuse cases, ethics, pathology signs of child abuse, diagnostic techniques is suspected child abuse cases, physical examination, reporting and counseling.   The drug abuse portion of this class involves a specific and detailed investigation of substance abuse diagnosis and treatment including but not limited to alcohol; cocaine; opiates including morphine and heroin; barbiturates and benzodiazepines; neuroexcitory drugs and stimulants; depressants; anxiolytics; marijuana; LSD; glue; and designer drugs. The human sexuality portion of win study the development and anatomy of sexual and reproductive organs; endocrine control of sexually, psychosexual responses, sensory innervation of sex organs, the sexual response cycle in men and women, normal sexual practices, abnormal sexual behaviors, and psycho physiological behaviors recently elucidated.

OCCUPATIONAL AND REHABILITATION MEDICINE (40 hours) This is a lecture consisting of the study of occupational diseases including the anatomy, physiology and pathology and treatment.   This study includes psychiatric disorders, as well. Rehabilitation portion will study fundamentals of neurologic and physical rehabilitation techniques, and relearning.

NUTRITION (40 hours) This is a lecture consisting of the study of food and its use; assessment of nutrition status; primary nutrition disorders, obesity, food sensitivity, malnutrition in disease states, nutrition support, nutrition as a cofactor in disease, nutritional factors in health promotion, nutritional factors in disease prevention.

MOLECULAR BIOLOGY (100 hours) - This course bridges the gap between histology, physiology, and biochemistry. The course teaches students about microcellular mechanisms which include cellular transport and sorting, receptor mediated endocytosis, microtubule dynamics, cell powerhouses, translation of mRNA, membrane architecture, membrane cytochemistry, cilia structure and dynamics, cytoskeletal microfilament structure, nuclear organization, organization of chromosomes, nucleolar structure and function, movement through nuclear pores, epithelial polarity, adhesion molecules. This course will also provide the student with more detailed information on the structure, operation and physiology of organelles and microorganelles.

SYSTEMIC PATHOLOGY 2 (160 hours) This course is a continuation of the general and introduction to systemic pathology course described above. It consists of lecture and laboratory study of pathology and pathophysiology of the endocrine system, breast, female genital tract, male genital tract, kidneys and urinary tract, lymphoreticular system, blood and bone marrow, skin, osteoarticular and connective tissues.

PHYSICAL DIAGNOSIS (80 hours) This course is a preclinical course of lecture, laboratory, and clinical introduction. It consists of the study and training in medical recording and confidentiality; interviewing techniques and history-taking; general physical examination, examination of the skin, nails and hair; ear; nose and throat; respiratory system; heart and cardiovascular system; abdomen; female breast and genitalia; male genitalia; bone, joint and muscle and the nervous system including the cranial nerves motor system, cerebellar system, sensory system, and the unconscious patient organ. This course will include investigation of signs, symptoms and patient presentations, organ orientation, instrument usage and evaluation of current medical arts and sciences. The medical diagnosis portion of the class will train students in diagnostic protocol, procedure, costs, and administration. It will include blood counts, electrolyte panels, lipid and cholesterol studies, endocrine studies, pap smears, pathologic studies and methods, spinal taps, medical protocol, and physician referrals.

MEDICAL DIAGNOSIS (40 hours) The medical diagnosis portion of the class will train students in diagnostic protocol, procedure, costs, and administration. It will include blood counts, electrolyte panels, lipid and cholesterol studies, endocrine studies, pap smears, pathological studies and methods, spinal taps, medical protocol, and physician referrals

EPIDEMIOLOGY & PREVENTIVE MEDICINE (80 hours) This is a lecture course that includes the study of causes of diseases, establishing causality, descriptive studies, incidence and prevalence, age standardization, life expectancy, analytic studies, prospective risk, risk, relative risk, retrospective studies interventional studies, methodological issues, historical and geographical controls, randomized controls, ethical

issues. Specific disease epidemiology will be discussed and analyzed such as influenza, cold, yellow fever, polio, food poisoning, etc. The preventive medicine part of the class will include the study of medical preventive (primary-secondary) patterns of mortality and morbidity in developing countries.

INTRO RADIOLOGY (40 hours) This is a preclinical class consisting a lecture, laboratory, and clinical study. It consists of a study of radiological imaging such as X-rays, Computer Aided Tomography. Magnetic resonant imaging, ultrasound including Doppler ultrasound, angiography, cerebral and spinal contrast studies, nuclear imaging studies, ventilation/perfusion studies, etc.

INTRO PATIENT CARE AND TREATMENT (120 hours) This is a preclinical course. The purpose is to prepare the medical student to take responsibility for the care and management of patients It is a series of short courses consisting of hospitality, demeanor, physician responsibility, medical management and protocol, cost-to-patient analysis, ethics, specific training in triage, emergency techniques and protocols, basic *dental hygiene, dental care and referral,* acute cardiac and life support, chest pain protocols, burn management, electrolyte management, blood and plasma transfusions and protocols, drug abuse diagnosis and treatment, obstetrical and gynecological management, neonate management and care, pediatric care immunization, health and well-child care. This course will also include introduction to anesthesiology, surgery, and surgical techniques. Additionally, this course covers the use of intravenous fluids and solutions during emergencies, surgery, and other situations. This course will, additionally, consists of a computerized patient simulator. The medical student will learn blood gas calculations, acid-base analysis and treatment, and EKG interpretation, trauma, and critical life-support for cardiac arrest, arrhythmias, and sudden cardiac death.

INTRO CLINICAL MEDICINE (80 hours) - This is a preclinical course. This course trains medical students to recognize, diagnose and treat common clinical pathologies. The course covers infections, skin diseases, diseases of the joints and bones, respiratory disorders, cardiovascular disorders, renal disease, endocrine, metabolic and nutritional disorders, gastrointestinal disorders, disorders of the liver and pancreas, disorders of the blood and lymph, disorders of muscles and connective tissue, disorders of the eye and nervous system.

All students must pass the Basic Science Comprehensive Examination and the must receive the Basic Science Completion Certificate before moving onto clinical rotations or taking the USMLE Part 1.

## CLINICAL SCIENCES

The last six trimesters, ninety-two (92) weeks consists of sixty (60) weeks of core clerkships (Internal Medicine, Obstetrics and Gynecology, General surgery Pediatrics, Family Medicine, Psychiatry, and Emergency Medicine), twenty (20) weeks of electives, and twelve weeks of mandatory community service.

The purpose of the clinical sciences curriculum is to train the medical student to apply the concepts and principles that are important in health and diseases and that constitute the basis of safe and effective patient care. As stated by the USMLE, St. Luke goal is to provide the medical knowledge and understanding of clinical sciences considered essential for the providing patient care under supervision, including emphasis on health promotion and disease prevention. St. Luke's curriculum for clinical science rotations is cantered around the essentials for medical education required by the Liberia Medical and Dental Council, and the Content Description for USMLE step and the Clinical Skills Assessment Examination given by the Educational Commission for Foreign Medical Graduates.

Clerkships will be available for students for all clinical science students in Liberia. Transfer students will also permitted to do clinical rotations in Liberia. *Clinical rotations will be available in Liberia, the United States, and other countries.*

**Clinical Science Courses - Year 3 (Core Rotations)**

| <u>CORE</u> | <u>Liberia</u> |
|---|---|
| | <u>72 Weeks</u> |
| Internal Medicine | 12 weeks |
| Obstetrics and Gynecology | 08 weeks |
| General Surgery | 12 weeks |
| Pediatrics | 08 weeks |
| Family Medicine / Primary Care / Preventive Medicine | 06 weeks |
| | |
| Psychiatry | 06 weeks |
| Emergency Medicine | 04 weeks |
| Radiology | 04 weeks |
| Community Medicine | 12 weeks |

**<u>ELECTIVES</u>**:  04 weeks minimum                              **<u>20 weeks</u>**

Any combination of the above rotations with 4 weeks minimum except the last rotation.  Twenty (20) weeks total.
Surgery Subspecialties
General Surgery, Neurosurgery, Orthopedic Surgery,
Urology, Ophthalmology, Plastic Surgery, Oncology
Surgery, Obstetrics and Gynecology, Pediatric Surgery,
Cardiothoracic Surgery, Ear Nose and Throat, Transplant
Surgery, Maxilofacial Surgery, etc.
Internal Medicine
Endocrinology, Cardiology, Neurology, Hematology,
Oncology, Gastroenterology, Pneumology, Dermatology,
Infectious Diseases, Preventive Medicine, Immunology,
Epidemiology, etc.
Pediatrics and subspecialties
Pediatrics, neonatology, pediatric surgery, pediatric oncology, etc.
Psychiatry and subspecialties
Family Practice and subspecialties or General Medicine
Emergency Medicine and subspecialties, Critical Care
Medicine
Community or Preventive Medicine
Rehabilitation Medicine
Clinical Pathology (including intro to autopsy)
Refugee Medicine

**Weeks Total**                                                        **92**

Each student in clerkship will be required to submit a three-page report on a specific medical pathology, epidemiology, signs & symptoms, diagnosis, and treatment, or one interesting case history, each rotation. The topics will be provided by St. Luke's administration and they will be based on the contents of the Liberia Medical Licensing Examination (LMLE), the USMLE Step 2 Content Outline, and the USMLE CSA Content Outline. The case history should be discussed with your proctor. The purpose of these reports is two-fold:

(1)     The reports will help the student in his/her preparation for the Liberia MLE, and the USMLE Step 2 and CSA exams,

(2)     The reports will help provide information that may be used to help other students prepare for the Liberia MLE, USMLE Step 2, and CSA exams.

All reports will be kept at the school office and/or on-line and each will be available for students, staff and administrators of the school for review, if needed.

Clinical Science students will be required to participate in clerkships from six to eight hours daily. Additionally, there will be lectures, Liberia MLE reviews, and USMLE Part 2 and CSA reviews scheduled weekly where attendance is mandatory. The lectures are given by specialists in their fields and are to supplement the knowledge and experience they acquire doing their clerkships. The purpose of the LMLE, USMLE Part 2 and CSA reviews is to prepare each student with the information they need to pass the LMLE, the USMLE Part 2 and CSA examinations.

# Exhibit 37 – LMB Press Release, March 2005

LIBERIA MEDICAL BOARD (LMB)
MINISTRY OF HEALTH & SOCIAL WELFARE
MONROVIA, LIBERIA

### PRESS RELEASE

March 29, 2005

LADIES AND GENTLEMEN OF THE PRESS.

The Liberia Medical Board, in her meeting of March 15, 2005, deliberated on the issue of "St. Luke Medical School" reportedly operating in Liberia. While it is not our policy to run the affairs of the Board in the press, we feel obliged at this time , to set the record straight on this very crucial issue, for the benefit of the general public. This move is especially imperative since "St. Luke Medical School", in the last few days, provided headlines in the print and electronic media. Accordingly, the Liberia Medical Board is pleased to present the following facts as contained in the records and files of the Board for the information of the general public.

1.  During the Board Meeting of February 12, 2004, the secretariat of the Board presented documents of "19 doctors" who reportedly completed their course of study at St. Luke Medical School for the degree of Doctor of Medicine (MD).

2.  The documents were presented to the office of the Board for licensure by Dr. Meimei Dukuly, on behalf of St. Luke Medical School , since he was the contact person.

3. The Board was greatly angered by this bold and shameless act which is considered an insult to the integrity and professionalism of the Liberia Medical Board, since in fact:

    a. The Board has no knowledge of a "St. Luke Medical School" operating in Liberia.

    b. The Board can not and does not issue license to any Doctor who

       ➢  Is not a graduate of a recognized medical school,

       ➢  Does not present a certificate of internship from the JFK Medical Center,

       ➢  Does not satisfactorily pass a comprehensive clinical assessment examination, or

       ➢  who does not present a valid license from the country where he/she was trained, or has practiced medicine.

4. The Board therefore did not admit the applications of the doctors for discussion, but rather warned the representatives of "St. Luke Medical School" to legally and properly apply to operate a medical school in Liberia by meeting all requirements thereto.

5. On March 8, 2005, the Liberia Medical Board received a letter of invitation to the "Campus of St. Luke Medical School" in Gaye Town, Old Road, Congo Town, for assessment for the purpose of granting a

permission to operate a medical School. Three documents were attached to the letter of invitation:

   a.   The Article of Incorporation from the Ministry of Foreign Affairs

   b.   An Act of Legislature legitimizing the establishment of the School

   c.   A letter of Attestation from the Commission on Higher Education, Ministry of Education.

        allowing preparatory activities for the establishment of the School.

6.   On Friday, March 18, 2005, three members of the Board visited what was supposed to be the "Campus of the St. Luke Medical School".

Those who visited were:

Assoc. Prof. Horatius Brown, MD, MSc, FWACS
Deputy Chief Medical Officer/JFK MC
Chairman, Liberia Medical Board

Assoc. Prof. Samuel Dopoe, MD, MSc (Specialist in Otorhinolaryngology), Chairman, Department of ENT
Chief Medical Officer of JFK MC & Chairman of the Accreditation Committee of the Board and

Prof. S. Benson Barh, BSc, MD, MPH, FWACP
Deputy Minister/Chief Medical Officer-RL and Secretary, LMB.

The findings of the Board were as follows:

   a.   The Board had difficulties in locating the so-called "Campus" due to an uneasy access to a building in obscurity .

   b.   The building was a run-down dwelling home under major renovation by a few workers.

# Exhibit 38 – Benson Barh Contract with SLSOM from 2004
## (reserved)

# Exhibit 39 – Benson Barh Receipt of Payment from 2004
### (reserved)

Exhibit 40 - "Secret Letter" sent by Benson Barh to W.H.O.,
the National Accreditation Board, and Medical and Dental
Council of Ghana (reserved)

# Exhibit 41 – George Gollin's Power Point Presentation that is Linked at Least 7 Times On the Internet (reserved)

**Exhibit 42 – The First 5 Pages of the 91-page Document George Gollin Sent to the Ghana National Accreditation Board (reserved)**

# Exhibit 43 – The 91-page Document George Gollin Published on his University of Illinois Website (reserved)

See http://www.hep.uiuc.edu/home/g-gollin/pigeons/SLSOM/pacer_document_1_modified_version_electronic_exhibit_41.pdf

# Exhibit 44 – "Exhibit 1" from the Previous Lawsuit CV-01791-RGK (reserved)

# Exhibit 45 – "Exhibit 1" George Gollin Published on his University of Illinois Website (reserved)

See

http://www.hep.uiuc.edu/home/g-gollin/pigeons/SLSOM/pacer_document_1_first_version_paper.pdf

# Exhibit 46 – List of False Statements made in the 91-page document authored by George Gollin (reserved)

**Exhibit 47 – Letter from National Accreditation Board to the Attorney General of Republic of Ghana submitted to Court of Appeal**



"AG 7"

National Accreditation Board
Ministry of Education
P. O. Box GT 3256
Cantonments Accra

In case of reply the
number and date of this
letter should be quoted

Ref. No.   NAB/A/02/PTE/114
Tel:   021 – 518610/518570/286013-4
Fax:   021 – 518629
Email:   nab@nab.gov.gh
Website:   www.nab.gov.gh

Dated on: 15-12-2009

Republic of Ghana

December 11, 2009

THE HON. ATTORNEY-GENERAL &
MINISTER FOR JUSTICE
ATTORNEY-GENERAL'S DEPARTMENT
ACCRA

Dear Madam,

RE: IN THE MATTER OF THE REPUBLIC VS. NATIONAL ACCREDITATION BOARD & ANOR EXPARTE: ST. LUKE SCHOOL OF MEDICINE

We forward herewith, copies of letters we have received from the Dean of the University of Illinois College of Medicine, the Administrator of the Oregon Student Assistance Commission, Office of Degree Authorisation and a covering letter to the latter from the Ministry of Foreign Affairs and Regional Integration with regard to the pending case.

We would be grateful if you consider these letters in your further applications and submissions to the Court.

Yours faithfully,

RICHARD K. ADJEI
SENIOR ASSISTANT SECRETARY
FOR: EXECUTIVE SECRETARY

**Exhibit 48 – Caution Letter from Ministry of Foreign Affairs, Republic of Ghana as a Result of Office of Degree Authorization Letter,  submitted to Court of Appeal**

In case of reply the
number and date of this
letter should be quoted

TEL: 664951-3/664970/663750/
676765/664650/675027
FAX: 665363/667823

My Ref. No.....**SCR. PO/USA**

Your Ref. No...........



**REPUBLIC OF GHANA**

MINISTRY OF FOREIGN AFFAIRS
AND REGIONAL INTEGRATION,
P. O. BOX M 53,
ACCRA, GHANA.

DATE **20TH NOVEMBER, 2009.**

## CAUTION AGAINST GRANTING OF APPROVAL/ACCREDITATION TO ST. LUKE SCHOOL OF MEDICINE TO ISSUE MEDICAL DEGRESS IN GHANA

I have been directed to forward, herewith, for your attention and urgent action, letter reference No. WA/INF/4 dated 17th November, 2009 and its attachment received from our Mission in Washington DC.

2.    The Oregon Student Assistance Commission Office of Degree Authorization is by the letter cautioning the National Accreditation Board, (NAB) of Ghana against granting approval to St. Luke "School of Medicine" to enable the latter to issue medical degrees to Ghanaians due to the fact that the activities the school do not confirm with foreign degrees accreditation practices of the U.S.A.

3.    It would be most appreciated if the National Accreditation Board (NAB) could take urgent action to avert possible sanction against Ghanaian educational institutions.

*For:*    **MINISTER FOR FOREIGN AFFAIRS
& REGIONAL INTEGRATION
GLORIA POKU (MRS)
DEPUTY DIRECTOR/AMERICAS BUREAU**

**MR. KWAME DATTEY,
NATIONAL ACCREDITATION BOARD (NAB),
NO: 6 BAMAKO STREET, EAST LEGON,
P. O. BOX CT 3256,
ACCRA.**

**Encl.**

**Exhibit 49 – Defamation Letter from Alan Contreras to Republic of Ghana (faxed version) Submitted to Ghana Court of Appeals**



# Oregon

Theodore R. Kulongoski, Governor



Oregon Student Assistance Commission
Office of Degree Authorization
1500 Valley River Drive, Suite 100, Eugene, OR 97401
(541) 687-7452 Fax (541) 687-7419
www.osac.state.or.us/ODA

RECEIVED
NOV 1 6 2009
FILE No.
REG. No.

October 30, 2009

Mr. Kwame Dattey
National Accreditation Board (NAB)
No. 6 Emniko Street, East Legon
P. O. Box CT 3256
Accra
GHANA.

Dear Mr. Dattey:

It has come to our attention that your agency may be about to issue an approval or accreditation to the notorious entity that does business under the name of St. Luke School of Medicine. We are concerned that an entity with the notoriety the name of St. Luke School of Medicine has. We are called "medical degrees" that could be used by unscrupulous people around the world to pretend to be qualified on unsuspecting patients.

We are concerned about what such a decision would do to the reputation of Ghanaian colleges around the world. Oregon banned the use of St. Luke degrees some years ago, and we would have to ban the use of all Ghanaian degrees if St. Luke is allowed to operate for this is that Oregon law requires us to ban acceptance of foreign degrees on the basis of actions of the nation in question.

If the government of Ghana authorizes St. Luke to issue "medical degrees", we will have no choice but to conclude that Ghana does not have a meaningful quality approval process in which one degree issued by the 29 colleges now operating in Ghana would no longer be usable in Oregon.

Oregon is a small state far from Ghana and it may not affect your country very much. However, we urge you to consider the consequences of other states and nations making similar decisions if you issue an approval to the entity called St. Luke.

It is possible that decision-makers in Ghana simply did not have all of the information about St. Luke's past practices and its desperate search for a government willing to allow it to sell degrees from a site outside the United States, where it began operating illegally in California some years ago. St. Luke is not and has never been a legitimate provider of medical degrees.

Sincerely,

Alan Contreras
Administrator

cc: Adu Kwateng K. Arthur, Deputy Chief of Mission, Embassy of Ghana, Washington, D.C.
Task Officer for Ghana, U.S. Department of State, Washington, D.C.
U.S. Bureau, UNESCO, International Affairs, U.S. Department of Education, Washington, D.C.
Public Affairs Officer, Embassy of the United States, Accra, Ghana

**Exhibit 50 – Defamation Letter from Alan Contreras to Republic of Ghana (mail version) Submitted to Ghana Court of Appeals**



# Oregon
Theodore R. Kulongoski, Governor

**Oregon Student Assistance Commission**
**Office of Degree Authorization**
1500 Valley River Drive, Suite 100, Eugene, OR 97401
(541) 687-7452; Fax: (541) 687-7419
www.osac.state.or.us/ODA

October 30, 2009

Mr. Kwame Dattey
National Accreditation Board (NAB)
No. 6 Bamako Street, East Legon
P. O. Box CT 3256
Accra
GHANA

Dear Mr. Dattey:

It has come to our attention that your agency may be about to issue an approval or accreditation to the notorious entity that does business under the name St. Luke "School of Medicine" or the like. We are concerned that an entity with the unsavory history of the St. Luke business might be allowed to issue so-called "medical degrees" that could be used by unscrupulous people around the world to practice medicine on unsuspecting patients.

We are concerned about what such a decision would mean to the reputation of Ghanaian colleges around the world. Oregon banned the use of St. Luke degrees several years ago and we would have to ban the use of all Ghanaian degrees if St. Luke is approved. The reason for this is that Oregon law requires us to base acceptance of foreign degrees on the accreditation practices of the nation in question.

If the government of Ghana authorizes St. Luke to issue "medical degrees" we will have no choice but to conclude that Ghana does not have a meaningful postsecondary approval process, in which case degrees issued by the 23 colleges now operating in Ghana would no longer be usable in Oregon.

