Larry D. Walls #64696
9025 Wilshire Blvd., Penthouse
Beverly Hills, CA 90211
Phone: 310-275-4220
Fax:    323-296-2153
Lwalls@hotmail.com



FILED
CLERK, U.S. DISTRICT COURT

FEB - 8 2012

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ST. LUKE SCHOOL OF MEDICINE-GHANA, a Ghanian corporation, ST. LUKE SCHOOL OF MEDICINE -LIBERIA, a Liberian corporation, DR. JERROLL B. R. DOLPHIN, on behalf of himself, ROBERT FARMER, on behalf of a Class-Action<br><br>               Plaintiffs,<br><br>vs.<br><br>REPUBLIC OF LIBERIA; MINISTRY OF HEALTH, a Liberian Governmental Agency; MINISTRY OF EDUCATION, a Liberian Governmental Agency; LIBERIAN MEDICAL BOARD, a Liberian Governmental Agency; NATIONAL COMMISSION ON HIGHER EDUCATION, a Liberian Governmental Agency; NATIONAL TRANSITIONAL LEGISLATIVE ASSEMBLY, a Liberian Governmental Agency; DR. ISAAC ROLAND as official and individual; MOHAMMED SHARIFF as official and individual; DR. BENSON BARH as official and individual; DR. GEORGE GOLLIN as official and individual; DR. BRAD SCHWARTZ as official and individual, ALAN CONTRERAS as official and individual, UNIVERSITY OF ILLINOIS-URBANA CHAMPAIGN, an Illinois Institution of Higher Learning; STATE OF OREGON, Office of Degree Authorization, the NATIONAL ACCREDITATION BOARD OF THE REPUBLIC OF GHANA, EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, a | Case No.  CV:11-06322-RGK-(SHx)<br><br>**JURY TRIAL DEMANDED**<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>• **CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983 (First Amend - Freedom of Speech, the Right to Peaceably Assemble and to Petition the Government for Redress; Fourth Amend - Unreasonable Search and Seizure;  Sixth Amend - Right to Confront Witnesses; Seventh Amend - Right to Trial by Jury; Eighth Amend - Prohibiting Cruel and Unusual Punishment; and Fourteenth Amend Amendment - Deprivation of Liberty, Due Process, and Equal Protection)**<br>• **CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1986 (Failure to Prevent Violations of Civil Rights);**<br>• **CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983 (Civil Action for Deprivation of Rights – State Liability)**<br>• **HARASSMENT BY PUBLIC OFFICIALS (U.S. CONSTITUTION 14TH AMENDMENT)**<br>• **VIOLATIONS OF ORS 348.615 (Appeal Procedure for Unaccredited Institutions)**<br>• **VIOLATIONS OF § 348.597 (Applicability of ORS 348.594 to** |



Pennsylvania non-profit corporation,
FOUNDATION FOR ADVANCEMENT OF
MEDICAL EDUCATION AND RESEARCH, a
Pennsylvania non-profit corporation,

Defendants.

348.615)
- **LIBEL (California Civil Code Section 45, 45a, 46)**
- **TRADE LIBEL & INTERFERENCE IN BUSINESS ADVANTAGE**
- **TREATY VIOLATIONS (November 21, 1939. 54 Stat. 1739; TS 956; 9 Bevans 595; 201 LNTS 163)**
- **VIOLATIONS OF §§ 2511 and 2520 of the Electronic Communications Privacy Act ("EPCA")**
- **VIOLATIONS OF 18 U. S. C. § 1030, § 2701 of the Stored Communication Act ("SCA")**
- **FRAUD (COMPUTER FRAUD AND ABUSE ACT )**
- **FALSE IMPRISONMENT**
- **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
- **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
- **INTERNET HACKING (COMPUTER INTRUSION, I.E. HACKING, CYBERTERRORISM, Title 47 USC § 223)**
- **INVASION OF PRIVACY**
- **INTERNET STALKING**

**JURY TRIAL REQUESTED**

## CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of all similarly situated persons, by and through their undersigned attorneys, Larry Walls, allege the following upon information and belief (except for those allegations pertaining to Plaintiffs, which are based on personal knowledge), after due investigation by undersigned counsel.

## NATURE OF THE ACTION

1. Plaintiffs, Dr. Jerroll Dolphin ( herein after "Dolphin"), St. Luke School of Medicine-Liberia ( herein after "SLSOM"), and St. Luke School of Medicine-Ghana (herein after

"SL-G") and as a Class Action on behalf of a class consisting of students, former students and graduates of SLSOM (the "Class") Exhibit A. Plaintiffs and the Class seek to recover damages caused to the Plaintiffs and the Class by the defendants conspiracy to destroy the reputation of the Plaintiffs and the Class by False Imprisonment, libel, fraud, invasion of privacy,  internet stalking, theft of Plaintiffs' private information, unlawful interception and access to acquired and exported data and other stored electronic communications in violation of The Friendship Treaty, Alien Torts Control Act, the Electronic Communications Privacy Act, The Computer Fraud Abuse Act, the Stored Communications Act, § 1983 of the Civil Rights Act, the First, Fourth, and xx Amendment of the United States Constitution, the California Internet Stalking Action, California CCP 1708.7, and common law accepted in California, Illinois, Oregon, New York, Texas, and other states affected by the class.

2.   In 2005, organized conspirators and Liberian government officials, including, and orchestrated by Mohammed Shariff ( herein after  "Shariff") of the Liberian National Transitional Legislative Assembly ( herein after  "NTLA"), Dr. Benson Bahr ( herein after  "Bahr"), of the Liberian Ministry of Health ("MH"); Dr. Isaac Roland (herein after "Roland") of the Liberian National Commission on Higher Education ("NCHE"); and others who were angered because SLSOM refused to pay bribes, attacked SLSOM in the media and Internet. When Dolphin refused to pay the bribe demands, these same public officials began making false public statements to the media, and sending letters with false statements worldwide to principle agencies involved in the recognition and listing of medical degrees and medical licenses.  Meanwhile, George Gollin (hereinafter "Gollin"), the University of Illinois-Urbana (hereinafter "Illinois") and Alan Contreras (hereinafter "Contreras"), and the Oregon Office of Degree Authorization (hereinafter "ODA") conspired to destroy the name and reputation of Dolphin and SLSOM  because of their racial and ethnic biases since 2003 until now. Using their positions as employees of their respective states, Illinois and Oregon, they have continuously made rampant, ridiculous, and unsubstantiated statements against Dolphin, SLSOM and the class, even sending

"fraudulent documents" (Exhibits 42, 43, 49, 50, and 51) to the Republic of Ghana to prevent the accreditation of St. Luke School of Medicine - Ghana and further destroy its reputation and the reputation of its owners, and the reputation of the class. Exhibits 47 and 48 ("Ghanaian Reaction") clearly demonstrate the affects of the fraudulent documents to officials of the National Accreditation Board ( herein after "NAB") and Attorney General of the Republic of Ghana. Furthermore, Gollin and the Illinois published this false, defamatory and fraudulent document on the Internet for more 6 months from August 2010 until March 2011 so that they could deliberately, publicly and internationally, defame and embarrass, Dolphin, SLSOM, SL-G , and the Class.

3.  Unbeknownst to the Plaintiffs and the members of the Class, and without their authorization, defendants Gollin, Schwartz, the Illinois, Contreras, and the ODA had been spying on the activities of Plaintiffs and Class members clearly demonstrated by the defendants' indiscriminate presentation of unreliable information on their State government agencies' web pages, often deliberately misrepresenting the internet-based information on the Internet, to further defame and embarrass the Plaintiffs and the class.

4.  Plaintiffs and the Class bring this action pursuant to §§ 2511 and 2520 of the Electronic Communications Privacy Act ("EPCA"), 18 U.S.C. §§ 2511 and 2520, § 1030 of the Computer Fraud and Abuse Act ("CFAA"), 18 U. S. C. § 1030, § 2701 of the Stored Communication Act (:"SCA"), 18 U.S.C. § 2701, § 1983 of the Civil Rights Act, 42 U.S.C. § 1983, the First, Fourth, Fifth, Sixth, Seventh, Eighth, **Amend** and Fourteenth Amendments of the United States Constitution, the California Internet Stalking Act ("CISA"), COMPUTER INTRUSION, I.E. HACKING, CYBERTERRORISM, Title 47 USC § 223, VIOLATION OF COPYRIGHT (Title 17 USC § 501), INVASION OF PRIVACY (Article 1, §1 of the California Constitution, INTERNET STALKING law ("CIS") (California Civil Code § 1708.7) and common law.

5.  This Court has original jurisdiction of Plaintiffs' and the Class' federal claims pursuant to 28 U.S.C. §§ 1331 and 1137, and supplemental jurisdiction over Plaintiffs' and the Class'

state law claims pursuant to 28 U.S.C. §§ 1891(b) and c as Dolphin is a resident of and/or maintains a permanent residence in this district.

6. In connection with the acts and conduct complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate and international commerce, including the internet and the United States Postal Service.

## JURISDICTION

## FEDERAL QUESTION JURISDICTION

Friendship treaty

### 7.   ALIEN TORT CLAIMS ACT

The Alien Tort Claims Act ("ATCA") of 1789 grants jurisdiction to US Federal Courts over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." SLSOM is a Liberian corporation, and SL-G is a Ghanaian corporation, seeking justice under this act.  Additionally, approximately one-third of SLSOM's student and graduate population (the Class) are aliens, mostly citizens of African Countries such as Nigeria, Ghana, and South Africa.

### 8.   FEDERAL STATUTES

The following Federal statutes pertaining to the civil rights of the Plaintiff apply to this lawsuit.

| FEDERAL STATUTE | TITLE |
| --- | --- |
| Title 42, Chapter 21, Subchapter I, § 1981(a) | Damages in cases of intentional discrimination in employment |
| Title 42, Chapter 21, Subchapter I, § 1983 | Civil action for deprivation of rights under the color of law |
| Title 42, Chapter 21, Subchapter I, § 1986. | Action for neglect to prevent (Illinois) |
| Title 42, Chapter 21, Subchapter I, § 1988(a). | Proceedings in vindication of civil rights |

| Title 42, Chapter 21, Subchapter VI | Unlawful Employment Practices |
| § 2000e2 | |
| Title 47 USC § 223 | Obscene or harassing telephone calls in the District of Columbia or in interstate or foreign communications |
| Title 47 USC.§ 230 : | Protection for private blocking and screening of offensive material |

**9.     CONSTITUTIONAL QUESTIONS**

**A.     U.S. CONSTITUTION Sec. 1331.**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. The Federal court is asked to make rulings on the following questions of law and justice:

(1. Can Illinois or Oregon State employees use their positions as government employees to defame, deny or interfere in business opportunity of citizens of the other states of the United States with impunity, and not subject themselves to civil lawsuits in Federal District courts because of the 11th Amendment of the United States Constitution?  The Plaintiff argues that those employees, agencies of the state, are not protected from Federal civil lawsuit for damages or equity.  Plaintiff asserts that State employees who defame, deny or interfere in business opportunities to citizens of other states of the United States are not protected by the 11th Amendment of the United States Constitution, and, they and the agencies that they work for are subject to civil lawsuits for damages.

(2. Can the State of Oregon publish "lists" of unaccredited universities and institutions (that have not violated any laws of the United States, or other states, or even the State of Oregon or Illinois) based solely on suspicion or personal prejudices of State employees, outside the processes of law, that subject students or graduates of those institutions to criminal punishment? .  The Plaintiffs and the Class asserts that those "lists" are

unconstitutional and violate the due process of law provisions of the United States Constitution.

(3. The State of Oregon "Diploma Mill List" laws denies the Class their rights to employment, rights to opportunity, rights of enjoyment, rights of congregation and assembly, without a trial or hearing   The "Diploma Mill List" violates the due process by labeling educational institutions as unlawful, and their students and graduates as criminals without trial and without right to redress, or appeal the decision. The State of Oregon "Diploma Mill List" is, therefore, unconstitutional.

(4. Can the State of Oregon enforce criminal sanctions or civil sanctions against students and graduates of universities, colleges and institutions on their "Diploma Mill List" who have not otherwise violated any other federal or state law?

(5 These Plaintiffs and the Class ask this Federal Court to define the jurisdiction to which Oregon law ORS 348.594 to 348.615.