Oregon is a small state far from Ghana and it may be that a ban on all degrees issued in Ghana would not affect your country very much. However, we urge you to consider the consequences of other states and nations making similar decisions if you issue an approval to grant medical degrees to the entity called St. Luke.

It is possible that decision-makers in Ghana simply did not have all of the information about St. Luke's past practices and its desperate search for a government willing to allow it to sell degrees from a site outside the United States, where it began operating illegally in California some years ago. St. Luke is not and has never been a legitimate provider of medical degrees.

Sincerely,

Alan Contreras
Administrator

cc: Mr. Adolphus K. Arthur, Deputy Chief of Mission, Embassy of Ghana, Washington, D.C.
Alonza Cook, Desk Officer for Ghana, U.S. Department of State, Washington, D.C.
Dr. E. Stephen Hunt, USNEI, International Affairs, U.S. Department of Education, Washington D.C.
Mary Scholl, Public Affairs Officer, Embassy of the United States, Accra, Ghana

**Exhibit 51 – Defamation Letter from Brad Schwartz to Republic of Ghana (mail version) Submitted to Ghana Court of Appeals**

# UNIVERSITY OF ILLINOIS COLLEGE OF MEDICINE

Office of the Regional Dean
at Urbana-Champaign

190 Medical Sciences Building, MC-714
506 South Mathews Avenue
Urbana, IL 61801-3618

November 16, 2009

Mr. Kwame Dattey
National Accreditation Board (NAB)
No. 6 Bamako Street, East Legon
P.O. Box CT 3256
Accra
GHANA

Dear Mr. Dattey:

As the Dean of a medical school that recruits from the most accomplished graduates of non-U.S. medical schools into its residency, I have concerns about the impending accreditation decision for what purports to be the St. Luke School of Medicine. I have had the opportunity to review data in the public domain about this alleged school, and about individuals who claimed to have earned a medical degree from it. There is no evidence whatsoever that this alleged school really exists, or that there are adequate facilities for the most rudimentary components of a medical curriculum. In fact, all evidence says that only a small empty unimproved room is at the location advertised for the St. Luke's School of Medicine.

Understanding that high quality is not absolutely dependent upon physical structures, I took the opportunity to review the publicly available records of individuals who claim to have graduated from this alleged school for evidence of a bona fide education. There are records of twelve individuals who claim to have degrees from St. Luke's. None of these people are licensed to practice medicine, and at least two have been incarcerated for practicing medicine without a license.

I bring this to your attention because accreditation or approval of the alleged St. Luke School of Medicine by officials in Ghana would make medical schools in the United States worry about the quality of any medical school in Ghana. As a result, such approval of St. Luke would put the graduates of legitimate medical schools in your country at a distinct disadvantage when attempting to gain advanced medical training.

Hence, by denying accreditation to St. Luke School of Medicine you will protect the reputations of legitimate medical school graduates from Ghana. Moreover, by denying St. Luke any hint of legitimacy you will protect innocent patients from abuse at the hands of potential pseudo-graduates.

Telephone: (217) 333-5465 / Fax: (217) 333-8868 / Email: connc@med.uiuc.edu / www.med.uiuc.edu

UIC • Chicago • Peoria • Rockford • Urbana-Champaign

The entity that passes itself off as the St. Luke School of Medicine has never been a legitimate educator of medical practitioners, and I urge you to make the owners of this entity own up to their dishonesty.

Sincerely,

Brad S. Schwartz, M.D.
Dean
Professor of Biochemistry and Medicine

**Exhibit 52 – False, Defamatory, and Threatening Statements in the 91-page document authored by George Gollin and the University of Illinois - Urbana.**

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 1. | When one of the participants is not acting in good faith, it can be fiercely difficult to detect and suppress the activity. | 3 | X | SLSOM did not act in bad faith. |
| 2. | Sometimes there is a dishonest degree provider. | 3 | X | SLSOM is not a dishonest degree provider |
| 3. | Sometimes an accreditor lacks the skill to detect misrepresentations.[3] | 3 | X | The Liberia NCHE is qualified to detect misrepresentations. SLSOM never misrepresented any fact to the NCHE.<br><br>This is an example of George Gollin's racism and bias. This |
| 4. | [3] For example, "Accreditation of College in Former Soviet Republic Raises Questions of Oversight,"Burton Bollag, *Chronicle of Higher Education*, September 8, 2006. See also "When Criminals Control the Ministry of Education," George D. Gollin, *International Higher Education*, 53, Fall 2008. | 3 | | No criminal has controlled the Ministry of Education of Republic of Liberia.<br><br>Gollin is author of document. |
| 5. | Even when it is aware that it appears to bestow legitimacy on an entirely fraudulent entity posing as a university.[4] | 3 | | SLSOM was not fraudulent. |
| 6. | [4] "Wolves in Chancellors' Clothing," George D. Gollin, *International Higher Education*, 55, Spring 2009. | 3 | | Gollin is referencing his own document as if he is an authority |
| 7. | Central to any effort at suppression of bogus schools is the accumulation of clear, irrefutable evidence documenting the unsavory practices and willful misrepresentations of an illegitimate degree provider. | 3 | | SLSOM was not a bogus school. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 8. | *Toward Effective Practice: Discouraging Degree Mills in Higher Education* released by the Council for Higher Education Accreditation (CHEA) and the United Nations Educational, Scientific and Cultural Organization (UNESCO).5 | 3 | | SLSOM did not make willful misrepresentations.<br><br>SLSOM was not an illegitimate degree provider.<br><br>Gollin is an author of these documents |
| 9. | The school's catalog misrepresents its physical facilities, either through inaccurate descriptions in text, or deliberately misleading photographs of buildings and grounds that could reasonably be thought to represent a campus, but do not; | 3 | X | SLSOM did not misrepresent its physical facilities in Liberia or Ghana. |
| 10. | A significant number of the school's instructors or administrators do not hold the academic credentials appropriate for successful discharge of their responsibilities, or claim bogus credentials from unrecognized degree providers; | 3 | X | SLSOM's instructors were qualified to teach at the level that they did.<br><br>Gollin infers that SLSOM instructors have bogus credentials but has no evidence of such. |
| 11. | The school operates, or has a history of operating, without legal authority from the appropriate government agency in its home jurisdiction; | 4 | X | SLSOM operated with appropriate legal authority. |
| 12. | In the case of the licensed professions, the school's graduates fail to obtain licenses, or fail to thrive as practitioners, with unusually large probability; | 4 | X | SLSOM's graduates did obtain licenses. |
| 13. | A significant portion of the school's graduates use their credentials for commercially deceptive or criminally fraudulent activities, indicating that the school is complicit in their deceptions; | 4 | X | No SLSOM's graduate has used their credentials for commercially deceptive or |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | criminally fraudulent activity. Neither SLSOM nor any of its officers have committed any fraud. |
| 14. | The school awards academic credit without requiring demonstration of mastery of the subject matter for which the credits are awarded; | 4 | X | SLSOM has never awarded academic credit without demonstration of mastery of the subject. |
| 15. | The school's articulation agreements with other schools reveal that the school awards transfer credits regardless of the level of mastery of the subject matter associated with the transferred credits; | 4 | X | SLSOM has not articulation agreement that will award transfer credits regardless of the level of mastery of subject matter. SLSOM has no known articulation agreements. |
| 16. | The school masks its internet domain registration information behind a privacy service, hiding the identities of its administrative officers; | 4 | X | SLSOM does not mask its internet domain registration. |
| 17. | The school will not reveal the names of its instructors or the identities of its senior administrators; | 4 | X | |
| 18. | The school shares a significant number of instructors or administrators with other schools known to hold any of the attributes listed above. | 4 | X | SLSOM does not share administrators or instructors with other schools. |
| 19. | The owners of the "St. Regis group" of diploma mills repeatedly claimed they were revamping their practices and policies. In spite of this, they continued to sell degrees to unqualified customers without providing meaningful instruction or portfolio evaluation. Over time the owners of St. Regis ran through 121 differently named "universities" of their own invention, only stopping when their computers and supplies used in fabricating diplomas were seized by | 4 | | SLSOM has nothing to do with St. Regis. Gollin previously stated that St. Regis University operated SLSOM. Gollin is associating SLSOM |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | U.S. federal authorities.6 James Kirk, the owner of the Louisiana-based "LaSalle University" diploma mill was imprisoned for his LaSalle business. Within weeks of the start of his prison term, Kirk and his wife had launched a new diploma mill named "Edison University" whose promotional material was mailed to customers from the city in which Kirk was incarcerated | | | with St. Regis. |
| 20. | 6 See the large volume of material associated with *United States of America vs. Dixie Ellen Randock et al.*, some of which is available online at http://www.hep.uiuc.edu/home/g-gollin/pigeons/#sru_usss. | 4 | | Another document authored by Gollin. |
| 21. | 7 *Degree Mills: the Billion Dollar Industry That Has Sold Over a Million* John Bear, Prometheus Books, Amherst, New York, 2005, page 52. | 4 | | Bear is a collaborator with Gollin. Gollin is implying that SLSOM is a degree mill. |
| 22. | In the European Union the Bologna Accords are intended to facilitate this by easing the transfer of academic credentials across national boundaries.8 8 A great deal of material discussing the Bologna Accords can be found in articles carried by *International Higher Education*, available online at http://www.bc.edu/bc_org/avp/soe/cihe/newsletter/. | 5 | | Gollin is the author of some of these articles. |
| 23. | | | | |
| 24. | | | | |
| 25. | The American owners of the "St. Luke School of School of Medicine" took advantage of the catastrophic civil war in Liberia to claim, without governmental challenge, to be training medical students in Monrovia. (They weren't.) In 2004 the Liberian government declared St. Luke to be operating illegally. In 2005 US embassy personnel in Liberia visited St. Luke and found "no evidence of anything resembling a functioning, credible medical school." Even so, St. Luke remained in the International Medical Education Directory database at least through 2005, entitling its customers to sit for the licensing exam. | 5 | X | SLSOM did not take advantage of any Liberian or Ghanaian governmental entity at any time. The Liberian government's 2004 challenge to SLSOM's legitimacy failed in Liberian Supreme Court in 2005. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | The US Embassy has never issued any statement as claimed by Gollin. |
| | | | | SLSOM's students and graduates had an 85% pass rate on the USMLE. |
| 26. | The "University of Science Arts and Technology" pretends to teach medicine in Montserrat and sports an imaginary pseudopod named the "Medical College of London." The owner holds an MD from a diploma mill, while the "dean" also works for the St. Luke School of Medicine. In spite of this, the "university" retains its directory listing. | 5 | X | SLSOM does not employ any dean who also works for USAT.<br><br>Gollin is trying to mislead the reader with dates and inaccurate information. |
| 27. | The International Medical Education unreliable input information and Foundation of International Medical early warning system that would receive unsolicited expert information, reliability ("is the country in the directory's accuracy.[10]<br>[9]Op. cit., "Wolves in Chancellors' Clothing."<br>[10]Op. cit., "Wolves in Chancellors' Clothing." | 5 | X | Documents authored by George Gollin.<br><br>George Gollin wants the reader to believe that he knows more about International medical education than the IMED or ECFMG. |
| 28. | The St. Luke School of Medicine (SLSOM), mentioned in the material quoted above, is currently seeking accreditation in Ghana to operate as a medical school authorized to award M.D. degrees. This is a disturbing turn of events, based on the past history and practices of the school and its owners. | 6 | X | The NAB and the courts of Ghana are more than adequate to oversee accreditation in Ghana. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | SLSOM-Ghana has adequately won its accreditation in Ghana. |
| | | | | George Gollin alludes to his personal racial prejudice to defame the owners of SLSOM, without any proof whatsoever. |
| 29. | At least three SLSOM customers in the United States have been imprisoned for their "medical" activities. | 6 | X | SLSOM, nor its owners, were not complicit, or ever even charged, with illegal activities. |
| 30. | One of the American owners of SLSOM, who is not licensed to practice medicine in the United States, has described practicing medicine (including giving injections and prescribing medication) on trips to Africa with an American colleague. | 6 | X | Misinformation by George Gollin.  What does being licensed in the USA have to do with practicing medicine in Africa. |
| | | | | Dr. Dolphin had authorization to treat Liberian refugees on each and every occasion it was done. |
| | | | | Dr. Dolphin does not claim to have given injections to Liberian refugees. |
| 31. | This same colleague was convicted of Medicare fraud in California in July 2009 for his activities unrelated to, but during the time he was also an SLSOM "professor." | 6 | X | At no time was any SLSOM professor convicted of fraud at any time. |
| 32. | In addition, some members of the graduating classes and senior administration | 6 | X | At no time was any SLSOM |

Page 6 of 94

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | of SLSOM have participated in the operation of medical diploma mills. | | | graduate participating in the operation of medical diploma mills. |
| 33. | In this report I discuss the historical record for the St. Luke School of Medicine and describe the activities of some of the members of its faculty, administration, and student body. In order to assay the outcomes of the education delivered by St. Luke to its students, I will describe the professional paths taken by some members of its 2002 graduating classes. The information is rich in complexity due to the tangled interconnections between the various personnel and organizations. | 6 | X | George Gollin has no historic record of any kind.<br><br>It is all hearsay or otherwise complete fantasy. |
| 34. | The SLSOM home page contains only a small number of links to pages elsewhere in the web site, though pages previously available through a chain of links that would begin at the home page are still present in the site's directories. | 7 | | George Gollin is attempting to mislead the reader.<br><br>At the time alluded to by Gollin, SLSOM was aware that it was being stalked, but did not know who the stalker was. |
| 35. | 11 http://www.classmates.com/profile/user/view?registrationId=221010121 | 7 | | Hearsay, from Internet. |
| 36. | 12 http://web.archive.org/web/20010712004809/http://www.stluke.edu/faculty.html and http://74.125.95.132/search?q=cache:ih4eAYTQbgoJ:www.classmates.com/directory/public/e/list.htm%3FregId%3D221010121+jerroll+dolphin+1973&cd=1&hl=en&ct=clnk&gl=us | 7 | | Hearsay, from Internet |
| 37. | The 2009 date and Inglewood location suggest that Dolphin resided in, or near Inglewood. Considerably more material is available to reinforce this Southern California presence for the Dolphins. | 8 | X | Dr. Dolphin resided in Ghana, West Africa. Complete speculation and fantasy. |
| 38. | 13 Information from a reliable source familiar with SLSOM's activities and | 8 | X | George Gollin has no reliable |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | personnel. | | | source familiar with SLSOM's activities and personnel. Hearsay. |
| 39. | [14] http://www.vitalinternational.org/Vitalcampus/Vitalcampus.html | 8 | X | This information was 2006 and was unreliable for November 2009. Hearsay. |
| 40. | [15] http://calcrusnews.com/CC/PUBLICATIONS/archives/2-5-2009.swf | 8 | X | Uncorroborated hearsay |
| 41. | A phonenumber.com search for people with last name "Dolphin" in Inglewood produces a hit to Glory Dolphin as the CEO of SLSOM. | 8 | X | Glory Dolphin was never CEO of SLSOM. Nor did she ever have any association whatsoever with the 8516 11th Ave, Inglewood, CA address. |
| 42. | Jerroll Bahruck Rudolph Dolphin and Susana Ofori-Atta Mitchell Dolphin have approached the Ghanaian National Accreditation Board (NAB)[16] requesting that it issue accreditation to the St. Luke School of Medicine to function as an MD-granting institution. | 8 | X | SLSOM - Ghana requested accreditation in Ghana in July 2007. All requirements for accreditation were met. |
| 43. | [16] http://nab.gov.gh/nabsite/ | 8 | X | The [16] http://nab.gov.gh/nabsite/ Does not exist. SLSOM's request for accreditation in Ghana was never publicized or posted by the NAB. This is a complete misrepresentation by George Gollin intended to mislead and misinform. |
| 44. | A Ghanaian court has ordered NAB to grant accreditation to SLSOM within 30 days of its recent ruling; the deadline corresponds approximately to the end | 9 | | The Ghanaian High Court did not post its ruling in favor of |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | of November. | | | SLSOM against the NAB; nor did SLSOM; nor did the NAB.<br><br>This demonstrates the collaboration and conspiracy of George Gollin and the National Accreditation Board. |
| 45. | [17] Information about the status of the SLSOM accreditation process from Nancy Keteku, Regional Educational Advising Coordinator for Africa, Bureau of Educational and Cultural Affairs, United States Department of State. | 9 | X | Hearsay. Nancy Keteku has no personal information regarding SLSOM. |
| 46. | A June 2003 update of the *WHO World Directory of Medical Schools: Base Year 2001*[18] lists SLSOM in Cape Coast, Ghana, stating instruction began there in September 1999. The update also lists SLSOM in Monrovia, Liberia at 206 Broad Street, with an August 2000 accreditation date. | 9 | | This information is verifiable. |
| 47. | In spite of its current lack of accreditation, SLSOM has sometimes described itself as (or having been) accredited, or operating an instructional facility in Ghana, or actively hiring staff for such a facility. This is evident in archives of the SLSOM site, with screenshots below.[19]<br>[19] July 12, 2001:<br>http://web.archive.org/web/20010712004848/www.stluke.edu/index.html<br>June 4, 2002:<br>http://web.archive.org/web/20020604074536/stluke.edu/index.html<br>August 6, 2003:<br>http://web.archive.org/web/20030806100755/www.stluke.edu/index.html<br><br>Last saved 11/11/2009 1:58:00 PM | 9 | X | This information was outdated and the reference was from 2001, 2002, and 2003.<br><br>According to the web.archive.org website:<br><br>"This calendar view maps the number of times http://www.stluke.edu/index.html was crawled by the Wayback Machine, *not* how many times the site was |

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | actually updated. More info in the FAQ." |
| | | | | SLSOM - Ghana never hired permanent staff for its Ghana campus. According to the Ghana NAB law, accreditation was to be completed within 90 days of official application. The NAB did not abide by its own law. |
| 48. | *Jerroll Dolphin, MD is unlicensed; he is the primary provider of curriculum and training* If Dolphin were to hold a physician's license it would have been issued by California. However, according to the Medical Board of California's "Physician License Lookup" facility, no licensed allopathic physician in California has the last name "Dolphin." In addition, there are no licensed osteopathic physicians in California with last name "Dolphin." [20] | 10 | X | Speculative and fantasy. Dr. Dolphin did hold a medical license. It is not in California. The was no law in the USA, nor Ghana, nor Liberia that provides the qualification of instructors of medical basic science. |
| 49. | May 15, 2004: http://web.archive.org/web/20040515094444/stluke.edu/campuses.html May 1, 2007: http://web.archive.org/web/20070501140842/http://www.stluke.edu/ March 8, 2008: http://web.archive.org/web/20080308194219/http://www.stluke.edu/ [20] http://www.medbd.ca.gov/lookup.html | 10 | | Note the dates of the websites provided by George Gollin. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | 21 http://www.evtestcenter.com/student/testselect.php?instructorid=JBDolphin<br>Last saved 11/11/2009 1:58:00 PM 10 | | | |
| 50. | Jerroll Dolphin is also the "Medical Training Director" of the Dolphins' "Vital International Foundation,"23 to be discussed below.<br>Last saved 11/11/2009 1:58:00 PM 12 | 11 | X | As of the date of George Gollin's last update of the 91-page document, Dr. Dolphin was not the Medical Training Director of Vital International Foundation. |
| 51. | It is curious that Dolphin conducts training session to prepare students for the US<br>Medical Licensing Exam, even though he is not licensed. | 12 | X | SLSOM's pass rate on the USMLE is about 85%. It is curious that George Gollin does not address the results of SLSOM's or Dr. Dolphin's instructional techniques. He only uses his disguised racial biases, speculations and fantasies to defame and fraud. |
| 52. | Dolphin also has a facebook page;26 his "friends" list27 includes Larry Lammers,28 an American who went to prison for a variety of offenses related to using his purchased SLSOM degree. | 13 | X | Larry Lammers never obtained a medical degree from SLSOM. Complete falsehood. |
| 53. | http://www.classmates.com/directory/public/memberprofile/list.htm?regId=22 1010121<br>25 http://web.archive.org/web/20040529133909/http://stluke.edu/faculty.html<br>26<br>http://www.facebook.com/search/?q=dolphin%2C+jerroll&init=quick#/profile. php?id=728800954&ref=<br>arch&sid=14096671033.2816944381..1<br>27<br>http://www.facebook.com/search/?q=dolphin%2C+jerroll&init=quick#/friends<br>24 | 13 | | Hearsay from internet, with the intent to besmear. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | /?id=728800954<br>as Facebook:<br>http://www.facebook.com/search/?q=dolphin%2C+jerroll&init=quick#/profile.<br>php?id=701571046 | | | |
| 54. | *SLSOM is a California entity, operating in the jurisdiction of the State of California*<br>"Dr. Dolphin" is the contact person for enrollment in USMLE training courses offered by St. Luke. The SLSOM home page has an active link to the training program, which initially brings visitors to an "SLSOM Online Agreement."[29] Dolphin's email address, jdolphin@stluke.edu, is visible in the next screen shot. | 14 | X | SLSOM - Liberia is a registered Liberia corporation.<br>SLSOM - Ghana is a registered Ghanaian corporation.<br>SLSOM - Liberia only chose to adjudicate complaints according to California law. |
| 55. | St. Luke identifies itself as based in the United States: "The Site is controlled, operated and administered by St. Luke School of Medicine from its offices within the United States of America. St. Luke School of Medicine makes no representation that materials at Stluke.edu are appropriate or available for use outside of the United States..." | 15 | X | Completely false.  Only the website is controlled, operated and administered within the USA. |
| 56. | It is reasonable to assume that the MD-issuing portion of SLSOM is also operating subject to California law, so that SLSOM's program for currently enrolled students who will receive SLSOM MD degrees is in California's jurisdiction. It is possible that SLSOM currently operates in violation of the California statutes, though this determination can only be made after an examination of SLSOM's history of applying for California licensure, and appealing any denials of licensure. | 15 | X | Completely false and speculatory.<br>SLSOM has never issued any degrees using California for jurisdiction.<br>SLSOM does not operate in violation of any California |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | statute. The State of California is well-able to prosecute anyone or any corporation operating in violation of its laws.[1] |
| 57. | *SLSOM is not registered as a California corporation* A search in the California Business Portal[30] maintained by the California Secretary of State for a California corporation which includes "St. Luke" or "Saint Luke" in its name returns no records for the St. Luke School of Medicine. The same is true for a search of LP/LLC entities known to California. The closest entry is to a "St. Luke Medical Center, Inc," formerly of Torrance, California, whose registration was suspended.[31] [30] http://kepler.sos.ca.gov/ [31] http://kepler.sos.ca.gov/corpdata/ShowAllList?QueryCorpNumber=C2832133 Last saved 11/11/2009 1:58:00 PM 15 | 15 | X | Completely false and speculatory This demonstrates George Gollin's complete lack of knowledge of SLSOM's operation. |
| 58. | *The St. Luke Medical Foundation is associated with SLSOM and the Dolphins* The GuideStar web site,[32] which carries information about nonprofit organizations, knows of a "St. Luke Medical Foundation" founded in 1990, and using the address 101 North La Brea Avenue, Suite 305, Inglewood, California.[33] This is related to the St. Luke School of Medicine: the www.watchdog.net web site identifies its contact person as "John Dolphin."[34] [32] http://www2.guidestar.org/ [33] http://www2.guidestar.org/ReportNonProfit.aspx?ein=94-119561&Mode=NonGx&lid=3972708dl=True [34] http://watchdog.net/ein/943119561/st-luke-medical-foundation | 16 | | Hearsay. NB: George Gollin's continual reliance on unreliable outdated internet derived information.[1] |