**10.  DIVERSITY JURISDICTION**

The Plaintiffs and the Class for their cause of action herein, state as follows

A.       This Court enjoys subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) (1) because the Plaintiff and Defendants are citizens of different states and countries and the amount in controversy exceeds $75,000.

B       Diversity jurisdiction is established based on the diversity of the principals of this lawsuit.

12.      SLSOM, a Liberian educational institution, established in 2000 and incorporated, in 2001, and chartered in 2003 by a lawful act approved by the Congress and Senate of the Republic of Liberia, and signed into law by the President of the Republic of Liberia.

13.      SL-G , a Ghanaian educational institution established and incorporated in 1998, and, by judgment of the High Court of Ghana, accredited in October 2009.  The judgment was appealed by the Ghana nab in December of 2009, after the NAB received a 91-page document authored by Gollin (Last saved 11/11/2009 1:58:00 PM), and defamatory and threatening letters from the ODA, authored by Contreras, and Dr. Schwartz, Dean, Illinois College of Medicine.

14.     SLSOM former medical students and graduates (class-action).  From 1998 until 2001, SLSOM only accepted medical transfer students who had completed their first two years of medical school, medical basic science.  These students only had to complete their last two years of medical school, called clinical sciences, at accredited hospitals where they would be trained by board certified physicians on real patients and equipment.  St. Luke School of Medicine did not conduct classes in Liberia until 2001 because it was too soon after the end of the civil war.

15.     DR. JERROLL B. R. DOLPHIN.  Plaintiff was, at all times relevant to the causes of action herein, and is co-founder and President of St. Luke School of Medicine since 1998. Dolphin is a graduate of San Jose State University with a Bachelor of Science in Physics, with a minor in Mathematics. Dolphin graduated with a Doctor of Medicine Degree from Spartan Health Sciences University, St. Lucia, West Indies.  Dolphin is also certified by the Education Commission for Foreign Medical Graduates ("ECFMG") for USMLE Step 1 and Step 2. Dolphin is, and has always been the majority owner of SL-G and SLSOM.  Dolphin resided in Ghana in the later part of 2004, and Liberia from November 2004 until May 2006.  He was resident in Ghana from May 2006 until July 2009, when he returned to the United States.

16.     The Class (MEDICAL STUDENTS). Robert Farmer is a natural person and resident of Maryland.  He is representative of and on behalf of a class-action of present and former the Class-Liberia, all natural persons. The members of the Class are residents of Maryland, Virginia, Illinois, Georgia, Florida, New York, Illinois, Tennessee,  Mississippi, Michigan, Texas, California, Washington, Oregon, New Jersey,Pennsylvania, North Carolina, South Carolina, Kentucky, Indiana, Connecticut, Idaho, Canada, Mexico, Liberia, Ghana, Nigeria, Cameroon, South Africa, United Kingdom, France, India, South Africa, Vietnam, Saudi Arabia, and other countries.  For the sake of clarity and organization, the list of Plaintiff medical students are set forth in Exhibit A and are incorporated herein as if fully set forth verbatim ("Medical Students"). At all times relevant herein, the Medical Students were or are students or graduates of SLSOM and represent the Class members.

DEFENDANTS

17.     REPUBLIC OF LIBERIA.  Defendant Republic of Liberia is a High Contracting Party to the Friendship Treaty, and the nation to which SLSOM is registered.

18.     MINISTRY OF HEALTH.  At all times relevant to this Complaint, Defendant MH was the primary institution for health care delivery services in the Republic of Liberia.  The MH is responsible for providing health and social welfare services to the citizens of Liberia.

19.     LIBERIAN MEDICAL BOARD. At all times relevant to this Complaint, Defendant Liberian Medical Board was the primary institution for the licensing of medical doctors in the Republic of Liberia.  It is a branch of the MH of the Republic of Liberia.

20.     MINISTRY OF EDUCATION.  At all times relevant to this Complaint, Defendant Ministry of Education was the education agency of the Republic of Liberia.

21.     NATIONAL COMMISSION ON HIGHER EDUCATION.  At all times relevant to this Complaint, Defendant NCHE was the national accrediting agency for the Ministry of Education of the Republic of Liberia ("NCHE").

22.     NATIONAL TRANSITIONAL LEGISLATIVE ASSEMBLY.  Defendant National Transitional Legislative Assembly ("NTLA") was the temporary legislative branch of the National Transitional Government ("NTG") of Liberia that operated in Liberia after President Charles Taylor left Liberia, in 2004 until the inauguration of President Ellen Johnson-Sirleaf in January 2006.

23.     DR. ISAAC ROLAND.  A resident of Monrovia, Liberia, at all times relevant to this Complaint, Defendant Roland was the Director General of the NCHE.

24.     MOHAMMED SHARIFF.  A resident of Monrovia, Liberia, at all times relevant to this Complaint, Defendant Shariff was a member of the NTLA of the Republic of Liberia from 2004 to 2006.  He was Chairman of the Health and Social Welfare Committee ("NTLA" or "NTLA-HSW") until June 2005, later becoming chairman of the NTLA's Executive Committee.

25.     DR. BENSON BARH. A resident of Monrovia, Liberia, at  all times relevant to this Complaint, Defendant Dr. Benson Barh in 2004 through June 2006, was Chief Medical Officer of Liberia and the Secretary of the Liberian Medical Board.

26.     DR. GEORGE GOLLIN.  At all time relevant to this Complaint, Defendant Gollin is a Professor of Physics at the Illinois the author of the infamous ODA's "diploma mill" list, ("DML"),  purports to be a higher education expert in "diploma mills" and fraudulent colleges and universities.  He also claims to be a consultant to the Republic of Liberia and its Ministry of Education.

27.     DR. BRADFORD S. SCHWARTZ. At all times relevant to this Complaint, Defendant Schwartz is the Dean of the College of Medicine, Illinois.

28.     Contreras.  Director of the State of Oregon, ODA. Authorizes the publication of Oregon's infamous "diploma mill" list,  omit. http://www.osac.state.or.us/oda/unaccredited.aspx.

29.     EDUCATION COMMISSION FOR FOREIGN MEDICAL GRADUATES.  At all times relevant to this Complaint, Defendant Education Commission for Foreign Medical Graduates ("ECFMG") administers the United States Medical Licensing Examination ("USMLE") to graduates of foreign medical education institutions. The USMLE is the standard medical examination for all medical students foreign and domestic.  ECFMG qualifies foreign medical graduates for residency in the United States by issuing an ECFMG certificate based upon successful completion of the USMLE Step 1 and Step 2.

30.     FOUNDATION FOR ADVANCEMENT OF INTERNATIONAL EDUCATION AND RESEARCH.  At all times relevant to this Complaint, Defendant Foundation for Advancement of International Education and Research ("FAIMER"), an ECFMG agency, maintained the International Medical Education Directory ("IMED"). The IMED is currently the sole source listing for qualified foreign medical schools in the United States.

31.     STATE OF OREGON, ODA ("ODA").  At all times relevant to this Complaint, Defendant State of Oregon, Office of Degree  Authorization purportedly provides for the protection of the citizens of Oregon and their post-secondary schools by ensuring the quality of higher education and preserving the integrity of an academic degree as a public credential.  The ODA is the publisher of Gollin's "Diploma Mill List", omit. http://www.osac.state.or.us/oda/unaccredited.aspx.   Contreras is the director of the ODA.

32.     UNIVERSITY OF ILLINOIS – URBANA CHAMPAIGN.  At all times relevant to this Complaint, the is an Illinois Institution of Higher Learning.  The University of Illinois is the employer of Gollin, and Dr. Schwartz.

## II.     VENUE

33 The proper venue for this matter is the Western Division of the Central District of California, United States District Court, as Dr. Jerroll B. R. Dolphin is a resident of Los Angeles, California and wherein Dolphin is the majority owner SLSOM and SL-G , and therefore has its place of business. Virtually each and all of the Plaintiffs' and the Class allegations are based on the defendants Internet published articles that have interstate and international readership.

## III.     COMMON FACTS AND ALLEGATIONS

## CLASS ACTION ALLEGATIONS

35. Plaintiffs bring this action as a Class Action under Rules 23(a), 23(b)(1), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of Plaintiffs and all other students, graduates and former students of SLSOM who were lawful recognized students of the same institution together with their families. Excluded from the Class are the Defendants herein, any subsidiary of any of the Defendants, any family members of the Defendants who attend or attended SLSOM, all employees and directors of Defendants or any subsidiary, and their legal representatives, heirs, successors or assigns of any such excluded person or entity.

36. The Class is so numerous that joinder of all members is impracticable. The student body of both SLSOM consists of approximately 250 students. Additionally, the proposed Class includes each SLSOM's student's immediate family members.

37. Plaintiffs' claims are typical of the claims of the other members of the Class, as Plaintiffs and all other members were injured in exactly the same way - by the violations of §§ 2511 and 2520 of the Electronic Communications Privacy Act ("EPCA"), 18 U.S.C. §§ 2511 and 2520, § 1030 of the Computer Fraud and Abuse Act ("CFAA"), 18 U. S. C. § 1030, § 2701 of the Stored Communication Act (:"SCA"), 18 U.S.C. § 2701, § 1983 of the Civil Rights Act, 42 U.S.C. §

1983, the First, Fourth, Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendments of the United States Constitution,  the California Internet Stalking Act ("CISA"), COMPUTER INTRUSION, I.E. HACKING, CYBERTERRORISM, Title 47 USC § 223, VIOLATION OF COPYRIGHT (Title 17 USC § 501), INVASION OF PRIVACY (Article 1, §1 of the California Constitution, INTERNET STALKING (California Civil Code § 1708.7) and California common law.

38. Plaintiffs will fairly and adequately represent the interests of the Class and has retained competent counsel.

39. Plaintiffs have no interests that are contrary to or in conflict with those of the Class.

40. A Class Action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damage suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the unlawful conduct alleged.

41. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a Class Action.

42. Common questions of law and fact exist as to all members of the Class and predominate over any questions effecting solely individual members of the Class. Among the questions of law and fact, common to the Class:

a. Whether Defendants' acts as alleged herein violated the ECPA, the CFAA, the SCA, § 1983, The Fourth Amendment of the United States Constitution,  California Civil Code § 1708.7, or common law;

b. Whether Defendants participated in and pursued the concerted action or common course of conduct complained of; and

c. Whether Plaintiffs and members of the Class have sustained compensable damages and, if so, the proper measure of such damages.

**SUBSTANTIVE ALLEGATIONS**

43.     Dolphin was asked by Liberian officials to start a medical school in Liberia in 1999.

44.     SLSOM was organized, authorized, incorporated and approved by various governmental agencies of the Republic of Liberia from 2000 through 2004 as demonstrated in Exhibits 2,3 ,4 and 31.

45.     SLSOM and A. M. Dogliotti had a signed agreement to cooperate in the education of SLSOM and A. M. Dogliotti students at the campus of A. M. Dogliotti. (Exhibit 55)

46.     A.M. Dogliotti, the medical school of the University of Liberia, had come to a state of disrepair from neglect and lack of funds. Most professors at A.M. Dogliotti had not been paid for more than four years. The agreement to cooperate was signed in the early summer of 2001. SLSOM  would pay A. M. Dogliotti's professors a minimum of $500 USD per month and up to $1500 USD per month or more. SLSOM started advertising for medical students, mainly in Nigeria.

47.     Dolphin came back to Liberia in early August 2001 to make arrangements for the expected 150 students to come and study at SLSOM with regular A. M. Dogliotti students. However, Dr. Benson Barh, the Dean of A. M. Dogliotti Medical School, quit and there was no named replacement as Dean.

48.     Without a person to discuss issues that might arise, Dolphin felt that enrollment at SLSOM in Monrovia should be postponed until suitable arrangements could be made with officials of A. M. Dogliotti. So, in early September 2001, he sent an email to all 200 of the accepted students to postpone their travel to Liberia until further notice. However, a few dozen of the students had already come to, or were in route to Liberia when the email notice was sent. Without an organized A. M. Dogliotti staff, and without anyone to discuss enrollment, class scheduling, and many other complex issues such as payment to professors, possession of classroom and building keys, responsibility of, and security of laboratory and classroom equipment, SLSOM could not practically keep its arrangement to partner with A.M. Dogliotti.