---

[1]

[1]

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 59. | More information about John Dolphin is available in a Zoominfo.com archive of an early SLSOM faculty page that dates from June 13, 2000, before SLSOM had acquired its stluke.edu domain.35<br><br>35 http://www.zoominfo.com/people/Dolphin_John_39091077.aspx. The archived faculty roster was from http://stlukesom.edu.hosting.pacbell.net/docs/faculty.html.<br><br>Last saved 11/11/2009 1:58:00 PM 16 | 16 | X | Hearsay. NB: George Gollin's continual reliance on unreliable outdated internet derived information.[1] |
| 60. | *The physical location of SLSOM in Ghana*<br>It is likely that the building that had been identified in the past by the school as the site of SLSOM is at 567 Koowulu Street in Accra. Though no longer linked into the SLSOM home page, photographs are still available on the web site here: http://stluke.edu/slsomghanapics.html. Here are two exterior pictures from the site. They<br>do not appear to correspond to the same building. | 19 | X | Complete speculation. George Gollin has never been to either Ghana or Liberia and has no personal knowledge. Therefore his speculation and presentation of information contained in the 91-page document is fraudulent and hearsay.[1] |
| 61. | Another family member, Glory Dolphin (perhaps the daughter of Jerroll) was associated with SLSOM in its first years of operation. The Dolphins also run the Vital International Foundation. | 20 | X | Glory Dolphin was not associated with SLSOM in its first years of operation.<br><br>The Dolphins do not run Vital International Foundation.[1] |

1
1
1

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 62. | In the past, St. Luke has sometimes claimed to be an accredited degree-granting institution in Ghana. It has also claimed to be running an academic program that awards MD degrees, even during times when it was not claiming to be accredited. | 20 | X | George Gollin does not make any specific fact. He is, again, besmirching SLSOM without any evidence or fact.[1] When was SLSOM awarding MD degrees when it was not accredited? |
| 63. | SLSOM is a California entity, though not registered as a corporation. The Dolphins have a significant physical presence in southern California, though they appear to have close ties to Ghana, perhaps through Susana's family. | 20 | X | Completely false and speculatory. There is no fact of anything in George Gollin's statements.[1] |
| 64. | Jerroll Dolphin is not licensed as a doctor of medicine or as a doctor of osteopathy.<br>Last saved 11/11/2009 1:58:00 PM 20 | 20 | X | Completely false. |
| 65. | SLSOM has stopped admitting new students, perhaps in association with its attempt to obtain accreditation: it would almost certainly be operating illegally (as it may have done in the past) if it were to enroll students in a degree-granting program without first obtaining operating permission from the Ghanaian authorities. | 21 | X | Speculation intended to besmirch SLSOM. SLSOM has not issued medical degrees from Ghana.[1] |
| 66. | It is likely that students already enrolled in SLSOM will still be awarded MD | 21 | X | Completely false and |

Page 15 of 94                     Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | degrees upon completion of any remaining requirements imposed on them by SLSOM. | | | speculative, intended to besmirch SLSOM.[1] |
| 67. | *Susana Mitchell Dolphin heads VIF and Jerroll Dolphin runs its training programs*<br>VIF is run by Susana Mitchell Dolphin; the VIF "Medical Training Director" is Jerroll Dolphin.[42] | 22 | X | Completely false.  At the time of the writing of the 91-page document, November 2009, Dr. Dolphin had no position with VIF.[1] |
| 68. | Even though Jerroll Dolphin has no license, he teaches USMLE classes through VIF. | 22 | | Where is the requirement for licensure a requirement in Ghana, Liberia, or the USA for teaching USMLE training? This statement intended to besmirch Dr. Dolphin. |
| 69. | *The Vital International Foundation shares infrastructure and personnel with SLSOM*<br>The VIF web site shows a US fax number (323) 372-3757 and a Ghanaian post office box as part of the information displayed with its "company information" data:[48]<br>[46] http://www.sos.ca.gov/business/be/cbs-field-status-definitions.htm<br>[47] http://www.idealist.org/if/i/en/av/Org/103824-287/c<br>[48] http://www.vitalinternational.org/Vitalcampus/Vitalcampus.html<br>Last saved 11/11/2009 1:58:00 PM 24 | 24 | | There is no law in California, Ghana, or Liberia stating that these corporations cannot share personnel.  This is what most non-profit organizations do: borrow expertise and resources from corporations or educational organizations.<br><br>This statement was intended to besmirch SLSOM. |

—
1
1

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | This clearly demonstrated that George Gollin is an internet stalker.[1] |
| 70. | These are the same coordinates used in the current internet domain registration for www.stluke.edu, shown earlier. The VIF and SLSOM web sites show photographs of the two organizations' facilities that indicate shared space, though a certain amount of repainting seems to have taken place between the photographs displayed on the two web sites. Compare the following screen shots from the VIF and SLSOM web pages http://www.vitalinternational.org/Vitalcampus/Vitalcampus.html (on the left) and http://stluke.edu/slsomghanapics.html (on the right):<br><br>*VIF's California and Ghana addresses*<br>A brochure for VIF at http://www.vitalinternational.org/vitalbrochure.pdf provides a map to the facility.<br>Last saved 11/11/2009 1:58:00 PM 25 | 25 | X | 2 pictures from 2 dates, almost 2 years apart, early 2006 and late 2007.<br><br>There is no law or requirement that the NGO VIF and the educational institution maintain separate buildings.<br><br>Also VIF has been non-functional since January 2007. SLSOM applied for accreditation in June 2007.<br><br>Virtually this entire 91-page document is fantasies and speculations of George Gollin. With no personal knowledge of the actual operations of SLSOM and VIF, George Gollin's statements are fraudulent and defamatory |
| 71. | Apparently the Evergreen Street address is an apartment building whose pool was closed briefly because its water was improperly chlorinated.50 | 27 | X | Completely false, fantastic and |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | 50 http://la.everyblock.com/pool-closures/by-date/2009/10/7/739750/ <br><br> Last saved 11/11/2009 1:58:00 PM 27 | | | speculative. <br><br> Dr. Dolphin and his wife vacated that property in 2004. The date of the George Gollin's data is 2009. <br><br> **George Gollin is attempting to accuse Dr. Dolphin of living in an apartment building whose swimming pool was not properly chlorinated!** <br><br> With no personal knowledge of the actual operations of SLSOM and VIF, George Gollin's statements are fraudulent and defamatory |
| 72. | *Is there a VIF – SLSOM – Earthcare International connection?* <br> The 544 Evergreen St. address is also the address associated with a tax exempt organization named "Earthcare International, Inc." The contact person for this organization is "Kofi M. Ladzekpo." There is only minimal internet presence for Earthcare known to Google. 51 <br> 51 http://www.taxexemptworld.com/organization.asp?tn=1271752 <br> Last saved 11/11/2009 1:58:00 PM 28 | 28 | X | Completely false, fantastic and speculative. <br><br> Dr. Dolphin has never heard of Kofi M. Ladzekpo and knows nothing of Earthcare International, Inc. <br><br> With no personal knowledge of the actual operations of |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 73. | Kofi Ladzekpo had also been the agent for "Redeemed Home Health Corporation,"[52] an organization that appeared in some online directories of home healthcare providers. Note that the corporation was dissolved. | 29 | X | SLSOM and VIF, George Gollin's statements are fraudulent and defamatory. Completely false, fantastic and speculative.[1][5] Dr. Dolphin has never heard of Kofi M. Ladzekpo or Redeemed Home Health Corporation, and knows nothing of Earthcare International, Inc. |
| 74. | *Summary: the Vital International Foundation* One is left with the general sense that VIF is unlikely to be an effective force for good in Ghana. VIF appears to have minimal staff, claims to offer training courses perhaps taught by the unlicensed Jerrold Dolphin, and organizes visits for volunteers, apparently providing little more than food and shelter for a price that seems high by Ghanaian standards. (The VIF web site describes the costs of spending time in Ghana to be low, recommending that travelers budget $20 to $30 per week "to moderately shop, take taxis, and use the internet cafes, etc."[53] The connection between VIF and SLSOM is clear. How much of the money brought in by VIF is actually used to pay expenses over and above the salaries of its staff?[52] | 30 | X | Completely false, fantastic and speculative. George Gollin only speculates at the effectiveness of VIF, and its staff, all of which is false. George Gollin falsely speculates about the organized visits of volunteers of VIF, that were conducted successfully since 1997 through 2004, even before Dr. Dolphin was |

---

[1] With no personal knowledge of the actual operations of SLSOM and VIF, George Gollin's statements are fraudulent and defamatory.
[5] Internet hearsay, therefore double hearsay

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | married to Susana Mitchell. |
| 75. | http://kepler.sos.ca.gov/corpdata/ShowAllList?QueryCorpNumber=C2683802 s3 http://www.vitalinternational.org/volunteer_money.html Last saved 11/11/2009 1:58:00 PM 30 | 31 | X | George Gollin uses data from 2001 to defame SLSOM in 2009[2] SLSOM had the PacBell internet site since 1998. |
| | The first of the PacBell SLSOM sites archived by the Internet Archive was captured March 5, 2001.s4 It is simple in structure and content in comparison to the SLSOM sites from a few years later, giving the visitor a clear sense that the web site was young, rather than one of long standing that had been neglected by the Internet Archive. In 2001 the home page described SLSOM as accredited by both Liberia and Ghana. | | | |
| 76. | A June 2003 update of the *WHO World Directory of Medical Schools: Base Year 2000s*5 lists SLSOM in Cape Coast, Ghana, stating instruction began there in September 1999.  The update also lists SLSOM in Monrovia, Liberia at 206 Broad Street, with an August 2000 accreditation date. | 32 | X | False and speculative. George Gollin knows nothing of the operation of SLSOM and is, himself, a fraud.[3] [4] , |
| | But it is a different matter whether or not the school was actually offering classes taught by competent faculty. | | | |
| 77. | s6 http://www.balancingact-africa.com/news/back/balancing-act524.html s7 http://www.tcach.uni.cc/update.pdf s8 http://domain- history.domaintools.com/?page=details&domain=sthke.edu&date=2004-02- 05 Last saved 11/11/2009 1:58:00 PM 32 | 32 | X | Error! Bookmark not defined., Error! Bookmark not defined. |

2   The date of George Gollin's defamatory document is 11/11/2009.  Please note the difference in the date referenced by George Gollin.  As of 11/11/2009, this information is not true or pertinent, and perhaps was not true at the date it published.
3   George Gollin knows nothing of the operation of SLSOM and is, himself, a fraud.  He has never been to Liberia or Ghana.  He has no personal knowledge.
4   This statement is completely false and speculative.

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 78. | An Inglewood address for Glory Dolphin appears in the "Payment Details" file currently available on the St. Luke web site at http://www.stluke.edu/stluke_payments.doc, as shown in the two screen images below: | 34 | X | 2, 3, 4, **Error! Bookmark not defined.** |
| 79. | The page is dated June 19, 2006 and specifies Monrovia, Liberia as the school's location, and describes it as offering a Doctor of Medicine degree. Elsewhere in the web page the addresses of the school's "Finance Officer" and "Admissions Officer" are given as a post office box in Ghana.<br><br>**St. Luke School of Medicine**<br>**Finance Officer**<br>**P.O. Box M241**<br>**Accra, Ghana**<br><br>**St. Luke School of Medicine**<br>**Admissions Officer**<br>**P.O. Box M241**<br>**Accra, Ghana** | 35 | X | George Gollin knows nothing of the operation of SLSOM and is, himself, a fraud.[5][6]<br><br>Is there anything wrong about officers of an educational institution having the same post office address?<br><br>Another attempt by George Gollin to besmirch SLSOM. |
| 80. | The locations specified for SLSOM have varied over time. The following have been claimed by the organization for itself in recent years. | 35 | X | George Gollin knows nothing of the operation of SLSOM and is, himself, a fraud.[7][8]<br><br>**Error! Bookmark not defined., Error! Bookmark** |

[5] George Gollin knows nothing of the operation of SLSOM and is, himself, a fraud. He has never been to Liberia or Ghana. He has no personal knowledge.

[6] This statement is completely false and speculative.

[7] George Gollin knows nothing of the operation of SLSOM and is, himself, a fraud. He has never been to Liberia or Ghana. He has no personal knowledge.

[8] This statement is completely false and speculative.

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | not defined. |
| | | | | Another attempt by George Gollin to besmirch SLSOM. |
| 81. | St. Luke claimed to be opening a branch campus in Lagos, Nigeria in 2004. The following screen shot of a January 10, 2004 archived page indicates that "Dr. Alfred Egedovo" is the contact person for the Nigeria operation,[9] which was scheduled to open in February 2004. Egedovo had been listed on the SLSOM web site as an August 2002 graduate of the school. (See material below.)<br><br>[9] January 10, 2004 archive of<br>http://www.stluke.edu/campuses/nigeria/nigeria.html<br>Last saved 11/11/2009 1:58:00 PM 35 | 35 | X | George Gollin knows nothing of the operation of SLSOM and is, himself, a fraud.'[10]  Error! Bookmark not defined., Error! Bookmark not defined.<br><br>Another attempt by George Gollin to besmirch SLSOM. |
| 82. | A December 8, 2004 archive of a St. Luke page advertized its Nigerian campus, announcing "ATTEND MEDICAL SCHOOL NOW! ST LUKE SCHOOL OF MEDICINE" and declaring that<br><br>Onsite and online programs are available leading to Doctor of Medicine. Now accepting applications in Lagos, Nigeria campus. We provide AMERICAN STYLE medical doctor training at affordable fees to student wishing to obtain the following degree under the St Luke University School of Medicine extension campus program. St. Luke graduates are eligible to take the United States medical licensing examination (USMLE) and practice in the USA. Our students can also participate in the exchange training rotations at our | 36 | X | Error! Bookmark not defined., Error! Bookmark not defined.  Error! Bookmark not defined. |

[9] George Gollin knows nothing of the operation of SLSOM and is, himself, a fraud. He has never been to Liberia or Ghana.  He has no personal knowledge.

[10] This statement is completely false and speculative.

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | campuses: India, Liberia, and United Kingdom, and clinical rotations in West Africa, USA, UK, India, Philippines, Middle East, Mexico, and the Caribbean. St. Luke currently has graduates practicing in USA, Ghana, Kenya, Nigeria, and India.60<br><br>The page listed "Jerroll B.R. Dolphin, M.D., President, St. Luke School of Medicine - Worldwide" and "Alfred O. Egedovo, M.D., Academic Officer, St Luke School of Medicine – Nigeria." It further stated that "SLSOM Doctor of Medicine graduates were<br>60 December 8, 2004 archive of www.stluke.edu/lagoscampus.html<br>Last saved 11/11/2009 1:58:00 PM 36 | | | |
| 83. | An SLSOM brochure shows Liberia's Dogliotti College of Medicine in a "campus photo."<br>The top photograph of the three on the cover of the SLSOM brochure created in 2001 and shown below is almost certainly an image of the A.M. Dogliotti College of Medicine, a professional school of the University of Liberia.<br><br>The brochure does not inform the student that the photo is not a St. Luke School of<br>Medicine campus photograph.<br>Last saved 11/11/2009 1:58:00 PM 37 | 37 | X | SLSOM did have an agreement to conduct classes with A.M. Dogliotti College in 2001. **Error! Bookmark not defined., Error! Bookmark not defined., Error! Bookmark not defined.**<br><br>This is just another attempt by George Gollin to besmirch SLSOM.[11] |
| 84. | It further stated that "SLSOM Doctor of Medicine graduates were<br>60 December 8, 2004 archive of www.stluke.edu/lagoscampus.html<br>Last saved 11/11/2009 1:58:00 PM 36<br>37 | 37 | | George Gollin attempts to make the reader believe that this statement is false. |

---

11   This is another attempt by George Gollin to besmirch SLSOM.

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | the TOP SCORERS in several West African Licensing Examinations. St. Luke School of Medicine students have a better than 80% pass rate for USMLE."; | | | However, SLSOM graduates were the top scorers on several West African Licensing Examinations. **Error! Bookmark not defined.** |
| 85. | For a year or two a list of alumni and "recent graduates" was posted to the SLSOM web site. This is shown in the screen shot that follows. Note that the lists refer to the named individuals as "graduates and alumni," "recent graduates," and "doctoral candidates." At no point are they referred to as recipients of honorary degrees. It is clear that the page<br>Last saved 11/11/2009 1:58:00 PM 38<br>39<br>intends these lists to be taken as rosters of (former) students of the St. Luke School of Medicine who have earned, or nearly finished earning, medical degrees. In addition, ways in which some SLSOM graduates used their degrees—to become a "professor" at a diploma mill masquerading as a medical school, or to serve as the chief medical officer of a company claiming to have discovered a cure for one form of skin cancer—show that these credentials issued by SLSOM were being used as if they were legitimate, earned medical degrees. | 38, 39 | X | Completely false statements intended to defame SLSOM and its graduates.<br><br>George Gollin offers no proof to his false claims, only naked speculative allegations.[12] |
| 86. | · March 2002<br>  o Stephen J. Arnett, M.D.<br>  o Brenda C. Arnett, M.D.<br>  o Herbert W. Winstead, M.D.<br>  o Edwin Muniz, M.D.<br>  o Thomas J. Mulvi, M.D.<br>  o Egbert G. Phipps, M.D.<br>  o John E. Curran, M.D. | 40 | X | Completely false.<br><br>George Gollin uses incorrect and outdated information to libel SLSOM.<br><br>Dr. Dolphin never authorized |

[12] George Gollin offers no proof to his false claims, only naked speculative allegations with the intent to prejudice the reader.

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 87. | Assuming that SLSOM really did begin operating in 1999, it awarded at least five MD degrees to students after at most two years of enrollment at St. Luke. The rest of the graduates, who received degrees in 2002, received their credentials after St. Luke had been operating for less than three years. | 40 | X | this information or these people to be posted on the internet as "SLSOM graduates". |
| | | | | All authentic SLSOM graduates had completed at least 2 years, some had completed more than 3 years of medical school, prior to enrollment at SLSOM and prior to 2005. |
| | | | | They were all transfer students into the 3rd or 4th year of a 4-year medical curriculum. |
| | | | | They all completed clinical rotations at accredited hospitals. |
| | | | | George Gollin, himself, is a liar and a fraud. |
| | | | | **Error! Bookmark not defined., 2, 3, Error! Bookmark not defined., 12** |
| 88. | *The roster of SLSOM faculty: June 2002*<br>The list of medical faculty was somewhat different on June 4, 2002. Ettinger and Kateh | 42 | X | The information referred to by George Gollin was always |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | were gone, but there were eleven new members:<br>· Marian Ewurama Addy, Ph.D., MS, B.Sc.<br>· Stephen J. Arnett, M.D., N.M.D.<br>· Michel Dioubate, M.D. Professor<br>· E. Esteban, M.D., N.M.D. (Probably Ernest Esteban)<br>· Hoyt Harris, M.D., N.M.D.<br>· Dowell Kelley, D.C.<br>· Thomas J. Mulvi, M.D., N.M.D.<br>· Edwin Muniz, M.D., N.M.D.<br>· Egbert G. Phipps, M.D. (M.A.), N.M.D.<br>· Stephanie West, N.M.D.<br>· Herbert W. Winstead, D.M.D., M.D.<br>Several of them—Arnett, Esteban, Harris, Kelley, Mulvi, Muniz, West, and Winstead—<br>were Americans.<br><br>Note that five of the new faculty had received MD degrees from SLSOM after graduating less than three months earlier: Arnett, Mulvi, Muniz, Phipps, and Winstead. Further, these new faculty (with degrees from SLSOM) became professors at the St. Luke School of Medicine less than three years after the September, 1999 SLSOM inception date. It is difficult to believe they could have become competent to teach medicine after such a short amount of time in the field. In addition, most (perhaps all) of these American professors (with their recently obtained SLSOM degrees) failed to obtain licenses to practice | | | incorrect and never authorized by Dr. Dolphin to be included on the SLSOM website.<br><br>George Gollin conspired with corrupt Liberian government officials in 2004-2009 to deny SLSOM students and graduates access to sit for the USMLE examinations, offered through the ECFMG.[13]<br><br>George Gollin and corrupt Liberian government officials are virtually the sole authors of libelous information about SLSOM on the internet and elsewhere.[14]<br><br>George Gollin is a racist, using obsolete, outdated, and incorrect information out-of-context to defame SLSOM. |

[13]  George Gollin conspired with corrupt Liberian government officials in 2004-2009 to deny SLSOM students and graduates access to sit for the USMLE examinations, offered through the ECFMG.