49.     Dolphin and SLSOM decided to start instruction without using A. M. Dogliotti. Therefore, in order to accommodate the students who had already arrived in Monrovia, SLSOM started classroom instruction at its offices in Monrovia in October 2001.  The Online curriculum was developed and used to supplement the instruction of the basic science students in Monrovia.

Simultaneously, SLSOM applied to the NCHE in October 2001 for approval as a tertiary institution.

50.     Also during this time, Mr. Frank Teah and Senator Beatrice Sherman, Teah's wife, reported to Dolphin, that Shariff, then head of the J. R. Kennedy Hospital in Monrovia, asked for a bribe of $6,000 USD a month to make SLSOM a "credible" institution in Liberia. Frank Teah and Sen. Sherman did not reply to Shariff's request. They reported to Dolphin that Shariff was a very ruthless individual and was not to be trusted.

51.     In November 2001, or earlier, the United States Department of State and Canada requested that Dolphin not send any additional U.S. or Canadian medical students to Liberia, as the State Department had received intelligence of increasing rebel activity in northern Liberia and that there was an eminent threat of civil war there.  SLSOM had several clinical science students, American and Canadian, at hospitals in greater Monrovia area.

52.     When war did break out in February 2002, SLSOM students fled Monrovia, Liberia in whatever and however they could. Some of the Nigerian students took refuge at 'Nigeria House', the Nigerian Embassy. Others took leave by boat, airplane, bus transport, and some even 'hitch-hiked' their way to Ghana. None could remove to the Ivory Coast because it also was beset with rebellion.  The Board of St. Luke School of Medicine decided to not send students to Liberia until stability was restored and the safety of the students could be assured.

53.     Dolphin visited Liberia again in June and August 2002. The SLSOM office and classrooms were completely wrecked.  There were bullet holes in every wall along with shrapnel stuck in most of the walls of the campus. The roof was also in disrepair.  The floors were covered with dirt and mud.

54.     Dolphin and the SLSOM staff spent many thousand dollars to repair the facility. On September 17, 2002, the NCHE issued to SLSOM-Liberia a Temporary Permit to Operate St. Luke School of Medicine in the Republic of Liberia. See Exhibit "3.

55.     On April 24, 2003, the National Legislature of the Republic of Liberia granted SLSOM a Charter, despite the threat of civil war. See Exhibit "31".

56.     Frank Teah, the SLSOM vice president, was called to Accra, Ghana to negotiate peace between the Liberian government and the warring Liberian factions. In the meantime, Sen. Beatrice Sherman carried on, personally carrying the Charter to President Taylor for his approval and signature while the fierce civil war was being fought for control of the city of Monrovia.

57.     On 7 August 2003, the President of Liberia signed into law "An act to incorporate St. Luke School of Medicine of the city of Monrovia, Montserrado County, Republic of Liberia, and grant SLSOM a Charter." See Exhibit "4".

58.     On August 8, 2003, the Ministry of Foreign Affairs published "An act to incorporate St. Luke School of Medicine of the city of Monrovia, Monsterrado County, Republic of Liberia, and grant SLSOM a Charter", which, in part, states:

*ARTICLE 1*

*SECTION 1:*

*St. Luke School of Medicine was established August 1, 2000, and incorporated August 22nd 2001 in the City of Monrovia, Montserrado County, Republic of Liberia, is hereby established in the name of St. Luke School of Medicine Incorporated (SLSOM), by and through its founders, Dr. Jerroll Dolphin, President.  Said school is hereby further granted this charter, which endows it with all the rights, privileges and benefits existing in similar institutions of higher learning within this Republic, and shall henceforth be known by the name and title "St. Luke School of Medicine".*

*SECTION 2: LEGAL STATUS*

*The St. Luke School of Medicine (SLSOM) is hereby made a legal and corporate entity with perpetual succession, and shall have the authority to contract, sue and be sued, plead and be impleaded in any court of competent jurisdiction within the Republic; to purchase or otherwise acquire and hold property, real and mixed up to the value of one hundred and fifty million United States dollars (US$150,000,000); the said St. Luke School of Medicine (SLSOM) shall be perpetually maintained in the Republic for medical education of the people of this nation, people of the other countries and for who may have the capacity to seek medical education.*

*"Article IX (page 6)  MISCELLANEOUS*

*SECTION*

1.  *This Charter may be amended by the Legislature of the Republic of Liberia upon application to them by and through the Founder of the St. Luke School of Medicine (SLSOM), passed by a two-third vote of the said Board of Trustees during a regular meeting of the Board of Trustees.*

See Exhibit "31"

59.      Five days later, after President Charles Taylor signed Act to Incorporate the 'Charter' into the law of the Republic of Liberia, he resigned from the office of President and fled Liberia to Nigeria.

60.      When Dolphin returned to Liberia in early September 2003, the SLSOM campus, on the top floor of the Luke Building on Broad Street was, again, entirely destroyed. Dolphin and SLSOM staff had conducted two complete renovations of the classrooms and offices on the top floors of the Luke Building. Dolphin decided to move the campus to a new location as soon as possible because the Luke building, a tall noticeable building,  was located next to the channel bridge (one block), a strategic battle location and had been subjected to bullet, RPG, and mortar damages from the two previous wars in 2002 and 2003.

61.      In November 2004, SLSOM staff found a suitable location to move the SLSOM campus in Gaye Town, a residential area on the bay side of Monrovia, with a 5-year lease. The new campus was formerly used as a primary and junior secondary school.   Please see Exhibit "32".

62.      SLSOM assembled finances, staff, and equipment for the new campus. In November 2004, Roland,  Director General of Liberia's NCHE, became aware of SLSOM's relocation and improvement efforts. Dr. Roland witnessed the transition of the SLSOM campus from its deplorable condition when SLSOM first took possession of the property to its new refurbished condition.

63.      On January 18, 2005, the NCHE, through Dr. Roland, issued a letter to Madame Carole Bede of ECFMG:

*"St. Luke School of Medicine has established an institution and is working hard towards providing the necessary physical facilities. As we speak there is large quantity of quality medical equipment including computers, modern books, microscopes, etc."* See Exhibit "6"

64.     However, on January 20, 2005, Carole Bede issued a letter to Dolphin, St. Luke School of Medicine, wherein she stated:

*"ECFMG and FAIMER have received an **unsigned and undated statement** apparently issued from the National Commission on Higher Education, Liberia, stating the St. Luke School of Medicine is not registered or accredited as a medical school in Liberia."*

*"Until such time as FAIMER receives confirmation that the government of Liberia recognizes St. Luke School of Medicine and that the school is authorized by the government to issue the Doctor of Medicine degree, students currently enrolled in, and graduates of, St. Luke School of Medicine are no longer eligible to be registered for USMLE examinations or for ECFMG certification."*

See Exhibit "5". ECFMG removed SLSOM from the IMED listing on January 20, 2005 based on an "unsigned and undated statement" from an unknown person.

65.     On February 25, 2005, Shariff asked Dolphin to come to the Capitol Building to meet with him. Dolphin met him at about 2 PM that same day. Shariff was immediately hostile, questioning Dolphin on the establishment of SLSOM, yelling incessantly all the while. Dolphin asked him to calm down. Shariff told Dolphin, "$6000 a month". Shariff did directly ask Dolphin for a bribe.

66.     Dolphin, to avoid giving an answer, asked Shariff to come see the campus. Shariff agreed and asked if he could bring a few other 'officials' with him. Dolphin and Shariff agreed to limit the number to three persons. They would meet at 11 AM on the next Tuesday, March 1, 2005.

67.     That Tuesday, March 1, 2005, when Dolphin arrived at the campus, Shariff had brought 15 newspaper and radio reporters. Dolphin reminded Shariff that they agreed to limit the number of people to three 'officials'. Shariff sneered, and loudly announced that he had a 'Press Release'

that he distributed, however, he refused to give a copy to Dolphin. Shariff libeled Dolphin and SLSOM's reputation because of Dolphin's refusal to pay bribes.

68.     Then Shariff loudly began to make a series of false accusations against Dolphin and SLSOM. Shariff accused SLSOM of committing criminal acts.   Shariff slandered Dolphin in the presence of newspaper reporters.

69.     Then Shariff insisted that the press be allowed to tour the facilities. Shariff stated that if the press was not allowed to inspect the facilities Dolphin would be in violation of "Article 44 of the Constitution of Liberia". Not knowing exactly what Article 44 was, Dolphin reluctantly allowed the reporters to enter the campus, take pictures, and ask questions. Shariff violated Dolphin's civil rights under the color of law.

70.     After 12 PM of the same day, Dolphin bade all the reporters to leave, and they all did. However, before Shariff left SLSOM, he asked Dolphin to come to the Capitol Building at 2:00 PM to meet with him, again mentioning the bribe of $6,000 US per month.  Shariff attempted to extort money from Dolphin.

71.     At 2 PM, Shariff called Dolphin on the telephone asking him where he was.  Dolphin, fearing that Shariff was going to again ask him outright for a bribe, told Shariff that he was fearful of coming to the Capitol Building without the representation of a lawyer.  He asked Shariff to write a summons so that he could have time to obtain adequate representation. Shariff became angry, telling Dolphin that he did not need a lawyer, and to "come now".  Dolphin reminded Shariff that he had made some criminal allegations against Dolphin and SLSOM at the press conference at the campus, and that he (Dolphin) had the right to be suspicious and concerned if he would walk out of the Capitol Building in handcuffs or not.

72.     On March 3, 2005, the NCHE issued a Statement of Attestation, attesting SLSOM's right to establish and operate a medical school. A copy of the Statement of Attestation was sent to ECFMG. See Exhibit "8".

73.     On March 7, 2005, the MH sent a letter to the Embassy of India in Liberia verifying that SLSOM Liberia was "...granted legislative permission to establish a college of medicine in Liberia in 2003." See Exhibit "34."

74.     SLSOM invited the Liberian Medical Board ("LMB") to inspect its campus. Dolphin and SLSOM professor Dr. Dukuly, went to the office of Dr. Benson Barh on Tuesday, March 8, 2005, and presented SLSOM's documentation and all of its legal credentials to him. Bahr appeared to be very upset and disturbed to see the documents shown to him. In fact, his face was flushed, turned red, and he shook his head slowly several times before he looked up to speak to Dr. Dukuly and Dolphin. Dr. Dukuly then presented SLSOM's Invitation for Inspection to Bahr. See Exhibit "35".

75.     Barh told Dolphin, in front of Dr. Dukuly, that he wanted $3,000 a month. Barh attempted to bribe Dolphin. Barh asked when SLSOM expected to start classes. Dolphin answered saying "this September." To which Bahr replied, "not if I can help it. Barh, thus, did threaten Dolphin.

76.     During the meeting, Barh mentioned to Dr. Dukuly that the Liberian Medical Board had never done an inspection of any medical school.  A. M. Dogliotti, the University of Liberia's medical school, had never been inspected nor had it ever been required for an inspection. According to the NCHE, only the NCHE had the authority to accredit tertiary institutions.

77.     On March 12, 2005, the NCHE issued a letter to the ECFMG, Madame Carole Bede, which, amongst other things, states:

> *"St. Luke School of Medicine is recognized by the Government of Liberia to award Doctor of Medicine degrees."*
>
> *"Recognition was granted from August 1, 2000 by the National Legislature of the Republic of Liberia"*
>
> *"Liberia presently recognizes St. Luke School of Medicine."*
>
> *"The government of Liberia previously recognized St. Luke School of Medicine."*

Italic emphasis is quotation from the text of the letter.  See Exhibit "9"

78.     After receipt of the NCHE letter, ECFMG placed SLSOM back on the IMED listing on or around March 22, 2005.

79.     On or about the night of Sunday, March 13, 2005, Dolphin's friends in Liberia started calling him, frantically telling him about a doctor who called himself Dr. Kpoto on the radio

denouncing SLSOM. They said that Kpoto stated that SLSOM was giving hundreds of 'fake' degrees to Indians from the streets who came to Liberia to register as doctors. He also said that SLSOM taking thousands of US dollars for these fake degrees.  Kpoto slandered Dolphin on the radio.  Kpoto, it was said, was the Dean of A. M. Dogliotti Medical School, of the University of Liberia.