[14]  George Gollin and corrupt Liberian government officials are virtually the sole authors of libelous information about SLSOM on the internet and elsewhere.

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | medicine in the United States. | | | |
| 89. | Other March 2002 SLSOM graduates are also described as holding major responsibilities in running SLSOM, only a few months after graduating:<br>· Thomas J. Mulvi is now "Chairman, Department of Clinical Medicine;"<br>· Edwin Muniz is now "Chairman of Department of Nutritional Medicine." | 43 | X | This information was incorrect when it was published on the internet. Dr. Dolphin never authorized its publication, most likely when he was traveling. |
| 90. | How can a legitimate program be taught by a faculty in which at least two of its professors have limited experience past medical school and at least two of its other professors are unlicensed? | 43 | X | There are many MCAT medical schools that employ or have employment personnel who were unlicensed.<br><br>George Gollin uses incorrect and outdated information to libel SLSOM. |
| 91. | *Professor Taliaferro Harris, M.D., convicted of Medicare fraud*<br>Taliaferro Harris, M.D., is a Professor of Anatomy and Physiology. He does not hold a license as an MD in Arkansas, California, Tennessee, or Illinois. He obtained his MD degree from Ross University School of Medicine and served for a time as an adjunct faculty member in Nutrition at Southeast Arkansas College. [63] Harris is listed as a<br>[63] https://www.scark.edu/student/2006-07SEARKCollegeCatalog.pdf<br>Last saved 11/11/2009 1:58:00 PM 43<br>44<br>professor in all the St. Luke faculty rosters that are available on the Internet Archive, spanning the period July 12, 2001 through June 6, 2004.[64] Harris might have known Jeroll Dolphin from high school. Dolphin is a 1967 graduate of Dorsey High School, in Los Angeles. He has a classmates.com web page indicating this.[65] Harris is a 1968 graduate from the same school.[66] Images from classmates.com for Harris follow. He describes himself as a | 43 – 47 | X | Dr. Dolphin and Dr. Harris had the permission of the Medical and Dental Council of Ghana to treat the Liberian refugees in 1998. There are a dozen witnesses to prove this fact. That is why to this date, the Medical and Dental Council of Ghana has not asked for the prosecution of Dr. Dolphin.<br><br>1, 2, 3, 4, 5, 6<br><br>There many other associate |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | medical doctor in his classmates submissions.<br>64 http://web.archive.org/web/*/www.stluke.edu/faculty.html<br>65 http://www.classmates.com/profile/user/view?registrationId=221010121<br>66<br>http://www.classmates.com/profile/user/view?registrationId=202633101#profileMain<br>Last saved 11/11/2009 1:58:00 PM 44<br>45<br>Taliaferro Harris appears to have spent time practicing medicine without a license in Ghana in collaboration with Jerroll Dolphin. The SLSOM web site currently carries an account titled "Two Days Experience At A Refugee Camp In Ghana" above the byline<br><br>"Jerroll Dolphin, M.D." 67 In it, Dolphin describes working with "Dr. T. W. Harris" at the "Bora-Bora Liberian Refugee Camp about 30 miles west of the Capitol City, Accra, Ghana" in 1998. (Dolphin is probably referring to the Buduburam camp.68) His coworker was "Taliaferro Harris, M.D., Professor of Anatomy and Physiology, Doctor of Medicine, Ross University School of Medicine, Dominica, Biology, Tennessee State University, Former Professor Anatomy and Physiology, Arkansas State University, Pine Bluff." The Medical Board of California does not show a Taliaferro Harris (or anyone with a similar name) in its list of licensed MD's.69 Neither Tennessee's70 nor Arkansas'71 nor Illinois' boards show a license for Harris. Harris is not licensed to practice medicine in the United States.<br><br>Dolphin's account of treating Liberian refugees in Ghana would suggest that he was practicing medicine; prescribing medication, giving injections, and giving antibiotics to patients. It is worth reproducing his account of his activities in its entirety. | | | professors of anatomy who have MD degrees teaching anatomy in the USA.<br><br>George Gollin is using his racism to disqualify Dr. Harris as an anatomist, even though Dr. Harris taught anatomy at Arkansas State University.<br><br>In his racism and hatred, George Gollin completely ignores the good accomplished by Dr. Dolphin and Dr. Harris at that brief encounter with the refugees.<br><br>He had no contact with any of the refugees at the camp. He has no personal knowledge of what happened. He is only speculating because of his racial hatred of Dr. Dolphin and Dr. Harris, being black Americans. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | Our day started several days earlier after our first visit to the Bora-Bora Liberian Refugee Camp about 30 miles west of the Capitol City, Accra, Ghana. That day Dr. T. W. Harris and I examined over 160 patients during a three-hour visit, at night. When we arrived in late October 1998, the sun was setting and we asked that the "Word" be spread that two American doctors were at the camp and would examine those people needing treatment. It took 10 minutes to find a single light bulb and candles were lit to illuminate the waiting room, which was already full of patients.

It took another thirty minutes for two gallons of water to arrive so that Dr. Harris and I could wash our hands after each examination. We were equipped with exam gloves, otoscopes, and tongue depressors. Nurses set up triage in the waiting room and we were told that there were a hundred people in line before we started examining patients.

We worked at a frantic pace. Inexperienced in Africa, we wrote patients prescriptions after we examined them, based on our clinical judgement alone. The patients kindly took our prescriptions and thanked us. We provided simple

67 http://stluke.edu/refugeecp.html
68 http://en.wikipedia.org/wiki/Buduburam
69 http://licenselookup.mbc.ca.gov/licenselookup/search.php
70 http://health.state.tn.us/Licensure/index.htm
71 http://www.armedicalboard.org/directory/
Last saved 11/11/2009 1:58:00 PM 45
46
explanations of our diagnosis. After about twenty minutes, some of them came back, kindly excusing themselves, and telling us that they would not be able to fill the prescriptions because they did not have money or work. | | | |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | We realized that we had been working as the "great American Doctors", diagnosing and prescribing medicine and giving advice to people needing more than good advice. If we were to make a difference at this refugee camp, we would have to provide the medicine we prescribed to aid these suffering people. | | | |
| | Working under the light of a sixty-watt bulb, Dr. Harris and I continued. Several children were brought in looking like the starved poster children you see on American television. One elderly woman was brought into our dim examining room in a wheelbarrow listless and unresponsive. After much examination and discussion we determined that she was in a hypoglycemic diabetic coma and after we administered sugar water to her, she woke up. | | | |
| | Another woman had spinal injury, which was untreated for several years. More than a dozen children had marasmus determined from the reddened hair and swollen bellies. A half dozen had kwashiorkor and were crying for the want of food. More than half of the patients we saw were in dyer need of food and water. Malnutrition was rampant. | | | |
| | After four hours, we quit for the night. There were more than 450 people in the line. So we had our assistants number little tags and hand those out so that the people stnding in line would not loose their place the next time we came. | | | |
| | The next day, we voted to purchase medicine instead of food because we did not have enough money to feed the whole camp. We could provide enough prototype medicines to supply the camp for at least a month. With about $900 USD, we purchased a sizeable quantity of prototype medicines based on the disease distribution we saw the night before. We went back to the Bora-Bora | | | |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | Refugee Camp that Saturday determined to make a difference. | | | |
| | We arrived at the camp at 7:00 AM. We were going to use a larger facility and we had 4 Liberian nurses and a Physicians Assistant we called Dr. Andrew. There were two experience pharmacy technicians, also Liberians, whose dark distribution room was next to my examining room. Dr. Harris also had an exam room, and Andrew was assigned to clean the patients' ears with hydrogen peroxide and inject medicines as prescribe by him, Dr. Harris and myself. All people entering the facility had to wash their extremities in bleach-water to prevent inadvertent infection. It took two hours to bring enough water to start examining the patients. When we started there were 650 people in line at 9:00 AM. | | | |
| | Again we all worked at a feverish pace. The difference this time was our ability to dispense medicine, both pills and injectables by needle and IV. Malnutrition was the most prominent problem. Every patient was also given chloramphenicol eyewash and about 90% were treated with mebendazole or metronidazole for worm infections. Seven children were brought into the clinic listless with fever of undetermined origin. They were all treated with antibiotic/lemon/sugar water mixture for infection and re-hydration. They all recovered some strength within 30 minutes of treatment were moving and smiling.  We treated more than 40 patients for malaria with injections of chloroquine. 20 children and 8 adults had scabies and other topical skin parasites. They were treated with Lindane shampoo that I brought over from the USA by coincidence. 40 adult patients had hypertension.  They were treated with beta-blockers mostly and calcium-channel blockers which were bought a very inexpensive price. They were each given a 30 to 60 day Last saved 11/11/2009 1:58:00 PM 46
47 | | | |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | supply. Bronchitis was common and we had TMP-SMZ for all patients with those problems. We encountered three cases of pneumonia, which we treated very aggressively, with combinations of antibiotics. We had a variety of penicillins and cephalosporins that we dispensed according to our clinical judgement of the patients' conditions. We were unable to do blood tests. | | | |
| | Indeed we were so overwhelmed that it would not be expedient or productive, nor did we have the equipment to do so anyway. We encountered more than 20 cases of STDs. Children and adults were brought in with ENT infections, asthma, bronchitis, possibly botulism and dysentery, impetigo, dermatitis, myalgia, eye infections, diabetes type II, parasitic infections including gastrointestinal worms, cystircercosis, trichinosis, schistosomiasis, etc. Many elderly were treated for diabetes. | | | |
| | Most adults had symptoms of depression, and by the way, 70% of the adults were women. Most of the adult men had been killed during the Liberian civil war. | | | |
| | Many families were not genetic families. The older women picked up abandoned and orphaned children on the road from Liberia to Ghana. These children knew no other mother than the kind woman who has acted as a mother for them since their separation from their natural families. At 3:00 PM, we were told there was more than 900 people in line. | | | |
| | We worked 9:00 PM that night. We attended more than 400 patients and families. Sometime during the afternoon, we asked the experienced nurses to recommend drugs and treatment for the masses of people asking to be seen. | | | |
| | Only the most severe would be seen by Dr. Harris and Dr. Dolphin, and some | | | |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | of the less suffering, asked to see a doctor, just for their own well being and gratification. We were told that we were the first doctors in the seven-year history of the refugee camp who actually put their hands on the patients, and the first to dispense medicine. | | | |
| | We came back for a follow-up visit that Monday. We did not announce our arrival and we only stayed a few hours. None of our patients complained of feeling worse. Most said they felt better and some said it was miraculous. None of our patients died. All of the children recovered. My only regret was that we couldn't distribute food as well as medicine. | | | |
| | Although Ghanaians do not suffer like the Liberian refugees, they do have common environmental problems that are endemic to that region such as malaria, parasitic infections, hypertension, etc. | | | |
| | You will find that a clinical rotation in Ghana or Liberia will be very demanding and rewarding. You will use all of what you learned in medical school . . . . . . . . | | | |
| 92. | It appears that Jerroll Dolphin and Taliaferro Harris arrange medical tourism trips in western Africa. Keep in mind that neither individual has a license to practice medicine in the United States. "Dr. Tollie Harris" is mentioned in an announcement for "a ten-day tour to Ghana to treat Liberian refugees and patients at the RFK Hospital in Monrovia, Liberia"[73] In the following screen shot.<br>[72] http://stluke.edu/refugeecp.html<br>[73] http://lists.topica.com/lists/TheBlackList/read/message.html?sort=a&mid=130 0600086 | 47 – 48 | X | All of George Gollin's statements are completely false and fantastic.<br><br>Dr. Dolphin never arranged "medical tourism trips" anywhere at anytime.<br><br>Dr. Dolphin never sent the email referenced by George |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|----------|-----------------|------|-------|---------------------|
| | Last saved 11/11/2009 1:58:00 PM 47 | | | Gollin in the 91-page document. |
| | | | | This is a fraudulent reference and another example of the fraud committed by George Gollin. |
| | | | | Double internet hearsay or complete fraud by George Gollin. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | **48**<br><br>Please Foward: Reception/Meeting for Refugee Volunteers    ⊕ Jan 19, 2000 20:25 PDT<br><br>=================================<br>The following message was received at TheSite-@listbot.com<br>and is being forwarded to you, the list owner.<br>=================================<br><br>Greetings to all,<br><br>Dr. Jerroll Dolphin, a dedicated brother in California, who specializes in<br>AIDS, has established a medical school and hospital in Cape Coast Ghana.<br>If<br>you are or know any physicians or intermediate healthcare persons, would<br>you<br>please foward this message on to them. Thank you - Karen<br><br>In a message dated 1/16/00 8:56:13 AM Pacific Standard Time,<br>scorn-@pacbell.net writes:<br><br><<<br>Ladies and Gentlemen and Students,<br>St. Luke School of Medicine at Cape Coast, Ghana, and St. Luke Medical<br>Foundation, in association with the Economic Development Foundation, are<br><br>sponsoring a ten-day tour to Ghana to treat Liberian refugees and<br>patients at<br>the RFK Hospital in Monrovia, Liberia.<br><br>This trip will take place in April 2000.<br><br>A celebration, reception and planning meeting is schedule Jan 22 2000<br>at<br>the home of Dr. T. W. Harris, in Los Angeles at 3PM. The address is:<br><br>Dr. Tollie Harris<br>4504 Kernsey Ave<br>Los Angeles, Ca. 90008<br><br>If you have any questions regarding this trip, and you are unable to<br>attend,<br>please feel free to call me at 323-292-3561, in Los Angeles.<br><br>Thank you, sincerely,<br><br>-- Dr. Dolphin<br>President, St. Luke School of Medicine at Cape Coast<br>Cape Coast, Ghana<br>>> | | | |
| 93. | The web page http://www.nurseweek.com/features/00-01/ghana.html holds a | 48 – | X | Dr. Dolphin's name was not |

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | description of a 1999 relief mission to Ghana by "Project Africa 2000." Note that "T.W. Harris, MD" is among the participants, and that the organization is the "St. Luke Medical Foundation." | 50 | | mentioned in these paragraphs. This is irrelevant to SLSOM or Dr. Dolphin. It is, however, another attempt by George |
| | On Dec. 1, 1999, Jerome Griffin, PhD, executive director of the Economic Development Foundation in Los Angeles, returned from a trip to Ghana as part of Project Africa Medical Relief Mission to aid Liberian refugees. He and eight healthcare workers provided medical care to 1,000 refugees in just four days. | | | Gollin to besmirch Dr. Dolphin and SLSOM. |
| | Despite working sunup to sundown in a small cement room, he can't wait to go back. | | | Dr. Dolphin was in Los Angeles in December 1999 and had nothing to do with this trip. |
| | The volunteer physicians and nurses administered emergency medical relief to Liberians in the Buduburam refugee camp near Accra, Ghana. More than 50,000 Liberians fled their country during its 10-year civil war, and many now live in camps in nearby Ghana. | | | The St. Luke Medical Foundation provided medicine and money to the previous trip in 1998. |
| | "We saw 1,000 people and treated 800," Griffin said. "Most of them hadn't seen a doctor in three or four years, and some had lived there for eight years. There's a tremendous need for assistance." | | | What is wrong with Dr. Griffin's group treating Liberian refugees? Is it a crime. |
| | Griffin's team included Erik Fleischman, MD; Shawn Dillon, DDS; T.W. Harris, MD; Janice Sivard, RN; Anna Hallowanger, RN; and Anita Williams, RN. Lonzena Harkless served as a volunteer counselor and support person…<br>Last saved 11/11/2009 1:58:00 PM 48<br>49 | | | Note that George Gollin does not attack the Caucasian personnel in Dr. Griffin's group. |
| | In 1998, Griffin and his colleagues spent $20,000 of their own resources to set up the foundation and made their first trip under the umbrella of Project | | | |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | Africa. For the latest trip, the St. Luke Medical Foundation, Ward African Methodist Episcopal and First African Methodist Episcopal churches, Los Angeles City Councilman Mark Ridley-Thomas, music executive Clarence Avant, the Roger and Sheryl Reeves family, and the Economic Development Foundation donated $50,000 for medicine and supplies. The team also collected $50,000 worth of HIV/AIDS medicine from private donors.74 | | | |
| 94. | The web page posts the address of "Project Africa 2000" as 6709 Latijera (La Tijera) Blvd, Suite #122, Los Angeles, CA 90045, phone (310) 840-4597 for those willing to make donations. This is also an address mentioned previously for Vital International Foundation | 49 | X | Completely false statement. |
| 95. | Perhaps the Project Africa 2000 trip is the same one described by Jerroll Dolphin, shown earlier | 49 | X | Completely false and speculative statement. |
| 96. | In 2008 Taliaferro Harris was indicted for felony health care fraud. He was convicted in 2009. The illegal activities appear to have been going on while he was a "professor" at SLSOM. From the indictment: | 49 & 50 | X | Hearsay.  Gollin does not provide any references.

Dr. Harris has not been employed for SLSOM since 2001. |
| | Beginning on an unknown date and continuing to in or about May 2005, in Los Angeles County...defendants TALIAFERRO HARRIS... and SUSANNA ARTSRUNI..., together with other co-schemers known and unknown to the Grand Jury, knowingly and willfully, and with intent to defraud, executed and attempted to execute a scheme: (a) to defraud a health care benefit program, that is, Medicare, in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the control of Medicare, in connection with the delivery of and payment for health care benefits, items, and services... | | | This has nothing to do with SLSOM.  He is trying to infer that Dr. Dolphin and SLSOM had something to do with Medicare fraud.

Dr. Dolphin had nothing to do with Dr. Harris and his conviction at the time. |
| | Defendant HARRIS, representing himself to be a licensed physician or a licensed physician assistant, interviewed and/or examined the Medicare | | | |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | beneficiaries and signed medical charts and records for services that were either medically unnecessary or were not provided at all. Because defendant HARRIS did not have a provider number that could be used to bill Medicare for his services, defendant HARRIS's services were billed using the provider numbers of physicians who had also been hired to work at the clinic, but who generally were not there on a day-to-day basis. | | | Dr. Harris was not a professor at SLSOM at the time of his conviction or at the time of his alleged illegal activities. |
| | The medical clinic caused claims to be submitted to Medicare reflecting that a physician and/or a physician assistant had provided the recruited patients with necessary medical services when, In reality, the medical services were not medically necessary or were not provided at all. | | | |
| | Last saved 11/11/2009 1:58:00 PM 49<br>50<br>During the course of the scheme, defendants HARRIS and ARTSRUNI, and their co-schemers, billed Medicare for at least $178,000 in medical services purportedly rendered, and obtained at least $88,000. 75<br>75 *United States of America vs. Taliaferro Harris, aka Robert Newman, and Susanna Artsruni, February 2008* | | | |
| 97. | *Professor Steve Arnett, SLSOM Vice President is unlicensed and has significant involvement with other medical diploma mills*<br>SLSOM Vice President Arnett had held a Kentucky surgical assistant's license but was pressured to surrender it voluntarily in 2008.76 A resident of Kentucky, he does not hold a valid Kentucky physician's license.<br><br>Besides his involvement with SLSOM, Arnett has also been closely connected with the University of Science Arts and Technology Medical College of London and the Lady Malina Memorial Medical College, both owned by Orien Tulp, a retired professor of nutrition from Drexel University with a legitimate | 50 | X | Steve Arnett was not the Vice President of SLSOM since 2003 when it was determined that he was conning SLSOM.<br><br>SLSOM and Dr. Dolphin admitted that their brief association with Steve Arnett was a mistake. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | PhD from the University of Vermont and an MD from the "International University of Fundamental Studies" diploma mill.[77] The following April 30, 2005 screen shot of the USAT entry in the ECFMG IMED data base shows Arnett as the USAT-MCL "Dean."[78] | | | Dr. Dolphin reported Arnett's activities to the FBI, Pikeville Kentucky office in 2003, Agent Spaughn.<br><br>Arnett also conned the officials of USAT for a brief period.<br><br>Neither Dr. Dolphin or Dr. Tulp had anything to do with Lady Malina Memorial Medical College. |
| 100. | [76] Information from a Kentucky official familiar with this incident.<br>[77] December 30, 2003 archive of www.mcl-edu.co.uk/1441.html . Tulp's PhD was awarded in 1974 by the University of Vermont; October 17, 2009 archive of http://www.drexel.edu/catalog/archive/pdf/2003/GRAD-2002-2003.pdf and http://www.med.uvm.edu/alumni/downloads/PhD_Class_List.pdf Drexel University Catalog 2002-2003, Graduate Program in Nutrition and Food Science. See also "Medical college kicked off campus," Phil Baty, The Times Higher Education, 17 October 2003. Also: October 17, 2009 archive of http://www.usat.ms/contact.htm and http://www.wvs.state.wv.us/acupuncture/licensees.html. "Orien L. Tulp (USA), Doctor of Medicine, Diploma DM No. 150736" from an October 1, 2009 archive of "International University of Fundamental Studies Full Accredited and Registered Post Graduation Degree/Honour Holders in 2007 Registered Post Graduate Honour Holders in 2007": http://www.mufo.ru/downloads/Bulletin-No3.pdf .<br>[78] April 30, 2005 archive of the USAT listing in the IMED data base.<br>Last saved 11/11/2009 1:58:00 PM 50 | 50 | X | Internet hearsay.<br><br>This is Double internet hearsay that is completely irrelevant to whether Dr. Dolphin or SLSOM has committed any fraud.<br><br>It is another attempt by George Gollin to besmirch and dishonor SLSOM and Dr. Dolphin. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 101. | For the bizarre nature of IUFS, see a July 11, 2003 archive of www.iufs.edu/GKA-Med_Center.html. Richard Hoyer was listed as the "Director/CEO" of the IUFS "GKA International Medical Center" while "Professor Dr. Hans J. Kempe" was its "Chief of Medical Staff." Kempe explained how the GKA cured patients with cancer: "Diseases don't exist naturally but the incapability of the water molecules to transport, storage and send Energy and Information throughout the body. This development led me to the discovery of the 62 Frequencies of the creative human cell structure and to computerized programs stimulating the function of the healthy cell... The GKA activates the molecules of the water, corrects the Spin of the Electrons and enables the force to transport Energy and Information throughout the entire body - and when this is balanced, the human body function is healthy!" That is utter nonsense. | 50 | X | This is Double internet hearsay that is completely irrelevant to whether Dr. Dolphin or SLSOM has committed any fraud. Dr. Dolphin never heard of neither Richard Hoyer nor Hans J. Kempe and knows nothing of IUFS. It is another attempt by George Gollin to besmirch and dishonor SLSOM and Dr. Dolphin. |
| 102. | Neither USAT-MCL nor Lady Malina actually offer instruction, though they do pretend to be medical schools. In the following April 5, 2005 screen shot from the USAT-MCL web site, we read "UK PROGRAM LOCATIONS - Classes for the MD and other academic programs are conducted at Suite 505, 107 Fleet Street, Central London, UK, Postcode EC4A 2AB, Tel: 01634-324-007." But one of my colleagues stopped at that address and took photographs. There was no Medical College of London to be found. She wrote A quick note to say that Rashid (my T.A.) and I took the morning to discover the Medical College of London. We found 107 Fleet Street, took a photo as evidence, buzzed our way inside, took the very elegant elevators to the 5th floor—only to find—you'll be happy to know—absolutely nothing. In suite 500-502 a generic career center that had no affiliation with anything you sought. We looked for 505 and it was simply a hidden room, certainly not a suite, and nothing with a name or label. The building is a Business Exchange. | 50 – 55 | X | This is Double internet hearsay that is completely irrelevant to whether Dr. Dolphin or SLSOM has committed any fraud. It is another attempt by George Gollin to besmirch and dishonor SLSOM and Dr. Dolphin. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | Suite 505 was down a darkened, locked hallway. My Illinois colleague and her teaching assistant found a janitor who let them into the hall. They pounded on, then photographed, the unmarked, unopened door. There was no such thing as the Medical College of London at 107 Fleet Street.<br><br>Last saved 11/11/2009 1:58:00 PM 51 | | | |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|