80.    The National Security Agency, NSA, arrested and detained Dolphin at his room at the Metropolitan Hotel at 7 AM the morning of Tuesday March 15, 2005. The NSA agent asked Dolphin to pay for the taxi ride to the agency's headquarters in Mamba Point, not far from the US Embassy.  Dolphin was questioned by two NSA agents for more than 3 hours. Further detained, Dolphin was then question by the NSA Director who stated that Shariff called him about a "fake" medical school in Liberia.  The NSA Director released Dolphin in the presence of his attorney and US Embassy Deputy C'harge de Affaires, David Kraehenbuehl after Cllr. Abdullai presented SLSOM's official documentation,  The documentation included the Minister of Health's letter to the World Health Organization (August 2000), SLSOM's Articles of Incorporation (August 2001), the NCHE's Permit to Operate (September 2002), the Act to Incorporate St. Luke School of Medicine approved by the Liberian legislature (April 2003), the Bill signed by President Charles Taylor (August 2003), and the Statement of Attestation (March 2005).  The documentation presented to the NSA Director was already public record. Thus Dolphin was falsely arrested and publicly embarrassed and harassed by Liberian officials.

81.    The following day, March 16, 2005, Shariff and his conspirators caused the following newspaper article to be published in Monrovia media, and on the internet. Another Degree Granting Medical College in Liberia, The Inquirer, Monrovia, Liberia March 16, 2005.

> "It has been gathered that an entity accredited by the Government of Liberia to run as Medical College has already issued degrees to individuals without running classes.

> According to investigation, the St. Luke School of Medicine said to be located in Gaye Town, Sinkor, was accredited by an Act of the National Legislature to run as a medical college. But report said the school has not officially begun classes, but has already gone go-ahead issuing diplomas to some so-called graduates.

*Investigation revealed that the existence of the school as a degree granting institution came to light recently when some students in Asia called the India Consul to verify the existence of the school, which has been issuing degrees.*

*The sources said the school was targeting students in Asia because most of the people in that part of the world want to be doctors, but can not afford the cost of acquiring such education and degree there, and have therefore decided to use the on-line program to get their "documents" since they believed that the St. Luke School of Medicine was operating in Liberia.*

*It was also said that the school has an affiliation with the University of Liberia, but this was denied by Dr. Al Hasan Conteh, president of the university when he was approached on the issue yesterday.*

*At the same time, some medical doctors contacted over the issue, expressed concern about this latest development because they said it has the potential to further damage the image of the country.*

*Assemblyman Dr. Mohammed Shariff, chairman of the house standing committee on health, said the whole thing about the school is fake. He blamed some people in government for this situation.*

*He said, he has received complaints from some graduates of the A. M. Dogliotti College of Medicine of the University of Liberia, who said the issue of St. Like was an embarrassment to them.*

*He said his committee is investigating the matter as this was serious and must be dealt with accordingly. He said this was a scam that some individuals are using to extort money from people desirous of getting in the medical profession. He said these individuals went to other countries and were thrown out, but some individuals in government are working with them to bring shame to this country.*

*Also, a statement of attestation issued by the National Commission on Higher Education is said to be raising eyebrows. Investigation revealed that the commission had gone ahead*

*to grant rights and a statement to operate to the institution without it meeting all the*

*requirements, something the school is said to be using.*

*Health Minister Dr. Peter Coleman who was contacted on the issue yesterday,*

*confirmed that the school has been accredited by an act of the national legislature. He said*

*the school was now preparing to operate as it has been also accredited by the Commission*

*of Higher Education.*

*Asked about the issuance of diplomas without classes, Dr. Coleman said the school also*

*runs an "online program." But said he is not aware of the issuance of diplomas. He said the*

*medical authorities in Liberia do not "recognize" such online program, which is said to be*

*existing in Nigeria and Ghana.*

*Efforts to get a word from Education Minister, Dr. Evelyn Kandakai, the president and*

*chief executive officer of the school, Mr. Jerroll Dolphin, MD, and the Indian Consul proved*

*futile as their cell phones were switched off. "*

Italics are quotations from the newspaper article.  This newspaper article is replete with

false statements, and was also published on the Internet.  Thus, officials of the

government of Liberian did libel and slander Dolphin, SLSOM, and the class.  Thus

Dolphin, SLSOM, and the Class were subjected to public humiliation, stress, and

embarrassment by Shariff with his false accusations

82.    On Thursday, March 17, 2005, the Liberian Federal Bureau of Investigation ("FBI")

questioned Dolphin in the presence of his lawyer for 2 hours.  Dolphin was questioned by the

Director of the FBI who also stated that Shariff called him about a "fake" medical school in

Liberia.  Dolphin was released after Dolphin's lawyer presented SLSOM's official Liberian

documentation,  The documentation included the Minister of Health's letter to the World Health

Organization (August 2000), SLSOM's Articles of Incorporation (August 2001), the NCHE's

Permit to Operate (September 2002), the Act to Incorporate St. Luke School of Medicine

approved by the Liberian legislature (April 2003), the Bill signed by President Charles Taylor

(August 2003), and the Statement of Attestation (March 2005).   The documentation presented to

1    the Director of the FBI was already public record. Thus Dolphin, SLSOM, and the Class were

2    subjected to public humiliation, stress, and embarrassment by Shariff with his false accusations.

3    83.    On Friday, March 18, 2005, after Dolphin paid the Liberian Medical Board $500, the

4    LMB inspected the SLSOM campus in Gaye Town. See Exhibit 10.

5    84.    During the inspection Barh said to Dolphin that if he "were in the United States, he

6    would be paid at least $3,000 a month for what he was doing" (as a Dean of the medical school).

7    85.    Dolphin reminded the inspection team that this was the best-equipped classroom and

8    laboratories in all of Liberia and that A. M. Dogliotti's did not have the furniture, equipment,

9    books, computers, Internet service, electricity, painting, and other facilities that SLSOM had at

10   its campus. Bahr did not want to look at SLSOM's curriculum, which was available online, and

11   on every computer as well. See Exhibit "36."

12   86.    Officials from the United States Embassy called Dolphin telling him to meet them at

13   SLSOM's campus the next Monday morning at 10 AM. On March 21, 2005, they arrived at the

14   SLSOM campus in a United States Embassy truck. One younger man was an experienced

15   teacher working at the United States Embassy, and the other middle-aged man was a nurse also

16   working for the United States Embassy. They took pictures with a digital camera as they

17   inspected the campus. The nurse noticed that the microscopes needed light sources to which

18   Dolphin acknowledged the situation. The nurse also said that it was a simple problem to fix and

19   it was not significant. They told Dolphin that SLSOM was the best-equipped campus, medical or

20   otherwise, in Liberia. They were impressed that SLSOM had curriculum and studies online, and

21   were also impressed with the quality and quantity of the CD-ROM's. Some of Dolphin's pictures

22   of the SLSOM campus in March 2005 are displayed in Exhibit "33".

23   87.    On Tuesday afternoon, March 22, 2005, Dr. Dukuly notified Dolphin that he had

24   received word that the inspection report from the Liberian Medical Board was available and that

25   they should collect it together. Dolphin and Dukuly were very disappointed to see the inspection

26   report. The LMB short report was replete with false information: See Exhibit "10".

27

28

(a) The building was not undergoing major renovation. One small portion of the roof was undergoing repair when the inspection was done. The LMB knew about the repair in advance.

(b) The SLSOM Student Handbook had been online for more than five years. A copy was given to the LMB officials prior to the inspection.

(c) The library was set up. SLSOM had 400 library books and 100 interactive medical CD-ROM's SLSOM expected to have 15-30 students, maximum, at that campus. This represented a book to student ratio of about 18:1.

(d). SLSOM had two laboratory rooms. Each laboratory room could accommodate 12 students, or 24 students if working in pairs. The microscopes were displayed in one laboratory, and the stethoscopes, sphygmomanometers, various blood testing kits, centrifuges, stains, chemicals, and other lab equipment was displayed in the other laboratory.

Thus Liberian Medical Board did libel Dolphin and SLSOM, which Dolphin was the majority owner.

88.     On Friday morning, March 25, 2005, Dolphin left Monrovia, traveling by taxi to Roberts International Airport, about 30 miles from downtown Monrovia, to catch an 11 AM flight to Accra, Ghana.  Just as he was about to board the airplane, several Immigration agents approached him, took him under arrest, took his passport, telephone, and boarding pass.  They did not have a warrant, nor did they give him any reason for his arrest and detention.  They escorted him to the Immigration and Naturalization Office at the airport. Despite his pleas to allow him to catch the flight to Ghana so that he could be with his wife for Easter Sunday, they ignored him.  Thus Dolphin was falsely arrested and denied travel, a Friendship Treaty violation. Thus, again, Liberian officials did inflict emotional distress on Dolphin.

89.     Instead, the Immigration officials called Shariff and the Minister of Justice, Kabinah Janeh, former leader of LURD ("Liberians United for Reconciliation and Democracy"), one of the rebel coalitions that fought the civil war in 2002 and 2003 in Liberia, and told them of Dolphin's arrest.  Shariff was also a known member of LURD.  Dolphin was falsely imprisoned in

Liberia under the color of law, without being charged for any crime. His right to travel freely was also a violation of the Friendship Treaty. Thus, again, Liberian officials did inflict emotional distress on Dolphin.

90.     On Monday afternoon, March 28, 2005, Dolphin and his attorney then gave Deputy Minister of Justice Edward Gobah copies of St. Luke School of Medicine's legal documents, asking for the return of Dolphin's passport and tickets. After carefully reading the documents, Deputy Minister Gobah went on to tell Dolphin's attorney and Dolphin that "there is no way that the Ministry of Justice would prosecute Dolphin or St. Luke School of Medicine....... We would lose. St. Luke is a legal entity and a legal university. You have all the required documents. You can teach whatever you choose and anyway you want to teach it." Dolphin asked "What about online?" Gobah replied saying "Online instruction is not illegal in Liberia. Not even for medicine."Just as important is what Gobah said next. "This is really a fight between Shariff and Peter Coleman. Shariff hates Coleman. They even had a fist fight once in Dr. Coleman's office." He went on to elucidate more about the bad blood between the two. Gobah added "The Ministry of Justice does not want to get involved in what is really a personal dispute that has spilled over into the public eye."

91.     Deputy Minister Gobah, then called the Director of Immigration and Naturalization Service, and told him "You know about Dolphin?" We heard the Director say "yes". "Do you have his passport?" Back came the reply: "Yes." Gobah told him to be in his office in 10 minutes. When the INS Director arrived he told him to "give Dolphin his passport immediately" and to never take it again. The director asked Dolphin's attorney and Dolphin to come to his office Tuesday afternoon to collect the passport. To which Dolphin's attorney agreed.

92.     On Tuesday morning, March 29, 2005, at 11 AM, another friend of Dolphin called to tell him that Dr. Benson Barh, the Chief Medical Officer of Liberia and the Secretary of the Liberian Medical Board had called a press conference and was blasting SLSOM in front of 3-dozen reporters at the MH conference room. Dolphin called Dr. Dukuly to find out if it was true. Dr. Dukuly confirmed it saying "I told you to get here." Dolphin replied, "I couldn't get there any sooner." Benson Barh and Dr. Horatious Browne were conducting a press conference to which

they were lying outright about SLSOM. United States Embassy in Liberia officials were also at
the press conference. See Exhibit "37". At the conference, Bahr began making false statements
about SLSOM, screaming and condemning the school at the top of his voice. At the end of the
press conference they called for the arrest of Dolphin, knowing by sight that Dolphin was in the
conference room to which the reporters looked at Dolphin for his response, some taking pictures
of Dolphin. Thus, again, the Liberian Medical Board did libel and slander Dolphin and SLSOM
to which Dolphin is the majority owner. Thus, again, Liberian officials, Dr. Benson Barh and
Dr. Horatious Brown, did inflict emotional distress on Dolphin.

93.     On the morning of Thursday, March 31, 2005, Dolphin read the bold front page
newspaper headline "Medical Board Threatens to Prosecute Founder of 'Fake' Medical School".
Shariff and Dr. Benson Barh and their co-conspirators caused the following newspaper article to
be published in Monrovia media, and on the internet. It read as follows:

Medical Board Threatens to Prosecute Founder of 'Fake' Medical School, Alloycious
David, Monrovia, Liberia The News, March 31, 2005.