Page 42

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 103. | London.<br>The "Lady Malina Memorial Medical College" is an appendage of USAT-MCL.[79]<br>As shown below, in January 2005 its contact page named Steve Arnett as the primary link to the organization.[80]<br>[79] January 10, 2005 archive available at<br>http://web.archive.org/web/20050110215416/http://www.uhsusat. info/.<br>[80] January 10, 2005 archive:<br>http://web.archive.org/web/20050110220553/www.uhsusat. info/univerity_of_health_sciences_lady_malina_contact.html<br>Last saved 11/11/2009 1:58:00 PM 53 | 50 – 55 | X | This is Double internet hearsay that is completely irrelevant to whether Dr. Dolphin or SLSOM has committed any fraud.<br><br>It is another attempt by George Gollin to besmirch and dishonor SLSOM and Dr. Dolphin. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | 54 | | | |

**Contact The University Of Health Sciences**

If you have questions, please contact Steve Arnett. You can call, e-mail, write, or even fax us. For more information about the School or the courses available, please feel free to contact our Administration Office. An application is available upon request.

**U.S. Information Offices:**
Lady Malina Memorial Medical College
*Eastern US Information Office*
No. 62 Van Borders Rd
Falcon. KY 41426
Phone. (606) 349-1660
Phone. (606) 349-7929
Toll Free. (877) 499-1660
Fax. (606) 349-1660
E-mail: sarnett@tooshifs.net

The USAT faculty roster listed a number of SLSOM-affiliated individuals, including Arnett, Muniz, Esteban, Mulvi, and Muniz. See the following screen shot.

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 104. | 55<br><br>In a May 16, 2005 archive of the Lady Malina web site it is stated that USAT-MCL and Lady Malina have merged:<br><br> | 55 | X | Double internet hearsay that is completely irrelevant to whether Dr. Dolphin or SLSOM has committed any fraud.<br><br>It is another attempt by George Gollin to besmirch and dishonor SLSOM and Dr. Dolphin. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 105. | The "accreditation" of USAT-MCL from Montserrat is not an indication of quality. The other (there are only two) medical school in the FAIMER-IMED data base for Montserrat is "Seoul Central College of Medicine," a school in the unrecognized "Atlanta Central University."[81] Neither USAT-MCL nor the Seoul Central College of Medicine have had<br>[81]<br>https://imed.faimer.org/details.asp?country=654&school=&currpage=1&cnam e=MONTSERRAT&city=&<br>region=&rname=&mcode=654020&psize=25<br>Last saved 11/11/2009 1:58:00 PM 55<br>56<br><br>*any* of their graduates pass the U.S. Medical Licensing Exam. It is possible that none of their students have even registered to take the exam.[82] | 55 – 56 | X | Double internet hearsay that is completely irrelevant to whether Dr. Dolphin or SLSOM has committed any fraud.<br><br>It is another attempt by George Gollin to besmirch and dishonor SLSOM and Dr. Dolphin.<br><br>Complete speculation by George Gollin. He cannot legally obtain student records from the ECFMG or USMLE to determine if any student or graduate of any medical school has registered or passed any USMLE licensing examination. |
| 106. | A screen shot of part of a May 29, 2004 archive of the SLSOM faculty roster is shown below. Note the continuing presence of Arnett, listed as "Vice President, St. Luke School of Medicine, Dean, Department of Natural | 56, 57 | X | George Gollin is committing a fraud and deliberately misrepresenting USAT in his intention to misrepresent SLSOM and Dr. Dolphin.<br><br>Completely false. SLSOM did not publish any faculty list because SLSOM officials |

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | Medicine, Director, Public Relations, Student Loan Programs, and Director of Alternative Education and Research."[83] | | | knew they were being stalked, but they did not know who was stalking them until January 2010, George Gollin. |
| | | | | The faculty list that George Gollin refers to was incorrect in May 2004. He obtained obsolete information by scouring www.stluke.edu, looking for scraps like a dog looking for a bone in a mound of paper. |
| 107. | Arnett has received significant local press coverage in Kentucky, primarily in articles written by Valarie Honeycutt Spears, some in her "Degrees of Harm" series. Here is her October 13, 2008 article "Med schools scrutinized: Stephen Arnett Linked To Online, Foreign Programs."[84]<br><br>The Kentucky Board of Medical Licensure has opened an investigation into whether a Magoffin County man who promoted online and foreign medical schools has broken any state laws, C. Lloyd Vest, an attorney for the board, said yesterday. Stephen J. Arnett, a former tombstone salesman and Free Will Baptist minister, promoted the St. Luke School of Medicine, an online school based in Liberia, from an address in Falcon, a small Magoffin County community, until 2003. He held key titles at the school, including vice president, and helped recruit students and place them in Kentucky hospitals and clinics.<br><br>Vest said board officials decided to launch a new investigation following a | 57 | X | This is double internet hearsay and is completely irrelevant to SLSOM's current operation.<br><br>Nonetheless, the newspaper article states that Arnett held a position with SLSOM until 2003, as stated by Dr. Dolphin.<br><br>It states that SLSOM students were placed at Kentucky hospitals and clinics. This demonstrates that George Gollin, himself, is a liar and a fraud. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | threepart series in the Herald-Leader and that the board would turn over any evidence to the appropriate authorities. The state attorney general's office also began investigating Arnett's involvement with the foreign school after a reporter called with questions. 84 "Med schools scrutinized: Stephen Arnett Linked To Online, Foreign Programs," Valarie Honeycutt Spears and Lee Mueller, Lexington, KY Herald-Leader, October 13, 2008. Last saved 11/11/2009 1:58:00 PM 57 | | | |
| 108. | 58 The articles outlined how three men who have been convicted of practicing medicine without a license -- two in Kentucky and one in Rhode Island -- used their affiliation with St. Luke to treat patients or to study in clinical settings. In the 1990s, Arnett owned and ran several Eastern Kentucky clinics. State authorities investigated complaints against him, but he has never been criminally charged in connection with his medical activities. | 58 | X | Both George Gollin and the author of this newspaper article are trying to associate SLSOM with Steve Arnett in 2008 even though the newspaper article states that Arnett's association with SLSOM ended in 2003. |
| | Now a licensed massage therapist in both Kentucky and West Virginia, Arnett now maintains an office at 624 James S. Trimble Drive, inside the Paintsville Ramada Inn, called Health and Sports Wellness Center. | | | This is outrageous and egregious, to associate SLSOM and Dr. Dolphin with Steve Arnett more than 5 years after their admitted dissociation. Dr. Dolphin has had no contact with Steve Arnett since 2003. |
| | A company at the same address is listed in Kentucky Secretary of State records as ISO-Diagnostics Testing of Kentucky with Steve "Arnette" -- the last name spelled with an extra "e" -- as the organizer and director. | | | |
| | But Arnett is rarely seen in the office, hotel employees said. "He comes in once or twice a month, checks his mail, pays his rent and you'll never see him till next time," Frankie Tackett, a desk clerk at the Ramada, said yesterday. | | | Steve Arnett's last words to Dr. Dolphin were "You don't know how to make any |

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | Filing cabinets and a lighted Tiffany-style lamp on a desk can be seen through the glass door to the office, located just off the hotel lobby. A seal on the door says the center is a member of the American Medical Massage Therapy Association. Services listed include massage therapy, neuromuscular therapy, cellulite treatment, naturopathic/homeopathic remedies and reflexology, as well as homeopathic and natural health products and nutritional consultation. | | | money". |
| | A Herald-Leader reporter visited the office three times this week and found the door locked. Arnett could not be reached yesterday and has declined the Herald-Leader's repeated requests for interviews. | | | |
| | Arnett has been licensed as a naturopath in Idaho and Washington, D.C., and as an acupuncturist in West Virginia. Naturopathy involves using only natural elements or the body's own immune system to treat disease. | | | |
| 109. | St. Luke President Jerroll Dolphin said in a recent interview that he stopped working with Arnett in 2003 and took away an honorary medical degree the school had given him because he thought Arnett was giving degrees without requiring proper course work. | 58 | | True<br><br>However, this was stated to Ms. Valarie Honeycutt Spears in 2005, in a telephone interview when Dr. Dolphin was in Liberia.<br><br>In this article, the author is using a conversation from 3 years earlier to sell newspapers without informing the readers. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | It was Steve Arnett giving degrees without requiring course work. |
| | | | | However, to the best of Dr. Dolphin's knowledge, they were not medical degrees. |
| 110. | Though some states have questioned the school's legitimacy, Dolphin said St. Luke offered an intensive curriculum and was not a diploma mill -- a school without accreditation that awards degrees for money and little work. | 58 | X | The only states that question SLSOM's legitimacy are the ones that use George Gollin's fraudulent "diploma mill list" published by the Office of Degree Authorization of the State of Oregon. |
| 111. | Larry Lammers worked in a chain of accident injury centers in Kentucky and served a jail sentence for practicing medicine without a license.<br><br>Court documents show that Arnett recruited him to St. Luke. Lammers completed course work, Dolphin said, but did not receive a medical degree because of his Kentucky conviction. | 58 | X | Lammers was recruited by Steve Arnett. Lammers also submitted incomplete police report from Kentucky that did not show his previous conviction in Florida.<br><br>Corrective action has alleviated the submission of false police reports.<br><br>Lammers did not complete his course work. He did not receive a medical degree from SLSOM. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | Lammers was suspended from SLSOM in 2003 when he violated SLSOM Clinical Rotation rules to "not practice medicine" and maintain physician oversight at all times. |
| 112. | Arnett arranged for Andrew E. Michael to observe a heart specialist in Lexington. While in Kentucky, Michael was convicted in Nevada of practicing medicine without a license. He served a jail sentence and is back in custody on federal credit card charges. He never completed his studies at St. Luke, Dolphin said. | 59 | X | Steve Arnett also recruited Andrew Michael.

Michael submitted a false police report to SLSOM for admission that did not show his conviction of practicing medicine without a license.

Michael was immediately suspended from SLSOM when it was found out that he was a felon in 2003.

Corrective action has alleviated the submission of false police reports. |
| 113. | John E. Curran, who was sentenced in August to 12 1/2 years in federal prison in Rhode Island, said Arnett provided him with diplomas in medicine and naturopathy. Dolphin said Curran was never a legitimate St. Luke student. | 59 | | Steve Arnett also recruited John Curran. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | SLSOM has no documentation whatsoever for Curran. He was never a student of SLSOM. |
| | | | | He was arrested in 2003. SLSOM had nothing to do with his illegal activity. |
| 114. | Take note of Jerroll Dolphin's misrepresentation of the connection between SLSOM, Arnett, Curran, and others in the article. *Professor Thomas J. Mulvi, M.D., N.M.D., and Chairman, Department of Clinical Medicine is unlicensed* Mulvi uses a Brooklyn, New York address.[85] He does not hold a physician's license in New York State.[86] In 2007 he was listed on the USAT-MCL web site as the "President USAT New York, USAT Florida, AMERICUS - American International University, Belize."[87] [85] http://www.wvs.state.wv.us/acupuncture/licensees.html [86] New York State Office of the Professions: http://www.op.nysed.gov/opsearches.htm. [87] http://www.degreediscussion.com/forums/viewtopic.php?=&highlight=domini ck&p=24166#p24097 Last saved 11/11/2009 1:58:00 PM 59 60 | 50 | X | Completely false. George Gollin uses some unknown website or source to libel Dr. Dolphin and SLSOM. Dr. Dolphin has dissociated himself and SLSOM with Mulvi since 2003. Any credentials that he obtained from SLSOM were obtain through Steve Arnett. George Gollin writes the State of Oregon's Office of Degree Authorization warning, and he does not disclose this to the reader. Dr. Dolphin knows nothing about American International |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | 60 <br><br> 4. University of Health Science, UHS-USAT New York: American International University, Belize <br> *Academic Office* <br> *Thomas Mehl* <br> President USAT New York, USAT Florida, AMERICUS - American International University, Belize <br> *Clinical Science Department* <br> *Dr. A. Cogal Clinical Consultant* <br> **Contact The American International University, Belize** <br> U.S. Information Offices: <br> 204 15th Street <br> Brooklyn, NY 11215 <br> Main: (718) 768-3800 <br> Information: (718) 768-6200 <br><br> The State of Oregon's Office of Degree Authorization carries this warning about AIUBelize: <br> "Fraudulent, carries false certification reading "ADA - State of Oregon USA." Any degree bearing this certification is fraudulent." | | | University and neither he nor SLSOM has any association with it. |
| 115. | On the 2002 SLSOM faculty roster, Edwin Muniz is listed as Edwin Muniz, M.D., N.M.D. N.M.D., Southern College of Naturopathic Medicine M.D., University of the East, School of Medicine Dean of Muniz Teaching Institute and Clinic Board Member, Southern Graduate Institute Chairman of Department of Nutritional Medicine[92] | 60 | X | False. <br><br> Muniz was also recruited by Steve Arnett in 2002. <br><br> George Gollin is using a brief and incorrect reference of 2002 to disparage Dr. Dolphin and SLSOM in 2009 and 2011. |
| 116. | Muniz uses a Brandon, Florida address.[89] He does not hold a physician's license in Florida.[90] Muniz is the subject of a Wikipedia biography[91] almost | 60 - 64 | X | Double internet hearsay that is completely irrelevant to |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | certainly written with Muniz's consent. On the 2002 SLSOM faculty roster, Edwin Muniz is listed as Edwin Muniz, M.D., N.M.D. N.M.D., Southern College of Naturopathic Medicine M.D., University of the East, School of Medicine Dean of Muniz Teaching Institute and Clinic Board Member, Southern Graduate Institute Chairman of Department of Nutritional Medicine[92] Google is unaware of the "Muniz Teaching Institute and Clinic." The "University of the East, School of Medicine" may refer to the "University of the East College of Medicine" in the Philippines. It seems unlikely that Muniz has a legitimate, earned MD degree. [88] http://www.osac.state.or.us/oda/unaccredited.aspx [89] http://www.wvs.state.wv.us/acupuncture/licensees.html [90] FloridaDepartment of Health: http://ww2.doh.state.fl.us/IRM00PRAES/PRASLIST.ASP [91] http://en.wikipedia.org/wiki/Edwin_Mu%C3%B1iz [92] http://web.archive.org/web/20020604034735/http://sltuke.edu/faculty.html Last saved 11/11/2009 1:58:00 PM 60 61 An Edwin Muniz is described in a Wikipedia page. In it Muniz is said to have obtained "a Ph.D. in Bioastronautics and Astrobiology from the International Institute for Advanced Studies" in 1986. If it exists at all, this entity is not accredited in the United States. The article then states "In 1989, he earned his second Ph.D. degree, this time in Aerospace Physiology, from Clayton State University in Morrow, Georgia." A Google search for the two strings "Aerospace Physiology" and "Clayton State University" returns only eight hits, all to material naming Muniz. | | | whether Dr. Dolphin or SLSOM has committed any fraud. It is another attempt by George Gollin to besmirch and dishonor SLSOM and Dr. Dolphin. SLSOM has no record of Muniz earning a degree in "Aerospace Medicine" or "Pharmaceutical Medicine" Dr. Dolphin never heard of Clayton State University, Dominick Flarey, Bryer State University, American Institute of Health Care Professionals, or "Central States Consortium of Colleges and Schools" and certainly neither Dr. Dolphin nor SLSOM has any affiliation or relationship with any of those persons or organizations. George Gollin is committing a fraud and deliberately misrepresenting this |

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | There is good reason for the paucity of Google hits in a Clayton State Aerospace Physiology search. The school's registrar confirmed in a phone call that Muniz never received a PhD from CSU, and in fact could not possibly have received such a degree since Clayton does not award any PhD degrees at all, with the highest degree being a <br> Last saved 11/11/2009 1:58:00 PM 61 <br> 62 <br><br> master's.[93] This is further supported by the CSU web page giving a brief history of the school:[94] <br><br> In 1981, Clayton State, though cooperation with the Georgia Department of Technical and Adult Education, began offering applied associate degrees and certificates. Five years later, the Board elevated the institution to baccalaureate status as Clayton State College, with four-year programs in nursing and business. Later, the establishment of the Bachelor of Applied Science degree made Clayton State a national leader in bridging the gap between applied associate programs to bachelor's degrees, which offered students little, in any, loss of credit. <br><br> Founding president Downs retired in January 1994 and was succeeded by Dr. Richard A. Skinner. Under Skinner's leadership, Clayton State was elevated to university status as Clayton College & State University in 1996 and became the first public university in the Southeast, and one of the first in the nation, to issue notebook computers to all students at all levels in all majors. This transformed the campus and made Clayton State a national pioneer in "ubiquitous computing." .... <br><br> ...[In] 2005, the university as a whole underwent its fourth name change, becoming Clayton State University on May 18, 2005. Later that same year, the Board approved Clayton State's first graduate degree program, the Master of | | | information in his intention to misrepresent SLSOM and Dr. Dolphin to the public. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | Arts in Liberal Studies (MALS)… Perhaps the Muniz article is mistaken about the source of his degree. There is, for example, a diploma mill named "Clayton University," access to whose home page is password protected.[95] The CU web site includes this amusing question and answer on its "frequently asked questions" page: "[Question]:Do you sell degrees without requiring the students to pass courses? [Answer]: Absolutely not! All of Clayton's degree programs take the equivalent of several years to complete. Clayton awards degrees based on the learning you have achieved not only on the time you have been studying. Degrees are awarded solely based on what you know and have demonstrated…."[96] There is also the "Clayton College of Natural Health" which does not offer degrees in any field that includes the word "Aerospace" in the program name.[97] The Muniz article also asserts that "he decided to go to medical school and in 2002, he earned his MD degree in Aerospace Medicine, from the St. Luke's University School of Medicine. He subsequently completed a Doctor of Philosophy (Ph.D.) in Pharmaceutical Medicine at St. Luke's University School of Medicine." [98] The link in the Wikipedia [99] Phone conversation with a Clayton State University official, November 9, 2009. [94] http://about.clayton.edu/history.htm [95] http://www.claytonuniversity.com/ [96] http://www.claytonuniversity.com/Questions.html [97] http://www.ccnh.edu/catalogthankyou.aspx?online=yes [98] http://en.wikipedia.org/wiki/Edwin_Mu%C3%B1iz Last saved 11/1/2009 1:58:00 PM 62 63 article used to document his St. Luke credentials takes visitors to an Internet Archive of a page from Jerroll Dolphin's St. Luke School of Medicine.[99] Muniz is listed as an "Advisory board member of the American College of Hypnotherapy."[100] This organization is part of Dominick Flarey's "American | | | |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | Institute of Health Care Professionals"; Flarey was the primary operator of the Breyer State University diploma mill and the executive director of AIHCP. One of the organizations under the AIHCP umbrella was the "Central States Consortium of Colleges and Schools," an accreditation mill that issued bogus accreditation to the University of Science Arts and Technology-Medical College of London and the Lady Malina Memorial Medical College.<br>⁹⁹http://web.archive.org/web/20020604045614/http://stluke.edu/graduates.html<br>¹⁰⁰http://www.aihcp.org/board.htm<br>Last saved 11/11/2009 1:58:00 PM 63 | | | |
| 117. | *Professor Egbert Phipps runs unsavory degree providers widely described as diploma mills*<br>Egbert Phipps is the "Founder and CEO" of "Weston Reserve University,"¹⁰¹ a degree providing entity widely described in unflattering terms inside the higher education community. Its name is confusingly similar to the properly accredited "Case Western Reserve University." Phipps is also the "Founder and Chair" of the malodorous degreegranting "Alternative Medicines Research Institute."¹⁰²Phipps is identified in *Bears' Guide* as one of the officers of "Stanton University."¹⁰³ He holds a variety of advanced degrees, some honorary, from scrofulous organizations such as "Bircham International University"¹⁰⁴ Phipps is probably based in Canada, sometimes using an address in Vancouver, British Columbia.¹⁰⁵<br>¹⁰¹ http://westonreserve.org/message.htm<br>¹⁰² http://www.altmedresearch.org/AMRI/faculty.htm<br>¹⁰³ *Bears' Guide to Earning Degrees by Distance Learning, 15ᵗʰ edition*, John B. Bear, PhD and Mariah P.<br>Bear, MA, Ten Speed Press, Berkeley (2003).<br>¹⁰⁴ Bircham University web page: | 64, 65 | X | False.<br><br>Phipps was also recruited by Steve Arnett in 2002.<br><br>George Gollin is using a brief and incorrect reference of 2002 to disparage Dr. Dolphin and SLSOM in 2009 and 2011.<br><br>Double internet hearsay that is completely irrelevant to whether Dr. Dolphin or SLSOM has committed any fraud.<br><br>It is another attempt by George Gollin to besmirch and Gollin to besmirch and |