> Liberia Medical Board has threatened to turn over the founder of the
> "fake" St. Luke Medical School and his collaborators to the Justice Ministry for
> prosecution if they continue to "abuse and insult" the integrity and
> professionalism" of the country's Medical Board.
>
> The Board said it cannot and will not discuss application of any doctor
> from the Medical School because there is no school in Liberia known as the St.
> Luke Medical School.
>
> The Board noted that unless the "illegal school" can be accredited, it
> would not license any doctor that it has given diploma to.
>
> Prof. S. Benson Barh, Chief Medical Officer of Liberia, told reporters
> Tuesday that the 'counterfeit school' through Dr. Meimei Dukuly presented a list
> of 19 doctors who reportedly completed studies at St. Luke Medical School for the
> degree of Doctor of Medicine ("MD").

*Annoyed over dubious existence of the institution, Dr. Barh said it was*
*shameful to have learned that a list of reported trained doctors, who claimed to*
*have passed through the walls of the school, was presented to the Medical Board.*

*"We are not aware and have no knowledge of the medical school, but we*
*will rather warn representatives of the bogus school to legally and properly apply*
*to operate a medical institution in Liberia," he stressed.*

*He, amongst many other things noted, that the Medical Broad visited the*
*school's so- called campus and observed that what it saw does not even represent*
*a status of an elementary school's campus, adding in reality, the building is a*
*"run down" dwelling home under major renovation which lacks electricity,*
*laboratory, class rooms, running water among others basic requirements for a*
*representation of a medical institution...*

Italics are quotations from the newspaper article. This newspaper article above is replete with false statements, and was also published on the Internet. Thus, officials of the government of Liberian did libel and slander Dolphin, SLSOM, and the class. Barh and LMB officials threatened Dolphin with malicious prosecution and false imprisonment under the color of authority, and violating the Friendship Treaty. Thus, again, Liberian officials did inflict emotional distress on Dolphin. Thus Dolphin, SLSOM, and the Class were subjected to public humiliation, stress, and embarrassment by Shariff with his false accusations

94.    Benson Barh lied.  The previous year, 2004, Bahr consulted for SLSOM to write a document on the equivalence of medical education in Liberia to medical education in the USA for a price of $3000 USD.  SLSOM paid him in full, See Exhibit 38.

95.    On Friday morning, April 1, 2005, Dolphin was served with another summons at 9 AM again, just as he was leaving the Metropolitan Hotel for the airport. The summons was for a hearing by the NTLA-Health and Social Welfare Committee, chaired by Shariff the very same day at 2 PM. Dolphin told the server that he was not coming and to talk to his attorney, Dolphin's attorney.. Dolphin proceeded to the airport where he met the Colonel. The Colonel escorted him

to the desk of the Customs Department, wherewith he gave Dolphin his passport and left.  Thus, again, Liberian government officials harassed Dolphin, violating the Friendship Treaty.  Thus, again, Liberian officials did inflict emotional distress on Dolphin without due process of law.

96.     Dolphin did not learn until a few weeks later that Shariff still conducted the hearing regarding SLSOM despite the fact that no one on the SLSOM staff was present for questioning. Some reporters who were present at the hearing, at the demand of Shariff, told Dolphin, later, that it was a "kangaroo court" where Shariff had a list of 'haters' with prepared statements, with similar statements, almost word-for-word, coming forth to speak against SLSOM. The speakers did not have any facts to accuse SLSOM, only accusations such as "they are harming the people of Liberia", or " St. Luke is a 'fake' school", or " St. Luke School of Medicine does not exist in Liberia".  Thus Dolphin and SLSOM were further libeled and slandered.  Thus, again, Liberian officials did inflict emotional distress on Dolphin without due process of law.  Thus Dolphin, SLSOM, and the Class  were subjected to public humiliation, stress, and embarrassment by Shariff with his false accusations

97.     However, on Tuesday morning, April 5, 2005, Shariff and his conspirators caused the following newspaper article to be published in Monrovia media, and on the internet.

Fake Medical College Boss Flees? Mensiegar Karnga, Monrovia, Liberia The Analyst, April 5, 2005.

> Dr. Jerroll Dolphin, the proprietor and founder [of] the mysterious St. Luke Medical College, has reportedly left the country for fear of being prosecuted.

> Informed sources say Dr. Dolphin has "surreptitiously" abandoned his Metropolitan hotel on Broad Street to return home in the United States of America.

> There has been intense controversy over the whereabouts of the medical college.

> The A. M. Dogliotti College of Medicine had denounced the existence of the alleged fake college in Liberia, even though the school was successful in

*granting medical degrees to Liberians and other foreign nationals most of whom*

*were Nigerians and Indians.*

*Defending the existence of St. Luke Medical College in Liberia, the*

*country's Health Minister, Dr. Peter Coleman told reporter at a new conference*

*that the school was not a fake one, added that it met the approval of the 57th*

*national Legislative Assembly during the NPP regime.*

*Dr. Coleman added that he was unaware whether the institution was*

*registered with the committee on higher institution.*

*It appeared that the Health Minister's statement further increases tension*

*with his professional colleagues at A. M. Dogliotti and the Chairman on Health*

*at the NTLA, Dr. Mohammed Shariff who decided to take legal action against Dr.*

*Dolphin [on behalf of] the medical profession.*

Italics are quotations from the newspaper article. This newspaper article above is replete with false statements, and was also published on the Internet.  Thus, again, officials of the government of Liberian did libel and slander Dolphin, SLSOM, and the class  without due process of law.  Dolphin, SLSOM and the Class  was also threatened with malicious prosecution and false imprisonment under the color of law and authority, a violation of the Friendship Treaty.  Thus, again, Liberian officials did inflict emotional distress on Dolphin.

98.     Dolphin left from Accra, Ghana, to Monrovia, Liberia, the next morning at 7 AM, April 6, 2005, and arrived in Monrovia at about 9 AM, and returned to the Metropolitan Hotel. Once, in Liberia, Dolphin's mother, Mrs. Ruth Dolphin, called him from Los Angeles to tell him there was an article in the Los Angeles Times newspaper stating that he had fled Liberia for fear of prosecution and was 'thought to be hiding' in Los Angeles.  Thus, Dolphin and SLSOM was libeled and slandered by Liberian officials without due process of law.

99.     On April 11, 2005 the NCHE issued a letter to Madame Carole Bede, which stated SLSOM "does not exist" and was a "computer school." Upon receipt of this letter, the ECFMG-IMED without corroboration of the evidence or claims stated in this letter immediately withdrew

SLSOM from the IMED, and canceled the USMLE test results for all of the Class, past and present. Exhibit 11. Thus, again, Dolphin, SLSOM and the Class were libeled and slandered by Liberian officials without due process of law.. The officials of the Republic of Liberia did commit trade libel and interference in business advantage of Dolphin. The Liberian officials also violated the Friendship Treaty. The ECFMG and IMED negligently violated the civil rights and business advantage of Dolphin. Thus, again, Liberian officials did inflict emotional distress on Dolphin and the Class.

100.    On April 12, 2005, at about 3 PM, Dolphin and Dolphin's attorney went to the Capitol Building to the office of Shariff. The hearing started about 3:30 PM and it was a farce. After being called to order by Shariff, a line of about a dozen people came to speak to the so-called committee that consisted of Shariff and another LURD member of the NTLA, a friend of Shariff.

101.    The first person to speak was Dr. Kpoto, whom Dolphin did not know personally. He accused Dolphin and SLSOM of fraudulently issuing medical diplomas to hundreds of Indians and Liberians 'off the streets', and that SLSOM "does not exist in Liberia." Kpoto offered no proof of his allegations. Next to speak was Benson Barh who said SLSOM was a 'fake' school and that it "does not exist in Liberia." Several other Liberian doctors, most of whom Dolphin did not know at all, also came to speak. They all made similar false allegations about SLSOM harming the health and safety of Liberians and that "it does not exist in Liberia." Towards the end of the line was Roland, who was physically shaking. He ended his short speech again with "it does not exist in Liberia." Minister of Education. Dr. Evelyn Kondakai, came to the podium with a canned speech, which also ended with the phrase "it does not exist in Liberia." Thus, again, Dolphin and SLSOM was libeled and slandered by Liberian officials without due process of law. Dolphin was also threatened with malicious prosecution and false imprisonment under the color of law and authority, violating his civil rights and violating the Friendship Treaty. Thus, again, Liberian officials did inflict emotional distress on Dolphin.

102.    The next to last person to speak was the Minister of Health, Dr. Peter S. Coleman. Dr. Coleman spoke highly of St. Luke School of Medicine for several minutes then he stopped talking and held his head down. Shariff prodded Coleman for a few moments to continue by say

"and, Dr. Coleman...and Dr. Coleman..." several times. Dr. Coleman looked and Dolphin and nodded his head, then he looked at Shariff. Shariff said "and, Dr. Coleman", then Dr. Coleman said, "I was misled" and the room went quiet with awe. Dr. Coleman went on to say that his advisers mislead him and he made mistakes in giving SLSOM the support he had given it in the past.

103.    After Dr. Coleman was dismissed from the podium, Dolphin was called to answer questions. Dolphin's attorney objected to many questions. Shariff started to yell at Abdullai saying that he should not be representing Dolphin. Thus Shariff under the color of authority tried to deny Dolphin his right to be represented by an attorney.  Thus, again, Liberian officials did inflict emotional distress on Dolphin without due process of law and violated the Friendship Treaty.

104.    Dolphin told Shariff and the audience that the previous speakers made false allegations about Dolphin and SLSOM and that they had no facts to prove anything about what they were saying.  Dolphin also accused Shariff of making false allegations with no facts to base his false claims.  Dolphin asked what law of the Republic of Liberia had he violated? To which no answer was given. Shariff was clearly misusing his position in the temporary NTLA to abuse, defame, and harass Dolphin and SLSOM, and the Class.

105.    Shariff started yelling, threatening to jail Dolphin for contempt of the NTLA. Dolphin yelled back saying that he would go to jail, and then to a court of law, and, in the court of law, he would put an end to these farce hearings and this 'kangaroo court'.  Thus, again, Dolphin and SLSOM was libeled and slandered by Liberian officials.  Dolphin was also threatened with malicious prosecution and false imprisonment. Thus, again, Liberian officials did inflict emotional distress on Dolphin without due process of law. Thus Dolphin, SLSOM, and the Class were subjected to public humiliation, stress, and embarrassment by Shariff with his false accusations

106.    Soon afterward, after 6:30, Shariff adjourned the hearing and told Dolphin that he must remain in the room because he was "held in contempt" of the NTLA. Abdullai had to leave for another meeting but he reminded Dolphin of what to do. It was already dark, and the Capitol

1   Building was without electricity. Shariff lit a few candles.  Thus, again, Dolphin and SLSOM

2   was libeled and slandered by Liberian officials.  Dolphin was also falsely imprisoned by Shariff

3   who was misusing his governmental authority. Thus Dolphin, SLSOM, and the Class  were

4   subjected to public humiliation, stress, and embarrassment by Shariff with his false accusations

5   107.    Soon thereafter, Shariff and another hoodlum-looking fellow wearing matching snake-

6   skin pants, vest and shoes, discussed matters amongst themselves for about 10 minutes. Then

7   Shariff came to Dolphin and said he was going to take my passport.  He took Dolphin's passport

8   saying that he was going to copy it for NTLA purposes and use and left the room. Dolphin with

9   his cellular phone called the United States Embassy, when Shariff refused to return his passport,

10  and an embassy official answered. Dolphin told him that he was at the Capitol Building for an

11  NTLA hearing. The official said that he knew Dolphin and identified himself. Dolphin explained

12  that he was at the Liberia Capitol building for a NTLA – HSW hearing on SLSOM and that

13  Shariff had taken his passport without his permission. The official asked if Shariff was available

14  and that he wanted to talk to Shariff.  Thus, again, Dolphin and SLSOM was harassed by

15  Liberian officials.  Dolphin was also threatened with malicious prosecution and false

16  imprisonment.  Thus, again, Liberian officials did inflict emotional distress on Dolphin without

17  due process of law.

18  108.    Shariff returned to Dolphin his passport.  Then Shariff asked Dolphin if he could use his

19  telephone to explain something to the US Embassy official, to which Dolphin refused.  During

20  another 30 minutes waiting, Shariff and his hoodlum-looking friend were conversing.  Shariff

21  told Dolphin that he could leave because he did not want to make Dolphin a martyr, however, he

22  could not leave Liberia and he would be stopped if he tried. Thus, again, Dolphin and SLSOM

23  was harassed by Liberian officials.  Dolphin was falsely imprisoned in Liberia under the color of

24  law and denied travel.  Dolphin was also threatened with malicious prosecution.  Thus, again,

25  Liberian officials did inflict emotional distress on Dolphin without due process of law.

26  109.    On April 16, 2005, two of Dolphin's in-laws from Ghana, Benjamin Ofori-Atta and

27  Fugah Benoni, came to assist the campus upgrade. They arrived in Liberia on Saturday, April 16,

28  2005. Their background was in day-labor construction and drafting.