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | http://www.bircham.net/index.php?option=com_content&view=category&lay out=blog&id=45&Itemid=68 [105] http://www.altmedresearch.org/AMRI/contact.htm Last saved 11/11/2009 1:58:00 PM 64 65 According to the College of Physicians & Surgeons of British Columbia, Phipps does not hold a valid British Columbia physician's license. [106] | | | dishonor SLSOM and Dr. Dolphin. SLSOM has no record of Phipps earning a degree of any kind. Dr. Dolphin has received numerous emails from Phipps where Phipps asked, and even offered payment of large sums of money, for Dr. Dolphin to validate his "credentials" so that he can sit for Canadian medical exams.  Dr. Dolphin refused each and every time. George Gollin is committing a fraud and deliberately misrepresenting this information in his intention to misrepresent SLSOM and Dr. Dolphin to the public. |
| 118. | *Professor Herbert W. Winstead, D.M.D., M.D. is not a licensed physician* On the 2002 SLSOM faculty roster, Winstead is listed as Herbert W. Winstead, D.M.D., M.D. D.M.D., University of Louisville M.D. (M.A.), Open International University President, Cedar Grove Wellness Center | 65 – 67 | X | Dr. Winstead is or was a licensed Dentist. Winstead earned his diploma. He was well over 60 years old when he accomplished that |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | Educational Vice President, Southern Graduate Institute Chairman, Department of Manual Medicine Chairman, Department of Homeopathic Medicine [107] Winstead is based in Walling, Tennessee. The Cedar Grove Wellness Center is in Quebeck, Tennessee, [108] only two miles from Walling. [106] https://www.cpsbc.ca/node/264 [107] http://web.archive.org/web/20020604034735/http://stluke.edu/faculty.html [108] http://www.yelp.com/biz/cedar-grove-wellness-center-quebeck Last saved 11/11/2009 1:58:00 PM 65 66 Winstead sometimes refers to himself in professional situations as holding both a legitimate DMD degree and a genuine MD degree. [109] However, the Tennessee Department of Health only knows of his license to practice dentistry, not medicine. [110] Even though Winstead only has a genuine license to practice dentistry in Tennessee, he claims an MD in a web site that validates "National Provider Identifiers." [111] In addition, Winstead is listed that way in a provider reference page. [112] Tennessee only recognizes his DMD credential. [113] [109] http://www.dr.com/dr-herbert-winstead.html [110] http://health.state.tn.us/licensure/results.asp [111] http://www.npivalidator.com/NPI_Codes_5739.html [112] http://www.dr.com/dr-herbert-winstead.html [113] http://health.state.tn.us/licensure/Practitioner.ASP?prof=1201&licnum=1997& Filenum=2235 Last saved 11/11/2009 1:58:00 PM | | | task. It was his choice to not go on to residency, not SLSOM's. George Gollin is committing a fraud and deliberately misrepresenting this information in his intention to misrepresent SLSOM and Dr. Dolphin to the public. Again, this is double internet hearsay. |
| 119. | *Chief Executive Officer Glory Dolphin was also "Chief Business Development* | 68 – | X | Completely false. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | *Officer" in 2001*<br>A reverse address search on www.phonenumber.com for the Inglewood address used in the 2004 stluke.edu domain registration returns three hits, as shown below.<br>Last saved 11/11/2009 1:58:00 PM 67<br>68 | 71 | | Double hearsay from the internet, which is completely false.<br><br>SLSOM occupied 8516 11th Ave, Inglewood from 2001 through 2005.<br><br>Neither Dr. Dolphin nor anyone truly associated with SLSOM knows anything of F. O. B. International or Luis Cannon.<br><br>George Gollin is committing a fraud and deliberately misrepresenting this information in his intention to misrepresent SLSOM, Dr. Dolphin, and members of Dr. Dolphin's family to the public. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | 68 | | | |



68

**3 Results matching "8516 11, Inglewood, CA, 90305".**
Need More Help With Your Search?

Map View

Select -

---

WORK LISTING

**F.O.B. International**
Job title:      unavailable
Company:    F.O.B. International

8516 S 11th Ave, Fl 2ND
Inglewood, CA 90305-1987
(323) 750-1801
Listing Detail

SPONSORED LINKS
Looking Background Info for F.O.B.
International
myLife
View F.O.B. International's Profile

---

WORK LISTING

**Cannon Louis**
Job title:      unavailable
Company:    Cannon Louis

8516 S 11th Ave.
Inglewood, CA 90305-1987
(323) 750-4679
Listing Detail

SPONSORED LINKS
Looking Background Info for Louis
Cannon
myLife
View Louis Cannon's Profile

---

WORK LISTING

**Dolphin Glory**
Job title:      Chief Executive Officer
Company:    St Luke School of
                   Medicine

8516 S 11th Ave, Fl 2
Inglewood, CA 90305-1988
Listing Detail

SPONSORED LINKS
Looking Background Info for Glory
Dolphin
myLife
View Glory Dolphin's Profile