110.    On or about Tuesday April 19, 2005, Dolphin's two in-laws from Ghana were arrested by INS agents in the "Red Light" District of Monrovia while shopping for food. They were taken for questioning to INS Headquarters in downtown Monrovia when they mentioned that they were in Liberia to work at SLSOM. Dolphin's attorney was called to get the two men out of INS detention. Dolphin went to the Ghana High Commission ("Embassy") and asked the Ambassador to intervene, to which he did. The INS agents were looking for Dolphin's in-laws because the immigration records from the airport stated that they traveled to Liberia for SLSOM business. They were released from INS headquarters in the early night. Their passports were seized and they were told, that they would not get their passports back until they proved that they had return tickets to Ghana. Thus, again, Liberian officials did harass and inflict emotional distress on Dolphin without due process of law.

111.    On Friday April 22, 2005, Frank Teah, Sen. Sherman, Dr. Dukuly and Dolphin, all, received summonses from the NTLA-HSW Committee to appear on Tuesday August 26, 2005 for another hearing. SLSOM was supposed to provide documentation on several topics to which Dolphin said he would refuse to do so.

112.    Shariff and his conspirators caused the following newspaper article to be published in Monrovia media, and on the internet.  Health Minister Confesses: Says "My Advisers Misled Me", The Analyst, Monrovia, Liberia April 22, 2005.

> After fiercely defending the existence of a purported medical college which his professional colleagues had rowdily denounced, Health Minister Peter S. Coleman now appears to have realized that he was being "misled" by his "expert advisers."
>
> Leading members of the Liberia Medical Board had challenged Coleman's claim that the school exists and threatened to "prosecute those attempting to insult the integrity and professionalism of the board."
>
> Two of the board members, Dr. Benson Barh and Dr. Horatious Brown, told reporters at the Health Ministry that the board "has no knowledge of the existence of a medical school named "St. Luke Medical School" in Liberia.

*The fiasco about the existence of the college hit the news last January when the Dean of the A. M. Dogliotti College of Medicine, University of Liberia, Dr. Robert Kpoto, who is also a proprietor of the Med-Link Clinic in Monrovia, investigated the entire episode.*

*After a careful research, Kpoto discovered that the non-existing medical school was "clandestinely issuing diplomas and medical degrees to Liberians and other foreign nationals to form part of the medical labor force..."*

*[Health Minister Coleman] declared his intention to "suspend all interactions with St. Luke Medical School effective immediately pending the results of the various inquiries currently underway."*

*Coleman also said the ministry will conduct an independent inquiry "to ensure that the procedures and vetting mechanism by which expert advice is preferred for the Minister of Health is beyond reproach and that another St. Luke fiasco is never again allowed occurring.*

*Observers say the Health Minister's latest concession that the St. Luke Medical College does not actually exist seems to have ended the intense controversy over doubts about the school's presence in Liberia.*

Italics are quotations from the newspaper article. Virtually every sentence is a lie. This newspaper article above is replete with false statements, and was also published on the Internet. Thus, officials of the government of Liberian did libel and slander Dolphin, SLSOM, and the class. Thus officials of the Liberian government, again, threatened Dolphin, SLSOM officials and the Class with malicious prosecution and imprisonment. Thus, again, Liberian officials did inflict emotional distress on Dolphin and the Class.

113.   At no time before, during, or after these announcements did anyone from the MH, the NTLA-HSW committee, or from A. M. Dogliotti School of Medicine interview or question any staff member or executive of SLSOM. No one other than Roland knew or even asked anything about SLSOM's curriculum, students, or graduates. Nor was any written report, if there was a report, about any investigation of SLSOM ever seen by anyone other than Shariff. No agency or person who has publicly stated to have investigated SLSOM has ever produced any evidence to

1  newspaper reporters or to a court of law. Thus Liberian government officials did misuse their

2  official positions to defame Dolphin, SLSOM, and the Class.

3  114.    The hearing got started around 2 PM on Tuesday, April 26, 2005.  The hearing was held

4  in Shariff's office at the Capitol Building. The room was full of reporters, many with cameras,

5  and a few 'witnesses' that Shariff had brought to impress the reporters. This time everyone was

6  sworn-in by someone holding a Bible. Then there was a prayer ceremony. Dolphin, Frank Teah,

7  Sen. Sherman, and Dr. Dukuly were in attendance, as were Dolphin's in-laws, Benjamin Ofori-

8  Atta and Fugah Benoni, both Ghanians appearing as witnesses for SLSOM. A representative of

9  the United States Embassy was also present during the hearing, at Dolphin's request.

10  115.    After the prayer Shariff began his 'inquiry' by introducing the Consul General of India.

11  He accused SLSOM of being a 'diploma mill' that sold medical diplomas to more than 700

12  Indians off of the streets. He offered no proof. Shariff then called Dr. Dukuly. He questioned the

13  authenticity of Dukuly 's credentials, forgetting that Dr. Dukuly was once the Minister of Health

14  of Liberia. Dukuly informed Shariff that he was a graduate of Temple University, Philadelphia,

15  Pennsylvania, medical school.

16  116.    Then Shariff turned his attention to the Hon. Frank Teah who answered all questions with

17  authority and facts. Frank Teah was questioned about the each of SLSOM's authorizing legal

18  documents. He gave detailed facts about how each document was approved. Shariff backed off

19  questioning Frank Teah because Shariff saw the mood of the crowd, and more importantly the

20  mood of the reporters, change to the favor of SLSOM during Teah's questioning

21  117.    Then he called Dolphin's in-laws, who stood up in a corner of the room. He accused them

22  of coming to teach medicine at SLSOM. When they replied that they were construction workers

23  who had come only to help Dolphin finish the landscaping and fencing for the SLSOM campus

24  in Gaye Town, the audience laughed loudly. Shariff was very embarrassed.

25  118.    Then Shariff called Senator Beatrice Sherman to testify. She told how she met Dolphin

26  and how she, the Hon. Frank Teah, Health Minister Dr. Peter Coleman, and Dr. Dukuly and

27  others worked hard to get the SLSOM charter passed in the congress and senate of Liberia. Then

28  she told of how she carried the Act and Bill to then President Charles Taylor, personally, dodging

gunfire and fighting, risking her life due to the heavy fighting in Monrovia during the last days of the civil war in August 2003. She was at Taylor's home when he signed the documents. Then she carried them back to the Capitol Building, again dodging gunfire and fighting, where the Act and Bill were put into the Congressional and Senatorial records, and then the documents were also officially recorded in the Presidential records and the Ministry of Foreign Affairs.

119.    Shariff could not continue to question Sen. Sherman because now the mood had shifted even further and the audience turned against Shariff. Shariff said loudly "the Act is a fake". Then Sen. Sherman broke a 'bombshell'. She turned to Shariff and very loudly said, "You are a fake. You asked us for a bribe of $6,000 United States Dollars a month."

120.    The Hon. Frank Teah immediately contributed, yelling, " St. Luke School of Medicine did not want you to be a part of this school. We knew your reputation as a troublemaker. Why would we pay you $6000 a month? Who are you?" The audience went crazy, some reporters accused Shariff of a vendetta. Dukuly added, "You are the fake. You are not a real doctor.  You are only trying to get back at Minister Coleman". Dolphin yelled "You wanted a $6000 a month bribe from me, and Benson Barh wanted a bribe, too."

121.    The entire room was abuzz. Cameras were flashing. Reporters were running over to Sen. Sherman and Frank Teah for more comments, ignoring Shariff 's call to come to 'order'  He immediately called the meeting to adjourn. Dolphin, Frank Teah, Sen. Sherman, Dr. Dukuly all stepped outside into the hallway to a circus of reporters wanting more information. Shariff walked quickly away to the stairway with a few reporters following him asking questions on the allegations made by Sen. Sherman, Frank Teah, Dolphin, and Dr. Dukuly.

122.    On 27 April 2005, Carole Bede issued a letter to St. Luke School of Medicine, which states:

> "On April 25, 2005, FAIMER received a letter dated April 11, 2005 from Isaac Roland, Ed. D. Director General, National Commission on Higher Education, Ministry of Education, Liberia. In his letter, Dr. Roland stated that although the Commission had issued a "letter of attestation to St. Luke School of Medicine," after investigation, it has been determined that St. Luke School of Medicine does not exist in the Republic of

*Liberia and that "the Secretariat of the National Commission therefore revokes the*
*attestation effective immediately." A copy of this letter is enclosed."*
*"Therefore, although previously listed in IMED, St. Luke School of Medicine-Liberia is*
*no longer listed in IMED and students and graduates of the school are not eligible for*
*the USMLE or ECFMG certification."*

Italic emphasis is quotation from the letter. This quotation above is replete with false statements. Thus, officials of the government of Liberian did libel and slander Dolphin, SLSOM, and the class. Thus, again, Liberian officials did interfere in the business advantage of SLSOM without due process of law. Thus, again, did Liberian officials inflict emotional distress on Dolphin. Thus, again, the ECFMG-FAIMER-IMED did negligently damage the reputation and business opportunities of Dolphin and SLSOM, and the civil rights of the class.

123.   Completely disregarding and discrediting the documentation ECFMG-FAIMER-IMED received from trustworthy Liberian government officials prior to 2005, ECFMG, with bias removed SLSOM from the IMED on April 27, 2005. ECFMG did not bother to corroborate SLSOM's removal with the NCHE, or verify the authenticity of the letter, the only letter concerning SLSOM sent to ECFMG from the NCHE using a typewriter instead of it being a word-processed document.

124.   Several days later Dolphin received a copy of the document that NCHE mailed to the Educational Commission for Foreign Medical Graduates that the ECFMG received on April 25, 2005. The NCHE never sent a copy of this letter to St. Luke School of Medicine, as required by law. See Exhibit "11".

125.   Dolphin was scheduled to leave Liberia Tuesday morning, May 10, 2005. At 6:30 AM. Frank Teah called Dolphin telling him that he could not leave Liberia. He asked Dolphin to turn on the radio and listen to any station. Dolphin did only to hear that the NTLA had ordered the closure of SLSOM and that all property of SLSOM would be seized immediately, and that all officers of SLSOM would be arrested and prosecuted, Friendship Treaty violations. The radio broadcast went on to say that Dolphin was prohibited from leaving Liberia and that his passport would be seized and Dolphin will be arrested at Roberts International Airport.  Thus, Liberian

1   officials did slander Dolphin and SLSOM, as well as threaten harm and malicious prosecution to

2   Dolphin.  Thus, again, Liberian officials did inflict emotional distress on Dolphin and the Class.

3   126.      Dolphin told one of his staff members to run and buy a newspaper about St. Luke School

4   of Medicine. When the staff member returned Dolphin saw the headlines:

5   127.     NTLA Orders 'Bogus' St. Luke University Closed, James West, Liberian Observer, Monrovia, Liberia May 10, 2005.

> Lawmaking body of Liberia says it has established that the school of
>
> medicine is a fake medicine institute, has endangered the health of Liberians.
>
> Following several weeks of investigation into its operations in Liberia, the
>
> National Transitional Legislative Assembly (NTLA) says the management of St.
>
> Luke School of Medicine has endangered the health of the public and should be
>
> turned over to the Justice Ministry for prosecution.
>
> The transitional assembly said it has been established that St. Luke School
>
> of Medicine is a fake medical institute and is not a legal establishment.
>
> The NTLA's Joint Committee on Health and Education which conducted
>
> the probe recommended to plenary that the purported medical school be closed
>
> down immediately and all banks be instructed to freeze their assets pending the
>
> conclusion of the Justice Ministry's inquiry.