Select -

---

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 120. | "Glory Dolphin" is also probably the same person as Glory Dolphin-Hammes, the subject of "Women Increasingly Take Top Roles in Family Businesses," a May 9, 2004 article in the *San Jose Mercury News* written by Michelle Chandler. | 68 | | This excerpt from the 91-page document clearly demonstrates George Gollin's speculation and lack of knowledge.<br><br>George Gollin is a fraud masquerading as a crusader. He is a liar and a racist.<br><br>He will attack anyone or any institution that is private and minority owned. |
| 121. | Note the presence of "Glory Dolphin," listed as the "Chief Executive Officer" for SLSOM. Selecting the single record for her yields three "sponsored links" which identify her age as 34. Perhaps she is Jerroll Dolphin's daughter: with his 1967 graduation date from high school he would be approximately 26 years her senior. | 68 | X | This excerpt from the 91-page document clearly demonstrates George Gollin's speculation and lack of knowledge.<br><br>George Gollin is a fraud masquerading as a crusader. He is a liar and a racist.<br><br>He will attack anyone or any institution that is private and minority owned. |
| 122. | The July 11, 2001 brochure for St. Luke, produced at a time when SLSOM identified itself as a Liberian school, names Glory Dolphin as the brochure's author in the PDF file's document properties, as shown below.115 The file is still present on the SLSOM web site, though there are no links to it accessible through the current home page. | 69 | X | The information that George Gollin refers to from SLSOM's website was never true. That is why there are no links to it. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | 114 July 12, 2001 archive of www.stluke.edu/faculty.html<br>115 March 9, 2003 archive of http://www.stluke.edu/slsm_brochure.pdf .<br>Last saved 11/11/2009 1:58:00 PM 69 | | | Gollin is a liar and a cheat. |
| 123. | A "Medical Student Catalog" continues to be available on the SLSOM web site with URL http://www.stluke.edu/stluke_catalog.doc, though there are no links to it in the present version of the site. This version of the catalog describes the organization this way: | 70 | X | The information that George Gollin refers to from SLSOM's 2001 website is not true in 2009 or 2011. That is why there are no links to it.<br><br>Gollin is a liar and a cheat. He is using internet links from 2001 to make false assertions in 2009 and 2011. |
| 124. | The Microsoft Word document properties for the catalog show that it was created November 12, 2006 and last saved by "Dolphin." The Company field is "IQAir," the name of the air filter business run by Glory Dolphin-Hammes. Perhaps "CSUF FACULTY RESEARCH" is inherited from a document originally written by a California State University, Fullerton author. | 70 | X | Completely false.<br><br>Glory Dolphin only worked briefly at SLSOM in 2001 and never since.<br><br>The original work on that catalog, was done at CSUF by Dr. Dolphin.<br><br>Gollin is a liar and a cheat. He is using outdated and irrelevant internet links from 2001 to make false assertions in 2009 and 2011. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 125. | *John E. Curran, M.D., class of March 2002, incarcerated for practicing without a license* Curran does not have a Rhode Island physician's license.[116] He is currently serving a 150 month sentence for his "medical" activities.[117] Here is the text of a news story giving some of the details. [116] https://healthri.mylicense.com/Verification/ [117] "Doctored Diplomas: For Some Medical Degrees, It's Log On, Pay Up—A trail of bogus claims and life-threatening consequences," Valarie Honeycutt Spears, Lexington, KY *Herald-Leader*, October 1, 2006. Last saved 11/11/2009 1:58:00 PM 71 | 71 | X | Curran was recruited by Steve Arnett in 2003. Curran was never a student at SLSOM. SLSOM has never had any academic or financial records or payment of fees for Curran. He, like Phipps contacted Dr. Dolphin for verification for his "diploma", also offering money to which Dr. Dolphin refused each and every time. Dr. Dolphin asked Arnett "who the hell is this guy?" |
| 126. | Curran, Michael and Lammers all worked toward medical degrees from online schools that were promoted from the remote mountain community of Falcon, Ky. There, sitting at a computer, was the man behind the schools -- Stephen J. Arnett, 47, who had been a Free Will Baptist minister before becoming involved in the medical field, court records say. | 72 | X | Curran never did any coursework at SLSOM. None of those criminals were awarded degrees by SLSOM. Stephen J. Arnett was a corrupt individual who recruited those individuals in 2002. Arnett's brief association with SLSOM ended in 2003 when Dr. Dolphin and SLSOM reported |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | him to the Pikeville KY FBI office. |
| | | | | The FBI officials said their priority was "terrorism" and then they turned the investigation of Arnett to the Kentucky State police. |
| | | | | No charges were brought against Arnett by either the FBI or Kentucky police. |
| | | | | Gollin who has no personal knowledge of SLSOM, its operations, or history is alleging that Dr. Dolphin and SLSOM - Liberia was complicit with Arnett, which is a complete lie. |
| | | | | Dr. Dolphin and SLSOM tried to stop Arnett's corrupt activities. Neither Dr. Dolphin nor SLSOM profited in any amount from Arnett's activities. |
| 127. | The most prominent of the schools Arnett has been associated with is St. Luke School of Medicine, which has had a number of incarnations. | 72 | X | The Southern Graduate Institute was owned and |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | St. Luke and its Southern Graduate Institute – a division that focused on naturopathy – are central to the criminal cases against Curran, Michael and Lammers. | | | operated by Stephen J. Arnett, not SLSOM.<br><br>SLSOM had nothing to do with the operation of SGI.<br><br>Dr. Dolphin and SLSOM tried to stop Arnett's corrupt activities. Neither Dr. Dolphin nor SLSOM profited in any amount from Arnett's SGI activities. SLSOM's association with Arnett and the SGI ended in 2003. |
| 128. | St. Luke President Jerroll Dolphin, contacted in Liberia, West Africa, said Arnett had been affiliated with the school and that, at one point, the two planned to establish a school in Kentucky. However, when Dolphin received calls from people he didn't know were students, he suspected that Arnett was granting St. Luke diplomas without the appropriate course work.<br><br>In 2003, the two men severed their relationship and Dolphin said he revoked Arnett's honorary medical degree.... | 70 | | The newspaper article stated that the relationship was severed in 2003.<br><br>Dr. Dolphin also reported Arnett's activities to the FBI in 2003, they did nothing to stop it. |
| 129. | He incorporated a company called Foreign Alternative Medical Education, as well as St. Luke School of Medicine. Both had a Falcon, Ky., address that Arnett used. | 73 | X | SLSOM was already incorporated in Liberia. The KY incorporation by Arnett was a fraudulent cover for his illegal activities. It was unknown to Dr. Dolphin. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 130. | Not long afterward, Robert Irving, a student from one of Arnett's online schools, was warned by the state medical licensing board to close a medical practice he had begun in Elizabethtown, according to board documents. | 73 | X | Completely false. |
| | | | | The SGI was not a division of SLSOM. |
| | Irving said he received a doctor of naturopathy degree from Southern Graduate Institute, a division of St. Luke, in 2001. His contact was Arnett. Irving | | | Irving received his SGI certificate in 2001. |
| | did six-week rotations for orthopedics, physical rehabilitation and anesthesiology at an Accident Injury Center in Lexington where Larry Lammers worked. | | | SLSOM was not contacted until 2002 by Arnett and had no relationship with Arnett or SGI. |
| 131. | Irving, Curran, Lammers and Michael have all said they thought they were receiving a legitimate medical education from schools Arnett was promoting. | 73 | | This demonstrates that Arnett and SGI were complicit with Curran, Lammers, and Michael, not Dr. Dolphin nor SLSOM. |
| | | | | Dr. Dolphin never heard of these individuals until after meeting with Arnett in 2002. |
| 132. | *Michael Hejazi, M.D., class of August 2001, is unlicensed* Hejazi lives in New Jersey[118] and served (at least in 2007) as an adjunct instructor at County College of Morris. He does not have a license to practice medicine in New Jersey.[119] | 73 | | Dr. Hejazi also has a PhD.<br><br>Gollin is trying to libel and slander Hejazi for Gollin's own deceitful purposes. |
| 133. | *Mary Anthony Julve, M.D., class of August 2001, is unlicensed* Julve lives in New Jersey.[120] She does not have a license to practice medicine | 73 – 74 | | Gollin conspired with corrupt Liberian officials to remove |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | in New Jersey.121<br>118 Julve and Hejazi cointacted me about the public availability of their SLSOM degree information. They use the same return address in correspondence.<br>119 http://www.state.nj.us/cgi-bin/consumeraffairs/search/searchentry.pl<br>120 Op. cit., Julve-Hejazi letter.<br>121 Op. cit., http://www.state.nj.us/cgi-bin/consumeraffairs/search/searchentry.pl<br>Last saved 11/11/2009 1:58:00 PM 73<br>74<br>*Peter Michael Kolosky, M.D., class of August 2001, is unlicensed*<br>Peter Kolosky lives in Connecticut, according to an Intelius.com search. He does not hold a Connecticut physician's license.122<br>*Laurie Ann Luisi Kolosky, M.D., class of August 2001, is unlicensed*<br>Laurie Kolosky also lives in Connecticut, according to an Intelius.com search. She does not hold a Connecticut physician's license.123<br>*Astara Sunrise Burlingame, M.D., class of August 2001, is unlicensed*<br>Astara Sunrise Burlingame live in Washington. She does not hold a physician's license there.124 | | | SLSOM from the IMED, and invalidate the USMLE test results of SLSOM students and graduates.<br><br>However, George Gollin does not state his complicity in the removal of SLSOM from the IMED. However, he chooses to denigrate the efforts and accomplishments of SLSOM graduates after he has actively participated in the demise of recognition of the educational institution: to state that its graduates are "unlicensed".<br><br>George Gollin is a hypocrite and a bigot of the worst kind. |
| 134. | According to the Dundee, Michigan *Independent*, Lammers has been convicted of practicing medicine without a license in Florida, Kentucky, and Michigan.126 He has spent time in prison for these offenses. See the story, above, about Curran, Lammers, and Michael. Here is a photograph of Lammers at a sentencing hearing in Ohio.127<br>122 http://www.physicians.dph.state.ct.us/web_public/web_public.show<br>123 http://www.physicians.dph.state.ct.us/web_public/web_public.show<br>124 https://fortress.wa.gov/doh/providercredentialsearch/SearchResult.aspx<br>125<br>http://web1.ky.gov/GenSearch/LicenseList.aspx?AGY=5&FLD1=arnett&FLD | 75 | | Lammers was already suspended from SLSOM, in 2003, for the same reason he was arrested, practicing medicine without a license in Kentucky. He violated SLSOM's clinical rotation agreement.<br><br>SLSOM did not condone his |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | 2=&FLD3=&FLD4=&TYP E= <br> [126] "Man arrested for treating patients without license," *The Independent*, Dundee, Michigan, October 1, 2004. http://www.dundeeonline.com/articles/10.1.2004.html. "Doctored Diplomas: For Some Medical Degrees, It's Log On, Pay Up—A trail of bogus claims and life-threatening consequences," Valarie Honeycutt Spears, Lexington, KY *Herald-Leader*, October 1, 2006. <br> [127] "Unlicensed practitioner sentenced, unrepentant Defendant could go free despite 1-year jail term," George J. Tanber. Toledo, Ohio *Blade*, April 8, 2005. <br> Last saved 11/11/2009 1:58:00 PM 74 | | | criminality or conduct. |
| 135. | Lammers told the judge that he has a chiropractic degree and has completed four years of online study at St. Luke School of Medicine, which is based in Liberia, West Africa. | 76 | X | False. <br><br> Lammers did not do 4 years of online study at SLSOM. <br><br> SLSOM does not, nor has it ever offered, 4-years of online study for a medical degree. <br><br> Lammers is not a SLSOM graduate. He submitted falsified police report for admission. He was recruited by Steve Arnett in 2002 and dismissed from SLSOM in |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | 2003. |
| | | | | SLSOM has taken corrective action since 2003 to assure that its applicants were not criminals or fraudulently using someone's identity. |
| 136. | *Andrew E. Michael, M.D., class unknown, incarcerated for practicing without a license*<br><br>Andrew Michael has had a number of collisions with the law. He was indicted in August 2006 for bank fraud after having made (in collaboration with his codefendants) "approximately $2,288,926.72 in fraudulent charges…"<br><br>At that time he was still on probation after having spent four months in prison for practicing medicine without a license. 129 Michael is currently in federal prison, having been given a 48 month sentence, and ordered to pay restitution in the amount $3,680,662.61 to the banks he defrauded.130<br><br>129 *United States of America vs. Andrew Michael, Bernadette Pagan, and Phyllis Ries*, 2:06-CR-290-KJDPAL, filed August 8, 2006.<br><br>130 "Las Vegas man enters guilty plea in credit fraud case: Wife, mother join in deal with federal prosecutors," Antonio Planas, *Las Vegas Review-Journal*, January 11, 2008.<br>http://www.lvrj.com/news/13702877.html<br>Last saved 11/11/2009 1:58:00 PM 76 | 77 | X | Completely false association.<br><br>Note that Michael is a criminal who has made his living as a con-man. He was arrested for practicing medicine without a license before he applied to SLSOM in late 2002, recruited by Steve Arnett. He submitted false police report to SLSOM for admission.<br><br>Michael was dismissed from SLSOM in 2003. It was discovered that he had submitted a false police report for admission to SLSOM.<br><br>The news articles introduced by George Gollin is dated August 2006 and January 2008, long after he was |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | dismissed from SLSOM for admission fraud in 2003. SLSOM was victimized by Michael's con. |
| | | | | SLSOM has taken corrective action since 2003 to assure that its applicants were not criminals or fraudulently using someone's identity. |
| 137. | *David W. Karam, SLSOM MD, class of June 2002, is unlicensed* David Karam is based in El Paso Texas. He does not hold a Texas physician's license.131 He is an organizer of a number of unsavory businesses that give the appearance of pursuing medical research, including one that claims to have a single-application cure for one form of skin cancer. Using his SLSOM credentials to confer an aura of legitimacy to this organization, Karam sold a pair of investors $400,000 in stock, then walked away from the company. See material, below. | 77 – 84 | X | This is 3rd rate internet hearsay designed to libel and slander David Karam, SLSOM and Dr. Dolphin. Gollin reaches deep into the mud to come up with this garbage. The Securities and Exchange Commission (SEC) has the investigative power and authority to prosecute any type of securities fraud. If the suspected that Dr. Karam committed a $400,000 fraud, he certainly would have been prosecuted. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | If the SEC would prosecute Martha Stewart and send her to prison for avoiding a $45,000 loss, it would certainly have prosecuted Dr. Karam if he had committed any fraud or violated any securities laws. |
| | | | | "Hogwash" George Gollin has no qualifications to denigrate BioLife Labs product. He is not a physician. |
| | | | | At the time of the writing of the 91-page document, Dr. Karam did not hold any position with SLSOM. |
| | | | | George Gollin is a blatant tyrannical bigot who is attempting to manufacture evidence to libel, slander and destroy anyone or any institution that disagrees with him. |
| 138. | *Summary: the worrisome personnel of the St. Luke School of Medicine* SLSOM listed the names of students who had received MD degrees from the school in 2001 and 2002. These were presented as earned degrees, not | 84 | X | False The list of faculty and recent |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | honorary degrees, and were considered credentials adequate to permit the installation of a number of these graduates into senior faculty and administrative positions at SLSOM within a few months of the award of their degrees. | | | was generated by Steve Arnett in 2002, and was not authorized by Dr. Dolphin. It was removed from the SLSOM website. |
| | The SLSOM site listed a total of 20 "graduates" who had received (or would receive) MD degrees. I was able to find the states-of-residence for 12 of these alumni. A check of state physician licensure data bases revealed that *none of* them had obtained physician's licenses. One of them is currently in prison for his "medical" activities. | | | SLSOM did not list 20 graduates at any time. |
| | Several other individuals claiming to hold SLSOM MD degrees have also landed in prison. | | | Gollin, himself, conspired with corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates. |
| | A large number of the American SLSOM faculty before 2008 were unlicensed. Many of them held MD degrees issued by SLSOM. Some (Dolphin and Harris) practice without licenses on trips abroad. | | | |
| | Harris was convicted of Medicare fraud while on the SLSOM faculty. | | | However, George Gollin does not state his complicity in the removal of SLSOM from the IMED. However, he chooses to denigrate the efforts and accomplishments of SLSOM graduates after he has actively participated in the demise of recognition of the educational institution: to state that its graduates are "unlicensed". |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | George Gollin is a hypocrite and a bigot of the worst kind. |
| | | | | George Gollin has no idea of the faculty of SLSOM, past or present. All of his statements to the left are factitious. |
| | | | | Dr. Harris was not a member of SLSOM faculty since 2001. |
| | | | | Dr. Dolphin does hold a license. |
| | | | | Gollin is a liar and a fraud. |
| 139. | **The St. Luke School of Medicine in Liberia**<br>*SLSOM declared illegal in 2004 by Liberia*<br>The 2006 claim made in the SLSOM catalog that St. Luke is accredited in Liberia is untrue. In October 2004, the Liberian Embassy's web site published a statement signed by Isaac Roland, EdD, Director General of Liberia's National Commission for Higher<br>Last saved 11/11/2009 1:58:00 PM 84<br>85<br>Education, and D. Evelyn Kandakai, EdD, Liberia's Minister of Education, declaring SLSOM to be operating illegally.139 | 84 – 85 | X | False.<br><br>The document referred to by George Gollin was never signed by anyone.<br><br>SLSOM was not operating illegally.<br><br>SLSOM and Dr. Dolphin filed lawsuit in the Supreme Court of Liberia in July 2005 and won by default in August 2005. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| |  | | | George Gollin asks the reader of the 91-page document to believe that a hearsay internet publication precedes a Liberian Supreme Court order.<br><br>Gollin, himself, conspired with corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates.<br><br>However, George Gollin does not state his complicity in the removal of SLSOM from the IMED. However, he chooses to denigrate the efforts and accomplishments of SLSOM graduates after he has actively participated in the demise of recognition of the educational institution.<br><br>George Gollin is a hypocrite and a bigot of the worst kind. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 140. | The statement further explained<br>As regards the St. Luke Medical College, evidence also shows that no such college exists in Liberia ; therefore, it cannot claim to have obtained accreditation from the Commission. The Commission also nullifies the existence of such an institution in Liberia , until such time as all pertinent requirements as noted above are met. It therefore goes without saying that similar notice is being sent our to all institutions which are making claims similar to St. Regis and St. Luke that have not met the requirements as herein noted.[140]<br><br>The declaration could be found on the embassy web site as recently as May 2008.<br>[139] October 11, 2004 statement posted to http://www.embassyofliberia.org/news/item_a.html<br>[140] Op. cit., October 11, 2004 statement posted to http://www.embassyofliberia.org/news/item_a.html<br>Last saved 11/11/2009 1:58:00 PM 85 | 85 | X | Completely false.<br><br>False, false, false.<br><br>Virtually every sentence is false.<br><br>SLSOM and Dr. Dolphin filed lawsuit in the Supreme Court of Liberia in July 2005 and won by default in August 2005.<br><br>George Gollin asks the reader of the 91-page document to believe that a hearsay internet publication carries more authority than a Liberian Supreme Court order.<br><br>Additionally, Dr. Dolphin was in Liberia in 2004-2006 and is an expert eyewitness to what happened. George Gollin was never in Liberia and he is presenting double hearsay newspaper articles to libel SLSOM and Dr. Dolphin. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | Gollin, himself, conspired with the same corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates. |
| 141. | *SLSOM in the Liberian press*<br>The St. Luke School of Medicine has received a thorough drubbing in the Liberian press in recent years. The stories include these:<br>· "Gov't Finally Closes St. Luke," Monrovia, Liberia *The Inquirer*, July 19, 2005:<br>The Government of Liberia has ordered the immediate closure of the St. Luke School of Medicine for illegally operating in the country.<br><br>According to an Information Ministry release issued over the weekend, the government's decision is based on the findings and recommendations of a five-member committee constituted last March to probe the existence of St. Luke. A full criminal investigation is to be conducted against the proprietor of the school and others who may have knowingly aided the process of opening the school.<br><br>All medical degrees issued by St. Luke School of Medicine are nullified and the school pronounced non-existent in Liberia, in keeping with the committee's recommendations approved by the Chairman of the National Transitional Government of Liberia, His Excellency Charles Gyude Bryant... | 86 | X | Completely false.<br><br>False, false, false.<br><br>Virtually every sentence is false.<br><br>SLSOM and Dr. Dolphin filed lawsuit in the Supreme Court of Liberia in July 2005 and won by default in August 2005.<br><br>George Gollin asks the reader of the 91-page document to believe that a hearsay internet publication carries more authority than a Liberian Supreme Court order.<br><br>Additionally, Dr. Dolphin was |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | in Liberia in 2004-2006 and is an expert eyewitness to what happened. George Gollin was never in Liberia and he is presenting double hearsay newspaper articles to libel SLSOM and Dr. Dolphin. |
| | | | | Gollin, himself, conspired with the same corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates. |
| 142. | "Another Degree Granting Medical College in Liberia?," *The Inquirer*, Monrovia, Liberia March 16, 2005. | 87 – 88 | X | Completely false. |
| | It has been gathered that an entity accredited by the Government of Liberia to run as Medical College has already issued degrees to individuals without running classes. | | | False, false, false. |
| | According to investigation, the St. Luke School of Medicine said to be located in Gaye Town, Sinkor, was accredited by an Act of the National Legislature to run as a medical college. But report said the school has not officially begun classes, but has already gone go-ahead issuing diplomas to some so-called graduates. | | | Virtually every sentence is false. |
| | | | | SLSOM and Dr. Dolphin filed lawsuit in the Supreme Court of Liberia in July 2005 and won by default in August 2005. |
| | Investigation revealed that the existence of the school as a degree granting institution came to light recently when some students in Asia called the India Consul to verify the existence of the school, which has been issuing degrees. | | | George Gollin asks the reader |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | The sources said the school was targeting students in Asia because most of the people in that part of the world want to be doctors, but can not afford the cost of acquiring such education and degree there, and have therefore decided to use the on-line program to get their "documents" since they believed that the St. Luke School of Medicine was operating in Liberia.<br><br>It was also said that the school has an affiliation with the University of Liberia, but this was denied by Dr. Al Hasan Conteh, president of the university when he was approached on the issue yesterday.<br><br>At the same time, some medical doctors contacted over the issue, expressed concern about this latest development because they said it has the potential to further damage the image of the country.<br><br>Last saved 11/11/2009 1:58:00 PM 86<br>87<br>Assemblyman Dr. Mohammed Sheriff, chairman of the house standing committee on health, said the whole thing about the school is fake. He blamed some people in government for this situation.<br><br>He said, he has received complaints from some graduates of the A.M. Dogliotti College of Medicine of the University of Liberia, who said the issue of St. Like was an embarrassment to them.<br><br>He said his committee is investigating the matter as this was serious and must be dealt with accordingly. He said this was a scam that some individuals are using to extort money from people desirous of getting in the medical profession. He said these individuals went to other countries and were thrown out, but some individuals in government are working with them to bring shame to this country.<br><br>Also, a statement of attestation issued by the National Commission on Higher Education is said to be raising eyebrows. Investigation revealed that the | | | of the 91-page document to believe that a hearsay internet publication carries more authority than a Liberian Supreme Court order.<br><br>Additionally, Dr. Dolphin was in Liberia in 2004-2006 and is an expert eyewitness to what happened. George Gollin was never in Liberia and he is presenting double hearsay newspaper articles to libel SLSOM and Dr. Dolphin.<br><br>Gollin, himself, conspired with the same corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | commission had gone ahead to grant rights and a statement to operate to the institution without it meeting all the requirements, something the school is said to be using. | | | |
| | Health Minister Dr. Peter Coleman who was contacted on the issue yesterday, confirmed that the school has been accredited by an act of the national legislature. He said the school was now preparing to operate as it has been also accredited by the Commission of Higher Education. | | | |
| | Asked about the issuance of diplomas without classes, Dr. Coleman said the school also runs an "online program." But said he is not aware of the issuance of diplomas. He said the medical authorities in Liberia do not "recognize" such online program, which is said to be existing in Nigeria and Ghana. | | | |
| | Efforts to get a word from Education Minister, Dr. Evelyn Kandakai, the president and chief executive officer of the school, Mr. Jerroll Dolphin, MD, and the Indian Consul proved futile as their cell phones were switched | | | |
| 143. | "Medical Board Threatens to Prosecute Founder of 'Fake' Medical School," Alloycious David, Monrovia, Liberia *The News*, March 31, 2005 | 88 | X | Completely false. |
| | Liberia Medical Board has threatened to turn over the founder of the "fake" St. Luke Medical School and his collaborators to the Justice Ministry for prosecution if they continue to "abuse and insult" the integrity and professionalism" of the country's Medical Board. | | | False, false, false. |
| | The Board said it cannot and will not discuss application of any doctor from the Medical School because there is no school in Liberia known as the St. Luke Medical School. | | | Virtually every sentence is false. |
| | The Board noted that unless the "illegal school" can be accredited, it would not license any doctor that it has given diploma to. | | | SLSOM and Dr. Dolphin filed lawsuit in the Supreme Court of Liberia in July 2005 and won by default in August 2005. |
| | Prof. S. Benson Barh, Chief Medical Officer of Liberia, told reporters Tuesday | | | George Gollin asks the reader |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | that the 'counterfeit school' through Dr. Meimei Dukuly presented a list of 19 doctors who reportedly completed studies at St. Luke Medical School for the degree of Doctor of Medicine (MD).<br>Last saved 11/11/2009 1:58:00 PM 87<br>88<br><br>Annoyed over dubious existence of the institution, Dr. Barh said it was shameful to have learned that a list of reported trained doctors, who claimed to have passed through the walls of the school, was presented to the Medical Board.<br><br>"We are not aware and have no knowledge of the medical school, but we will rather warn representatives of the bogus school to legally and properly apply to operate a medical institution in Liberia," he stressed...<br><br>He, amongst many other things noted, that the Medical Broad visited the school's so- called campus and observed that what it saw does not even represent a status of an elementary school's campus, adding in reality, the building is a "run down" dwelling home under major renovation which lacks electricity, laboratory, class rooms, running water among others basic requirements for a representation of a medical institution... | | | of the 91-page document to believe that a hearsay internet publication carries more authority than a Liberian Supreme Court order.<br><br>Additionally, Dr. Dolphin was in Liberia in 2004-2006 and is an expert eyewitness to what happened. George Gollin was never in Liberia and he is presenting double hearsay newspaper articles to libel SLSOM and Dr. Dolphin.<br><br>Gollin, himself, conspired with the same corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates.<br><br>However, George Gollin does not state his complicity in the removal of SLSOM from the IMED. However, he chooses to denigrate the efforts and accomplishments of SLSOM |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | graduates after he has actively participated in the demise of recognition of the educational institution. |
| 144. | "Fake Medical College Boss Flees?," Mensiegar Kamga, Monrovia, Liberia *The Analyst*, April 5, 2005. | | | Completely false. |
| | Dr. Jeroll Dolphin, the proprietor and founder [of] the mysterious St. Luke Medical College, has reportedly left the country for fear of being prosecuted. | | | False, false, false. |
| | Informed sources say Dr. Dolphin has "surreptitiously" abandoned his Metropolitan hotel on Broad Street to return home in the United States of America... | | | Virtually every sentence is false. |
| | There has been intense controversy over the whereabouts of the medical college. The A.M. Doglotti College of Medicine had denounced the existence of the alleged fake college in Liberia, even though the school was successful in granting medical degrees to Liberians and other foreign nationals most of whom were Nigerians and Indians. | | | Dr. Dolphin did not flee Liberia. This is a lie.<br><br>SLSOM and Dr. Dolphin filed lawsuit in the Supreme Court of Liberia in July 2005 and won by default in August 2005. |
| | Defending the existence of St. Luke Medical College in Liberia, the country's Health Minister, Dr. Peter Coleman told reporter at a new conference that the school was not a fake one, added that it met the approval of the 57th national Legislative Assembly during the NPP regime. | | | |
| | Dr. Coleman added that he was unaware whether the institution was registered with the committee on higher institution. | | | George Gollin asks the reader of the 91-page document to believe that a hearsay internet publication carries more authority than a Liberian Supreme Court order. |
| | It appeared that the Health Minister's statement further increases tension with his professional colleagues at A.M Doglotti and the Chairman on Health at the NTLA, Dr. Mohammed Sheriff who decided to take legal action against Dr. Dolphin [on behalf of] the medical profession... | | | Additionally, Dr. Dolphin was in Liberia in 2004-2006 and is |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | an expert eyewitness to what happened. George Gollin was never in Liberia and he is presenting double hearsay newspaper articles to libel SLSOM and Dr. Dolphin. |
| | | | | Gollin, himself, conspired with the same corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates. |
| 145. | "Health Minister Confesses; Says 'My Advisers Misled Me'", *The Analyst*, Monrovia, Liberia April 22, 2005. | 88 | X | Completely false. |
| | After fiercely defending the existence of a purported medical college which his professional colleagues had rowdily denounced, Health Minister Peter S. | | | False, false, false. |
| | Coleman now appears to have realized that he was being "misled" by his "expert advisers." | | | Virtually every sentence is false. |
| | Last saved 11/11/2009 1:58:00 PM 88 | | | |
| | 89 | | | |
| | Leading members of the Liberia Medical Board had challenged Coleman's claim that the school exists and threatened to "prosecute those attempting to insult the integrity and professionalism of the board." | | | SLSOM and Dr. Dolphin filed lawsuit in the Supreme Court of Liberia in July 2005 and won by default in August 2005. |
| | Two of the board members, Dr. Benson Barh and Dr. Horatius Brown, told reporters at the Health Ministry that the board "has no knowledge of the existence of a medical school named "St. Luke Medical School" in Liberia. | | | George Gollin asks the reader of the 91-page document to |
| | The fiasco about the existence of the college hit the news last January when | | | |

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | the Dean of the A.M. Dogliotti College of Medicine, University of Liberia, Dr. Robert Kpoto, who is also a proprietor of the Med-Link Clinic in Monrovia, investigated the entire episode. | | | believe that a hearsay internet publication carries more authority than a Liberian Supreme Court order. |
| | After a careful research, Kpoto discovered that the non-existing medical school was "clandestinely issuing diplomas and medical degrees to Liberians and other foreign nationals to form part of the medical labor force..." [Health Minister Coleman] declared his intention to "suspend all interactions with St. Luke Medical School effective immediately pending the results of the various inquiries currently underway." | | | Additionally, Dr. Dolphin was in Liberia in 2004-2006 and is an expert eyewitness to what happened. George Gollin was never in Liberia and he is presenting double hearsay |
| | Coleman also said the ministry will conduct an independent inquiry "to ensure that the procedures and vetting mechanism by which expert advice is preferred for the Minister of Health is beyond reproach and that another St. Luke fiasco is never again allowed occurring. | | | newspaper articles to libel SLSOM and Dr. Dolphin. |
| | Observers say the Health Minister's latest concession that the St Luke Medical College does not actually exist seems to have ended the intense controversy over doubts about the school's presence in Liberia. | | | Gollin, himself, conspired with corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates. |
| 146. | ."NTLA Orders 'Bogus' St. Luke University Closed," James West, *Liberian Observer*, Monrovia, Liberia May 10, 2005. | 88 | x | Completely false. |
| | Lawmaking body of Liberia says it has established that the school of medicine is a fake medicine institute, has endangered the health of Liberians. | | | False, false, false. |
| | Following several weeks of investigation into its operations in Liberia, the National Transitional Legislative Assembly (NTLA) says the management of | | | Virtually every sentence is false. |
| | St. Luke School of Medicine has endangered the health of the public and should be turned over to the Justice Ministry for prosecution. | | | SLSOM and Dr. Dolphin filed |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | The transitional assembly said it has been established that St. Luke School of Medicine is a fake medical institute and is not a legal establishment. The NTLA's Joint Committee on Health and Education which conducted the probe recommended to plenary that the purported medical school be closed down immediately and all banks be instructed to freeze their assets pending the conclusion of the Justice Ministry's inquiry... | | | lawsuit in the Supreme Court of Liberia in July 2005 and won by default in August 2005.

George Gollin asks the reader of the 91-page document to believe that a hearsay internet publication carries more authority than a Liberian Supreme Court order.

Additionally, Dr. Dolphin was in Liberia in 2004-2006 and is an expert eyewitness to what happened. George Gollin was never in Liberia and he is presenting double hearsay newspaper articles to libel SLSOM and Dr. Dolphin.

Gollin, himself, conspired with corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 147. | **The University of Science Arts and Technology and its SLSOM connection** The University of Science Arts and Technology Medical College of London is not a legitimate school of medicine, in spite of its inclusion in the IMED data base. Last saved 11/11/2009 1:58:00 PM 89 | 89 | X | George Gollin wants the reader of the 91-page document to believe the he, George Gollin, is more expert regarding legitimacy of a Montserrat medical school than the government of Montserrat, ECFMG, and the IMED. George Gollin is a blatant tyrannical bigot who is attempting to manufacture evidence to libel, slander and destroy anyone or any institution that disagrees with him. |
| 148. | 90 As discussed earlier, there is no record of any USAT students ever passing the United States Medical Licensing Examination.141 | 90 | X | Completely false. |
| 149. | The USAT web site has shown faculty rosters featuring St. Luke School of Medicine graduates and faculty, including Steve Arnett ("Chief Academic Officer"), Ernest Esteban, and Edwin Muniz. | 90 | X | Completely false. Dr. Dolphin never heard of Ernest Esteban, who is not a graduate of SLSOM. Steve Arnett is not a graduate of SLSOM. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | George Gollin is using outdated and incorrect information to libel SLSOM, Dr. Dolphin, and USAT. |
| 150. | A visit to the Medical College of London address specified on the USAT-MCL web site at a time when the web site claimed it was in operation revealed that there was no sign of MCL at that London address. | 90 | X | This information is completely irrelevant to SLSOM and Dr. Dolphin. |
| | As shown earlier, Orien Tulp, the owner of USAT, holds an MD degree from the outrageous "International University of Fundamental Studies" diploma mill. | | | It is included in the 91-page document to cast doubt on the reputation of SLSOM and Dr. Dolphin. |
| | The Caribbean Accreditation Authority for Education in Medicine and other Health Professions (CAAM-HP) performed a review of USAT's "Application for initial provisional accreditation" in February 2007. 142 "The CAAM-HP after examination of the reports determined that it could not grant provisional accreditation for the programme as presented." | | | George Gollin is committing fraud. |
| 151. | Neither USAT-MCL nor SLSOM is legitimate. | 90 | X | Completely false.<br><br>George Gollin is a blatant tyrannical bigot who manufactures evidence to libel, slander and destroy anyone or any institution that disagrees with him. |
| 152. | The "faculty" of these two entities are intermingled. | 90 | X | Completely false.<br><br>George Gollin commingled |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | information from different dates to make false statements.<br><br>George Gollin is a blatant tyrannical bigot who manufactures evidence to libel, slander and destroy anyone or any institution that disagrees with him. |
| 153. | **Conclusions**<br>The St. Luke School of Medicine has a long, unsavory history, and the possibility receipt of Ghanaian accreditation should be of direct concern to the United States: accreditation will automatically qualify its students to sit for the USMLE. | 91 | X | George Gollin has manufactured his own untrue history of SLSOM to fit his bigot racist purposes. |
| 154. | In the past, SLSOM students were little more than customers, untrained in the medical arts. Of the dozen American SLSOM "students" I could locate, and who were identified on the SLSOM web site as graduates (or near-graduates), none had obtained physician's licenses. | 91 | X | Gollin, himself, conspired with corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates.<br><br>However, George Gollin does not state his complicity in the removal of SLSOM from the IMED. However, he chooses to denigrate the efforts and accomplishments of SLSOM graduates after he has actively |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | participated in the demise of recognition of the educational institution: to state that its graduates are "unlicensed". |
| | | | | George Gollin is a hypocrite and a bigot of the worst kind. |
| 155. | In the past, many SLSOM "faculty" were unqualified, holding neither licenses to practice medicine, nor MD degrees from legitimate schools. | 91 | X | Gollin, himself, conspired with corrupt Liberian officials to remove SLSOM from the IMED in 2004-2005, and invalidate the USMLE test results of SLSOM students and graduates. |
| | | | | However, George Gollin does not state his complicity in the removal of SLSOM from the IMED. However, he chooses to denigrate the efforts and accomplishments of SLSOM graduates after he has actively participated in the demise of recognition of the educational institution: to state that its graduates are "unlicensed". |
| | | | | George Gollin is a hypocrite and a bigot of the worst kind. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 156. | An alarming number of SLSOM students and faculty have been convicted of crimes relating to their "medical" activities. At least three have been imprisoned. | 91 | X | False.<br><br>Those students involved in criminal activities were convicted before they came to SLSOM. They falsified records for admission in 2002. They were dismissed from SLSOM in 2003 (Lammers and Michael).<br><br>Curran was never a student of SLSOM.<br><br>Dr. Harris was not a faculty member of SLSOM when he was convicted.<br><br>The ratio of former SLSOM students involve or convicted of criminal activity is that of any other college or university, less than 1%, comparable to the Universities in the USA.<br><br>This is another libelous statement from George Gollin, where he presents no facts. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| 157. | In the past, the St. Luke School of Medicine has been run by a small group of Americans, primarily Jerroll Dolphin in California, Stephen Arnett in Kentucky, and David Karam in Texas. None of them hold medical licenses. | 91 | X | Completely false.<br><br>Steve Arnett never ran SLSOM. This is a lie.<br><br>David Karam never ran SLSOM. This is another lie.<br><br>Dr. Dolphin was in Liberia and Ghana continuously since October 2003 through the end of 2009.<br><br>George Gollin is a fraud and a liar. |
| 158. | The conduct of Jerroll Dolphin as it pertains to SLSOM has been astonishingly inappropriate and irresponsible. | 91 | X | George Gollin has not proved that Dr. Dolphin has done anything inappropriate, irresponsible, wrong, or broken any law.<br><br>George Gollin is counting on racial biases and his confusing hodge-podge presentation of irrelevant and false information to influence readers of the 91-page document against SLSOM and Dr. Dolphin. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | Guilt by outdated associations? |
| 159. | There is no reason to believe that his activities as head of a new medical organization will be any different, no matter how firmly he might claim to have changed his ways. | 91 | X | George Gollin has not proved that Dr. Dolphin has done anything inappropriate, irresponsible, wrong, or broken any law. What activities of Dr. Dolphin was shown to be harmful? None.<br><br>George Gollin is counting on racial biases and his confusing hodge-podge presentation of irrelevant and false information to influence readers of the 91-page document against SLSOM and Dr. Dolphin. |
| 160. | It would be an enormous mistake to allow him to open a St. Luke School of Medicine facility in Ghana. | 91 | X | George Gollin has presented 91 pages of false statements, lies, and fantasies in this document.<br><br>How many of these false statements can he prove are true? None.<br><br>Instead, George Gollin will attempt to hide behind the United States Constitution 11th |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

| Item No. | False Statement | Page | False | Plaintiff's Comment |
|---|---|---|---|---|
| | | | | amendment for shielding as a "state government employee". |
| | | | | George Gollin is a complete fraud and a liar. |