This newspaper article above is replete with false statements, and was also published on the

Internet.  Thus, officials of the government of Liberian did libel and slander Dolphin, SLSOM,

and the class.  Thus, again, Liberian officials did inflict emotional distress on Dolphin and the

Class without due process of law.  Thus Dolphin, SLSOM, and the Class  were subjected to

public humiliation, stress, and embarrassment by Shariff with his false accusations.  The NTLA

did not have the legal authority to cause any of the claimed actions to occur.  Only the Liberian

Supreme Court has the authority to order a corporation closed, or its assets frozen.  The act was

not law-abiding.  Acts must be signed into law by the President of Liberia, which this action was

not done.  Therefore, Shariff and the NTLA overstepped their authority.

128.      About noon that same day, May 10, 2005, Frank Teah and Sen. Sherman, again,

called Dolphin to tell him that the NTLA did vote in favor of a reconsideration of the Act,

and that the Act was tabled and would not be reconsidered for at least 30 days. As it turned out the act was never reconsidered and Shariff was removed as Chairman of the NTLA-Health and Social Welfare Committee in June 2005. From then, he served as Chairman of the NTLA Executive Committee that interfaced with the National Transitional Government President Gyude Bryant.

129.    Dolphin, nor SLSOM, nor any of its officials were ever investigated or charged for any crime by the Justice Ministry, however, because of the threats of Shariff, Benson Barh, and other Liberian government officials, Dolphin had lived in fear, and still lives in fear. Thus, Dolphin, St. Luke School of Medicine, the Class were harassed, defamed, and persecuted by Liberia government officials under the color of law, a Friendship Treaty violation. Thus, again, Liberian officials did inflict emotional distress on Dolphin.

130.    On or around June 2005, Shariff announced the formation of a "5-member Executive Committee" to study St. Luke School of Medicine. The five-members included:

- Soko V. Sackor, LURD, NTLA Assemblyman
- Kabinah Janneh, LURD, Minister of Justice
- Vamba Kanneh , LURD, Minister of Transportation
- Dr. Evelyn Kondakai, Minister of Education
- Dr. Peter Coleman, Minister of Healthcare

131.    Dolphin was forbidden to leave Liberia, constantly under threat, public and private by Shariff. Thus, again, Liberian officials did violate the Friendship Treaty and inflict emotional distress on Dolphin. Thus again, Dolphin was falsely imprisoned by Liberian officials, as were his civil rights were violated, an abrogation of the Friendship Treaty.

132.    On Friday, July 15, 2005, through the Ministry of Information, Shariff and his conspirators caused the announcement below was broadcast on radio and television throughout Liberia. It was also published in the newspapers on Tuesday, July 19, 2005:

Gov't Finally Closes St. Luke, Monrovia, Liberia The Inquirer, July 19, 2005.

*The Government of Liberia has ordered the immediate closure of the St. Luke School of Medicine for illegally operating in the country.*

*According to an Information Ministry release issued over the weekend,*

*the government's decision is based on the findings and recommendations of a*

*five-member committee constituted last March to probe the existence of St. Luke.*

*A full criminal investigation is to be conducted against the proprietor of the*

*school and others who may have knowingly aided the process of opening the*

*school.*

*All medical degrees issued by St. Luke School of Medicine are nullified*

*and the school pronounced non-existent in Liberia, in keeping with the*

*committee's recommendations approved by the Chairman of the National*

*Transitional Government of Liberia, His Excellency Charles Gyude Bryant.*

*The committee had observed that an Act to Incorporate St. Luke was*

*approved in 2003, but was never enacted by the legislature in session.*

*The cabinet committee further observed that the St. Luke School issued medical*

*degrees in December 2001, January 2002, June 2002, August 2002, February*

*2003 and June 2003 when Monrovia was under attack.*

*The Cabinet Committee chaired by Justice Minister Kabinah Ja'neh,*

*included Education Minister Evelyn Kandakai, Transport Minister Vamba*

*Kanneh, Health Minister Peter Coleman and the Director General of the Cabinet,*

*Soko V. Sackor.*

The italic emphasis is quotation from the newspaper article.  The Cabinet Committee is

not a court of law.  They did not site a single violation of the Liberian law. The

Committee has no authority to invalidate any degrees or perform any other law

enforcement or legal act. Neither Dolphin or any member of the SLSOM board or staff

has ever seen the signed executive order from the then President Gyude Bryant. This

newspaper article above is replete with false statements, and was also published on the

Internet. Thus, officials of the government of Liberian did libel and slander Dolphin,

SLSOM, and the class.  Again Liberian officials did threaten Dolphin, SLSOM, and the

Class with malicious prosecution and harm, violations of the Friendship Treaty.. Thus,

again, Liberian officials did inflict emotional distress on Dolphin and the Class.

133.    On July 21, 2005, SLSOM filed a "Writ of Prohibition" in Liberia's Supreme Court

against the Liberian Government seeking redress against the false claims made by Liberian

government officials that SLSOM "does not exist" and prohibit further actions against SLSOM

by the government. The defendants named were the Minister of Justice, the Minister of

Education, The Five-Member Committee chaired by the Justice Minister, and any other Liberian

agency.  See Exhibit "12"

134.    On the same day, July 21, 2005, simultaneously to SLSOM filing a "Writ of Prohibition"

in Liberia's Supreme Court against the Liberian Government, the Minister of Justice, the Minister

of Information, and Mr. Shariff accompanied by more than 2-dozen members of the Liberia

National Police illegally raided the SLSOM campus, declared "non-existent" by select Liberian

government officials, and arrested an innocent SLSOM employee, Jessie Sackie, who was held

illegally for 24 hours.  Thus, again, Liberian officials did threaten Dolphin with harm.  Liberian

officials under the color of law and authority did attempt to falsely imprison Dolphin. These are

Friendship Treaty violations.

135.    Shariff and Janeh were looking to arrest,  detain, and possibly kill Dolphin while he was

in jail. Dolphin, at the same time, was filing the writ of prohibition at the Supreme Court of

Liberia. NB: Note that the Minister of Justice and the Minister of Information were members or

the Five-member committee, members of LURD, and friends of Shariff.  They did not present a

warrant to enter and search the SLSOM premises, nor to arrest Jessie Sackie or Dolphin.

136.    Dolphin went into hiding.  With the aid of a friend, Dolphin hid for the next two days

outside of Monrovia until July 23, 2005, venturing into Monrovia to conduct SLSOM's business

hidden under a cloth in a friend's car.  Thus, again, Liberian officials did violate the Friendship

Treaty and inflict emotional distress on Dolphin.

137.    On July 22, 2005, the Supreme Court issued an Order to Show Cause that prohibited the

Liberian government from taking action against SLSOM.  The 'show cause' hearing was

scheduled for Monday, July 24, 2005.  A Supreme Court justice ordered the Minister of Justice by telephone to release the SLSOM employee, Jessie Sackie.  See Exhibit "14"

138.     On July 24, 2005, only SLSOM attorneys and officials showed for the 'show cause' hearing. The order to 'prohibit Liberian government action against SLSOM was extended. Another hearing on the "Writ of Prohibition" was scheduled for August 4, 2005.

139.     On August 4, 2005, only SLSOM attorneys and officials showed for the 'Writ of Prohibition' hearing. The order to 'prohibit Liberian government action against St. Luke School of Medicine was extended, and another hearing on the "Writ of Prohibition" was scheduled for August 10, 2005 to which all defendants were duly served notices to appear by the Colonel Amos Dixon of the Court Marshall's Office. See Exhibit "15".

140.     On August 10, 2005, only SLSOM attorneys and officials showed for the 'Writ of Prohibition' hearing. The Supreme Court granted relief to SLSOM, ordering all agencies of the Liberian government to restore SLSOM to "status quo ante", that being an accredited medical school, complete with a charter, and an attestation. Additionally, the Supreme Court permanently ordered to "prohibit Liberian government action against SLSOM". A final Supreme Court hearing was scheduled on August 20, 2005 to which all defendants were duly served notices to appear by the Colonel Amos Dixon of the Court Marshall's Office.. An original copy of this order was sent to Madame Carole Bede at ECFMG, which was ignored. See Exhibit "16"

141.     On August 20, 2005, only St. Luke School of Medicine attorneys and officials showed for the 'Writ of Prohibition' hearings. On August 22, 2005, the Supreme Court granted SLSOM a "Clerk's Certificate", a default certificate indicating that Liberian government failed to respond or petition against SLSOM's "Writ of Prohibition." See Exhibit "17". All of the defendants were duly served copies of the "Clerk's Certificate" by the General Amos Dixon of the Court Marshall's Office on two occasions.

142.     On or about August 30, 2005, Madame Carole Bede at ECFMG, told Dolphin both by telephone and by e-mail that she would not comply with the Supreme Court order in September 2005. ECFMG would change SLSOM's status on the IMED only if it received instructions from

the NCHE. Dolphin objected stating that it was the very same organization that sent the false

documentation in the first place.

143.     On October 3, 2005, the NCHE for Liberia sent a letter to ECFMG:

> *"Based upon the ruling of the Supreme Court of the Republic of Liberia*
>
> *regarding St. Luke School of Medicine, the court has ordered the medical school*
>
> *reinstated to its previous status it was during the accreditation process."*
>
> *"Abiding by the Supreme Court Order, the National Commission on Higher*
>
> *Education hereby revokes the letter, dated April 11, 2005 (paragraph 12), which denied*
>
> *the existence of St. Luke School of Medicine and further advises that it should continue*
>
> *its existence"* ……..
>
> *"We also request that the St. Luke School of Medicine be included in the*
>
> *International Medical Education Directory as it was previously."*

The Italic emphasis is the quotation fro the letter. See Exhibit "18"

144.     ECFMG completely disregarded the NCHE letter. SLSOM was not listed on the IMED as

it was previously, and has not been since.

145.     After staying only six days in Los Angeles for his older brother's funeral, Dolphin

returned to Ghana, on or about October 17, 2005, where his wife insisted that he recover from the

trauma he experienced in Liberia before returning. He returned to Liberia the third Tuesday of

November 2005.  Dolphin was suffering from mental stress and depression from his ordeal in

Liberia.

146.     On December 7 2005, the NCHE for Liberia sent another letter to ECFMG:

> "that a campus of the St. Luke School of Medicine has been formally established in Gaye
>
> Town, Monrovia. The National Commission on Higher Education has inspected the
>
> campus before, and re-inspected it recently, and found it to be satisfactory and ready to
>
> operate."

147.     The italic emphasis is a quotation from the letter. See Exhibit "19"

148.    On 26 January 2006, Carole Bede representing Foundation for Advancement of International Medical Education and Research, Philadelphia, PA, issued a letter to Roland, NCHE, Republic of Liberia, which stated:

1.    *"What is the status of medical degrees awarded by St. Luke School of Medicine for the years 2000 to 2005? Are holders of degrees issued during those years recognized as physicians by the government of Liberia, and are they eligible to apply for medical licensure in Liberia?*

2.    *Are graduates of St. Luke School of Medicine who receive their medical degrees beginning January 2006 eligible for medical licensure in Liberia? If so, as of what date are (or will) these graduates be eligible for medical licensure in Liberia?*

3.    *Please confirm that instruction has begun at the campus of St. Luke School of Medicine in Gaye Town, Monrovia, and the date on which instruction began.*

The italic emphasis is a quotation from the letter. Exhibit 6.

149.    The NCHE, NCHE, has NEVER replied to, or answered this inquiry from Madame Carole Bede, of the Foundation for Advancement of International Education and Research, FAIMER, an ECFMG foundation. Similar questions about SLSOM's accreditation and campus were answered in a March 12, 2005, letter to ECFMG. See Exhibit "13"

150.    In February 2006, SLSOM bought two acres of land along the highway between Monrovia and Roberts Intentional Airport. It is across the highway from the military base and the new campus of the Methodist University.

151.    In March 2006, Dolphin filed for a building permit on the SLSOM land for a 15,000 sq. ft. building for basic sciences. The Department of Public Works would not give SLSOM the building permit because the Director knew of the SLSOM controversy. SLSOM did not obtain the building permit until July 2007.

152.    In June 2006, the Liberian President Ellen Johnson-Sirleaf dismissed several government officials for "acts of impropriety." One of the officials dismissed, Dr. Benson Barh, Chief

Medical Officer and Executive Secretary of the Liberian Medical Board, was a primary government official involved with misrepresenting SLSOM's Liberia Accreditation and Charter status worldwide. See Exhibit "20"

153.     On September 18, 2006, St. Luke School of Medicine filed a lawsuit against the Republic of Liberia in Liberia Civil Court, in Monseratto County, Liberia, at the Temple of Justice in Monrovia. The lawsuit named the Ministry of Education, the MH, and all those working under the scope and authority of the Republic of Liberia.  See Exhibit "21"

154.          Also see the following Exhibits regarding SLSOM's "Damages for Wrong" lawsuit in Liberia:

    a.   Exhibit "22 "

    b.   Exhibit "23"

    c.   Exhibit "24"

    d.   Exhibit "25"

    e.   Exhibit "26"

    f.   Exhibit "27"

    g.   Exhibit "28"

    h.   Exhibit "29"

    i.   Exhibit "30"

154.     On October 30, 2006, SLSOM obtained a "Default Certificate" against the Republic of Liberia. See Exhibit "30" Dolphin and SLSOM are informed and believe that neither the Ministry of Education nor the MH, the Liberian Medical Board, the NCHE, the NTLA or any of the following individuals answered SLSOM's last motion for fear of facing criminal conspiracy charges: Roland, Bahr, Dr. Kpoto, Shariff, Dr. Horatious Browne, and Dr. Evelyn Kandakai.

155.     Cllr. Ignatius Weah, SLSOM's attorney attempted to set hearings for both Default Certificates, so that both could be converted into an executable judgment. No Liberian court would allow him to set a hearing.  Further, Dolphin was told that he must take the Default Certificates to Claims Court. However, then and up to the time of this writing, no such Claims Court exists in Liberia, in violation of Liberia's own constitution.

156.    Cllr. Weah tried on numerous occasions to obtain an 'assignment' at Liberia Supreme Court for a final judgment on its "Writ of Prohibition", its civil court damage suit for $120,000,000 USD, and its civil court judgment against its campus landlord, Rebecca J. Moore. Now, the former National Transitional Government's Minister of Justice, Kabinah Janeh, was appointed an Associate Justice of the Supreme Court.  The very same Minister of Justice who along with Shariff raided the SLSOM campus in 2005.  He scheduled all cases that came before the Supreme Court. He would not schedule <u>St. Luke School of Medicine vs. The Republic of Liberia</u>.  Nor would Associate Justice Kabinah Janeh recuse himself from the case.

157.    Until now, SLSOM's lawyers have been unsuccessful in obtaining a date for the Supreme Court hearing.

**GEORGE GOLLIN, THE UNIVERSITY OF ILLINOIS – URBANA CHAMPAIGN**

158.    Gollin is a physics professor at the Illinois.  Gollin has been publishing defamatory information against Dolphin, SLSOM and the Class on his website at the Illinois since 2003 until now.  Gollin has admitted that he is a consultant to the Republic of Liberia and Liberia's Ministry of Education. In this manner, Gollin played a significant role in assisting Shariff, Bahr and Roland in sending false information to ECFMG, ultimately resulting in SLSOM's removal from the IMED, and played a significant role in the extortion and "shake down" of SLSOM and Dolphin.  Gollin ignored official government documentation concerning St. Luke School of Medicine authenticity.  Gollin "invents" and "fabricates" stories from false information he gets from the Internet about Dolphin and St. Luke School of Medicine.  Therefore, Gollin is a fraud. He has no personal knowledge or experience of Dolphin, SLSOM, SL-G , or the Class.

159.    Gollin's published statements on his Illinois website, http://web.hep.uiuc.edu/home/g-gollin/, have been used and referenced on at least 36 different websites in the United States alone. Some of the many false statements published by Gollin, representing the Illinois are presented.

160.    Gollin also holds himself out as an expert in "diploma mills" and how they operate: *"How do diploma mills operate? An extensive description of how certain well-known diploma mills work through the Internet and the Web while obscuring their owners' true identities. Based on research for [State of Oregon's Office of Degree Authorization] by Dr. George Gollin."*

*"How can I [Gollin] tell whether an institution is a degree mill? Most degree mills have certain characteristics. A good overview of these is available from University of Illinois."* None of the above description applies to SLSOM or SL-G , or to Dolphin (the majority owner of both institutions) or to the other owners of St. Luke School of Medicine.

161.    The Illinois and the State of Oregon's Degree Authorization has taken responsibility for Gollin's defamatory statements. On October 9, 2003, the Illinoisordered Gollin to remove the defamatory statements, with Chancellor Robin Kaler stating that "We were trying to help [Gollin] find a more appropriate place for his website" because a website on diploma mills should be "housed in a place that deals with accreditation."

162.    Additionally, Kaler admitted that Gollin's statements were defamatory "personal attacks."

163.    To date, Gollin's website at the Illinois still contains many of the defamatory statements listed above.  Gollin, attempting to avert attention from the University of Illinois, shipped his entire website with all its contents to the State of Oregon's ODA's website, where it is now currently housed.

164.    All of Gollin's statements listed above were patently false when made.

165.    Gollin, the the Illinois, and the State of Oregon's ODA continue to defame SLSOM by publishing and hosting Gollin's unsubstantiated "research."

166.    Gollin, the Illinois, and the State of Oregon's ODA, by publishing defamatory statements against SLSOM, harmed and continue to harm Dolphin's. SLSOM, SL-G , and the Class's reputation worldwide, with Gollin's actions ultimately playing a major role in ECFMG's removing SLSOM from the IMED.

167.    Gollin, the Illinois and the State of Oregon's ODA have refused to remove the defamatory material when asked to do so by SLSOM..

168.    The Illinois is complicit in its support of Gollin, who uses the Illinois letterhead and insignia to lend credibility to his misinformation.  The Illinois has permitted Gollin to use its computers and servers in Gollin's campaign against SLSOM.  Additionally, Gollin has slandered and libeled SLSOM in more than two dozen speaking engagements, as listed on his Illinois

website. Gollin's Illinois website contains seven direct links full of false and misleading information about SLSOM. Gollin and the Illinois are now using the United States Constitution's 11th Amendment as immunity against prosecution by civil lawsuit their tortious actions against law-abiding citizens of the United States and other countries, violating their civil rights.

169.    Gollin's defamatory comments have adversely affected Dolphin's professional medical and business career. Where Gollin discusses SLSOM, as set forth above, he invariably mentions Dolphin as SLSOM's president. By mentioning Dolphin by name in connection with Gollin's false statements, Gollin, the Illinois and the State of Oregon's ODA defamed Dolphin, the school's president, founder, and majority owner.

170.    Gollin's false statements are so numerous on the Internet, that it has impacted Dolphin's credit report, wherein it states that Dolphin is under investigation for fraud - a completely false statement.

171.    Gollin's false statements have impacted Dolphin's business opportunities. Dolphin was prevented from an opportunity to purchase stock and options from OptionsXpress because OptionsXpress believed him to be a fraud based on Gollin's false internet statements, and sited Dolphin's credit report and information regarding fraudulent activities in Liberia and Ghana.

172.    Gollin has demonstrated racial bias towards Dolphin, SLSOM, SL-G , the Class, and other Negroes and non-Caucasians in his internet postings, newspaper articles, institutions on his "Diploma Mill List" and other writings. The Plaintiffs will present to this honorable court some of the many writings of Gollin that demonstrate his racial bias, that the Illinois has more than tolerated and even supported.

173.    In November 2009, Gollin sent a another racially biased 91-page document, Exhibit 42 and 43, to the Ghana NAB full of false, libelous, and slanderous statements about Dolphin, Dolphin's wife, Susanna Mitchell, SLSOM, SL-G , and the Class. The document along with Exhibits 47, 48, 49, 50 and 51 (Exhibit 49 and Exhibit 50 were written by Contreras and Exhibit 51 was written by Schwartz) were submitted to the Ghana Court of Appeals by the NAB to appeal a judgment in favor of SL-G 's accreditation (not the same institution as SLSOM). Virtually all of the documents, yes, all, is unsubstantiated hearsay from Internet-based news

articles. It is indeed outrageous to assume that the reliability of undocumented and unscrupulous newspaper reporters that Gollin quotes have the same reliability or reputation as the Associated Press, United Press, or Reuters news services. Additionally, it is hearsay, double or even triple hearsay or malicious lies.

174. The Ghana NAB submitted Gollin's, Contreras', and Schwartz's documents, Exhibits 42, 43, 49, 50, and 51, to cast doubt on the credibility of Dolphin and SLSOM because SLSOM-Ghana won accreditation in Ghana through a decision of the Ghana High Court in October 2009.

175. In Gollin's document, he alludes to Dolphin being a fraudulent criminal, despite the fact that Dolphin was never arrested in Liberia or sued for fraud by anyone from Liberia, or anywhere else in the world including the United States before, during, or after SLSOM's crisis in Liberia in 2005. Furthermore, he accused Dolphin's wife of embezzlement without any proof, only naked assertions that cause her name and reputation to be publicly disparaged in Ghana.

**BRAD SCHWARTZ, THE UNIVERSITY OF ILLINOIS – COLLEGE OF MEDICINE.**

176. Schwartz is a co-conspirator of Gollin and Contreras (see below). Until May 2010, Dolphin had never heard of him. However, Schwartz did conspire with Gollin and Contreras to deny the civil rights of, interfere with the business opportunities of, and libel and defame Dolphin, SLSOM, SL-G , and the Class when he submitted a letter to the Republic of Ghana along with Gollin and Contreras in November 2009. Exhibit 51 and 54. Schwartz had the responsibility to assure the comments he made about Dolphin, SLSOM, SL-G , and the Class were true, but he did not do so. Defendant Schwartz never interviewed Dolphin, not any official of SLSOM or SL-G , nor any member of the Class, nor did he examine any official documentation before writing and submitting his defamatory document, Exhibit 51, to the Republic of Liberia. Therefore, having no personal knowledge nor factual knowledge of the Plaintiffs or the Class, Schwartz committed fraud against the Plaintiffs and the Class.

**ALAN CONTRERAS AND THE STATE OF OREGON'S ODA**

177. Contreras, is the Administrator of the State of ODA, and publisher of Oregon's "diploma mill" list, authored by Gollin and the Illinois. St. Luke School of Medicine has been on the "diploma mill" list since 2003. Contreras and the ODA never conducted a hearing as required

1  by ORS § 348.594.  Furthermore the ODA has no jurisdiction outside of the state of Oregon, §

2  348.597 Applicability of ORS 348.594 to 348.615.

3  178.    ORS § 348.597 ( Applicability of ORS 348.594 to 348.615) states:

4  1) Except as provided in subsection (2) of this section, ORS 348.594 (Definitions for ORS 348.594 to

5  348.615) to 348.615 (Appeal procedure) apply to all schools that operate in this state.

6  179.    Oregon law ORS 348.615 (Appeal Procedure) states:

7          "If the Oregon Student Assistance Commission refuses to grant approval to a school to

8          confer degrees or revokes the approval to confer degrees, the refusal or revocation shall

9          be subject to the right of review by an action brought in the circuit court of the county in

10         which the school is located. Such review shall be tried as an action not triable by right to

11         a jury. [1997 c.652 §14]"

12  180.    Contreras has already been declared to be a civil rights violator (see BENTON v.

13  OREGON STUDENT ASSISTANCE COMMISSION, Nos.  03-35975, 03-36002, Argued and

14  Submitted May 4, 2005. -- August 25, 2005).  "The district court's reasoning .... that defendant

15  Contreras violated Plaintiff's (Benton's) constitutional rights ..... "  "Specifically, the district

16  court concluded that defendant "Contreras' application of the regulations to plaintiff's degrees

17  resulted not from an intent to achieve the goals of the regulations, but because of bias toward the

18  institution from which they were received."    That finding is not challenged on appeal."

19  181.    Contreras has racial bias against Dolphin, St. Luke School of Medicine, and the Class.

20  His racial bias is clearly displayed in this letters to the Republic of Ghana, Exhibit 49 and Exhibit

21  53. Contreras and the ODA in those letters seek extortion against the Republic of Ghana, and

22  clearly violate the civil rights of, interfere with the business opportunities of, and libel and

23  defame Dolphin, St. Luke School of Medicine and the Class. When writing about another person

24  on the internet, Contreras refers to the person as "a Dolphin in black-face".

25  182.    Gollin, Schwartz, and Contreras, no not one, prior to sending the 91-page document and

26  their libelous letters have been to Liberia or Ghana.  Therefore, they, themselves, have no

27  personal knowledge of what they claim to be facts concerning Dolphin,  St. Luke School of

28  Medicine, or the operation of St. Luke School of Medicine.  Consequently, all of their statements