Exhibit 52

False Statements Of George Gollin In The 91-Page Document, Exhibits 42 and 43

Exhibit 52

**Exhibit 53 – False, Defamatory, and Threatening Statements in the document authored by Alan Contreras and the Office of Degree Authorization.**

False Statements Of Alan Contreras In The 91-Page Document, Exhibit 49 and 50

Exhibit xx – Libelous Statements of Alan Contreras and the Office of Degree Authorization (Exhibit xx)

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| 1. | It has come to my attention that your agency may be about to issue approval or accreditation to the notorious entity that does business under the name "St. Luke School of Medicine" or the like. | P1, S1 | X | | SLSOM's notoriety is solely from George Gollin and Contreras since 2003.  Contreras is labeling SLSOM without any proof of wrongdoing. It is based on Contreras' racial bias. |
| 2. | We are concerned that an entity with the unsavory history of the St. Luke business might be allowed to issue so-called "medical degrees" that could be used by unscrupulous people around the world to practice medicine on unsuspecting patients | P1, s2 | X | X | SLSOM is not a dishonest degree provider. SLSOM has never authorized unlawful practices. No SLSOM graduate has used his/her medical degree to do harm to any person.  Unscrupulous crazy people may have gotten copies of fraudulent SLSOM diplomas and unfortunately displayed them.  However, SLSOM has never condoned their unlawful actions or practices. |
| 3. | We are concerned about what such a decision would mean to the reputation of Ghanaian colleges around the world. | P2, s1 | X | X | This is the introduction to Contreras' extortion attempt against the Republic of Ghana and an example of Contreras' racism and bias. |
| 4. | Oregon banned the use of St. Luke degrees several years ago, and we would have to ban the use of all Ghanaian degrees if St. Luke is approved. | P2, s2 | X | X | The State of Oregon Office of Degree Authorization has no jurisdiction outside of Oregon, and certainly has no jurisdiction outside of the USA. See ORS 348.609.  The Office of Degree Authorization did not accord SLSOM due process or operation of law |

Page 1 of 5                                           Exhibit 53

False Statements Of Alan Contreras In The 91-Page Document, Exhibit 49 and 50

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| | | | | | when it banned SLSOM degrees in Oregon. ORS 348.594 Definitions for ORS 348.594 to 348.615. |
| | | | | | As used in ORS 348.594 (Definitions for ORS 348.594 to 348.615) to 348.615 (Appeal procedure): |
| | | | | | (a) "Diploma mill" means: (A) A school against which a court or public body, as defined in ORS 174.109 ("Public body" defined), has issued a ruling or finding, after due process procedures, that the school has engaged in dishonest, fraudulent or deceptive practices related to the award of degrees, academic standards or student learning requirements; or |
| | | | | | (B) An entity without legal authority as a school to issue degrees valid as credentials in the jurisdiction that authorizes issuance of degrees. |
| | | | | | SLSOM-Liberia has legal authority to issue degrees. |
| | | | | | SLSOM has never engaged in dishonest, fraudulent or deceptive practices related to the award of degrees, academic standards or student |

Page 2 of 5

Exhibit 53

False Statements Of Alan Contreras  In The 91-Page Document, Exhibit 49 and 50

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| | | | | | learning requirements.<br><br>Oregon's Office of Degree Authorization "diploma mill" list is created by Defendant George Gollin without adherence to the legal requirements or a court or other public has ever summonsed SLSOM for any hearing or court procedure, anywhere in the world. |
| 5. | The reason for this is that Oregon law requires us to base acceptance of foreign degrees on the accreditation practices of the nation in question. | P2, s5 | X | X | This is a lie. There is no Oregon law cited. This is just another part of Contreras' extortion attempt against Ghana due to his racial bias against SLSOM. |
| 6. | If the government of Ghana authorizes St. Luke to issue "medical degrees" we will have no choice but to conclude that Ghana does not have a meaningful postsecondary approval process, in which case degrees issued by the 23 colleges now operating in Ghana would no longer be usable in Oregon. | P3 | X | X | This is a character assassination against SLSOM.<br><br>Ghana's accreditation process was extensive and quite detailed. It included a physical inspection of the 40,000 square feet campus by an certified architect; an on-campus visitation by the NAB that included prominent and respected members of the Ghana Medical and Dental Council and the Deans of the other medical schools in Ghana; a detailed survey of SLSOM's library and computer system and internet facilities by Ghana's most respected librarian; and a detailed financial survey by Ghana's most respected certified accountant. Additionally, SLSOM was required to submit an Environmental Impact |

Exhibit 53

False Statements Of Alan Contreras In The 91-Page Document, Exhibit 49 and 50

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| | | | | | Report that was approved by the Ghana Environmental Agency as well as obtain city and other licenses. |
| 7. | Oregon is a small state far from Ghana and it may be that a ban on all degrees issued in Ghana would not affect your country very much. | P4, s1 | X | X | This is a threat. Oregon's unconstitutional "diploma mill" list is used by more than a dozen states and several countries like Belgium and Korea and others. They think that there has been some kind of legal process where these so-called "diploma mills" have gone through a **"court or public body, as defined in ORS** 174.109 ("Public body" **defined), has issued a ruling or finding, after due process procedures, that the school has engaged in dishonest, fraudulent or deceptive practices related to the award of degrees, academic standards or student learning requirements".** |
| 8. | However, we urge you to consider the consequences of other states and nations making similar decisions if you issue an approval to grant medical degrees to the entity called St. Luke. | 5 | X | X | This is a threat. Oregon's unconstitutional "diploma mill" list is used by more than a dozen states and several countries like Belgium and Korea and others. Ghanaian officials are now threatened by international disapproval and sanctions.  See Exhibit xx and xx. |
| 9. | It is possible that decision makers in Ghana simply did not have all of the information | P5 | X | X | This is a lie. |

Page 4 of 5

Exhibit 53

False Statements Of Alan Contreras  In The 91-Page Document, Exhibit 49 and 50

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| | about St. Luke's past practices and its desperate search for a government willing to allow it to sell degrees from a site outside the United States where it began operating illegally in California some years ago. | | | | SLSOM has never "sold" degrees.  In the United States or anywhere else.<br><br>SLSOM is and was operating in Liberia.  Dr. Dolphin is in California. |
| 10. | St. Luke is not and has never been a legitimate provider of medical degrees. | P5 | X | | This is a lie.<br><br>SLSOM is duly recognized in Liberia.  See the Liberia Supreme Court order Exhibit xx. |
| 11. | Cc: Mr. Adolphus S. Arthur, Deputy Chief of Mission, Embassy of Ghana, Washington D.C.Abeena Cook, Desk Officer for Ghana, U. S. Department of State, Washington, D.C., Dr. S. Stephen USNEL, International Affairs, U.S. Department of Education, Washington D.C., Mary Scholl, Public Affairs Officer, Embassy of the United States, Accra, Ghana | CC. | | X | This is just the beginning a list of public officials and agencies to whom the Office of Degree Authorization and Contreras have sent this libelous letter. |

Exhibit 53

**Exhibit 54 – False, Defamatory, and Threatening Statements in the document authored by Brad Schwartz and the University of Illinois College of Medicine.**

False Statements Of Brad Schwartz  In The 91-Page Document, Exhibit 51

Exhibit xx – Libelous Statements of Brad Schwartz and the University of Illinois College of Medicine (Exhibit xx)

| Item No. | Defendant's Libelous  Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| 1. | As the Dean of a medical school that recruits from the most accomplished graduates of non-US medical schools into its residency, I have concerns about the impending accreditation decision for what purports to be the St. Luke School of Medicine. | P1, S1 | X | | This is a fraudulent statement.

SLSOM's notoriety is solely from George Gollin and Contreras since 2003.  Now Brad Schwartz is labeling SLSOM without any proof of wrongdoing. It is based on Brad Schwartz's racial bias and close association with George Gollin, also a professor of the University of Illinois.. |
| 2. | I have had the opportunity to review data in the public domain about this alleged school, and about individuals who claimed to have earned a medical degree from it. | P1, s2 | X | X | This is evidence of Brad Schwartz's reliance on internet hearsay, virtually all by corrupt liberian officials and George Gollin.

There is nowhere on public domain any SLSOM graduate who has committed any crime.

SLSOM is not a dishonest degree provider

SLSOM has never authorized unlawful practices.

No SLSOM graduate has used his/her medical degree to do harm to any person.

Unscrupulous crazy people may have gotten copies of fraudulent SLSOM diplomas and unfortunately displayed them in a brief period |

Exhibit 54

False Statements Of Brad Schwartz In The 91-Page Document, Exhibit 51

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| | | | | | between 2002-2003. However, SLSOM has nothing to do with their unlawful actions or practices. |
| 3. | There is no evidence whatsoever that this alleged school really exists, or that there are adequate facilities for the most rudimentary components of a medical curriculum. | P1, s3 | X | X | This is a fraudulent statement.<br><br>SLSOM display pictures of its Accra, Ghana campus online, including some of its laboratories, library, classrooms, and computer laboratory, Exhibit XX.<br><br>Brad Schwartz has no access to SLSOM's online curriculum or student records. |
| 4. | In fact, all evidence says that only a small empty unimproved room is the location advertised for St. Luke School of Medicine. | P1, s4 | X | X | This is a fraudulent statement.<br><br>SLSOM display pictures of its Accra, Ghana campus online, including some of its laboratories, library, classrooms, and computer laboratory, Exhibit XX. It is a 40,000 square foot facility with 5 large separate laboratories (with microscopes, glassware, and scientific equipment), library, 4 classrooms for 120 students, computer laboratories, professors' offices and offices for SLSOM officials.<br><br>SLSOM's Liberia campus is a smaller 3,200 square foot facility with 2 classrooms for 50 students, 2 fully equipped laboratories, a library, and computer laboratory. |

Exhibit 54

False Statements Of Brad Schwartz In The 91-Page Document, Exhibit 51

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| | | | | | Brad Schwartz has no access to SLSOM's online curriculum or student records. |
| 5. | Understanding the high quality is not absolutely dependent upon physical structure, I took the opportunity to review the publicly available records of individuals who claim to have graduated fro this alleged school for evidence of a bona fide education. | P2, s1 | X | X | This is evidence of Brad Schwartz's reliance on internet hearsay, virtually all by corrupt liberian officials and George Gollin. |
| | | | | | There is nowhere on public domain any SLSOM graduate who has committed any crime. |
| | | | | | SLSOM is not a dishonest degree provider |
| | | | | | SLSOM has never authorized unlawful practices. |
| | | | | | No SLSOM graduate has used his/her medical degree to do harm to any person. |
| | | | | | Unscrupulous crazy people may have gotten copies of fraudulent SLSOM diplomas and unfortunately displayed them. However, SLSOM has nothing to do with unlawful actions or practices. |
| 6. | There are records of twelve individualswho claim to have degrees from St. Luke's. None of these people are licensed to prectice medicine, and at least two have been incarcerated fro practicing medicine without a license. | P2, s2 | X | | This is evidence of Brad Schwartz's reliance on internet hearsay, virtually all by corrupt liberian officials and George Gollin. |
| | | | | | There is nowhere on public domain any SLSOM graduate who has committed any crime. |

Exhibit 54

False Statements Of Brad Schwartz In The 91-Page Document, Exhibit 51

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| | | | | | Two former SLSOM students, Andrew Michael and Larry Lammers submitted fraudulent police reports to obtain admission to the medical school in their efforts to minimize their sentences or to affect the outcome of their impending trials. Both were expelled from SLSOM immediately when it was learned of their previous illegal practices. They never graduated from SLSOM. |
| | | | | | As to the other alleged ten 'graduates' of SLSOM, Brad Schwartz has relied on the statements of George Gollin in the 91-page document authored by George Gollin. |
| | | | | | SLSOM is not a dishonest degree provider. |
| | | | | | SLSOM has never authorized unlawful practices. |
| | | | | | No SLSOM graduate has used his/her medical degree to do harm to any person. |
| | | | | | Unscrupulous crazy people may have gotten copies of fraudulent SLSOM diplomas and unfortunately displayed them. However, SLSOM has nothing to do with unlawful actions or practices. |
| 7. | I bring this to your attention because accreditation or approval of the alleged St. | P3, s2 | | X | This is a threat. |

Exhibit 54

False Statements Of Brad Schwartz  In The 91-Page Document, Exhibit 51

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| | Luke School of Medicine by officials in Ghana would make medical schools in the United States worry about the quality of any medical school in Ghana. | | | | Brad Schwartz's is displaying his racial bias. |
| 8. | As a result, such approval of St. Luke would put the graduates of legitimate medical schools in your country at a disadvantage when attempting to gain advanced medical training. | P3, s2 | X | X | This is a lie.  This is a threat.<br><br>Brad Schwartz's is displaying his racial bias.<br><br>Brad Schwartz is virtually reciting the same words as Alan Contreras and George Gollin in their libelous documents.<br><br>Foreign Medical Graduates (FMGs) do not automatically start practicing medicine, especially in the United States.  They must pass three examinations before they are authorized for hospital training in a residency, called internship.  In the USA, the examinations are the United States Medical Licensing Examinations, Step 1, Step 2, and Clinical Knowledge (CK).  The Step 1 and Step 2 examinations are each 600 questions, taking two days each.  The CK examines clinical skills of medical students in a one-day onsite assessment using actors or real patients in Philadelphia, Pennsylvania.. |
| 9. | Hence, by denying accreditation of St. Luke School of Medicine you will protect the reputation of legitimate medical school | P4, s1 | X | X | This is a lie.  This is a threat.<br><br>Now Brad Schwartz has joined forces with |

Page 5 of 7

Exhibit 54

False Statements Of Brad Schwartz In The 91-Page Document, Exhibit 51

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| | graduates from Ghana. | | | | George Gollin and Alan Contreras to defame SLSOM. He is repeating the same false statements as George Gollin. |
| | | | | | Brad Schwartz's is displaying his racial bias. |
| | | | | | Brad Schwartz is virtually reciting the same words as Alan Contreras and George Gollin in their libelous documents. |
| 10. | Moreover, by denying St. Luke any form of legitimacy you will protect innocent patients from abuse at the hands of potential pseudo-graduates. | | | | This is a lie. This is a threat. |
| | | | | | Brad Schwartz's is displaying his racial bias. |
| | | | | | Brad Schwartz is virtually reciting the same words as Alan Contreras and George Gollin in their libelous documents. |
| | | | | | Foreign Medical Graduates (FMGs) do not automatically start practicing medicine, especially in the United States. They must pass three examinations before they are authorized for hospital training in a residency, called internship. In the USA, the examinations are the United States Medical Licensing Examinations, Step 1, Step 2, and Clinical Knowledge (CK). The Step 1 and Step 2 examinations are each 600 questions, taking two days each. The CK examines clinical skills of medical students in a one-day on-site assessment using actors or real |

False Statements Of Brad Schwartz In The 91-Page Document, Exhibit 51

| Item No. | Defendant's Libelous Statement | Paragraph | False | Threat | Plaintiff's Comment |
|---|---|---|---|---|---|
| 11. | The entity that passes itself off as St. Luke School of Medicine has never been a legitimate educator of medical practitioners, and I urge you to make the owners of this entity own up to their dishonesty. | P5 | X | | patients in Philadelphia, Pennsylvania..<br><br>This is a lie.<br><br>See Exhibits xx, xx, xx, xx, xx, xx, xx, and xx.<br><br>The pass rate of SLSOM students and graduates is over 90% internationally, and 85% on the USMLE.<br><br>What dishonesty has the owners of SLSOM (Dr. Jerroll Dolphin, Fifi Ellis, and others) done?<br><br>This displays Brad Schwartz's bias against Negroes. |

Page 7 of 7

Exhibit 54

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV11- 6322 PSG (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division** | **[ ] Southern Division** | **[ ] Eastern Division** |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
**CIVIL COVER SHEET**

| **PLAINTIFFS** (Check box if you are representing yourself ☐) | **DEFENDANTS** |
|---|---|
| Sr. LUKE SCHOOL OF MEDICINE-GHANA, a Ghanain corporation, ST. LUKE SCHOOL OF MEDICINE -LIBERIA, a Liberian corporation, DR. JERROLL B.R. DOLPHIN, on behalf of himself, Robert Farmer, on behalf of a class action | REPUBLIC OF LIBERIA; MINISTRY OF HEALTH, MINISTRY OF EDUCATION, LIBERIAN MEDICAL BOARD, NATIONAL COMMISSION ON HIGHER EDUCATION, NATIONAL TRANSITIONAL LEGISLATIVE ASSEMBLY; DR. ISAAC ROLAND; MOHAMMED SHARIFF; DR. BENSON BARH; DR. GEORGE GOLLIN; DR. BRAD SCHWARTZ, ALAN CONTRERAS, UNIVERSITY OF ILLINOIS-URBANA CHAMPAIGN; STATE OF OREGON; Office of Degree Authorization, the NATIONAL ACCREDITATION BOARD OF THE REPUBLIC OF GHANA, EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, FOUNDATION FOR ADVANCEMENT OF MEDICAL EDUCATION AND RESEARCH |

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Jerroll Dolphin
P.O. Box 941009, Los Angeles, CA 90064

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☑ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☑ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☑ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No  ☐ **MONEY DEMANDED IN COMPLAINT:** $ 389,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Title 42, Chapter 21, Subchapter I, § 1981(a),1983,1985, 1988(a),2000e2; Title 47 USC § 223,230; Title 18, Part I, CHAPTER 13, § 241, 242, more

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 340 Marine | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 355 Motor Vehicle Product Liability | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | **IMMIGRATION** | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**CV11-06322**

**FOR OFFICE USE ONLY:**  Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

| CV-71 (05/08) | **CIVIL COVER SHEET** | Page 1 of 2 |

UNITED STA    S DISTRICT COURT, CENTRAL DISTRIC    CALIFORNIA
**CIVIL COVER SHEET**

) **IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☐ No ☑ Yes
If yes, list case number(s): _10-CV-01791 RGK-SH_

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): 10-CV-01791 RGK-SH

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or

☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | MARYLAND, REPUBLIC OF LIBERIA, REPUBLIC OF GHANA |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☑  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | OREGON, ILLINOIS, REPUBLIC OF LIBERIA, REPUBLIC OF GHANA |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
Note: **In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | OREGON, ILLINOIS, REPUBLIC OF LIBERIA, REPUBLIC OF GHANA |

* **Los Angeles, Orange, San Bernardino, l......, ..... ...... ..... ..... ..** **Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date _July 29, 2011_

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |