1  JUAN C. BASOMBRIO (CA#150703)
   basombrio.juan@dorsey.com
2  DORSEY & WHITNEY LLP
   600 Anton Blvd., Suite 2000
3  Costa Mesa, CA  92626
   Telephone:  (714) 800-1400
4  Facsimile:  (714) 800-1499

5  Attorneys for Defendant
   NATIONAL  ACCREDITATION BOARD
6  OF THE REPUBLIC OF GHANA

7

8              **IN THE UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10 | ST. LUKE SCHOOL OF MEDICINE- | NO.:  CV:11-CV-06322-RGK(SHx)
   | GHANA, et al.,                |
11 |                               |
   |              Plaintiff,       | **DECLARATION OF AMMA A.**
12 |                               | **GAISIE IN SUPPORT OF THE**
   | v.                            | **NATIONAL ACCREDITATION**
13 |                               | **BOARD OF THE REPUBLIC OF**
   | REPUBLIC OF LIBERIA, et al.,  | **GHANA'S MOTION TO DISMISS**
14 | Defendants.                   | **THE FIRST AMENDED**
   |                               | **COMPLAINT**
15

16

17                                   HEARING:
                                     DATE:  July 23, 2012
18                                   TIME: 9:00 a.m.
                                     COURTROOM 850
19

20

21

22

23

24

25

26

27

28

## DECLARATION OF AMMA A. GAISIE

I, Amma A. Gaisie, declare that if called to testify in this action, I could and would competently testify to the following matters based on my personal knowledge and/or information and belief based on the Republic of Ghana's representation of the National Accreditation Board of the Republic of Ghana ("Ghana NAB"):

1.      I am over 18 years of age, a citizen of the Republic of Ghana, an attorney duly admitted to practice law in the Republic of Ghana, and the Solicitor General of the Republic of Ghana.  I am authorized to make this declaration, and do make this declaration, in support of the Ghana NAB's motion to dismiss the First Amended Complaint herein.

2.      The Ghana NAB is an instrumentality of the Republic of Ghana created by operation of law on 20th August 2007, by the National Accreditation Board Act, 2007, Act 744.  The Ghana NAB is a public institution empowered by the Republic of Ghana to, among other things, evaluate whether any private or public school including medical schools may receive accreditation to operate within Ghana.  The functions of the Ghana NAB are, therefore, wholly governmental in nature.  The Ghana NAB is charged with the responsibility to protect the public and ensure that graduates of medical schools in Ghana are qualified to practice the profession.

3.      The St. Luke School of Medicine ("SLSOM"), with Dr. Jerroll Dolphin (MD) as its President and C.E.O., submitted an application to establish a St. Luke School of Medicine in Cape Coast, Ghana.  The application is the subject of pending litigation in Ghana initiated by SLSOM.

4.      Specifically, on October 27, 2008, SLSOM filed a lawsuit against the Ghana NAB before the Ghana High Court (the local trial court), which is pending. The lawsuit is entitled: <u>In the Matter of an Application by St. Luke School of</u>

1

Medicine Ghana Limited for Accreditation by the Ghana National Accreditation Board and In the Matter of the Application by St. Luke School of Medicine Ghana Limited for Judicial Review, Etc., in the Superior Court of Judicature, in the High Court of Justice (Fast Track Division), Accra – A.D. 2008, case number AP 12/2009 (the "Ghana Action").

5.    The Ghana Action is in the nature of a petition for mandamus against the Ghana NAB seeking to order Ghana NAB to grant accreditation to SLSOM. Attached hereto as Exhibit A is a true and correct copy of the Notice of Motion and supporting Affidavit filed by the Applicant, SLSOM in the Ghana Action. Attached hereto as Exhibit B is a true and correct copy of the Written Statement of the case filed by the Applicant, SLSOM in the Ghana Action.   Attached hereto as Exhibit C is a true and correct copy of the Affidavit in Opposition filed by the Respondent, Ghana NAB in the Ghana Action.  These pleadings are sufficient to describe the parties' contentions in the Ghana Action.

6.    On October 19, 2009, the Ghana High Court Judge ruled in favor of SLSOM in the Ghana Action, holding that the Ghana NAB should have accredited the school for the training of medical practitioners.  Attached hereto as Exhibit D is a true and correct copy of the trial court Ruling in the Ghana Action.

7.    In the Ghana Action, the Ghana NAB has appealed the decision of the trial judge to the Ghana Court of Appeals.

8.    The specific grounds for the appeal are, as follows:

(a)    That the trial court judgment is against the weight of evidence.

(b)    That the Learned Judge erred in holding that, by making the grant of the accreditation subject to the expression of approval by the Medical and Dental Council, the Ghana NAB had divested itself of its own decision making authority.

2

1    (c)    That the Learned Judge erred in holding that there was

2  unreasonable delay by the Ghana NAB which necessitated the granting of an order

3  of mandamus.

4    (d)    That the Learned Judge erred in declaring that the Applicant

5  (SLSOM) has satisfied all the statutory pre-conditions for being accredited by the

6  Respondent (Ghana NAB) as a tertiary institution for the training of medical

7  practitioners.

8    (e)    That the Learned Judge erred in holding that the Applicant

9  (SLSOM) has been refused accreditation by the Ghana NAB.

10    Attached hereto as Exhibit E is a true and correct copy of the Notice of

11  Appeal filed by the Respondent, Ghana NAB in the Ghana Action.

12    9.    The official position of the Ghana NAB is that SLSOM has not yet

13  been refused accreditation.  Rather, it is SLSOM that has not satisfied the

14  requirements for accreditation as directed by the Ghana NAB, which required

15  SLSOM to provide certain information and evidence to the Ghana NAB, as is

16  described in the Declaration of Richard Adjei, Head of the Accreditation

17  Department of the Ghana NAB filed concurrently herewith.

18    10.    On March 9, 2010 the Ghana NAB filed a motion to stay the

19  execution of the aforementioned decision of the Ghana High Court.  The Ghana

20  Court of Appeal granted the stay on March 24, 2010.  The appeal of the Ghana

21  NAB is pending before the Ghana Court of Appeal.

22    11.    It is also the official position of the Ghana NAB that the learned High

23  Court Judge did not have the jurisdiction to determine that SLSOM had fulfilled

24  the requirements and therefore Ghana NAB should accredit them.  The Ghana

25  NAB is, therefore, submitting before the Court of Appeal the following additional

26  issue:  The learned trial judge acted outside his jurisdiction when he made the

27  determination that SLOSOM had fulfilled the requirement for accreditation.

28

DECLARATION OF AMMA A. GAISIE
CASE NO. CV:11-06322-RGK(SHx)

1    12.   Accordingly, there are pending legal proceedings in Ghana between

2    SLSOM and the Ghana NAB which will determine whether SLSOM is entitled to

3    accreditation in Ghana.

4    13.   The government of Ghana and the Ghana NAB have a strong interest

5    in seeing that these matters are resolved and adjudicated by the courts in Ghana,

6    because the dispute between SLSOM and the Ghana NAB involves an important

7    state interest of the Republic of Ghana; that is, the protection of the public and to

8    ensure that graduates of medical schools in Ghana are duly qualified to practice the

9    profession.

10   14.   Further, the decision of the Ghana NAB with respect to accreditation

11   of SLSOM is a governmental function and an act of state. The Ghana NAB is an

12   instrumentality of the Republic of Ghana created by law. As explained in the

13   Declaration of Mr. Adjei, the Ghana NAB is a public institution empowered by the

14   Republic of Ghana to, inter alia, evaluate whether medical schools may receive

15   accreditation to operate within Ghana. The functions of the Ghana NAB are,

16   therefore, wholly governmental in nature.

17   15.   It would be unduly burdensome, and would result in undue and great

18   expense, for the Ghana NAB to have to defend this action in the United States.

19   SLSOM applied for the establishment of a medical school in Ghana, and it would

20   be subject to Ghana law and regulations, not the laws or regulations of the United

21   States or California. This matter is, therefore, governed entirely by Ghana law. To

22   my knowledge and information, the relevant witnesses and information is located

23   primarily in Ghana. If this case was to proceed in the United States, it may also be

24   impossible to subpoena witnesses in Ghana for examination in United States

25   courts. The fact that SLSOM filed a prior-pending action in Ghana constitutes an

26   admission that the proper forum for the resolution of this dispute is the courts of

27   Ghana.

28

4

DECLARATION OF AMMA A. GAISIE
CASE NO. CV:11-06322-RGK(SHx)

1      16.    Indeed, the judicial forum in Ghana is obviously available and has

2  jurisdiction over the parties.  Dr. Dolphin was the President and C.E.O. of the

3  school in Ghana, and as such he also would be subject to personal jurisdiction in

4  Ghana.  The claims of SLSOM and Dr. Dolphin are intertwined, and in large part

5  indistinguishable, because they related to the same issue, whether SLSOM has the

6  right to receive accreditation in Ghana.

7      17.    Ghana's Constitution establishes a system very similar to the United

8  States, with three separate branches of government, the executive, judiciary and

9  legislative.  The judiciary is an independent branch of government, and SLSOM

10  and Dr. Dolphin can receive a fair and just adjudication of their claims in Ghana.

11  Obviously, as we have seen already, the trial court ruled in favor of SLSOM.

12  While the Ghana NAB disputes the correctness of that ruling, the fact that the

13  ruling was in favor of SLSOM indicates that the judicial branch will not favor the

14  government party over the private party.

15      18.    The Ghana NAB, as an instrumentality of the Republic of Ghana, is

16  entitled to foreign sovereign immunity under international law, and I understand

17  that also to be the case under United States law which codified international law.

18  The Ghana NAB invokes its foreign sovereign immunity and does not waive it.

19      19.    Accordingly, on behalf of the Ghana NAB, and the Attorney General

20  of the Republic of Ghana, I respectfully request that this Court dismiss this action

21  so that the matter may proceed to a final adjudication solely before the courts of

22  Ghana, where the prior action filed by SLSOM is currently pending.

23      I declare under penalty of perjury under the laws of the United States that

24  the foregoing is true and correct.  Executed on 6th June, 2012 in Accra, Ghana.

25

26                  By:

27                  AMMA A. GAISIE

28

DECLARATION OF AMMA A. GAISIE
CASE NO. CV:11-06322-RGK(SHx)

<u>IN THE SUPERIOR COURT OF JUDICATURE</u>
<u>IN THE HIGH COURT OF JUSTICE,</u>
<u>(FAST TRACK DIVISION),</u>
<u>ACCRA – A.D 2008.</u>

SUIT No. .........

IN THE MATTER OF AN APPLICATION  BY ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED FOR ACCREDITATION BY THE NATIONAL ACCREDITATION BOARD.

AND

IN THE MATTER OF AN APPLICATION BY ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED FOR JUDICIAL REVIEW

AND

IN THE MATTER OF:

THE REPUBLIC

VRS

NATIONAL ACCREDITATION BOARD
REPRESENTED BY PROF. J.S.K. AYIM
H/No. 6, BAMAKO STREET, EAST LEGON, ACCRA.
(UPON WHOM PLAINTIFF SHALL DIRECT SERVICE)

RESPONDENT

EX PARTE : ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED ..... APPLICANT

NOTICE OF MOTION.
APPLICATION FOR JUDICIAL REVIEW IN THE NATURE OF MANDAMUS.
ORDER 55 r 4 (1) of C.I 47.

PLEASE TAKE NOTICE that this honourable court shall be moved by MESSRS DERY & CO., counsel for and on behalf of applicant herein praying this honourable court for an order of judicial review in the nature of an order of mandamus directed at the National Accreditation Board for the reliefs set out and upon the grounds set forth in the accompanying affidavit.

And for such further order or orders as to this honourable court may seem fit.

Exhibit A page 6

DATED AT DERY & CO, 2nd FLOOR, BORWAH HOUSE, (OPP. SIGHT & SOUND SECRATARIAL SCHOOL),  KWAME NKRUMAH AVENUE, ADABRAKA-ACCRA, THIS 20TH DAY OF OCTOBER, 2008.

SOLICITORS FOR APPLICANT
D E R Y  &  C O.
AL PRACTITIONERS, CONSULTANTS
& NOTARIES PUBLIC

THE REGISTRAR,
HIGH COURT,
FAST TRACK DIVISION,
ACCRA.

And for service on :

1.      The National Accreditation Board represented by its chairperson Prof. J. S. K. Ayim whose address for service is H/No. 6, Bamako Street, East Legon, Accra.

2.      The Attorney General, Attorney General's Department, Ministries, Accra.

Exhibit A page 7

IN THE SUPERIOR COURT OF JUDICATURE
IN THE HIGH COURT OF JUSTICE,
(FAST TRACK DIVISION),
ACCRA – A.D 2008.

SUIT No. ........

IN THE MATTER OF AN APPLICATION  BY ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED FOR ACCREDITATION BY THE NATIONAL ACCREDITATION BOARD.

AND

IN THE MATTER OF AN APPLICATION BY ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED FOR JUDICIAL REVIEW

AND

IN THE MATTER OF:

THE REPUBLIC

VRS

NATIONAL ACCREDITATION BOARD
REPRESENTED BY PROF. J.S.K. AYIM
H/No. 6, BAMAKO STREET, EAST LEGON, ACCRA.
(UPON WHOM PLAINTIFF SHALL DIRECT SERVICE)



............./RESPONDENT

EX PARTE : ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED ..... APPLICANT

AFFIDAVIT IN SUPPORT OF MOTION FOR JUDICIAL REVIEW.
ORDER 55 r 4(2) of C.I. 47.

I, SUSANA MITCHELL DOLPHIN nee SUSANA OFORI ATTA of H/No. 9012 Koowulu Street Lartebiokoshie, Zoti, Accra in the Greater Accra Region of the Republic of Ghana make oath and say as follows-:

1.    That I am the deponent herein and a director of applicant whose consent and authority I have to depose to this affidavit for and on its behalf the facts  of  which unless otherwise stated are within my personal knowledge.

2.    That applicant is a company limited by shares initially incorporated under the laws of the Republic of Ghana with the name St. Luke's School of Medicine at Cape Coast Limited and has its registered offices situate at H/No. A567/2, Koowulo Street,

Zoti, Larterbiokorshie in the Greater Accra Region of the Republic of Ghana and carries on business as per its registered objects as an educational institution.

3.   That although all processes relating to this present suit should be served on applicant's solicitors as per their address indicated on the motion paper applicant's address for service is also its registered address indicated at paragraph 2 herein.

4.   That respondent is a statutorily established body known as the National Accreditation Board (hereinafter simply called "the Board") which Board has among its statutory functions; the accreditation of both public and private tertiary institutions as regards the contents and standards of their programmes and is governed by a body comprising representatives from various institutions and stakeholders in the education sector headed by its chairperson who at all times material to this application is a certain Prof. J.S.K. Ayim and that its address for service is H/No. 6, Bamako Street, East Legon, Accra.

5.   That pursuant to its objects, applicant has set up facilities and infrastructure at its registered offices aforesaid with a view to establishing an institution for the training of medical practitioners in the Republic of Ghana and for the benefit of the people of the Republic of Ghana.

6.   That having set up the basic infrastructure necessary for the establishment of such an institution applicant applied to the Board for authorization the reason being that under and by virtue of the rules regulating the accreditation of institutions in the Republic of Ghana all tertiary institutions must be accredited by the Board and since the training of medical practitioners can only be pursued at the tertiary level of education, accreditation of applicant by the Board is necessary to enable applicant pursue its objects.

7.   That upon receipt of applicant's application for authorization the Board as required by the rules regulating such applications for authorization appointed a team to conduct an inspection of the premises in which applicant intends to carry out its educational programmes and that the team submitted its report on the result of its inspection exercise to the Board later than the fourteen days period stipulated by the rules on the accreditation process for so doing.

8.   That upon receipt of the team's report the Board issued an interim authorization to applicant which authorisation entitles applicant to set up a governing body for the institution, commence or continue with the mobilization of financial resources needed, commence or continue assembling academic facilities or development of physical facilities required for running the school unless the Board is of the opinion that the information which forms the basis of the application is either inaccurate or is faulted on grounds stipulated by the rules. (Annexed hereto and marked exhibits "SL1" and "SL2" is a copy of the letter dated 18/04/05 notifying applicant that the Board had approved the recommendation of the team that applicant be granted "three (3) year authorisation with effect from April 18, 2005 to

continue its preparations for accreditation as well as the interim authorization dated 18/04/05).

9. That under the rules regulating the process of accreditation applicant who had been given interim authorization is permitted to apply for accreditation within a period of three years from the date of the authorization and that in making such application the only conditions that applicant must satisfy is providing specific information to the Board relating to applicant's draft constitution indicating the name and location of applicant's school, its objects, membership of its governing body, list of academic and senior administrative staff employed among others.

10. That accordingly applicant duly applied for accreditation upon being issued with the interim authorization in or about 22/06/07 in which application the appropriate information required for accreditation was duly provided some of which information is clearly borne out by extracts from the underlisted documents annexed hereto and marked exhibits "SL3", "SL4", "SL5" and "SL6":

- letter dated 26/02/08 written by applicant to the Minister for Education requesting his intervention to enable applicant obtain accreditation.

- letter dated 09/06/08 written by the Board to applicant confirming that applicant will be able to support its programmes financially.

- Letter dated 18/06/08 written by applicant to the Deputy Executive Secretary of the Board indicating the extent to which it had complied with requirements for accreditation by the Board.

- Letter dated 14/08/08 to the Medical and Dental Council indicating the extent to which applicant had complied with the aforesaid Council's requirements.

11. That upon receipt of applicant's application for accreditation the rules on the accreditation process require the Board to appoint an accreditation panel to examine and assess whether applicant has satisfied the conditions of interim authorization, has sufficient physical and academic facilities required to commence and continue academic work and has assembled sufficient human resources and other resources for effective work and subsequent thereto appoint an accreditation panel which is required to submit its report to the Board within one (1) month of its appointment.

12. That the accreditation panel submitted its report to the Board, which Board upon receipt of the report is required to refer the report of the accreditation panel to applicant for its comments where necessary and that the Board in accordance with the rules referred the report of the accreditation panel to applicant for comment.

13. That upon receipt of the report of the accreditation panel applicant reacted to same in a one hundred and eighty-seven (187) page report with supporting documents

and indeed appropriately refuted the adverse portions of the accreditation panel's report and that applicant's reaction to the accreditation panel's report received the approval of another team of experts appointed by the Board whose report is annexed hereto and marked exhibit "SL7".

14.   That the rules on accreditation require that upon receipt of applicant's comments the Board should grant accreditation to applicant unless the Board is not satisfied either that applicant's constitution provides a sound basis for the academic and administration facilities of applicant's instruction or that applicant's instruction has not effectively organized adequate human, physical and financial resources to operate the institution in the Republic of Ghana and/or that it has failed to comply with standards prescribed by the Board.

15.   That although applicant duly satisfied all the necessary statutory requirements for accreditation the Board instead of granting applicant accreditation as required by the rules refused so to do and rather referred applicant's application for accreditation to the Medical and Dental Council.

16.   That the Medical and Dental Council finally wrote to applicant by way of a letter dated 15/10/08 annexed hereto and marked exhibit "SL8" informing applicant that "the Council" which has no statutory authority or power to grant accreditation for the purposes for which applicant seeks accreditation "is unable to grant" applicant "any form of accreditation for medical training in Ghana" on the ground that applicant's "documents submitted and facilities do not meet the Medical and Dental Council" minimum requirements".

17.   That under the rules regulating the accreditation of institutions the accreditation process commenced by applicant in or about the year 2004 ought to have been completed within sixty (60) days from the time when the accreditation panel visited applicant  which fact is supported by point 4 of Part II of the roadmap to accreditation provided by applicant itself annexed hereto and marked exhibit SL10 but that the Board has still not granted accreditation to applicant well over year after applicant commenced the accreditation process.

18.   That accordingly the accreditation process which was started in June 2007 ought to have been completed by January 2008 or sooner and applicant would have started running its programmes by May 2008 thereby permitting it to start recovering its expenses in the sum of about three million dollars it has invested in infrastructure for purposes of establishing the institution and that as a result of the Board's failure to grant accreditation to applicant, applicant has lost income evidenced by the projections contained in the report annexed hereto and marked exhibit. (Annexed hereto and marked exhibits "SL9" and "SL10" are copies of two letters dated 02/01/08 and 02/05/08 written by applicant to the Executive Secretary and Deputy  Executive Secretary respectively of the Board outlining the loss suffered by applicant by reason of the board's failure to grant applicant accreditation).

19.    That having regard to all the circumstances of this case the Board has no reason to refuse to grant applicant accreditation especially that applicant has duly satisfied all requirements for accreditation and that as an administrative and statutory body the Board is required to exercise it powers reasonably, fairly and properly the failure by the Board to accord applicant accreditation is unfair and unreasonable

20.    That the fact that the Board's failure and/or refusal to grant applicant accreditation and its (the Board's) conduct with regard to the manner in which it has dealt with applicant's application for accreditation is unreasonable is supported by the following facts:

- The failure by the Board to appoint an accreditation panel within 30 days of applicant's application to determine applicant's application. The panel was appointed over 60 days later.

- The failure by the Board to grant applicant accreditation long after the accreditation panel had conducted its programme visit in November 2007. The Board is required as per its own roadmap followed by applicant to have given applicant accreditation by the end of January 2008.

- The Board's penchant for requesting that other and/or further requirements be met by applicant each time that applicant addresses a concern raised by the Board especially the requests contained in the Board's letter dated 09/05/08 annexed hereto and marked exhibit "SL11" which requests although not required under the law as a precondition for accreditation were met by applicant.

- The refusal by the Board to grant accreditation to applicant although applicant has met the requirements stated by the Board in its letter dated 09/05/08. The fact that the requirements were met is reflected in letters written by applicant dated 9/3/08 and 25/4/08 annexed hereto and marked exhibits "SL12" and "SL13".

- The refusal by the Board to grant applicant accreditation although applicant has satisfied all necessary requirements for accreditation as evidenced by the exhibits annexed hereto.

21.    That upon the advice of counsel the grounds upon which applicant brings the present application are as follows:

(i)    That the refusal by the Board to grant applicant accreditation is unreasonable.

(ii)    That the Board has failed to exercise its powers and/or discretion to grant accreditation fairly, candidly and properly.

(iii)    That the refusal by the Board to grant applicant accreditation is not in

accordance with law and contrary to the Board's own roadmap as published on its own website www.nab.gov.gh which is annexed hereto and marked exhibit "SL14").

22. That counsel advises me and I verily believe same to be true that this honourable court has supervisory jurisdiction by way of judicial review over the acts and decisions of bodies like the Council which take decisions affecting the statutory and common law rights of individuals and persons especially where as in this case such acts and decisions are not taken and/or made reasonably, fairly and/or are irrational.

23. That upon the advice of counsel I seek the following reliefs:

    (i)   A declaration that having duly satisfied all the statutory preconditions for being accredited the Board owes applicant an obligation to accredit applicant.

    (ii)  A declaration that accordingly the refusal by the Board to accredit applicant is unreasonable and unfair.

    (iii) An order of mandamus compelling the Board to accredit applicant.

    (iv)  General Damages for loss of earnings from May 2008 up to date when the Board finally grants accreditation to applicant.

    (v)   Costs on a full indemnity basis.

24. WHEREFORE I depose to this affidavit in good faith for and on behalf of applicant herein.

SWORN TO AT ACCRA
THIS ...... DAY OF
OCTOBER 2008.

                                        ..........................................
                                                    DEPONENT

                        BEFORE ME

            COMMISSIONER FOR OATHS
                JOHN   AHETOH
            Commissioner For Oaths
                P O BOX MP 1896
              MAMPROBI—ACCRA

IN THE SUPERIOR COURT OF JUDICATURE
IN THE HIGH COURT OF JUSTICE,
(FAST TRACK DIVISION),
ACCRA – A.D 2008.

SUIT No. AP 12/2009

IN THE MATTER OF AN APPLICATION BY ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED FOR ACCREDITATION BY THE NATIONAL ACCREDITATION BOARD.

AND

IN THE MATTER OF AN APPLICATION BY ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED FOR JUDICIAL REVIEW

AND

IN THE MATTER OF:

THE REPUBLIC

VRS

NATIONAL ACCREDITATION BOARD
REPRESENTED by PROF. J.S.K. AYIM
CHAIRPERSON OF THE BOARD
(UPON WHOM PLAINTIFF SHALL DIRECT SERVICE) ............ RESPONDENT

EX PARTE : ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED ..... APPLICANT

WRITTEN STATEMENT FILED PURSUANT TO ORDER 55 r 6(2) OF C.I. 47.

## 1.0 INTRODUCTION.

My LORD,

This statement has been filed in compliance with order 55 rule 6(2) of the rules of this Court. This rule requires an applicant after filing the application for judicial review to also file such number of copies of the applicant's statement of case as the Registrar shall determine setting out fully the arguments and relevant statutes or decided cases that the applicant wishes this Court to consider.

In the introductory part of this statement, we propose, first of all to set out the facts which provide the basis for applicant's cause of action against respondent. In the course of

- 1 -

recounting the facts, we shall summarize the processes that an applicant for accreditation must follow before obtaining accreditation. After setting out the facts, we shall briefly review the authorities and principles that govern the exercise of this Court's judicial review jurisdiction in so far as the remedy of mandamus is concerned before discussing in detail each of the grounds upon which the present application has been brought. In proposing to present the statement of applicant's case in this manner, we are not unmindful of the fact that the facts and grounds upon which this application has been brought are already within the cognizance of this Court having already set them out in sufficient detail in the affidavit in support of the application before this Court.

We however crave your indulgence, My Lord to permit us to adopt our proposed method of presenting applicant's statement of case. The reason is that our style would assist us immensely in presenting our arguments in this statement more coherently and lucidly. We shall therefore with your Lordship's permission state the facts of this case.

## 1.1 The facts.

As deposed to in the affidavit in support of the application before this Court, applicant is a corporate body registered under the laws of the Republic of Ghana. As a corporate entity applicant is registered to carry on business as an educational institution. Respondent for its part, is a statutory body established for the sole purpose of providing accreditation for both public and private institutions as regards the contents and standards of their programmes. In pursuance of its business objects aforesaid, applicant set up facilities and infrastructure at its registered offices with a view to establishing an institution for the training of medical practitioners in the Republic of Ghana. To legally and properly establish and run this institution, applicant requires accreditation from respondent. The rules on accreditation are set out in the National Accreditation Board Act of 2007 (Act 744) and the regulations made thereunder known as the Tertiary Institutions (Establishment and Accreditation) Regulations of 2002 (L.I 1700). We shall hereinafter simply refer to the parent statute as "the Act" and the legislation made under as "the regulations." Accreditation for applicant's institution is necessary because the training of medical practitioners in the Republic of

- 2 -

Exhibit B page 15

this can only be done at the tertiary level of education. The regulations require that any person who wishes to establish a tertiary institution should apply to respondent.[1]

Accordingly, applicant applied to respondent as the appropriate statutory institution responsible for accrediting statutory institutions for accreditation. As already submitted, we shall in the course of recounting the facts of this case also summarise the rules that provide for accreditation. We shall therefore, before dealing specifically with facts relating to the result of applicant's application for accreditation, discuss briefly the accreditation process. The process of accreditation takes several steps. The first is the application. Then the issuance of an interim authorization, after a team appointed by respondent to carry out an inspection of the premises in which an applicant intends to carry out its educational programmes, has duly carried out the inspection exercise and submitted its report on the result of its inspection exercise to respondent. It is on the basis of the team's report that respondent issues an interim authorization to an applicant. The effect of this interim authorization given by respondent permits the applicant among others to do the following;

- Set up a governing body for the institution.

- Commence or continue with the mobilization of financial resources needed for running the institution intended to be accredited.

- Commence or continue assembling academic facilities for the institution.

- Develop physical facilities required for running the school.[2]

Having complied with the requirements set out above, an applicant is required under the rules to apply for accreditation within a period of three years from the date of the authorization. For this purpose the only conditions that an applicant must satisfy is providing specific information to respondent relating to the following matters;

- Applicant's draft constitution indicating the name and location of applicant's school.

---

[1] See regulation 1 of the regulations.

[2] See regulations 1-6 of the regulations.

- 3 -

Ghana can only be done at the tertiary level of education. The regulations require that any person who wishes to establish a tertiary institution should apply to respondent.[1]

Accordingly, applicant applied to respondent as the appropriate statutory institution responsible for accrediting statutory institutions for accreditation. As already submitted, we shall in the course of recounting the facts of this case also summarise the rules that provide for accreditation. We shall therefore, before dealing specifically with facts relating to the result of applicant's application for accreditation, discuss briefly the accreditation process. The process of accreditation takes several steps. The first is the application. Then the issuance of an interim authorization, after a team appointed by respondent to carry out an inspection of the premises in which an applicant intends to carry out its educational programmes, has duly carried out the inspection exercise and submitted its report on the result of its inspection exercise to respondent. It is on the basis of the team's report that respondent issues an interim authorization to an applicant. The effect of this interim authorization given by respondent permits the applicant among others to do the following;

- Set up a governing body for the institution.

- Commence or continue with the mobilization of financial resources needed for running the institution intended to be accredited.

- Commence or continue assembling academic facilities for the institution.

- Develop physical facilities required for running the school.[2]

Having complied with the requirements set out above, an applicant is required under the rules to apply for accreditation within a period of three years from the date of the authorization. For this purpose the only conditions that an applicant must satisfy is providing specific information to respondent relating to the following matters;

- Applicant's draft constitution indicating the name and location of applicant's school.

---

[1] See regulation 1 of the regulations.

[2] See regulations 1-6 of the regulations.

Exhibit B page 17

- Its objects.

- Membership of its governing body.

- List of academic and senior administrative staff employed among others.[3]

An applicant who provides the aforesaid information to respondent is then examined and assessed by an accreditation panel appointed by respondent for purposes of ascertaining whether or not the applicant has satisfied certain conditions. The accreditation panel so appointed is required to submit its report on whether or not an applicant has complied with the aforesaid conditions to respondent within one (1) month of its appointment. The panel is specifically required to ascertain whether or not;

- Applicant has sufficient physical and academic facilities required to commence and continue academic work.

- Applicant has assembled sufficient human and other resources for effective work.[4]

- The report of the accreditation panel may be referred to an applicant where otherwise respondent proceeds to accredit an applicant. Respondent is required to accredit and applicant where it is satisfied that an applicant has met the following conditions;

- That applicant's constitution provides a sound basis for the academic and administration facilities of applicant's instruction; or

- That applicant's institution has effectively organized adequate human, physical and financial resources to        operate the institution in the Republic of Ghana; and/or

- That it has failed to comply with standards prescribed by the Board.[5]

Indeed, under the rules regulating the accreditation of institutions the accreditation process once commenced ought to be completed within sixty (60) days from the time when an

---

[3] See regulation 8 of the regulations.
[4] See regulation 9 of the regulations.
[5] See regulation 11 of the regulations.

- 4 -

Exhibit B page 18

accreditation panel completes its examination and assessment of an applicant's facilities. This is stated by respondent itself at point 4 of Part II of respondent's own roadmap to accreditation which is annexed to the affidavit in support of the application and marked exhibit SL9. This briefly sums up the accreditation process.

My Lord, from the facts set out in the affidavit in support of the application before this Court, it is our case that applicant duly satisfied all the aforesaid statutory requirements for accreditation. Upon applicant's application, applicant was duly granted interim authorization by respondent after the team appointed by respondent carried out an inspection of applicant's premises. We have exhibited to the affidavit in support of the application two documents marked "SL1" and "SL2." These are copies of the letter dated 18/04/05 notifying applicant that respondent had approved the recommendation of the team that applicant be granted a "three (3) year authorization with effect from April 18, 2005 to continue its preparations for accreditation as well as the interim authorization itself which is dated 18/04/05. Under the rules on accreditation respondent would not have issued the interim authorization in favour of applicant unless the conditions already discussed have been met.

Upon obtaining the interim authorization applicant applied for accreditation and provided all the necessary information required by the accreditation panel to recommend to respondent to accredit applicant. The accreditation panel submitted its report to respondent well outside the one (1) month statutory period. In its report, the accreditation panel made some adverse comments regarding the readiness of applicant for accreditation. The accreditation panel's report was referred to applicant for comment. In its reaction to the accreditation panel's report, applicant effectively countered the adverse comments contained in the accreditation panel's report. Applicant's reaction to the comments made by the accreditation panel against it is contained in a one hundred and eighty-seven (187) page report. Evidence of the fact that applicant effectively countered the adverse observations made by the accreditation panel regarding its readiness for accreditation can be found when we take a look at exhibit "SL7" exhibited to the affidavit in support of the present application.

- 5 -

Having countered these adverse comments made against it, the rules on accreditation require that at this stage, respondent grant applicant accreditation especially after all the concerns raised by the accreditation panel were effectively addressed by applicant. Respondent refused so to do and persisted in refusing so to do. The result was that applicant was constrained to write several letters arguing its point as to why the refusal to accredit applicant is unfair. In these letters applicant successfully demonstrated that respondent has no reason whatsoever to refuse to accredit applicant. Some of these letters are evidenced by the documents marked "SL3", "SL4", "SL5" and "SL6" which have been exhibited to the affidavit in support of the application. They are listed below as follows;

- letter dated 26/02/08 written by applicant to the Minister for Education requesting his intervention to enable applicant obtain accreditation.

- letter dated 09/06/08 written by the Board to applicant confirming that applicant will be able to support its programmes financially.

- Letter dated 18/06/08 written by applicant to the Deputy Executive Secretary of the Board indicating the extent to which it had complied with requirements for accreditation by the Board.

- Letter dated 14/08/08 to the Medical and Dental Council indicating the extent to which applicant had complied with the aforesaid Council's requirements.

The refusal to grant applicant accreditation apart, respondent referred applicant's application for accreditation to the Medical and Dental Council. The decision by applicant to refer applicant's application to the Medical and Dental Council is not only strange but illegal because nowhere in the accreditation process is respondent required to seek the intervention of the Medical and Dental Council to either assist it or as a condition precedent to granting accreditation. The Medical and Dental Council has no authority whatsoever to determine whether or not applicant should be granted accreditation. This illegality was made worse when the aforesaid Council wrote to applicant by way of a letter dated 15/10/08 informing applicant that "the Council" had decided not to grant" applicant "any

- 6 -

form of accreditation for medical training in Ghana on the ground that applicant's "documents submitted and facilities do not meet the Medical and Dental Council's minimum requirements". This letter is exhibited to applicant's affidavit in support of the application and marked exhibit "SL8."

If this is the ground upon which applicant has been refused accreditation by respondent, this Court should have no difficulty whatsoever in granting the present application. The reason is simply that assuming that the Council's conclusions that applicant had not satisfied the minimum requirements to meet the Council's standards to be correct, the rules on accreditation do not require applicant to meet the Council's standards. The standards that applicant is required to meet are those set out in the Act and the regulations and not those determined by the Council as the requirements. In any case, what requirements is the Council talking about? Are the Council's requirements different from those set out in the statutes referred to? And if they are, where are the Council's standards stated? Indeed, is there any legal basis for the Council to insist on its requirements outside that stated in the appropriate statutory provisions? The answers to these interrogatories are obvious. We would demonstrate this in the course of this submission. It is our submission that having regard to all the circumstances of this case respondent has no reason to refuse to grant applicant accreditation especially that applicant has duly satisfied all requirements for accreditation. It is our further submission that as an administrative and statutory body respondent is required to exercise its powers reasonably, fairly and properly and that the failure by respondent to accord applicant accreditation is unfair and unreasonable. The fact that respondent's refusal to grant applicant accreditation is unreasonable is supported by facts deposed to at paragraph 20 of the affidavit in support of the application as follows:

- The failure by respondent to appoint an accreditation panel within 30 days of applicant's application to determine applicant's application. The panel was appointed over 60 days later.

- The failure by respondent to grant applicant accreditation long after the accreditation panel had conducted its institutional visit in November 2007.

- 7 -

The Board is required as per its own roadmap followed by applicant ought to have given applicant accreditation by the end of January 2008.

-   Respondent's penchant for requesting that other and/or further requirements be met by applicant each time that applicant addresses a concern raised by the Board especially the requests contained in the Board's letter dated 09/05/08 annexed hereto and marked exhibit "SL13" which requests are not required under the law as a precondition for accreditation.

-   The refusal by respondent to grant accreditation to applicant although applicant has met the requirements stated by the Board in its letter dated 09/05/08.  The fact that the requirements were met is reflected in letters written by applicant dated 9/3/08 and 25/4/08 annexed hereto and marked exhibits "SL14" and "SL15".

-   The refusal by respondent to grant applicant accreditation although applicant has satisfied all necessary requirements for accreditation as evidenced by the exhibits annexed hereto.

We must point out even before we proceed to the next stage of our statement of case that if respondent had conducted its affairs according to its own roadmap on the accreditation process, the accreditation process which was started by applicant in October 2007 ought to have been completed by January 2008 and applicant would have started running its programmes by August 2008 thereby permitting applicant to start recovering its expenses in the sum of about three million dollars it has invested in infrastructure for purposes of establishing its institution which has not yet been accredited. There can therefore be no doubt that as a result of respondent's refusal to grant accreditation to applicant, applicant has lost income. This is evidenced by the projections contained in the report exhibited to the affidavit in support of the application and marked exhibits "SL10" and "SL11." These exhibits are copies of two letters dated 02/01/08 and 02/05/02 written by applicant to the Deputy Executive Secretary of the National Accreditation Board outlining the loss suffered by applicant by reason of the board's failure to grant applicant accreditation.

- 8 -

My Lord, we shall leave the narration of the facts of this case here and proceed to discuss the grounds upon which this Court would usually intervene and grant an order of mandamus in favour of an applicant.

## 2.0 GROUNDS UPON WHICH THIS COURT WOULD GRANT AN ORDER OF MANDAMUS.

After reviewing the authorities on the subject of mandamus a respected authority on the subject of judicial review of administrative action has written that;

> "Mandamus lies to secure the performance of a public duty, in the performance of which the applicant has a sufficient legal interest. The applicant must show that he has demanded performance of the duty and that performance has been refused by the authority obliged to discharge it.[6]

Explaining his position, the learned writer says that the nature of the interest required to support an application for an order of mandamus is that the applicant must show a legal right to the performance of the duty. What this means is that he must have a substantial personal interest in its performance. In terms of prior demand, he says that even where the respondent has not refused compliance in express terms, it is a question of fact whether his conduct evinces a clear determination not to comply and that there may be cases where the mere fact of non-compliance with a duty will be a sufficient ground for the award of a mandamus – e.g. where the applicant has been substantially prejudiced by the respondent's procrastination, delay in complying with the demand or request, the signification of readiness to comply only subject to conditions, or persistent temporizing and failure to give a direct answer,  may well be tantamount to refusal.[7]

Local authorities on the subject of mandamus are legion. Right from the very first edition of the Ghana Law Reports, a case on mandamus is recorded. It is a case reported as **In Re a Complaint To Police by Botwe and Mensah**[8].  In this case Ollenu J (as he then was) accepted as correct the conditions precedent for the issue of mandamus which are

---

[5] S.A. De Smith Judicial Review of Administrative Action. At page 561
[7] **Ibid** from page 572 onwards.
[8] [1959] GLR 457 H.C

- 9 -

consistent with those set out by the writer just referred to. These conditions were set out in paragraph 7 of the statement of claim of the applicants as follows;

(i)  There must be some legal right to be enforced, the purposes of which cannot be enforced by any other legal remedy equally convenient, beneficial and appropriate.

(ii)  There must have been a distinct demand and refusal to do the act.

(iii)  The duty to be performed must be some public or quasi-public legal duty; and

(iv)  It must appear that the order would be effective.

The same ingredients were enumerated in the case of **Republic v Chieftaincy Secretariat and Another; Ex parte Adansi Traditional Council**[9] per Annan J (as he then was) as follows:

(a)  That there was a duty imposed by the statute upon which he relied.

(b)  That the duty was of a public nature.

(c)  That there was a right in the applicant to enforce the performance of the duty; and

(d)  There had been a demand and a refusal to perform that public duty enjoined by statute.

On these tests, it is our contention that applicant has duly satisfied the conditions for the grant of mandamus. In the first place, applicant's interest in the subject matter of the mandamus, which is accreditation, cannot be doubted. Applicant desires accreditation from

---

[9] [1968] GLR 736 H.C. (see especially 1 and at page 739)

- 10 -

respondent to pursue its business objects. As a result of respondent's failure to grant applicant accreditation, applicant has lost and continues to lose money. Evidence of this has already been provided. To obtain accreditation, applicant has gone through all the processes of accreditation and has done everything to comply with them. Evidence that applicant has complied with all the requirements necessary for accreditation has been provided by the various documents exhibited to the affidavit in support of the application. There can therefore be no doubt that applicant has established a legal right to be enforced. Indeed it is our submission that in seeking to enforce this right, we find no better legal remedy equally convenient, beneficial and appropriate.

Further to this, it cannot also be disputed that applicant has made a demand for accreditation without success. Abundant evidence on this has also been exhibited to the affidavit in support of the application. Indeed on this point we have earlier submitted that the authorities are to the effect that it will be a sufficient ground for the award of a mandamus where as in this case applicant has been substantially prejudiced by respondent's procrastination, delay in complying with the demand or request or where the signification of readiness to comply is made only subject to conditions, or persistent temporizing and failure to give a direct answer. All these are tantamount to refusal. Needless to add that respondent's duty to grant applicant accreditation for its purposes is of a public nature. Needless to add that the medical and Dental Council's letter refusing accreditation after respondent surrendered its statutory powers to it to decide on the question of applicant's accreditation is sufficient evidence that respondent has refused applicant's demand.

As for the requirement that the applicant must demonstrate that he has a right to the duty which it is sought to be enforced by mandamus, the least said about it the better. The statutory provisions on accreditation make the grant of accreditation mandatory where as in this case applicant has satisfied the statutory requirements on accreditation. It is our submission therefore that applicant has satisfied all the conditions for the grant of mandamus. We shall however briefly discuss the specific grounds set out in the affidavit in support of the application as the basis for seeking the order of mandamus from this Court.

- 11 -

## 2.0 GROUNDS OF THE APPLICATION.

The grounds upon which we bring this present application have been stated at paragraph... of the affidavit in support of our application. The grounds are three and are stated as follows;

(i)     That the refusal by the Board to grant applicant accreditation is unreasonable.

(ii)    That Board has failed to exercise its powers and/or discretion to grant accreditation fairly, candidly and properly.

(iii)   That the refusal by the Board to grant applicant accreditation is not in accordance with law and contrary to the Board's own roadmap as published on its own website www.nab.gov.gh which is annexed hereto and marked exhibit "SL16").

We shall now in this statement discuss each of the grounds set out herein as well as in the affidavit in support of the application in detail.

## 2.1  That the refusal by the Board to grant applicant accreditation is unreasonable.

In the case of **Tema Development Corporation & Musah   v   Atta Baffour**[10] the Supreme Court held that one of the grounds upon which the Courts would intervene to grant an application for judicial review as in this case arises where the administrative action sought to be judicially reviewed can be impugned on grounds of illegality, irrationality and procedural impropriety. In this decision, the Supreme Court defined the grounds just outlined. By "illegality" the Supreme Court held was meant that the decision-maker must understand correctly the law regulating his decision-making power. With regard to "irrationality" the Court held that it could be succinctly referred to as Wednesbury unreasonableness – applicable to a decision which was so outrageous in its defiance of logic or of accepted moral standards that no sensible person, applying his mind to the

---

[10] [2005 -2006] SCGLR 121.

Exhibit B page 26

question to be decided, could have arrived at it. By "procedural impropriety" was meant not only failure to observe basic rules of natural justice or failure to act with procedural fairness towards the person who would be affected by the decision but also failure by an administrative tribunal to observe procedural rules expressly laid down in legislation by which its jurisdiction was conferred, even where such failure did not involve any denial of natural justice. *Associated Provincial Picture Houses Unions v Minister for the Civil Service (supra)* **(per Lord Diplock at 949 and 950-951) cited.**

It is important to note here that the "unreasonableness" test stated by the Supreme Court has been defined to include not only legal but moral standards. We have already argued that it is our view that respondent's refusal to grant applicant accreditation is unreasonable the reason being that respondent first of all failed to appoint an accreditation panel within 30 days of applicant's application to determine applicant's application. The panel was appointed over 60 days later. Second, respondent also failed to grant applicant accreditation long after the accreditation panel had conducted its institutional visit in November 2007. Respondent per its own roadmap which was followed by applicant ought to have given applicant accreditation by the end of January 2008. Third, respondent's penchant for requesting that other and/or further requirements be met by applicant each time that applicant addresses a concern raised by the Board especially the requests contained in the respondent's letter dated 9/05/08 which has been exhibited to the affidavit in support of the application and marked exhibit "SL13" which requests are not required under the law as a precondition for accreditation. Fourth, the refusal by the Board to grant accreditation to applicant although applicant has met the requirements stated by the Board in its letter dated 09/05/08. The fact that the requirements were met is reflected in the letters exhibited to this affidavit and marked exhibits "SL14" and "SL15". Finally, the refusal by respondent to grant applicant accreditation although applicant has satisfied all necessary requirements for accreditation as evidenced by the exhibits exhibited to the affidavit in support of the application. A review of the points summarized above which have been given documentary thrust by the documents exhibited to the affidavit in support of the application will reveal without doubt that respondent's conduct has been very unreasonable.

Exhibit B page 27

We shall not belabour this point. We shall therefore proceed to argue the next ground upon which this application has been brought.

## 2.1 That Board has failed to exercise its powers and/or discretion to grant accreditation fairly, candidly and properly.

In the case of **Tema Development Corporation & Musah v Atta Baffour** the Supreme Court also held that to qualify or be susceptible to judicial review, the decision-maker must be empowered by public law (and not merely, as in arbitration, by agreement between the parties) to make the decision. It is our submission that as an administrative and statutory body respondent is required to exercise it powers reasonably, fairly and properly. We have already made submissions to this Court to the effect that the refusal by respondent to accredit applicant is unfair and unreasonable. As earlier submitted, if respondent had conducted its affairs according to its own roadmap on the accreditation process, the accreditation process which was started in October 2007 ought to have been completed by January 2008 and applicant would have started running its programmes by August 2008. In this way respondent would have started recovering its expenses in the sum of about three million dollars it has invested in infrastructure for purposes of establishing the institution. There can therefore be no doubt that as a result of respondent's refusal to grant accreditation to applicant, applicant has lost income.

My lord article 23 of the Constitution of the Republic of Ghana provides for Administrative Justice.

It states that

> "Administrative bodies and administrative officials shall act fairly and reasonably and comply with the requirements imposed on them by law and persons aggrieved by the exercise of such acts and decisions shall have the right to seek redress before a court or other tribunal".

It is for this reason that we are praying this honourable court for the remedy of mandamus against the respondent in order to compel it to grant the applicant accreditation. My lord, the applicant as evidenced by exhibits SL 1, SL 2, SL 3 and SL 7 attached to the affidavit in

- 14 -

support of our application, has satisfied all the conditions precedents as per the roadmap put together by the respondent. For instance in exhibit SL 3 i.e. a letter dated June 9, 2008 in which one Yaw Frimpong Manso who appears to have been commissioned by the respondent to analyses the financial statements of the applicant stated in the last paragraph **"the finances of the school, as it has been clearly analyzed in the preceding paragraphs, will be sound and adequate. The school, therefore, will be able to support its academic programmes"**.

The aforementioned exhibits amongst others provides proof of the fact that the applicant has fulfilled the conditions precedent for the grant of accreditation.

We are therefore invoking the supervisory jurisdiction of this honourable court in the form of mandamus to compel the respondent to grant the applicant accreditation.

My lord article 33 of the Constitution of Ghana addresses the Protection of Rights by the Courts. It provides that:-

> (1) Where a person alleges that a provision of this Constitution on the fundamental human rights and freedoms has been, or is being or is likely to be contravened in relation to him, then, without prejudice to any other action that is lawfully available that person may apply to the High Court for redress.

> (2) The High Court may, under Clause (1) of this article, issue such directions or orders or writs including writs or orders in the nature of habeas corpus, certiorari, **mandamus** (our emphasis), prohibition and quo warranto as it may consider appropriate for the purposes of enforcing or securing the enforcement of any of the provisions on the fundamental human rights and freedoms to the protection of which the person concerned is entitled.

My lord, we are praying this court for judicial review in the nature of an order of mandamus directed against the respondent that it grants accreditation to the applicant.



Acquah JSC (as he then was) in the case of **R v. CA Ex parte Lands Commission Vanderpuye Orgles Estates Ltd interested party**[11] stated at page 78 that

> A statutory duty should be performed without unreasonable delay. Thus if any such delay occurred mandamus might be employed to enforce the performance of such duty. In the instant case even though the appellant had in its letter to the respondent threatened to revoke its concurrence to and expunge exhibit "A" from the property records, it had not written to inform the respondents whether they had carried out its expressed intention or retracted it. In the light of the unreasonable delay by the appellant to deal with the problem they had created, it was imperative for the respondent to resort to mandamus to compel it to perform its public duty since it was the most effective and beneficial remedy to determine both the validity of the appellant's contention and to achieve the restoration of the concurrence in question.

My lord in the case of **R v. Chief Accountant, District Treasury Kumasi; Ex parte Badu**[12] where the principle laid down in the case of **R.v. Eastbourne Corporation**[13] was applied it was held that,

> "...an order of mandamus lies against public officials in the performance of their public or quasi-public legal duty, to require them to carry out their duty. The order is not meant to review or control what such officials have done or what they do, but to compel them to act...The order will only issue if the duty required to be performed can be legally done"

[11] [1999-2000] 1 GLR 75
[12] [1971] 2 GLR 285
[13] (1900) 83 LT 338

- 16 -

My lord the remedy we are praying this court for as per the aforementioned authorities is at the discretion of this court, the exercise of discretionary power is circumscribed by article 296 of the Constitution of Ghana. It enjoins this honourable court to be fair and candid. My lord the authorities above are explicit on the fact that the courts would not make an order that would be an exercise in futility. My lord, the rights of the applicant that are been abused by the inaction and or negligence of the respondent are what we seek the orders of this court to have restored. Therefore this court in making the orders would certainly be making an order that is capable of been enforced hence it would not result in an exercise in futility.  The respondent is a public entity and there has been a delay in the discharge of its duties to the applicant. Without the intervention of this honourable court it is our contention that respondent would not act.

**2.3  That the refusal by the Board to grant applicant accreditation is not in accordance with law and contrary to the Board's own roadmap as published   on its own website www.nab.gov.gh which is annexed hereto and marked exhibit "SL16").**

We have already submitted that upon obtaining interim authorization applicant applied for accreditation and provided the information required by the accreditation panel to recommend to respondent to accredit applicant. This is evidenced by the documents we have exhibited to the affidavit in support of the application and marked "SL3", "SL4", "SL5" and "SL6".

My lord the respondent is the public authorised body that grants accreditation for the establishment of tertiary institutions. This body is enjoined to evaluate the application filed and facilities intended to be used by the applying institution and based on the judgment of the respondent grant accreditation. It therefore lies within the powers of the board to refuse or grant accreditation. The respondent therefore in the discharge of its functions exercises discretionary power.

My lord the Constitution of the Republic of Ghana provides in article 296 for the exercise of discretionary power. It states-

- 17 -

Exhibit B page 31

"Where in this Constitution or in any other law discretionary power is vested in any person or authority—

(a) that discretionary power shall be deemed to imply a duty to be fair and candid;

(b) the exercise of the discretionary power shall not be arbitrary, capricious or biased either by resentment, prejudice or personal dislike and shall be in accordance with due process of law; and

(c) where the person or authority is not a judge or other judicial officer, there shall be published by constitutional instrument or statutory instrument, regulations that are not inconsistent with the provisions of this Constitution or that other law to govern the exercise of the discretionary power.

My lord, the import of article 296 as stated above is clear, a public authority/body in this case the respondent, in the discharge of its duties is enjoined to exercise discretionary power is duty bound to be fair and candid. My lord to be fair is to uphold the rule of law it is to ensure that procedures and processes that precede and or inform decision making and implementation adhere to the rules and regulations governing the subject matter. The public body in the discharge of its functions should not be arbitrary or bias.

My lord Act, 744 and LI 1700 provides the legal basis for the work of the respondent. Essentially part 2 of LI 1700 provides for the stages of the accreditation process. It is as follows, that upon the receipt of the application for accreditation, the respondent shall appoint a panel to evaluate the appropriateness or otherwise of the academic facilities, and human rescurc to undertake the academic programmes as envisaged by the applicant. This panel is required to submit its report to the respondent within one month. The respondent upon the receipt of the report of the panel shall meet to consider the report of the panel. After this meeting of the respondent, where it is satisfied that all the requirements have been met it shall grant the applicant accreditation.

Exhibit B page 32

"Where in this Constitution or in any other law discretionary power is vested in any person or authority—

(a) that discretionary power shall be deemed to imply a duty to be fair and candid;

(b) the exercise of the discretionary power shall not be arbitrary, capricious or biased either by resentment, prejudice or personal dislike and shall be in accordance with due process of law; and

(c) where the person or authority is not a judge or other judicial officer, there shall be published by constitutional instrument or statutory instrument, regulations that are not inconsistent with the provisions of this Constitution or that other law to govern the exercise of the discretionary power.

My lord, the import of article 296 as stated above is clear, a public authority/body in this case the respondent, in the discharge of its duties is enjoined to exercise discretionary power is duty bound to be fair and candid. My lord to be fair is to uphold the rule of law it is to ensure that procedures and processes that precede and or inform decision making and implementation adhere to the rules and regulations governing the subject matter. The public body in the discharge of its functions should not be arbitrary or bias.

My lord Act, 744 and LI 1700 provides the legal basis for the work of the respondent. Essentially part 2 of LI 1700 provides for the stages of the accreditation process. It is as follows, that upon the receipt of the application for accreditation, the respondent shall appoint a panel to evaluate the appropriateness or otherwise of the academic facilities, and human resource to undertake the academic programmes as envisaged by the applicant. This panel is required to submit its report to the respondent within one month. The respondent upon the receipt of the report of the panel shall meet to consider the report of the panel. After this meeting of the respondent, where it is satisfied that all the requirements have been met it shall grant the applicant accreditation.

- 18 -

My lord the accreditation process began in November 2007. The first panel that visited the facilities of the applicant in its report to the respondent was not satisfied. This led to the respondent sending the report of the panel to the applicant for its comments. The applicant in its reaction to the report of the visitation panel, succeed in refuting the conclusions of the panel and this led to a subsequent positive comments made by another team of experts that was constituted by the respondent to visit the facilities of the applicant. This fact is evidenced by exhibit SL 7 attached to the affidavit of the applicant.

My lord in spite of this positive findings by the second team of experts who inspected the facilities of the applicant, the respondent in breach of the Act and the regulations refused to grant the applicant accreditation but rather in an unexplainable and illegal decision respondent referred the application of the applicant to the Medical and Dental Council to grant the accreditation to the applicant. My lord it is our respectful submission that this decision has no foundation in law, the Act is very clear and express on whose duty it is to grant accreditation to a tertiary institution seeking accreditation to run programmes in the Republic of Ghana institution. This is a point we believe we effectively dealt with earlier on in this statement. It is no other body but the respondent that has the authority to grant accreditation.

My lord, the only possibility for an external person/body to input into the decision whether to grant or not to grant accreditation is in the panel that is constituted by the respondent to undertake an accreditation process. This is provided for in section 9 of the Act. As previously noted the decision of the accreditation panel is required to be submitted to the respondent which shall convene to deliberate on the report of the panel. It is only when the respondent is satisfied that all the requirements for accreditation have been met that it SHALL GRANT ACCREDITATION TO THE INSITUTTION (our emphasis)[14].

---

[14] See regulation 10 of LI 1700 and Section 2 of Act 744

Exhibit B page 34

My lord, it therefore does not lie within the statutory functions of the respondent to delegate its powers to the Medical and Dental Council (MDC) to grant accreditation to the applicant.

My lord, NRCD 91 provides for the Council's Powers to Demand Particulars of Studies and Examinations[15]. It states

> (1) The Council shall have power to request any medical school or university to submit to the Council at such time as the Council may specify particulars of the courses of study and examinations at the school or university.
>
> (2) The Council may make such recommendations as it considers necessary with respect to such courses of study or examinations

My lord section 15 above does not make mention of the MDC accrediting medical schools or universities in Ghana. It only vests the MDC with power to demand medical schools or universities training medical personnel to make available to it their particulars of study and examinations. Our interpretation on this particular provision is further strengthened by section 4 of NRCD 91 which provides for the functions of the MDC. It states:-

> (1) The Council shall be concerned with medical and dental practitioners (hereinafter referred to as "practitioners") and shall be responsible for securing in the public interest the highest standards in the practice of medicine and dentistry in Ghana.
>
> **(2) The Council shall in particular—**

---

[15] See section 15 of NRCD 91

- 20 -

Exhibit B page 35

(a) ensure that courses of study and training in medicine or dentistry at any medical school or University in Ghana are such as can sufficiently guarantee possession of the knowledge and skill needed for the efficient practice of medicine or dentistry; (our emphasis)

(b) prescribe standards of professional conduct;

(c) uphold and enforce such standards by the disciplinary powers conferred upon it by this Decree; and

(d) be responsible for the keeping of registers of duly qualified practitioners.

My lord the function legally exerciseable by the MDC is found in section 4(2) as stated above. It is our contention that the power to ensure that "courses of study and training in medicine or dentistry at any medical school or University in Ghana are such as can sufficiently guarantee possession of the knowledge and skill needed for the efficient practice of medicine or dentistry" is just an element of the accreditation process as provided for in the Act. In deed section 26 of the Act defines accreditation to mean "the status accorded a tertiary institution or programme that satisfies the relevant standards determined by the Board".

It is our contention that section 4(2) is limited to the content of the courses of study, it does not extend to academic, residential and other infrastructural facilities, it does not include addressing the human resource capacities of the teachers in such institutions. It is therefore a mis-appreciation of the law to cede and or delegate the statutory powers of the respondent to the MDC.

In a situation that the respondent found it necessary to seek the advice of the MDC the opportunity to constitute a panel to undertake the accreditation process is an avenue provided by for by the Act that respondent to take advantage of expertise that

- 21 -

may not exist within respondent. My lord the MDC does not have the power to grant accreditation and the respondent is not mandated to delegate its functions and powers. In this regard it is an illegality for the MDC to have purported to undertake an inspection of the facilities of the applicant for the purposes of granting accreditation. This act has no foundation in law and we pray this honourable court to declare the acts of the MDC ultra vires the powers of the MDC and illegal. We pray this honourable court to order the MDC to refund to applicant all monies illegally collected by MDC from the applicant.

## CONCLUSION.

My Lord, at paragraph 23 of our affidavit in support of our application we have prayed this Court for the following reliefs:

(i)   A declaration that having duly satisfied all the statutory preconditions for being accredited the Board owes applicant an obligation to accredit applicant.

(ii)   A declaration that accordingly the refusal by the Board to accredit applicant is unreasonable and unfair.

(iii)   An order of mandamus compelling the Board to accredit applicant.

(iv)   General Damages for loss of earnings from August 2008 up to date when the Board finally grants accreditation to applicant.

(v)   Costs on a full indemnity basis.

We have in this application demonstrated the nature of the legal right necessary to support an application for a mandamus. In the case of **In Republic v Chief lands officer; Ex parte Allotey and others**[16], an application was made for an order of mandamus by a joint head of family to compel the chief lands officer to register a number of conveyances relating to land belonging to the Onamrokor Adain family. It was held at headnote 1 and at page 973 of the report per Cecilia Koranteng-Addow J that the writ of mandamus was a

---

[16] [1982-83] 2 GLR 971 H.C.

- 22 -

remedy which should avail *anyone showing that he had sufficient interest to be protected* and that there was no other remedy. As earlier submitted, it must be pointed out that the alternative remedy which ought to be pursued must be equally convenient, beneficial and appropriate to the order of mandamus sought by the applicant. We also submitted that respondent is a public body in the proper sense of it. In the case of **Republic v Chief Accountant, District Treasury, Kumasi; Ex parte Badu[17]** an application was brought for an order of mandamus made for purposes of commanding the respondent to stamp an instrument without exacting a penalty. It was held at headnote 1 and at page 288 of the report per Mensa Boison J that an order of mandamus lies against public officials in the performance of their public or quasi-public legal duty, to require them to carry out their duty.

DATED AT DERY & CO, 2nd FLOOR, BORWAH HOUSE, (OPP. SIGHT & SOUND SECRATARIAL SCHOOL), KWAME NKRUMAH AVENUE, ADABRAKA-ACCRA, THIS 25TH DAY OF NOVEMBER 2008.

................................................

SOLICITORS FOR APPLICANT

DERY & CO.
LEGAL PRACTITIONERS, CONSULTANTS
& NOTARIES PUBLIC

THE REGISTRAR,
HIGH COURT,
FAST TRACK DIVISION,
ACCRA.

And for service on:

1.    The National Accreditation Board represented by its chairman Prof. J.S.K. Ayim upon whom plaintiff shall direct service.

2.    The Attorney General, Attorney General's Department, Ministries, Accra.

---

[17] **[1971] 2 GLR 285 H.C.**

- 23 -

**IN THE SUPERIOR COURT OF JUDICATURE**
**IN THE HIGH COURT OF JUSTICE**
**(FAST TRACK DIVISION)**
**ACCRA – A.D. 2008**

**IN THE MATTER OF AN APPLICATION BY ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED FOR ACCREDITATION BY THE NATIONAL ACCEDITATION BOARD**

**AND**

**IN THE MATTER OF AN APPLICATION BY ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED FOR JUDICIAL REVIEW**

**AND**

**IN THE MATTER OF:**

**THE REPUBLIC**

**VRS.**

**NATIONAL ACCREDITATION BOARD** .................... **RESPONDENT**

**EX PARTE: ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED** .................... **APPLICANT**

---

**AFFIDAVIT IN OPPOSITION TO MOTION FOR JUDICIAL REVIEW IN THE NATURE OF MANDAMUS**

---

I, KWAME DATTEY, of National Accreditation Board, Accra, make oath and say as follows:

1. That I am the Executive Secretary of the National Accreditation Board and the deponent herein.

2. That I have the consent and authority of the National Accreditation Board to depose to this Affidavit in respect of facts and information that have come to my knowledge in the course of my duty as Executive Secretary of the Board.

3. That Applicant's Motion for Judicial Review in the Nature of Mandamus has been served on us, the Respondent, and we are opposed to same.

4. That when institutions apply for accreditation, the applications are examined to ascertain the state of preparedness of the applicant to commence operation and to

**Exhibit C page 39**

offer advice as to how and what the applicant ought to do to quicken the process of accreditation.

5. That the Board may issue an interim authorization to an applicant pending final accreditation.

6. That in furtherance thereof, a certificate of authorization is provided to the institution during the authorization phrase to assist them raise the stated resources as provided under the provisions of the Tertiary Institutions (Establishment and Accreditation) Regulations, 2002 ( L.I. 1700).

7. That an institution is not expected to advertise for nor admit students at this stage.

8. That the Respondent communicated this requirement to the Board of Trustees of St. Luke School of Medicine in a letter dated 18th January, 1999 issuing an interim authorization to the school. Annexed hereto and marked as Exhibit 'A' is the letter from the NAB to the Applicant.

9. That contrary to the provisions for the award of interim authorization St. Luke School advertised on the internet for students stating categorically that it had been accredited in Ghana in January, 1999. Annexed hereto and marked as Exhibit 'B' is a copy of the advertisement of St. Luke School of Medicine on the internet.

10. That by a letter a copy of which is annexed hereto and marked as Exhibit 'C', the Respondent communicated this impropriety to St. Luke School.

11. That the Applicant again fell foul of the law on  accreditation of institutions when it requested for and was subsequently listed by the World Health Organization in their periodical *Towards Unity for Health* in October, 2000.

12. That pursuant to the prior listing of St Luke in the periodical aforesaid, Foundation for Advancement of International Medical Research (FAIMER) a non-profit foundation of the Educational Commission for Foreign Medical Graduates (ECFMG), listed St. Luke in the International Medical Education Directory (IMED).

13. That FAIMER had indicated that ECFMG had received an application for examination for students from St. Luke School of Medicine.

14. That based on information received that the Applicant may not be accredited as a medical school in Ghana, FAIMER wrote to the Minister of Education for confirmation. Annexed and marked as Exhibit 'D' is the letter from FAIMER to the Minister of Education.

15. That in a letter dated November 19, 2004 the Respondent responded to the specific questions raised by FAIMER. Annexed hereto and marked as Exhibit 'E' is a copy of NAB's letter to FAIMER.

16. That the 3-year period for interim authorization for the Applicant lapsed in 2002 and in 2004 they applied for accreditation.

Exhibit C page 40

17. That the Respondent in a letter dated September, 14th 2004 responded to the Applicant's application raising their concerns. A copy of the said letter is annexed hereto and marked as Exhibit 'F'.

18. That the Applicant wrote back to NAB apologizing for the embarrassment it may have caused the Respondent. Annexed hereto and marked as Exhibit 'G 'is the Respondent's letter.

19. That the Applicant was subsequently granted a-three year Interim Authorization with effect from April 8th 2004. Annexed hereto and marked as Exhibit 'H' is a letter granting St. Luke another authorization.

20. That in accordance with regulations governing accreditation, it is the responsibility of the applicant institution to inform the Board when it has adequately assembled the relevant resources to begin the accreditation.

21. That assessment panels for programme accreditation are carefully chosen from academia; these include relevant professional bodies and practitioners. The original assessment panel that assessed the Applicant included the Deans of the Medical Schools in Ghana.

22. That, the panel that assessed the Applicant's programme did its work meticulously without any trace of bias.

23. That due to the vehement protestations by the Applicant about the report of the original panel, a review panel was appointed to study the hundred and eighty-seven (187) page rebuttal issued by the Applicant and to assist the Applicant to comply with specific recommendations and requirements necessary to merit accreditation.

24. That the reports submitted by the original assessment panel and the review panel indicated that the Applicant was not ready for accreditation. A copy of the report by the original assessment panel and the review panel has been attached hereto and marked Exhibits 'J' and 'K' respectively.

25. That mindful of the investment made by the Applicant, the Board requested the Applicant to fulfil specific requirements in order to put its school in better stead to merit accreditation.

26. That the Respondent required the Applicant to fulfil specific requirements based on the authority vested in the Respondent under Regulation 11 (1) (c) of Tertiary Institutions (Establishment and Accreditation) Regulation, 2002 (L.I.1700) which provides that the Board shall grant accreditation to an institution which has applied for accreditation if the Board is satisfied that the institution has complied with the relevant standards prescribed by the Board.

27. That Regulation 8 (2) of L.I. 1700 also provides that an application for accreditation shall be accompanied with the requirements set out under (a) – (f) of Regulation 8(2) in addition to other information that the Board may require.

Exhibit C page 41

28. That the Applicant has unfortunately failed and/or refused to fulfil specific requirements prescribed by the Board.

29. That those specific requirements were:

>   (a) to seek affiliation with an accredited institution in Ghana or elsewhere who will offer its qualification to graduates of St. Luke School of Medicine;
>
>   (b) to seek a medical facility where students of St. Luke School of Medicine would have their clinical rotation; and
>
>   (c) to obtain a consent from the Medical and Dental Council which is not only the licensing authority, by legislation, of medical practitioners in Ghana, but also the accrediting body for medical facilities, where medical students could be trained in clinical rotations.

30. That the Applicant had accepted the three pre-conditions set out under Paragraph 29 hereto without question until the Medical and Dental Council wrote to them.

31. That the Respondent cannot sacrifice quality for mediocrity and accredit an institution and its programmes to enable them enrol students who will neither be recognized by the appropriate authority nor practice in the country or elsewhere upon graduation.

32. That since the Applicant's aim is to establish a specialist tertiary institution whose graduates would deal with human lives, it would be irresponsible on the part of the Respondent to treat such an application as it would to any other tertiary institution.

33. That no investment is too great as to allow businessmen/women to experiment with the lives of human beings for no other reason than for profit.

34. That the Respondent has been very reasonable, under the circumstances, in dealing with the application for accreditation of the Applicant.

35. I therefore pray this Honourable Court to dismiss the application.

36. WHEREFORE I swear to this Affidavit in Opposition to the Motion.


.................................................
                        DEPONENT


SWORN IN ACCRA THIS 4TH DAY OF DECEMBER, 2008.

Exhibit C page 42

BEFORE ME

COMMISSIONER FOR OATHS

REGISTRAR
FAST TRACK COURT
A C C R A

AND TO THE APPLICANT OR HIS LAWYER, DERY & CO., 2ND FLOOR, BORWAH HOUSE, ( OPP. SIGHT & SOUND SECRETARIAL SCHOOL) KWAME NKRUMAH AVENUE, ADABRAKA – ACCRA.

**Exhibit C page 43**

EXHIBIT A

NATIONAL ACCREDITATION BOARD
P. O. BOX CT. 3256
ACCRA

NAB/A/02/PTE/114

18th January, 1999

Dear Sir,

### INTERIM AUTHORITY TO ESTABLISH
### ST. LUKE SCHOOL OF MEDICINE AT
### CAPE COAST

As you are aware, in response to your application dated 5th November, 1998, representatives of the Board of Trustees of the proposed St. Luke School of Medicine at Cape Coast, led by Dr. Terroll Dolphin, had preliminary discussions with the Accreditation Sub-committee of the National Accreditation Board (NAB) on Wednesday 13th January, 1999 in the office of the Chairman of NAB at the Department of Mathematics, University of Ghana, Legon.

2.     We wish to inform you that Interim Authority is hereby given to the Board of Trustees of the St. Luke School of Medicine at Cape Coast, Ghana who can be contacted at the following addresses:-

          U.S. Information Office
          St. Luke -Bethesda Medical Program
          6416 S. Western Avenue
          Los Angeles, California 90047

          Telephone:     (323) 291-3587, (888) 599-9666
          Fax:           (323) 753-0679

          E-mail:     scommand@pacbell.net

                    or

          C/O Dr. S. Fifi Ellis
          P. O. Box 2843
          Accra - Ghana.

          Telephone: 024-353536, 777790

This is the document referred to in the Oaths of K. Vetter and marked A J K Sworn on this 4th day of De.... 20...

to commence preparations for the establishment of the proposed St. Luke School of Medicine at Cape Coast, Ghana, subject to modifying its proposed programmes and syllabuses in accordance with comments of the National Accreditation Board.

Exhibit C page 44



3.   Under the Interim Authority the Board of Trustees:

    i)    may commence or continue the assembly of academic resources (including Finances, Teaching and non-teaching Staff, Library Services, Buildings and Equipment) appropriate to and adequate for the proposed academic programme(s) to be conducted at the School which have been or can be procured and the manner in which these will be maintained on a long terms basis,

    ii)    may commence or continue the development of physical facilities in conformity with the National Accreditation Board's Standards for Physical Facilities for Tertiary Institutions in Ghana,

    iii)    will come up with a time table indicating steps expected to be taken in the next three (3) years towards the realisation of the aims and objectives for which the School is to be established.

4.   The School can only advertise for students after the National Accreditation Board has given it explicit permission to do so after due consideration of reports submitted to the National Accreditation Board by appropriate panels appointed by NAB to assess the physical, financial, human and other relevant resources for the proper operation of the proposed Medical School.

    Thank you.

Yours faithfully,

N. KOTEY
EXECUTIVE SECRETARY

THE CHAIRPERSON
THE BOARD OF TRUSTEES
ST. LUKE SCHOOL OF MEDICINE
AT CAPE COAST
C/O DR. S. FIFI ELLIS
P. O. BOX 2843
ACCRA.

**Exhibit C page 45**

Email to St. Luke School of Medicine at Cape Coast                    http://www.stlukeschool.net.hosting.pacbell.net

# EXHIBIT 'B'                    9

## St. Luke School of Medicine at Cape Coast

### Cape Coast, Ghana, West Africa







**Curriculum**



**Faculty**

**Admissions Information**

**Tuition and Fees**

**Email**

**Home**

St. Luke School of Medicine is a private medical school accredited in both the Republic of Ghana and the Republic of Liberia, in West Africa. The Basic Science campus is located in Cape Coast, Ghana. It was established in June 1998 and accredited in January 1999 in Ghana, and August 2000 in Liberia. St. Luke's is registered with the World Health Organization in Geneva, Switzerland. Students and graduates of St. Luke's will be eligible to take the United States Medical Licensing Examination (USMLE), administered by the Educational Committee for Foreign Medical Graduates (ECFMG). St. Luke School of Medicine schedules three semesters each calendar year, each called a trimester. The trimesters are scheduled to begin the second or third Monday of January, May, and September, each year. Clinical science students can begin rotations on any working Monday at any time of the year.

St. Luke's offers a medical curriculum only. The medical curriculum is an nine or ten trimester, 140-152 week, curriculum leading to Doctor of Medicine degree.

St. Luke's also offers a medical curriculum online for students with previos advanced training in medical related fields. The online curriculum is similar to the onsite courses with a few exceptions: There are biweekly online examinations; online students must keep up with their course workload, grades, and schedule; any student falling behind will be removed from this program and be required to study onsite. The first online course will be presented in May 2001, starting with Human Anatomy. All online

4/26/01 9:03 AM

f2

Exhibit C page 46

students must have their own computers, Quick Time, and Netscape 4.0. Click on the Online Course link, below, for more information about this opportunity.


*St. Luke School of Medicine at Cape Coast*
*PHONE: 323-293-6575*
*FAX: 323-293-6036, E-FAX 801-751-1477*
*E-mail:*
*scommand@pacbell.net*
*stlukesom@instruction.com*
*Information Office:*
*P.O. Box 8390*
*Los Angeles, CA 90008*


Curriculum | Faculty | Admission Information | Tuition and Fees
View Cape Coast Campus | View News Articles about SLSOM
Email | Home | Online Courses | Download Brochure or Application
Two Days Experience at a Refugee Camp in Ghana

f2

4/26/01 9:03 AM

**Exhibit C page 47**



# Curriculum

## General Information

### Curriculum

General
Information

Pre-Medical
Curriculum

Basic Sciences

Clinical
Sciences

Community
Service





St. Luke School of Medicine provides a written curriculum for both basic and clinical sciences. The curriculum is provided to each student on enrollment. It is based on the United States Medical Licensing Examination as defined in the Content Description for Step 1, Step 2 and the Clinical Skills Assessment Examination (CSA). Additionally, St. Luke School of Medicine adheres to the requirements defined by the National Accreditation Board for Tertiary Institutions of Ghana, the Medical and Dental Council of Ghana, and the Business and Professions code for medical schools, defined by various States in the United States, which are members of the Federation of State Medical Boards of the United States.

Curriculum | Faculty | Admission Information | Tuition and Fees
View Cape Coast Campus | View News Articles about SLSOM
Email | Home | Online Courses | Download Brochure or Application
Two Days Experience at a Refugee Camp in Ghana

4/26/01 9:05 AM

Exhibit C page 48

St. School of Medicine at Cape Coast Online Basic Science Courses        http://www..stlukeson..edu.nosting.paobel..net/docs/online.htm



St. Luke
SCHOOL OF
MEDICINE

# Curriculum

## Basic Sciences

Curriculum

General
Information

Pre-Medical
Curriculum

Basic Sciences

Clinical
Sciences

Community
Service

Most of the Basic Science courses will also be online. The online courses are only available to students with advance training or experience in medical related fields. Most of the students accepted into the online program have Masters or Doctorate degrees. Students without advance training or experience in medical related fields need not apply for the online courses. Enrollment is limited, so applications should be sent as soon as possible.

The online courses utilize the same written curriculum as the onsite courses. The only differences are:

1. The online courses have biweekly examinations online.

2. Online students must keep up with the more rigoruous curriculum requirements, grading, and schedule.

3. Online students who do not keep up with their assignments or grades will be removed from the online program and must attend onsite basic science courses.

Online students should be equipped with Netscape 4.0 and Quick Time 4.0 and must sign an Online Participation Agreement with St. Luke School of Medicine.

Some scheduled attendance at the Cape Coast is required. Students may be required to verify their learning experience with visits to the Cape Coast campus biannually for onsite examinations for one week each. Additionally, at least one month is required to complete the fourth semester courses not presented with online course work. The courses available online are listed below. The online course will begin with Human Anatomy in May 2001.

3

4/26/01 9:09 AM

Exhibit C page 49

| TRIMESTER 1 (520 hours) | TRIMESTER 2 (480 hours) |
|---|---|
| Human Anatomy (200 hours) | Medical Biochemistry (160 hours) |
| Human Neuroanatomy (80 hours) | Medical Genetics (60 hours) |
| Histology & Embryology (80 hours) | Microbiology and Immunology (80 hours) |
| Human Physiology (160 hours) | Parasitology & Tropical Medicine (40 hours) |
| | General Pathology (100 hours) |
| | Biostatistics and Medical Writing (40 hours) |

| TRIMESTER 3 (460 hours) | TRIMESTER 4 (440 hours) |
|---|---|
| Systemic Pathology 1 (100 hours) | Systemic Pathology 2 (120 hours) |
| Pharmacology (160 hours) | |
| Behavioral Science (120 hours) | Epidemiology & Preventive Medicine (80 hours) |
| Child/Drug Abuse/Human Sexuality (40 hours) | Nutrition (40 hours) |

Students enrolled in the online program must purchase additional course materials at their own expense. They may have to purchase the Computer-Aided Learning software that is available at the Cape Coast campus.

If you have questions about your experience and would like an evaluation for the online program, please email your curriculum vitae or resume to SLSOM before you formally apply, with a return email address, fax or telephone number. You can contact SLSOM through one of the coordinates, below:

P.O. Box 8390, Los Angeles, CA 90008, USA

Telephone: +1-323-293-657, Fax: +1-323-293-6036, E-fax: +1-801-751-1477

E-mail: scommand@pacbell.net



# Africa At The Millennium
### A Cable TV Show about Africans and African-Americans

**HEALTH**

## Ghana-America Pact Starts New Era of Heal
### By Dr. Jerroll Dolphin and Dr. Ezekiel Mobley

Home

Mission Statement

Television

News

Travel

Music

Health

International

Business

Society

Women

On-Line Shopping

About The Host

**Contact Us**

E-Mail:
ECMglobal@aol.com
☎Phone/Fax: 323
937-7387
P. O. Box 360708
Los Angeles, CA
90036-1255



Figure 1. Dr. T.W. Harris and Dr. Jerroll Dolphin treating patients at the Liberian Refugee Camp, October 1998. this is an example of the kind of "refugee" medical treatment that students from the St. Luke School of Medicine are trained to provide.



Figure 8. The Kwame Nkrumah building is in the background, far right. In the foreground is one of the two adjacent buildings leased by SLSOM. It is yet unnamed.

S everal years ago it was only a drea
school/teaching hospital. staffed by an in
of physicians and nurses with the goal t
health care, training and research in Gh
West Africa. The dream was realized, i
at the St. Luke School of Medicine (
Coast, Ghana. Next month, in Novemb
school will graduate its premier class of
a full four year academic program

The modern state of Ghana was known du
colonial period as the "gold coast," in rec
role in the exportation of the precious met
current population of nearly 20 million pe
located on the coast of West Africa is a m
stability. Yet, the provisions of health car
people remains a daunting problem. This
magnified by refugees who flee to Ghana
Leone and neighboring Liberia.

"We have begun a bright, new era in creat
delivery systems to benefit the people of
Liberia," said Dr. Jerroll Dolphin, Preside
School of Medicine." Now we can truly
areas of modern treatment and research in

During the past three years, Dr. Dolphin o
monitored teams of physicians and nurses
medical relief projects in West Africa. Th
often involve treatment of HIV/AIDS, tub
malaria, diseases widespread among refug
political turmoil in nearby Liberia. Dr. D
Mobley held recent talks with senior offic
King/Drew Hospital and School of Medic
public healthcare facility in Los Angeles.

These initial discussions are the basis for i
far reaching role for King/Drew in HIV/A
strategies in Ghana and Liberia. for years
has developed similar activities in other p
Moreover, coordination of methodologies
Luke and King/Drew in West Africa woul
training for medical students based in the
would receive credit for additional trainin
Liberia.

Programs such as these will dramatically i
health infrastructure in West Africa, in th
provide extremely valuable training for U

f 2

4/26/01 9:06 AM

Exhibit C page 51

provide extremely valuable training for U
students.  Setting a an example for Ghana
partnership, final approval was granted by
medical authorities for the St. Luke Schoo
to begin operations on January 18, 1999.
information, see the link for the St. Luke
Medicine:  http://stlukesom.edu.hosting.p

#END#

[ Home ]

Copyright © 2000 Africa At The Millennium. All rights reserved.
Revised: March 21, 2001

4/26/01 9:06 AM

**Exhibit C page 52**

uke School of Medicine: Admission Information: Transfer Students http://www.stlukeson.edu.hosting.pacbell.net/docs/transfer_stud.htm



# Admissions Information

### Transfer Students



Admissions
Information

Educational
Requirements

Pre-Application
Consultation

Transfer
Students

Admission
Application

Check List

Students transferring from medical schools listed by the W.H.O. may be given convalidation of similar St. Luke School of Medicine courses. Transfer students need to complete a minimum of one academic year (two trimesters) in order to graduate from St. Luke School of Medicine, providing they have completed all other courses. Transfer students should submit with their applications copies of their medical school brochures and course syllabi to facilitate the convalidation process.

**Note:** All convalidations are evaluated on an individual basis, and are dependent on many variables, too numerous to delineate in this brochure.

The convalidation policy of St. Luke School of Medicine curriculum is subject to change. However it will not affect those students who were enrolled in St. Luke School of Medicine at the time when the rules were enforced.

Curriculum | Faculty | Admission Information | Tuition and Fees
View Cape Coast Campus | View News Articles about SLSOM
Email | Home | Online Courses | Download Brochure or Application
Two Days Experience at a Refugee Camp in Ghana

f 1

4/26/01 9:08 AM

**Exhibit C page 53**



# Admissions Information

## Educational Requirements

### Admissions Information

### Educational Requirements

### Pre-Application Consultation

### Transfer Students

### Admission Application

### Check List



St. Luke's prefers students with a bachelor degree or higher. All Ghanaian and Liberian applicants will have to provide their examination scores and their university transcripts as well as a copy of their diploma(s). All applicants from other countries will have to provide the equivalent examination scores and copies of their diplomas. A minimum of ninety semester units, or its equivalent, is required for admission for US and Canadian applicants. Applicants without a bachelor degree should have sufficient premedical training comparable to that described below in St. Luke's guide for premedical training. A minimum grade point average of 3.0 on a scale of 4.00 is required for all applicants. Additionally, all Canadian basic science applicants and US will have to provide their Medical College Aptitude Test scores (MCAT) scores or its equivalent, starting in the year 2001.

All applicants should be able to show that they have completed high school and they have the proper university preparation in mathematics, chemistry, biology, physics, and English to begin medical training. We do not offer remedial courses in premedical subjects. Applicants who have bachelor, masters or Ph.D. degrees will have to show original documentation of their degrees and their curriculum. Applicants without the sufficient scientific preparation will be required to take the appropriate courses elsewhere prior to starting the medical school curriculum.

Computer proficiency is encouraged. Modern medicine is moving into the computer era. St. Luke School of Medicine is also moving into the computer age. The administration maintains a library of medical computer software as study and training aids. Our staff will provide this software on all computers maintained by St. Luke Bethesda that are provided for student usage. The software includes studies in anatomy, cardiology, gastroenterology, orthopedics, hematology, neurologic localization, medical diagnosis and clinical medicine; patient simulators which include software in acute cardiac and life support, chest pain management, cardiac arrhythmia's (V-tach, V-fib, pulseless assystole, electrolyte deficiencies and excesses, etc.), fluid and electrolyte management, acid-base balancing, respiratory

f2

4/26/01 9:05 AM

Exhibit C page 54

School of Medicine: Admis...ormation: Educational Requirements http://www.stlukesom.edu.hosting.pacbell.net/docs/educ_require.htm

analysis and management, emergency medicine protocols, and others.

**Falsification of any documentation will lead to permanent denial of admission or permanent expulsion from St. Luke - Bethesda School of Medicine.**

Curriculum | Faculty | Admission Information | Tuition and Fees
View Cape Coast Campus | View News Articles about SLSOM
Email | Home | Online Courses | Download Brochure or Application
Two Days Experience at a Refugee Camp in Ghana

Exhibit C page 55

School of Medicine at Cape...ion: Information: Transfer Student    http://www.stlukesom.edu.hosting.pacbell.net/docs/tuition_fees.htm



**St. Luke**
**SCHOOL OF**
**MEDICINE**

# Tuition and Fees

All fees are per trimester unless stated otherwise. All fees are in United States Dollars (U.S.D.).

Curriculum

Faculty

Admissions
Information

Tuition and
Fees

Email

Home

### Basic Sciences and Clinical Sciences (Ghanaian/Liberian)

| | |
|---|---|
| $100.00 | Application fee (one-time) |
| $600.00 | Matriculation fee (one-time) |
| $1500.00 | Tuition per trimester |

### Basic Sciences and Clinical Sciences (Non-Ghanaian, Non Liberian)

| | |
|---|---|
| $100.00 | Application fee (one-time) |
| $600.00 | Matriculation fee (one-time) |
| $2500.00 | Tuition per trimester (limited enrollment, call for details) |

### Online Basic Sciences

| | |
|---|---|
| $2000.00 | Per Semester Fee in addition to regular tuition (limited enrollment) |

**Payments of Tuition and Fees can be made with MASTERCARD or VISA. TUITION AND FEES ARE SUBJECT TO CHANGE**

Curriculum | Faculty | Admission Information | Tuition and Fees
View Cape Coast Campus | View News Articles about SLSOM
Email | Home | Online Courses | Download Brochure or Application
Two Days Experience at a Refugee Camp in Ghana

1

4/26/01 9:04 AM

Exhibit C page 56





**St. Luke**
SCHOOL OF
MEDICINE

# Curriculum

## Clinical Sciences



### Curriculum

General
Information

Pre-Medical
Curriculum

Basic Sciences

Clinical
Sciences

Community
Service

The last five trimesters, ninety-six (96) weeks consists of sixty (76) weeks of core clerkships (Internal Medicine, Obstetrics and Gynecology, General Surgery, Pediatrics, Family Medicine, Psychiatry, Emergency Medicine and Community Medicine), and twelve (20) weeks of electives.

The purpose of the clinical sciences curriculum is to train the medical student to apply the concepts and principles that are important in health and disease and that constitute the basis of safe and effective patient care. As stated by the USMLE, St. Luke's goal is to provide the medical knowledge and understanding of clinical sciences considered essential for the providing patient care under supervision, including emphasis on health promotion and disease prevention. Our curriculum for clinical science rotations is centered on the Content Description for USMLE Step 2 and the Clinical Skills Assessment Examination given by the Educational Commission for Foreign Medical Graduates.

Clerkships are available for students for all clinical science students in Ghana. Transfer students are also permitted to do clinical rotations in Ghana. Additionally, all students who can obtain visas for entry into the United States are encouraged to do at least two semesters of clinical rotations in United States hospitals. As of January 2000, clinical rotations will only be available in Ghana and the United States.

Exhibit C page 57

| Internal Medicine | 12 weeks |
| Obstetrics and Gynecology | 08 weeks |
| General Surgery | 12 weeks |
| Pediatrics | 08 weeks |
| Family Medicine / Primary Care / Preventive Medicine | 06 weeks |
| Psychiatry | 06 weeks |
| Clinical Pathology (including intro to autopsy) | 04 weeks |
| Emergency Medicine | 04 weeks |
| Radiology | 04 weeks |
| Community Medicine (offered in Ghana only) | 12 weeks |
| ELECTIVES: any combination of the above rotations with 4 weeks minimum except the last rotation. Twelve (24) weeks total. | 20 weeks |
| Surgery Subspecialties | 04 weeks (min.) |

General Surgery, Neurosurgery, Orthopedic Surgery, Urology, Ophthalmology, Plastic Surgery, Oncology Surgery, Obstetrics and Gynecology, Pediatric Surgery, Cardiothoracic Surgery, Ear Nose and Throat, Transplant Surgery, Maxilofacial Surgery, etc.

| Internal Medicine | 04 weeks (min.) |

Endocrinology, Cardiology, Neurology, Hematology, Oncology, Gastroenterology, Pneumology, Dermatology, Infectious Diseases, Preventive Medicine, Immunology, Epidemiology, etc.

| Pediatrics and subspecialties | 04 weeks (min.) |

Pediatrics, neonatology, pediatric surgery, pediatric oncology, etc.

| Psychiatry and subspecialties | 04 weeks (min.) |
| Family Practice and subspecialties | 04 weeks (min.) |
| Community or Preventive Medicine | 04 weeks (min.) |
| Rehabilitation Medicine | 04 weeks (min.) |

Each student in clerkship will be required to submit a two-page report on specific medical pathology, epidemiology, signs & symptoms, diagnosis, and treatment, each two weeks. The topics are provided by St. Luke administration and they are based on the contents of the USMLE Step 2 Content Outline, and the USMLE CSA

3

4/26/01 9:09 AM

Exhibit C page 58

Content Outline. The purpose of these reports are two-fold:

1. The reports will help the student in his/her preparation for the USMLE Step 2,
2. The reports will help provide information that may be used to help other students prepare for the USMLE Step 2.

All reports will be kept at the school office and/or on-line and each will be available for students and administrators of the school for review, if needed.

Clinical Science students are required to participate in clerkships from six to eight hours daily. Additionally, there will be lectures and USMLE Part 2 and CSA reviews scheduled weekly where attendance is mandatory. The lectures are given by specialists in their fields and are to supplement the knowledge and experience they acquire doing their clerkships. The purpose of the USMLE Part 2 and CSA reviews is to prepare each student with the information they need to pass the USMLE Part 2 and CSA examinations.

Curriculum | Faculty | Admission Information | Tuition and Fees
View Cape Coast Campus | View News Articles about SLSOM
Email | Home | Online Courses | Download Brochure or Application
Two Days Experience at a Refugee Camp in Ghana

4/26/01 9:09 AM

**Exhibit C page 59**

EXHIBIT 'C'

15

NATIONAL ACCREDITATION BOARD
P. O. BOX CT. 3256
ACCRA

NAB/A/02/PTE/114

31st October, 2001

THE CHAIRPERSON
THE BOARD OF TRUSTEES
ST. LUKE SCHOOL OF MEDICINE
AT CAPE COAST
C/O DR. S. FIFI ELLIS
P. O. BOX 2843
ACCRA-GHANA.

Dear Sir,

### ADVERTISEMENT OF ST. LUKE SCHOOL OF MEDICINE AS AN ACCREDITED INSTITUTION IN GHANA ON THE INTERNET

Our attention has been drawn to your advertisement on the internet on the establishment of a St. Luke School of Medicine as a Medical School located at Cape Coast allegedly accredited in Ghana by the National Accreditation Board (NAB).

Our records show that NAB gave a letter of Interim Authority reference number **NAB/A/PTE/114 dated 18th January, 1999** (copy attached) to the Board of Trustees of the St. Luke School of Medicine at Cape Coast:

> **"to commence preparations for the establishment of the proposed institution at Cape Coast subject to modification in its programmes and syllabuses in accordance with comments of the National Accreditation Board".**

paragraph four(4) of the letter specifically stated that

> **"the school can only advertise for students after the National Accreditation Board has given it explicit permission to do so ...".**



Exhibit C page 60

Obviously NAB has not given the Board of Trustees any permission to admit students, we therefore demand that you take the necessary steps to correct that impression.  Also St. Luke School of Medicine has neither been accredited as an institution nor approved to offer any tertiary programmes.

We advise that you follow the normal procedure for accreditation and regularise the activities of the School.

Thank you.

Yours faithfully,

F.Y.O. AMOAH
DEPUTY EXECUTIVE SECRETARY

CC:  The Hon. Minister for Education
Accra.

Prof. D.A. Akyeampong
Chairman (NAB).

The President
Ghana Medical and Dental Council
Accra.

mot/st.luk

**Exhibit C page 61**

EXHIBIT D

## MINISTRY OF EDUCATION, YOUTH AND SPORTS



**REPUBLIC OF GHANA**

n case of reply, the
number and date of this
letter should be quoted:

My Ref. No:....DA287/354/01...

Your Ref. No:...............................

Ministry Branch Post Office
P. O. Box M 45
Accra

9th November, 2004



**THE EXECUTIVE SECRETARY
N. A. B
ACCRA**

## ST. LUKE SCHOOL OF MEDICINE AT CAPE COAST

The attached copy of letter dated October, 6, 2004 addressed to the Hon.
Minister on the above subject is forwarded to you for your urgent
response.

**RUBY A. BEECHAM MRS.
DIRECTOR, TERTIARY
FOR: MINISTER**



**Exhibit C page 62**

# FAIMER®

## Foundation for Advancement of International Medical Education and Research

3024 Market Street
4th Floor
Philadelphia, PA 19104-2685
USA

215-823-2268
215-386-9767
www.faimer.org

**PRESIDENT**
John J. Norcini, Ph.D.

**CHAIR**
James A. Hallock, M.D.

**VICE CHAIR**
Jordan J. Cohen, M.D.

**SECRETARY**
Donald O. Nutter, M.D.

**TREASURER**
Dennis M. Donohue, C.P.A.

**BOARD OF DIRECTORS**
Busharat Ahmad, M.D., F.A.C.S.
Sandra T. Barnes, Ph.D.
Jordan J. Cohen, M.D.
Joel A. DeLisa, M.D., M.S.
Richard R. Eakin, Ph.D.
N. Lynn Eckhert, M.D., Dr.P.H.
Thomas C. Gentile, Jr.
James A. Hallock, M.D.
Arthur Kaufman, M.D.
John B. Kostis, M.D.
John J. Norcini, Ph.D.
Donald O. Nutter, M.D.
Elizabeth O. Ofili, M.D., M.P.H.
Stephen I. Schabel, M.D.
Richard J. Schmid
Jamsheer Talati, M.B., B.S.
Douglas W. Voth, M.D.
Sharon Wood-Dauphinee, Ph.D.

October 6, 2004

Kwadwo Baah-Wiredu
Minister of Education
Ministry of Education
POB M45
Accra
Ghana

Re: St. Luke School of Medicine at Cape Coast

Dear Minister:

The *International Medical Education Directory* (*IMED*) provides an accurate and up-to-date resource of information about medical schools that are recognized by the government agencies in the countries where the medical schools are located. The agency responsible for this recognition in most countries is the Ministry of Health.

*IMED* is maintained by the Foundation for Advancement of International Medical Education and Research (FAIMER®), a non-profit foundation of the Educational Commission for Foreign Medical Graduates (ECFMG).

FAIMER has listed St. Luke School of Medicine at Cape Coast in the *International Medical Education Directory*, based on a prior listing by the World Health Organization in their periodical *Towards Unity for Health* in October 2000. The listing in stated instruction had begun at the medical school in September 1999. ECFMG has received applications for examination for students from St. Luke School of Medicine, and also has received copies of Doctor of Medicine degrees issued from the medical school in August 2001. Recently, however, we have received information that St. Luke School of Medicine may not be registered or accredited as a medical school in Ghana.

Consequently, we are writing to ask that you or a member of your staff write to FAIMER as soon as possible to provide the following information:

1.  Is the St. Luke School of Medicine at Cape Coast currently recognized by the government of Ghana for award of the Doctor of Medicine degree?

2.  On what date was recognition granted?

3.  If the St. Luke School of Medicine is not presently recognized by the government of Ghana for award of the Doctor of Medicine degree, was the

*FAIMER is a non-profit foundation of the Educational Commission for Foreign Medical Graduates that is committed to advancing international medical education.*

Exhibit C page 63

school previously granted recognition that has since been withdrawn?  If so, please state the effective dates of the period of previous recognition.

4. If St. Luke School of Medicine was never granted any form of recognition by the government of Ghana for award of the Doctor of Medicine degree, what was the reason for the request to the World Health Organization to list the school in their publications?

Your assistance is greatly appreciated.  If possible, please reply by fax to +215-386-9767.

Sincerely,

Carole Bede
Senior Research Analyst
*International Medical Education Directory*

Exhibit C page 64

EXHIBIT `E

NATIONAL ACCREDITATION BOARD
P. O. BOX CT. 3256
ACCRA

NAB/A/02/PTE/114

November 19, 2004

CAROLE BEDE
SENIOR RESEARCH ANALYST
INTERNATIONAL MEDICAL EDUCATION DIRECTORY
FOUNDATION FOR ADVANCEMENT OF
INTERNATIONAL MEDICAL EDUCATION AND RESEARCH
3624 MARKET STREET
4TH FLOOR
PHILADELPHIA, PA 19104-2685
U.S.A.

Dear Sir,

## RE: ST. LUKE SCHOOL OF MEDICINE AT CAPE COAST

Your letter dated October 6, 2004, on the subject above addressed to the Minister of Education has been referred to this Board for action.

We wish to respond to the specific questions raised by your Foundation as follows:

1. The St. Luke School of Medicine purported to be located at Cape Coast applied for and was granted Interim Authority on 18th January, 1999, to establish a Medical School. Specifically, under the Interim Authority, an institution could:

    i.   commence or continue the assembly of academic resources (including finances, staff, library services, building and equipment) appropriate to and adequate for the proposed academic programme(s) to be mounted at the institution,

    ii.  commence or continue the development of physical facilities in accordance with the norms specified in the "National Accreditation Board (NAB) Standards for Physical Facilities for Tertiary Institutions",

    iii. come up with a time table indicating steps expected to be taken in the next three years towards the realisation of the aims and objectives for which the institution is to be established, but

    iv.  **may neither advertise for nor admit students.**

Exhibit C page 65

The letter of Interim Authority expressly stated that the School could only advertise for students after the National Accreditation Board had given it explicit permission to do so.

2.  The Interim Authority granted to St. Luke School of Medicine on 18th January, 1999 was for a period of three (3) years. Effectively therefore, the said Authority became invalid after 17th January, 2002.

3.  From (1) and (2) above, the St. Luke School of Medicine never had any recognition from the Government of Ghana to admit and train students in Medicine, let alone award the Doctor of Medicine degree.

4.  --- Indeed, the School had no basis to apply for listing by the World Health Organisation. When it came to our attention that the School had advertised on the Internet in April 2001 (**copy of advertisement attached as Appendix "A"**) we wrote to demand that the authorities took steps to withdraw the said advertisement forthwith.

--- A copy of the letter from the President of St. Luke School of Medicine reacting to the concerns raised by the Board is attached as **Appendix "B"**.

In conclusion, we reiterate that the St. Luke School of Medicine at Cape Coast has not been granted accreditation to run any programme or award any degrees in Medicine in Ghana. It has, however, just submitted an application for accreditation to operate at a location in Accra but this application is yet to be considered.

Yours faithfully,

KWAME DATTEY
EXECUTIVE SECRETARY

CC:  The Hon. Minister
     Ministry of Education, Youth & Sports
     P. O. Box M.45
     Accra

     Attn.:  Mrs. Ruby A. Beecham
             Director, Tertiary Education

Mot/St.Luke.Hon.M.O.E.

2

**Exhibit C page 66**

EXHIBIT "F"

NATIONAL ACCREDITATION BOARD
P. O. BOX CT. 3256
ACCRA

NAB/A/02/PTE/114

September 14, 2004

THE PRESIDENT
ST. LUKE SCHOOL OF MEDICINE
C/O P. O. BOX M.241
ACCRA

Dear Sir,

## APPLICATION FOR ACCREDITATION

Your letter dated August 26, 2004 refers.

We have studied your documents and wish to make the following observations:

i.     The Board of Trustees of St. Luke School of Medicine was given
       Interim Authority to establish the School at Cape Coast;
       --- (copy of letter attached);

ii.    On October 31, 2001, the Board drew your attention to the impropriety
       of advertising the St. Luke School of Medicine on the Internet as an
       accredited institution in Ghana without authority and to demand that
       you took the necessary steps to correct that impression;
       --- (copy of letter attached);

iii.   The 3 year period that the Interim Authority allowed for establishment
       of the institution had lapsed since 2002 and, therefore, rendered the
       Interim Authority invalid;

iv.    The proposed St. Luke School of Medicine is assuming a substantially
       new form with its intended collaboration/partnership with the Valley
       View University College and this needs to be clearly defined.

Under the circumstances, therefore, the Board requests that you submit fresh
responses with respect to questionnaires on:

   ➢      Information for Institutional Accreditation;

Exhibit C page 67

> ➤   Financial Standing of Tertiary Institutions;
> ➤   Assessment of Libraries in Tertiary Institutions.

In addition, you would have to pay the relevant fees of $850.00 and $550.00 (or the cedi equivalences) for institutional visit and each programme accreditation respectively for the process of accreditation to commence.

Yours faithfully,

KWAME DATTEY
EXECUTIVE SECRETARY

Mot/st.luke.sch.accred.

Exhibit C page 68



## ST. LUKE SCHOOL OF MEDICINE
**Office of the President**
Information Office: 8516 11th Avenue, Inglewood, California 90305 USA
Telephone (323) 565-2725; Fax (323) 565-2724; E-Fax (323) 372-3757
Website: http://www.stluke.edu, E-mail: jdolphin@stluke.edu

November 9, 2004

KWAME DATTEY
EXECUTIVE SECRETARY
National Accreditation Board
Ministry of Education
P. O. Box CT 3256
14 Cantonments-Accra
Republic of Ghana
Tel. No.: 518630
Fax No. 518570
E-mail: nab@iiafricaonline.com.gh

Ref. No.: NAB J02/PTEI1, September 14, 2004

Sir,

Thank you for your letter referenced above.

It is our sincere wish to adhere to, in every detail, the rules and wishes of the Ghana National Accreditation Board. In this effort, I will respond to your statements to the best of my ability.

**Referencing i.**

i. The Board of Trustees of St. Luke School of Medicine was given Interim Authority to establish the School at Cape Coast;

> St. Luke School of Medicine acknowledges its failure to establish the School at Cape Coast. We do not want to make excuses for what transpired. We made five documented attempts to obtain financing for renovation of the Cape Coast campus based on inflated estimates we received from Ghana of $150,000 plus our estimated start-up costs of $135,000. It was not until after the three-year expiration date of our interim authority did we realize that we were duped regarding the startup costs, and that we realized we did not need a loan at all. If we did not get this false information on the renovation costs, we would have

Page 1 of 3

Exhibit C page 69



ST. LUKE SCHOOL OF MEDICINE
**Office of the President**
Information Office: 8516 11th Avenue, Inglewood, California 90305 USA
Telephone (323) 565-2725; Fax (323) 565-2724; E-Fax (323) 372-3757
Website: http://www.stluke.edu. E-mail: jdolphin@stluke.edu

started immediately because we had the money to renovate the Cape Coast site, both then and now.

We apologize to the National Accreditation Board for our gullibility at that time. We apologize for any embarrassment it may have caused. We will not fall victim to this kind of deceit again, as we have reliable partners in Ghana again.

**Reference ii.**

ii. On October 31, 2001, the Board drew your attention to the impropriety of advertising the St. Luke School of Medicine on the Internet as an accredited institution in Ghana without authority and to demand that you took the necessary steps to correct that impression;

St. Luke School of Medicine removed all known, obvious, and visible references to Ghana accreditation from the site at the request of the National Accreditation Board. No known references to accreditation in Ghana are included on St. Luke School of Medicine's web site on the Internet. We have publicly admitted we are not accredited in Ghana on the Internet, and we do not have any Ghana registered students.

After my many consultations at the National Accreditation Board in the past 2 years, I am fearful of even the slightest mention of Ghana on the Internet.

St. Luke School of Medicine has a large web site of over 5000 files, pictures, and videos. The SLSOM web site contains over 1 billion bytes of information. If there is any mention of accreditation in Ghana, it is unintentional and inadvertent. We do not intend to mislead anyone.

**Reference iii.**

iii. The 3-year period that the Interim Authority allowed for establishment of the institution had lapsed since 2002 and, therefore, rendered the Interim Authority invalid;

St. Luke School of Medicine acknowledges the 3-year period of interim authority, since 1999 through 2002, has expired.

Exhibit C page 70



## ST. LUKE SCHOOL OF MEDICINE
### Office of the President
Information Office: 8516 11th Avenue, Inglewood, California 90305 USA
Telephone (323) 565-2725; Fax (323) 565-2724; E-Fax (323) 372-3757
Website: http://www.stluke.edu, E-mail: jdolphin@stluke.edu

**Reference iv.**

iv. The proposed St. Luke School of Medicine is assuming a substantially new form with
its intended collaboration/partnership with the Valley View University College and this
needs to be clearly defined.

> The responsibilities of each entity regarding the collaboration will be delineated
> in an amendment to the original application to the NAB for Valley View
> University-St. Luke School of Medicine.

Under the circumstances, therefore, the Board requests that you submit fresh responses
with respect to questionnaires on:

- Information for Institutional Accreditation;
- Financial Standing of Tertiary Institutions;
- Assessment of Libraries in Tertiary Institutions.

> St. Luke School of Medicine received these questionnaires and the response
> submitted 8 November 2004 to the National Accreditation Board.

> St. Luke School of Medicine has paid $866 toward the accreditation process.
> We will pay the remaining fees as we go through the accreditation process, step-
> by-step.

We thank the National Accreditation Board for its assistance and advice in this process.

Thank you, sincerely,

Jerroll Dolphin, M.D.
President
St. Luke School of Medicine

Page 3 of 3

**Exhibit C page 71**

EXHIBIT 'H'

NAB/A/02/PTE/114

April 18, 2005

THE PRESIDENT
ST. LUKE SCHOOL OF MEDICINE
P. O. BOX M.241
ACCRA

Dear Sir,

## ACCREDITATION OF ST. LUKE SCHOOL OF MEDICINE

At its 4th Meeting held on 14th April, 2005, the Accreditation Committee of the National Accreditation Board (NAB) approved the recommendation that:

- St. Luke's School of Medicine be granted **a three (3)-year Authorisation with effect from April 18, 2005** to continue its preparations for accreditation.

The School is, therefore, requested to pay $1,500 (or its cedi equivalent) for the Certificate of Authorisation to be issued.

Yours faithfully,

KWAME DATTEY
EXECUTIVE SECRETARY

Mot/st.luke.sch.accred.

This is the document referred to in the Oaths of ... marked ... sworn on this ... day ... me ... 200.

Exhibit C page 72



REPUBLIC OF GHANA

## NATIONAL ACCREDITATION BOARD
### (Ministry of Education)

## INTERIM AUTHORISATION TO ESTABLISH A TERTIARY INSTITUTION
### (L.I. 1700, Regulation 6(1))

## 9TH NOVEMBER 2004

In response to the application dated.................................................................................Interim

authorisation is hereby given to **DR. JERROLL DOLPHIN, P. O. BOX M 241, ACCRA**

*Name and Address of Applicant*

## 021 682439                                              021 682438

Fax No.............................................                Tel No...........................................

E-mail Address.................**info@stluke.edu**..................................

to commence preparations for the establishment of a new Tertiary Institution to be known as........

## ST LUKE SCHOOL OF MEDICINE - GHANA

2. Under the interim authorisation...... **DR. JERROLL DOLPHIN**

*(Name of applicant)*

    (i)  may commence or continue the assembly of academic resources (including finances, staff, library services, building and equipment) appropriate to and adequate for the proposed academic programme to be conducted at the institution,

    (ii)  may commence or continue the development of physical facilities in accordance with the norms specified in the "National Accreditation Board (NAB) Standards for Physical Facilities for Tertiary Institutions",

    (iii)  will come up with a time table indicating steps expected to be taken in the next three years towards the realisation of the aims and objectives for which the institution is to be established, and

    (iv)  may neither advertise for nor admit students.

3. The interim authorisation is valid for three years with effect from the.........day of.......**18TH APRIL 2005**

CERTIFICATE NO. NAB/IAU/   0000029

                                                *Executive Secretary*

                                NATIONAL ACCREDITATION BOARD

*This certificate remains the property of the National Accreditation Board (Ministry of Education) and must be surrendered on demand.*

Exhibit C page 73

CONFIDENTIAL

NATIONAL ACCREDITATION BOARD (NAB)
ACCREDITATION PANEL REPORT

ON     DOCTOR OF MEDICINE (MD)     PROGRAMME/COURSE
NEW PROGRAMMES/COURSES

NB:   (To be completed by the accreditation panel members after the end of an accreditation exercise)

A.    Name of Institution: ... .St Luke's School of Medicine .......

B.    Name of Department/Unit/Faculty/School/College in which the Programme/Discipline/Course is offered:  The Basic Sciences, Microbiology/Physiology/Anatomy/Biochemistry/Pathology/Pharmacology

C.    Programme/Discipline/Sub-Discipline/Course  for  which  accreditation  is  being sought. The MD programme but with emphasis on the Basic Sciences

D.    Date of the Accreditation visit:    From...29th November 2007.......

                                         To: ...30th November 2007.........

Summary of Panel's findings:

1.1    Philosophy and objectives of Programme /Discipline/Sub-Discipline

       i. (Please comment on adequacy of philosophy and objectives in so far as they give guidance to teachers to produce the right kind of manpower in the particular area).

       Although the a philosophy of the School is quoted in a mission statements as being to "improve the health care systems in Africa by training physicians to give superior and humane medical care to people living in under-privileged areas in Africa, the programme is modelled to train and provide doctors for the American market.

**Exhibit C page 74**

ii.  Are there any sub-divisions of programmes or specialists? (i.e. BSc Administration, Accounting, HRM) for which degree will be awarded).

N/A

1.2     The Curriculum
i.   Is it adequate and appropriate for the level of programme?

There is a discrepancy between the Curriculum provided and the outline of the plan of lectures.   Copies of the detailed course outline were not provided as hard copies. We were referred to the website of the school for the details. The programme is to be run like an "Assembly Line". This involves 3 sessions in a calendar year.  Each Academic year would be made up of two sessions.  The School would have a new intake at the start of every session.   At the end of the first year there will be 3 different classes, six at the end of the second year, 9 at the end of the third year and 10 at the end of the fourth year.

*Physiology:* The course outline is provided but the detailed course content is needed.

*Anatomy:*  The brochure provided by the School gave course outlines for Gross Anatomy, Histology and Embryology. However, details of course content were not given. A detailed description of the course content of gross anatomy, histology and embryology is needed to enable proper assessment of the adequacy and appropriateness of the anatomy curriculum.

*Biochemistry:* The course outlines in medical biochemistry, medical genetics and molecular biology are based on the content of the United States Medical Licensing Examination. This is not the best way to draw up a curriculum for medical training in Africa. If the Philosophy and the Objectives are taken seriously then the curriculum needs to be modified. We will need a more detailed description for proper assessment.

*Pathology:* The time allocated to Pathology, 80 hours for General Pathology and 240 hours (shared with Pathology Practical) for Systemic Pathology is adequate. Outline of the courses is satisfactory except that one would not put diagnosis and autopsies under General Pathology. The detailed syllabus of the three courses is not given.  I have difficulty understanding and following the on-line courses, which were expected to provide the details. In view of this no comment can be given on the adequacy and appropriateness of the content. The information on the on-line course site indicates that Jerrol B.R. Dolphin MD will be the main lecturer involved in teaching Pathology and the person to contact on any problem regarding the Pathology course. The impression one gets from the site is that the course has been written by Jerrol Dolphin MD. However, Jerrol Dolphin is

2

Exhibit C page 75

not listed as lecturer in Pathology but is responsible for school administration and program development and coordination and a Primary lecturer for Physiology.

i.  Please indicate inadequacies that should be rectified to improve the curriculum.

The time allotted to teaching does not allow for students to do self-tutoring.

It is also difficult to understand how the three intakes (students) a year will be possible especially as most of the lecturers are expatriates who are not domiciled in Ghana.

1.3   Admission Requirements
   i.   State published admission requirements
Admission requirements are clearly stated but there is some ambiguity about the relevance of some of the requirements e.g. "English in the under-graduate programme" and "Valid passport".

   ii.  Please comment on appropriateness of stated admission requirements

The requirements include those that would not normally be what a Ghanaian graduate would possess. Examples are GRE, MCAT. This again would suggest that there would be a bias for graduates from North America.

The policy on Transfer of students from and to other Universities is not well defined.

Minimum requirements are not clearly stated.

   iii. Please scrutinize tentative list of students to be enrolled if available. List the names of all unqualified students and state the deficiency with regard to each of them.

N/A

Exhibit C page 76

### 1.4    Academic Regulations

i.   Does the Institution have published academic regulations? **Yes**

ii.   Does the document sufficiently cover all academic activities of the institution?
**Yes**

iii.   What arrangements have been put in place to make the regulations available to students and staff?

**Not applicable yet**

### 1.5    Internal Course Assessment

a.   (i) Does the institution have an internal course assessment policy?

**Yes**

(ii) Please comment on coverage and mode of evaluation (if available), clarity and adequacy of marking schemes.
**Mode of Assessment not clear yet. The examination will mainly be MCQs.  The School will consider reviewing the planned mode of examination to add an essay component**

(iii) What does it entail? e.g. Essay type multiple type, questions, project work, viva voce, others (please specify)
**Mainly computer based MCQs**

(iv) What percentage will each category contribute in a given examinations eg. Essay type questions, project work, viva voce, others (please specify)
**This has not been stated yet**

b.   State the mix of levels (i.e. Knowledge, Comprehension, Application, Analysis, Synthesis and Evaluation) of cognition at which the examination questions will be pitched.
**None available yet**

c.   State the names and qualifications of each proposed external examiner/moderator. (Indicating year and institution of acquisition of degree).

4

**Exhibit C page 77**

None available yet but it is not planned that there will be external moderation of the examinations

1.6     Practical Work (PW) /Field Trips (FT)

i.     Does the institution have a policy for practical work and field trips?
The program does not show practical schedules for any of the following areas

Physiology. There is a need to clearly state what practicals would be done in physiology and to come out with a practical schedule that will show how the laboratory space will be utilised.

*Anatomy* The brochure does not give any information on the curriculum of practical work in gross anatomy and histology. However, infrastructural provision has been made for practical work. It is advised that SLSOM should provide a clear statement of the programme for practicals in gross anatomy and histology.

*Pathology*
There is no information on how the Pathology practical course will be run. SLSOM should provide the information and state how many of hours allocated to Pathology will be given to this course.

*Biochemistry* No information on the biochemistry/ molecular biology/ molecular genetics practical work. Need to state clearly types of practical work to be done and for how long.

ii.     Please comment on relevance and adequacy to the programme.
Owing to the deficiencies noted above it is not possible to comment on the adequacy and relevance of the anatomy component of the programme.

iii.     Where not applicable state and give reasons?

iv.     What monitory schemes are in place?

N/A

**Exhibit C page 78**

1.7    **Supervised Industrial Attachment (SIA)/Vacation Training (VT)**

i.   Does the Institution have provision for supervised industrial Attachment Vocational Training?

**N/A**

ii.   Will students and the Industrial Institution be required to report on the SIA/VT?

**N/A**

iii.   Will the reports count in the overall assessment of the students?

**N/A**

iv.   Please comment on relevance and adequacy to the programme.

**N/A**

v.   Where not applicable state and give reasons.

**N/A**

vi.   What monitoring schemes are in place?

1.8   **Mandatory Courses**
The exigencies of the twenty-first century world demand that ALL students in tertiary institutions be given training in communicative skills and information communication technology.

i.   Is there any provision for such courses?
**No.  There is no provision for such courses.  The four-year Program is so packed that there is no provision for such mandatory courses**

6

Exhibit C page 79

i. How many contact hours are allocated to each?

1.9   Student Assessment of Course Content and Teaching
  i.  Is there any policy for students' assessment of course content and teachers?

There is NO policy in place

  ii.  Please comment on systems in place that enable students to assess the course content (CC) and the performance of teachers (T) formally and objectively (e.g. by the use of formats)

No plan appears to be in place yet for student evaluation of the teachers or the programme.

1.10   Peer and Professional Assessment of Course Content

  i  Is there any provision for Peer and Professional assessment of course content?

No

  ii.  How relevant and adequate is it?

## 2.00   EXAMINATIONS

2.1   Standard of Questions

Please base assessment on review of sample examinations and tests, continuous assessment and clarity of sample questions set for the past three years, syllabus coverage at the appropriate level, and relevance for Ghanaian situation.   Highlight factors that may improve the quality of students' performance.

Not applicable yet

2.2   Marking Schemes
  i.  Does the programme have any policy on marking scheme?

Not applicable yet

Exhibit C page 80

    ii.  Please comment on clarity and adequacy of sample marking schemes.

**Not applicable yet**

2.3    **Project Work /Long Essay**

In the case of new programmes base comments on discussions with teachers at post on PW & FT, if there are no sample marking scheme.

2.4    **Moderation /External Examination System/Marking of Scripts**

    i.  Is there any policy on external moderation and marking of scripts?

    ii.  **No plans have been made to involve external examiners. The Program will rely heavily on the USMLE Steps 1 and 2**

    iii.  Please comment on the proposed involvement of external examiners/moderators in the examination process. Please attach a list of proposed external examiners/moderators together with their CVs which must include their qualifications (stating when and where obtained)

8

Exhibit C page 81

1.0    STAFFING

3.1    Teaching Staff

a.    Provide Data on Academic Staff by Highest Qualification:

A list has been provided for physiology but none of the lecturers stated has been appointed yet. (a list is attached).

Two Professors of Anatomy have been listed but they are not on the ground yet. Their CVs were not available for perusal.

The two Professors whose names appear under Biochemistry are the same Professors listed under medical genetics; we will need their CVs. No teachers listed for Molecular biology!!

| Highest Qualification | No. of Staff | | |
|---|---|---|---|
| | Full -Time | Part -Time | Visiting |
| PhD | | | |
| MPhil | | | |
| MA/MSc (researched degree) | | | |
| MA/MSc | | | |
| BA/BSC | | | |
| Other(specify) | | | |
| Total | | | |

b.    Provide Data on Teaching Staff by Rank

| Rank | Full -Time | Part -Time | Visiting |
|---|---|---|---|
| Professors | | | |
| Associate professors | | | |
| Senior lecturers | | | |
| Lecturers | | | |
| Tutors | | | |
| Others (specify) | | | |
| Asst. lecturers | | | |
| Others (specify) | | | |
| Total | | | |

c.    Please collect list of Academic and Professional staff showing their qualification(s) as well as the institution and the year in which it was obtained.

Exhibit C page 82

d.    The minimum number of teaching staff per programme is six (6)

NB:    Please comment on adequacy of teaching staff, (stating total required and staff-at-post, full-time and part-time and visiting lecturers.  State staff-student-ratio for the programme)

**There is no teaching staff at post**

## 3.2    Teaching Load

Please comment on the actual teaching load per teacher per week (see page 16 of Form NAB/CPEF)

**Not applicable yet**

## 3.3    Staff-Student Ratio (SSR)

**Not applicable yet**

Comment on vis-à-vis the NCTE Norms i.e.:

| | |
|---|---|
| a. Administration | 18 :1 |
| b. Agriculture | 12 :1 |
| c. Arts | 18 :1 |
| d. Education | 20 :1 |
| e. Engineering /Technology | 12:1 |
| f. Environmental Studies | 12:1 |
| g. Law | 18:1 |
| h. Medicine /Dentistry | 8:1 |
| i. Pharmacy | 12:1 |
| j. Science | 12:1 |
| k. Social Science | 18:1 |
| l. Veterinary Medicine | 8:1 |
| m. Earth and Mineral Sciences | 12:1 |
| n. Nursing | 15:1 |
| o. Midwifery | 10:1 |

## 3.4    Research Output
a.    Please comment o quality and volume of staff research output in refereed journals, etc.

**Not applicable yet**

10

Exhibit C page 83

c.   What has been the institution's contribution to knowledge/National development since its establishment?

No: applicable yet

Provide list of staff publications in the past three (3) years such as

- Articles in Refereed Journal
- Books
- Scores (Music/Dance)
- Works of Art
- Others (Specify)

**Not applicable yet**

c.   State major research projects (National/International) undertaken by each staff

**Not applicable yet**

3.5   **Administration of Department /Unit Responsible for the Programme.**

NB:   Please comment on:
1.11  The qualifications, administrative experience and academic leadership capacity of the proposed head of department/unit responsible for the programme.

**No appointments made yet.**

1.12 State his/her highest academic (and professional) qualification in the relevant field/programme.

**Not applicable yet**

1.13. State his/her minimum administrative experience prior to being appointed Head).

**Not applicable yet**

3.6   **Non-Teaching Staff (Administrative Support)**
a.  Comment on adequacy (or excess numbers) and quality of non-teaching administrative support staff (all categories appointed or to be appointed) for the programme. Please attach list and summary table showing numbers by type of work (administrator, accountants, secretaries etc).

**Not available yet**

Exhibit C page 84

**Non-Teaching Staff (Technical Support)**

b. Comment as in (a) above appropriate designations (such as technologists, technicians, laboratory assistants etc) should be used.  Please state additional staff required if necessary.  Indicate superfluous staff (if any).

**Not available yet**

3.7   **Staff Development (SD)**
Is there any policy on staff development?

**There is no policy on Faculty development**

If yes, please comment on:

i.   The scheme for both teaching and non-teaching staff, stating among other things, its coverage eg study-leave for higher qualifications, attendance at workshops, conferences, and seminars at which papers would be read etc.

**The School plans to employ people with the highest qualification, so no plans have been made for those who would want to obtain higher qualification.  Provision has however, been made for in-service training.**

ii.   What percentage of recurrent vote is earmarked for SD?

**Figures have not been decided yet?**

4.0   **Students**
i.   Please state the projected total student load per week for Full-time (FT) and Part-time (PT) students.

**The time-table looks packed.  Students are expected to have a 40 hour week**

4.1   **Students Enrolment by Programme and Year of Study**

i.   Please state projected enrolment schedule by sub programme for the next five (3) years.

**With the projected intake of 45 students every trimester, the total number of students per year would be 135 and for the three years the total will be 405 with each session of 45 at a different stage of the programme.**

ii.   Please state projected staff-student ratio for each programme.

12

Exhibit C page 85

Not yet defined since the staff numbers are not certain yet

5.0   PHYSICAL FACILITIES

5.1   Laboratory space and equipment, workshop space and equipment, staff offices

Please comment on the state and adequacy of physical facilities available for students and staff involved with the programme, the sizes of the facilities vis-a-vis the NAB Standard for Physical Facilities and Equipment.

*Physiology:* There is a laboratory which, will be used for physiology, biochemistry and pharmacology. For a class of 45, the space is adequate. However the nature of the programme at SLSOM suggests that time-tabling would be a problem. There is a need to equip the laboratory with modern equipment. Most of the microscopes which were on display were field microscopes with no light source.

*Anatomy:* The room designated as GROSS ANATOMY LABORATORY is rather small. It cannot accommodate even three dissection tables. It is not big enough to accommodate 45 students. There is:
- no provision for additional ventilation. This is necessary because of the build-up of formalin fumes that inevitably occurs during dissection
- no floor drainage to take care of the inevitable spills that occurs during transfer of cadavers from storage to dissection tables.
- no plumbing in the room and there are no hand washing facilities in the gross anatomy "lab"

The wooden tables the School intends to use as dissection tables are not suitable considering the corrosive nature of embalmed material.
The waste (sewage) from the gross anatomy lab must be safely disposed of. There is no provision for safe disposal. The school has not yet applied for permit to receive and store cadaveric material

*Pathology.* The room intended for Pathology Laboratory requires physical changes, which have been discussed with the President of SLSOM. In particular, the Microbiology and Pathology laboratories require preparation rooms. The preparatory room for microbiology should have a microbiological safety hood/cabinet fitted with external exhaust fitted with appropriate filters (not on list of equipment to be procured). A separate room for Pathology museum is required. No installations had been made in the two laboratories and therefore no comments can be made on the adequacy of installed equipment and other facilities. The room sizes when the physical changes are made should be enough for 30 to 40 students.
The School intends to use the Korle Bu Teaching Hospital for the autopsy practical but no formal approach has yet been made to the hospital

Exhibit C page 86

Space has been allocated for the practical classes in biochemistry, physiology, histology and embryology for 30 students; no laboratory fitting as yet. Office space provided for the Departments is inadequate. No store room for biochemicals/chemicals/ glassware and no provision for a preparation room.

5.2     Safety

a.    Fire - Please comment on fire safety provision and any consultations with the Ghana National Fire Service and electricity (National Grid/Generator).

There is a general lack of fire escape exits and fire extinguishers in all the buildings inspected. No fire warning systems installed in any of the laboratories especially in the microbiology laboratory where burners are expected to be used. The School has been advised not to use LPG gas cylinders in the laboratory but to install a central LPG gas storage tank outside the building and pipe the gas into the laboratory.

b.    Environmental Sanitation and Water Supply

Please comment on the state of environmental sanitation (particularly within the department/unit for programme), disposal methods for solid and liquid wastes, sources of drinking water (GWSC), well, rain water)

The environment is neat.   The source of water was the GWC and reservoir tanks.

The toilets in some areas of the buildings are inadequate for the number of projected students.

c.    Electricity Supply

Please comment on source of electricity supply

ECG is the main source of power.  No backup power provided yet.

d.    Health
Comment on facilities and/or arrangements in place to take care of staff and students who fall sick on the campus(es) of the institution.

No clear-cut plan put in place yet

14

Exhibit C page 87

6.0    Library

Please comment on

i     Space (including Reading Area)

The main library is at a very early stage of construction. The present space is inadequate to accommodate the projected number of students

ii.    Relevance and currency (up-to-dateness) of reference books, textbooks, journals and general books

There is a modest collection of Anatomy books and atlases. With the exception of the Atlases, the textbooks were rather dated. There is a need to provide newer editions and add more volumes on radiological anatomy, embryology

The coverage of Pathology books is good but they are few. Considering the way the Pathology courses fit into the whole programme, the books are not enough as two batches of students will be doing Pathology at any time. The number of each reference book should be increased.

Modest collection of recent Biochemistry books. Need to include medical biochemistry textbooks. No Journals and general

iii.   availability of reprographic equipment (e.g. photocopier) CD Rom, access to internet, others (specify)

l

Reprographic material is inadequate, Computers are old.  Internet access should be improved.

iv.    State qualifications and relevant experience of the institution (s) Librarian and other Senior Professional Staff.

No librarian available

7.0    Level of Programmes

(a)    Please state the level of the certificate/diplomas to be awarded to final year students vis-à-vis other National /recognized qualifications, such as under-graduate diplomas, first degrees, post-graduate diplomas, masters degrees, etc

(b)    Certification

Exhibit C page 88

i.  Please state the name and address etc of the institution that will examine an award certificates to students.

**Has not yet been determined but the School is more attracted to American Certification.**

ii.  Please attach a copy of the agreement with the named institution.

**8.0   Funding**

i.  Has the institution any bank account in its name? (Yes/No)

**Yes**

ii.  State the particulars of its bankers

**It is a local bank- The Trust Bank**

iii.  Are these confirmed by the bank statements examined by the panel?

**Bank Statements sent to the Panel by Mail**

iv. Please state amount of direct funds to be allocated to the programme

**The School is not sure of this yet.**
V.Does the department prepare budgets? Yes/No
   (Please inspect current budget)

**Not relevant yet since there are no departments.**

vi. Is there a funding gap between income and expenditure?  If yes, how significant is the deficit/surplus?

**Information not yet available**

vii.  Are the accounts audited? Yes/No
   (Please examine latest Audit Report and attach a copy).
**None done yet**

16

**Exhibit C page 89**

vii.  Please comment on the financial sustainability of the programme

It is not possible to determine this at the moment since the school has not started
functioning properly yet. There was no finance department and no financial
projections were made available. We need to see the business plan for the
school.


ix.  State sources of funding (including level of fees for each programme, and percentage (%)
contribution of each to total funding

So far, it appears as if fees will form the main source of funding. It will again be
difficult to say if this will be adequate as the level of salaries and the total work
force has not been determined.


x.  Endowment Fund
Does the institution have an Endowment Fund? No

Exhibit C page 90

## SUMMARY OF GRADING

Please grade the under listed using a scale of A (Excellent), B (Good), C (satisfactory), D (Poor).

| | | Grade |
|---|---|---|
| 1.0 | **Academic Content** | |
| 1.1 | Philosophy and Objectives | Not very clear.... |
| 1.2 | Curriculum | Not very clear.... |
| 1.3 | Admission Requirements | **Needs refining** |
| 1.4 | Academic Regulations | Very clear................ |
| 1.5 | Internal Course Assessment | Not well defined.......... |
| 1.6 | Practical Work/Field Trips | Not defined.......... |
| 1.7 | Supervised Vacation Training/ Industrial Attachment | N/A........................ |
| 1.8 | Arrangements for provision of Mandatory course in communication skills and communication information technology | None yet................ |
| 1.9 | Student assessment of Course Content and Teaching | N/A.............. |
| 2.0 | **Examination** | **Grade** |
| 2.1 | Standard of sample questions | None available yet........ |
| 2.2 | Sample Marking Scheme | No applicable yet........... |
| 2.3 | Projected Work/Loading Essay | None done yet |
| 2.4 | Arrangements for examinations | Not formalised yet |
| 2.5 | Arrangements for Certification | Not done yet........ |
| 2.6 | Credentials of Certificating Authority | None yet.............. |

Exhibit C page 91

| 3.0 | Staffing | Grade |
|---|---|---|

Arrangement for the appointment of qualified:

| | | |
|---|---|---|
| 3.1(a) | Teaching Staff – Full Time | Not clearly spelt out yet |
| 3.1(b) | Teaching Staff (Visiting Teachers) | Not clearly spelt out yet |
| 3.1(c) | Teaching Staff – Part-Time | Not clearly spelt out yet |
| 3.2 | Teaching Load per Teacher | Not clearly spelt out yet |
| 3.3 | Staff/Student Ratio | Not clearly spelt out yet |
| 3.4 | Research Output | None yet......... |
| 3.5 | Administration of Department (Head) | Not set up yet........ |
| 3.6(a) | Non-Teaching Staff (Administrative Support) | Poor................. |
| 3.6(b) | Non-Teaching Staff (Technical Support) | Poor............. ........... |
| 3.7(a) | Staff Development Scheme (Availability) | None |
| 3.7(b) | Staff Development Scheme (Implementation) | N/A...................... |

| 4.0 | **Physical Facilities /Equipment** | Grade |
|---|---|---|
| 4.1(a) | Laboratories – Space | **Inadequate** |
| 4.1(b) | Laboratories – Equipment | **Inadequate**................. |
| 4.2(a) | Workshop – space | **Inadequate**............... |
| 4.2 (b) | workshops – equipment | **Inadequate**.............. |
| 4.3 | Classroom | **Poor**................. |
| 4.4 | Office Accommodation | **Satisfactory**.............. |
| 4.5 | Safety | **Poor**.............. |
| 4.6 | Health | **Not set up yet** |
| 4.7 | Environmental Sanitation | **Satisfactory**.............. |

**Exhibit C page 92**

| | | Grade |
|---|---|---|
| 5.0 | **Library** | |
| 5.1 | Space (Including Reading Area) | **Room for library under construction** |
| 5.2 | Textbooks | **A few available** |
| 5.3 | Journals | **Non Available** |
| 5.4 | General Books | **Latest editions needed.** |
| 5.5 | Internet /CD Rom Facilities | **Below average...** |
| 5.6 | Reprographic Equipment (e.g. Photocopier) | **Inadequate...................** |
| 6.0 | Employment Prospects Of Students | **Good.........** |

| | | Grade |
|---|---|---|
| 7.0 | **Funding** | |
| | 7.1(a) Proposed Funding of Programme | **Fairly Adequate** |
| | 7.1(b) Proposed Level of Fees | **Affordable (Foreign Students)** |
| 7.2 | Endowment Fund | **Not available.....** |

8.0   Ethics Policy         ...........................

i.   Does the Institution have an Ethic Policy? **Yes a very comprehensive one**

ii.   How does it address the issues of staff-student relations?

**The policy clearly defines staff-student relations**

iii.   How does it address the issues of student-student relation?

**Student-student relation is also clearly defined by the policy**

iv.   Ethics in Research                 **No research is being done at the moment**

20

**Exhibit C page 93**

9.0    Other Remarks

(If any  including other relevant points that may not have been captured in this document)

The MD degree proposed by SLSOM could create confusion because the Ghanaian educational system views "MD" as an advanced (postgraduate) degree in medicine.

SLSOM does not have the status of a tertiary institution yet and therefore must be affiliated to an accredited tertiary institution in order to be able to award degrees.

SLSOM does not have a hospital where clinical rotations will be undertaken. Arrangements with a hospital accredited by the Medical and Dental Council as meeting the requirements for training medical doctors will have to be made.

Since no Ghana-based lecturers have been appointed, it is not clear who will handle the clinical rotations. If this will be handled by expatriate lecturers it is not clear what arrangements have been made with the Ministry of Health/Ghana Health Service for these lecturers to be employed/contracted by MOH/GHS.

The stair way in the main building is too narrow to be used as the main teaching area. The Program gives students no free time for recreation; in-fact, there is no facility for recreation.

Lease agreements/ financial arrangements need to be legally verified

The accommodation proposed to house their students is too far away from the teaching area.  It does not provide enough space for the students

10.0   Facts Sheet

Head of the institution should sign a facts sheet based o the state of affairs including (modified staff) enrolment (total male and female) per programme and year of study as at the time to the visit.

No

21

Exhibit C page 94

## Deficiencies

States below deficiencies identified and suggest remedies for the rectification of each of them.

| Deficiencies Identified | | Suggested Remedies |
|---|---|---|
| **ANATOMY** | | |
| Curriculum: | details of course content of gross anatomy, histology and embryology not given. | Spell out the course contents |
| | Practical programme  not given | Details of the practical scheduled for anatomy, histology and embryology to be provided. |
| Laboratories | Gross Anatomy Lab<br>- not big enough to accommodate proposed student intake<br>- poor design | - Increase laboratory space<br><br>- provide extractor fans, good lighting, good ventilation, floor drainage, hand washing facilities, waste disposal, suitable dissection tables, safety equipment |
| | - No Preparation Room | - Provide prep room for gross anatomy and histology labs |
| | - Equipment and materials | - provide cadaver storage facilities, teaching equipment ( eg white board, x-ray viewing boxes, histology slides, |
| Books | Text books - | -Provide current editions, & more textbooks on histology and embryology |
| **PHYSIOLOGY** | | |
| Curriculum: | Details of course content needed<br>Details of practicals needed<br>Appointment of lecturers and their presence in Ghana a full time staff | |

22

Exhibit C page 95

Laboratories   Lack of modern equipment

Books        Text books -

PATHOLOGY

| | |
|---|---|
| Curriculum | Details of the on-line programme should be provided and made clearer. The person in charge of the pathology programme should be clarified. Details of the content of practicals should be provided. The hours for theoretical and practical aspects of the programme should be spelt out. |
| Laboratories | Preparation rooms fitted with appropriate safety cabinet should be provided. Need for a museum. Not clear where museum specimens will be obtained from. If from Korle Bu then need to obtain assurance from hospital of absolute importance. Provide for external gas tank and gas piped into laboratory. |
| Books | Number of each recommended reference book to be increased. |
| Autopsy | Arrangement to use facility at Korle Bu or other hospitals need to be made. Assurance of use of such facility of utmost importance. |

BIOCHEMISTRY

| | | |
|---|---|---|
| Curriculum | There is the need to give details of the courses in biochemistry, molecular biology and medical genetics. Sequencing of the courses is important. | On-line programme should be made clearer. |
| | The types of practicals to be done | |

**Exhibit C page 96**

need to be stated.

No teachers for Molecular biology

**CONCLUSION**

On the basis of the information provided above, we do not think that St Luke's School of Medicine is ready for accreditation as a Medical School.

24

Exhibit C page 97

### REPORT AND RECOMMENDATIONS OF THE SUB-COMMITTEE SET TO RECONCILE SLSOM'S COMMENTS ON THE PANEL'S REPORT ON SLSOM'S APPLICATION FOR ACCREDITATION AT THE ACCREDITATION COMMITTEE'S MEETING OF MARCH 5TH 2008

**Members of the Sub-committee:**
**Prof. A.A. Adimado (KNUST, Kumasi)**
**Prof. Owusu Ansah (UCC, CapeCoast)**
**Dr. I.V. Oppong (UG, Legon)**
**Mr. John Dadzie-Mensah (NAB, Accra)**

At the Accreditation Committee's meeting of Wednesday March 5th 2008, it was concluded that the reaction of SLSOM to the Panel's report was quite voluminous and could therefore not be assessed at the said meeting. A sub-committee including Dr. Oppong, Professor Adimado, Professor Owusu Ansah and John Dadzie-Mensah was constituted to do a more thorough study of the Panel's report and SLSOM reaction and make recommendations to the committee to inform its decision on accreditation or otherwise. The Sub-committee was given the following specific tasks:

1. Review the report of the Panel of the Assessors of the programme of the St. Luke School of Medicine
2. Review the comments of the School against the original report as in (1) above and
3. Make recommendations to the Accreditation Committee
4. Any other relevant matter relating to the issue

The following summarizes the findings of the sub-committee in a corresponding order to SLSOM's comments on the Panel's report:

1. The Panel's assertion that *"........the programme is modeled to train and provide doctors for the American market"* is a good judgment based on the content of the objective statements of SLSOM. The fourth objective in SLSOM's response to the Panel's report states: *"to train physicians competently in basic and clinical sciences so they will have sufficient education and experience to pass the United States Medical Licensing Examinations BEFORE THEY GRADUATE".*

2. SLSOM may not have taken kindly to the description of their method for running the programme as "Assembly Line" by the Panel. This is a matter of interpretation. Whatever it is, the sub-committee reads strong business motive behind the method suggested by SLSOM. Although that is to be expected from a private institution, an overemphasis of the business orientation of the programme may result in an imbalanced consideration of possible operational challenges which would be detrimental to the philosophy of SLSOM. Although the sub-committee considers SLSOM's approach as an innovative one, it thinks it is inappropriate to have it adopted at the start of a demanding programme as medicine (which is an applied science requiring long period of apprenticeship). The model may be introduced later after some period of experimentation when SLSOM has become fully established. If SLSOM is to be

1

Exhibit C page 98

allowed to operate the system from the scratch then it must give an example of an institution that operates the model and an indication of its measure of success as a best practice. In addition, SLSOM would have to indicate whether or not any of its proposed resident faculty members has had an experience in working with the proposed model at a managerial level. The mentor institution of SLSOM must also indicate its acceptance of the model and indicate its adequacy for the award of its certificates to graduating students from SLSOM. This is more so because there is no indication as to which institution SLSOM is affiliated to.

3. SLSOM's intention to keep the programme running with full time resident professors and lecturers is well appreciated by the sub-committee. However, it would be important to know the anticipated minimum number of such resident professors and a proof of their commitment to be on full time.

4. SLSOM did not appear to have fully cooperated with the Panel on the issue of the content of its curriculum. Referring the panel to over 10,000 page material on its website to extract the content of the curriculum was unacceptable. The worst SLSOM could have done was to have provided a full content of the curriculum in a summarized form within the shortest possible time and refer to its website as an information resource which the Panel could visit out of interest. The sub-committee is also of the view that the curriculum may not necessarily be relevant in the Ghanaian environment just because it was in some other countries. SLSOM would have to justify its relevance in the Ghanaian environment and indicate how it would make up for any shortfalls.

5. The Panel's assessment that *"the M.D degree proposed by SLSOM could create confusion because the Ghanaian educational system views 'M.D.' as an advanced (postgraduate) degree in medicine"* is a good and correct observation. It is difficult for the sub-committee to agree with SLSOM's counter claim to the Panel's assertion (i.e. the M.D. degree would be '....an advanced graduate doctoral level degree') when the entry requirements do not insist on a first degree in medicine but rather, a general science background such as *"BSc Biological Sciences or its equivalent": "Applicants without a bachelor degree should have sufficient pre-medical training comparable to SLSOM's guide for premedical training....... All applicants should be able to show that they have completed high school and they have the proper university preparation in mathematics, chemistry, biology, physics, and English to begin medical training. SLSOM will NOT initially offer remedial in premedical subjects..........Applicants without the sufficient scientific preparation will be required to take the appropriate courses elsewhere before starting the medical school curriculum"*(quoted from SLSOM's completed questionnaire for NAB). These statements on Entry Requirements strongly suggest that SLSOM's M.D. programme cannot be '...an advanced graduate doctoral level degree'! How does SLSOM expect to train students in first and second degree medicine within 3 years when the person has no previous training in medicine? As an applied science, medical training requires at least 1 year apprenticeship (at least, that is the practice in Ghana- the housemanship concept). The Panel was therefore right in

2

**Exhibit C page 99**

raising fears of possible conflict with the Ghanaian system for training medical practitioners. SLSOM must come strong on justifying the feasibility of training students with no undergraduate medicine background at the post graduate level in medicine within three years. The Board must consider the professional risk implications of any such justification before accreditation is awarded. A hearing from the mentor institution is necessary for making any accreditation decisions.

6. The sub-committee considers SLSOM's concern about the Panel not conforming to the prescribed letter grading system by NAB as a valid point. That, however, does not rule out the substantive issues of lack of clarity in SLSOM's M.D programme and other pre-accreditation weaknesses.

Following these observations, the sub-committee invited the leadership of the St Luke School of Medicine to a meeting at the offices of the National Accreditation Board (NAB) on the 26th of March 2008. The purpose of the meeting was to seek clarifications from SLSOM on most of the issues that remained unclear to the sub-committee and also, establish the facts behind the disagreement between SLSOM and the commissioned panel of experts by NAB that evaluated SLSOM's set up.

The meeting started at exactly 3pm on the stated date with the following representations:

NAB:    Prof. A.A. Adimado (KNUST, Kumasi)
        Prof. Owusu Ansah (UCC, Cape Coast)
        Dr. I.V. Oppong (UG, Legon)
        Mr. John Dadzie-Mensah (NAB, Accra)

SLSOM: Dr. Jerroll B.R. Dolphin (M.D)
        Dr. Paul Ennin (M.D., FACOG)
        Mr. Earl N. Caldwell, II
        Mrs Susana Mitchell Dolphin

After a round of self introduction, the chairman of the meeting, Prof. Adimado emphasized that education is a social service and therefore, irrespective of whatever private business motive its quality should not be compromised. This, he said, was the reason for the existence of the Board and equally so for conducting the meeting to establish a common understanding of the issues between the parties. He also highlighted the point that the sub-committee's idea for calling the meeting with SLSOM was to seek clarification on SLSOM's stance on the Panel's report. The sub-committee led by Prof. Adimado then took the SLSOM representatives through the Panel's report point by point and sought their views at each stage before moving on to the next.

The table below summarizes the points representing the position of the panel as per its report, the sub-committees interpretation or understanding of those points, SLSOM clarifications,

3

Exhibit C page 100

agreement reached on the points by the sub-committee and SLSOM, the sub-committee's recommendations to SLSOM and actions taken by SLSOM so far on the recommendations after the meeting.

4

Exhibit C page 101

RESPONSE OF SLSOM TO SUB-COMMITTEE'S ENQUIRIES AT THE JOINT MEETING

| Issue from Panel's report | Sub-committee's understanding of the issue | SLSOM's Position on the issue | Agreed position between sub-committee and SLSOM | Sub-committee's recommendation/ SLSOM's actions on recommendations after the meeting |
|---|---|---|---|---|
| 1.Discrepancy in the curriculum provided and the outline of the plan of lectures. Detail description of course content/syllabus needed. Over dependence of the syllabus of the United States Medical Licensing Examination which gave an impression that either SLSOM was not projecting its own philosophy or was not being adaptive enough | Inadequate curriculum | SLSOM was of the view that the curriculum submitted to the panel during their visit contained detailed description of the course content and hence, the syllabus (copy submitted to sub-committee); course outline detailed in the response to the panel's report; and detailed course notes on SLSOM website(sample made available to the sub-committee) | It was agreed that the curriculum provided was descriptive enough and contained detailed information on the course content. The sub-committee however, was not in a position to judge the adequacy of the course content. | None |
| 2.STAFFING: Inadequate staffing list (no staff listed for some courses). No teaching staff at post. CVs not available. Multiple tasks for some Professors. | Inadequate information on prospective staff | SLSOM provided full list of prospective lecturers in its response to the panel's report and provided the CVs of most of them as well as communication on appointment offer and acceptance. | Copies of CVs and communication on appointment of professors to be made available to the committee the following day: Thursday 27th March 2008. | CVs of 10 prospective professors provided as agreed: 7 of them had offer and acceptance letters attached but three did not. Only one out of the 10 is currently resident in Ghana and none is from Africa except one (Nigerian). 7 of the CVs do not have references. All 10 have postgraduate qualifications. |

5

Exhibit C page 102

**RESPONSE OF SLSOM TO SUB-COMMITTEE'S ENQUIRIES AT JOINT MEETING**

| Issue from Panel's report | Sub-committee's understanding of the issue | SLSOM's Position on the issue | Agreed position between sub-committee and SLSOM | Sub-committee's recommendation/ SLSOM's actions on recommendations after the meeting |
|---|---|---|---|---|
| The MD programme of SLSOM is not a post graduate programme | The use of MD (1st degree) in the US system is at variance with the use of MD (post graduate degree in medicine) in the Ghanaian or British context | The US Medical Licensing Examinations is equivalent to a PhD | After a lengthy discussion both parties agreed that SLSOM's MD is a professional degree (1st degree) and not advanced post graduate degree as in PhD. Therefore, none of the prospective lecturers listed by SLSOM with just MD degrees from the US could lecture at a medical school in Ghana including SLSOM. | The sub-committee recommended that all prospective lecturers on the list with just MD degrees should be scrubbed. Because MD degree form India, Ghana or the UK could mean a postgraduate degree, SLSOM should submit the complete CVs of the qualified listed lecturers for scrutiny. SLSOM has since submitted the CVs which have been analyzed (please see copy attached) |
| PHYSICAL FACILITIES: Some are inadequate in terms of space while the design and set up of some, inappropriate for the intended purpose particularly the anatomy laboratory space and the library space. Some were suited for the purpose. | Inadequate facilities | The anatomy lab is a temporary facility. A more permanent structure was under construction at the time of the panel's visit. The panel's attention was drawn to that. Part of that permanent structure has since been completed | Agreed that some solutions needed to be found. | The sub-committee recommended that SLSOM should get the physical facilities right taking into consideration the anticipated number of students, at least, for the 1st year before any enrolment starts, by implication, before accreditation is considered. Some pertinent issues relating to the suitability of some furniture, equipment and design (of the anatomy laboratory) raised in the panel's report should be corrected. |

6

**Exhibit C page 103**

RESPONSE OF SLSOM TO SUB-COMMITTEE'S ENQUIRIES AT JOINT MEETING

| Issue from Panel's report | Sub-committee's understanding of the issue | SLSOM's Position on the issue | Agreed position between sub-committee and SLSOM | Sub-committee's recommendation/ SLSOM's actions on recommendations after the meeting |
|---|---|---|---|---|
| PHYSICAL FACILITIES (Continued): Anatomy laboratory space/facilities and Library space/facilities inadequate and/or inappropriate | Same as in panel's report | Agreed to some of the concerns. A more permanent library capable of seating 150 students is being put up. However, further investment into construction of the library and the permanent anatomy laboratory has seized until accreditation is granted. There are plans to complete these permanent structures before students come on board in September if accreditation is secured. Financiers not keen on putting in more funds until accreditation is awarded. | Although the argument that was put up by SLSOM in defense of the seizure of further major financial input was convincing, adequate library space/facilities and anatomy laboratory space/facilities remained basic requirements for accreditation consideration. | SLSOM needed to create the library and anatomy laboratory spaces and equip them to at least meet the needs of the anticipated number of students in the first year of operations to await the completion of the permanent structures/facilities in the same year. SLSOM has since increased the available space, through reassignment, to 100 students for the anatomy laboratory and 54 medical students (from 29) for the Gross Anatomy laboratory. The library space has increased from 30 to 70 students. (Please see attached copy of SLSOM documents showing the effort and photos) |
| Inadequate library books and journals | Same as in panel's report | Surprised at the panel's position since more than enough books, both shelved and unshelved, were available at the time of the panel's visit | Agreed on independent group/individual verification of the library stock. | Sub-committee recommended immediate commissioning of NAB's library expert to make an early expert visit |

7

**Exhibit C page 104**

RESPONSE OF SLSOM TO SUB-COMMITTEE'S ENQUIRIES AT JOINT MEETING

| Issue from Panel's report | Sub-committee's understanding of the issue | SLSOM's Position on the issue | Agreed position between sub-committee and SLSOM | Sub-committee's recommendation/ SLSOM's actions on recommendations after the meeting |
|---|---|---|---|---|
| | | At 3000 relevant books and 400 CD ROMs were available at the time of the Panel's visit. SLSOM discounted the Panel's assertion that some of the books were out dated and produced a list of the books in stock and the editions. SLSOM however agreed that there were not enough books on Histology but more than enough for all the others. | | The NAB library expert visit is part of the normal accreditation process following the panel's visit. St Luke should unpack any books it may have in boxes and keep them on the shelves for easy verification during the visit. |
| AFFILIATION: No evidence of affiliation. | Same as suggested by panel. | SLSOM has been following the Roadmap to accreditation provided by NAB which indicates accreditation before affiliation. However, SLSOM had initiated discussions with prospective mentor institutions. All those contacted requested for accreditation first before they committed themselves to any deal. The Ghana Medical and Dental Council was to pay a visit to SLSOM to inspect their facilities in the first week of April. | It was agreed that there was still the need for some commitment from a mentor institution if not a full affiliation sealed by a Memorandum of Understanding. | From hind sight the Roadmap to accreditation should be reviewed to make affiliation a pre-requisite for institutional accreditation. As it stands now, it is accreditation before affiliation. That notwithstanding, SLSOM need a paper trail on communication with a prospective mentor institution. The communication must indicate a strong interest by and commitment from the mentor institution to assume the role once accreditation is awarded. This is so for SLSOM because medicine is being treated here as a special case and justifiably so. |

8

Exhibit C page 105

| Issue from Panel's report | Sub-committee's understanding of the issue | SLSOM's Position on the issue | Agreed position between sub-committee and SLSOM | Sub-committee's recommendation/ SLSOM's actions on recommendations after the meeting |
|---|---|---|---|---|
| PRACTICAL WORK: the programme does not show practical schedules for any of the following areas: physiology, anatomy, pathology and biochemistry and therefore, panel was unable to comment on the adequacy and relevance of the anatomy component of the programme. | Same as panel's position. However, SLSOM provided detailed outline of the practical work in its response to the panel's report | Provided the information needed in the response to the panel's report. With permission from the Ghana Health Service (GHS), SLSOM would identify regional/district hospitals where students would acquire practical skills. A copy of a letter on a deal with the GHS in that respect was attached to SLSOM's response to the panel's report. | N/A | SLSOM should be mindful of low capacity in some regional hospitals to provide the expected support to the students. |
| FINANCES | | SLSOM's financiers reluctant to release additional funds until accreditation is granted. However, details of financial sustainability is provided in the completed questionnaire to NAB | | SLSOM needs to demonstrate financial sustainability. The financial statement provided by SLSOM in submitting its completed questionnaire to NAB has to be sent to NAB's financial expert for analysis. A visit of the expert to SLSOM should be arranged. SLSOM should consider operating an endowment fund for financial sustainability |
| Recreational facilities need to be put in place | Same as panel's position | In SLSOM plans to make these facilities available | | SLSOM indicated it has enough space around it's buildings to be used for recreational facilities/activities |
| | No courses in the humanities | SLSOM has considered that | SLSOM needs to consider African Studies if it is to go by its philosophy | SLSOM needs to add some subjects other than medicine in its curriculum to make the training of its students holistic. SLSOM agrees on African Studies |

9

**Exhibit C page 106**

- Space designated as anatomy dissection hall was not big enough to accommodate the proposed class size, inadequate ventilation and drainage
- None of the other laboratories were ready
- No fire escapes, no fire extinguishers
- There were no staff on the ground

11

Exhibit C page 107



In case of reply the
number and date of this
letter should be quoted

National Accreditation Board
Ministry of Education
P. O. Box CT 3256
Cantonments Accra

My Ref. No.   **NAB/A/02/PTE/114**
Tel. No.:   021 – 518630/518570/286013-4
Fax No.:   021 – 518629
E-mail:   nabsec@nab.gov.gh
Website:   www.nab.gov.gh

Republic of Ghana

7th November, 2008



### HON. ATTORNEY GENERAL AND MINISTER FOR JUSTICE
### ATTORNEY GENERAL'S DEPARTMENT
### ACCRA

### ATTN: MRS. AMA JANTUAH BANFUL

Dear Sir,

### RE: THE REPUBLIC VERSUS THE NATIONAL ACCREDITATION BOARD

We write to acknowledge the receipt of your letter – Ref. No. D45/SF.165/08 – dated October 4, 2008 on the above subject.

Please note that your letter was received on November 13, 2008

Our comments on the suit are as per the **attached**.

Yours faithfully,

**KWAME DATTEY**
**EXECUTIVE SECRETARY**

**Exhibit C page 108**

The National Accreditation Board (NAB) is indeed the body established to accredit public and private tertiary institutions with regard to the standards and contents of their programmes. It is in pursuit of this function that it (the NAB) received an application from the institution going by the name St. Luke's School of Medicine (SLSM), for the second time – in the year 2004.

The first step in the accreditation process involves the inspection of physical facilities and the discussion of the concept between the applicant institution and NAB. The Board may grant authorization valid for a three (3) year period but renewable for another three (3) years to an institution, to enable it prepare for accreditation. Institutions at this stage are not expected to advertise for students. The accreditation process itself involves the assessment, by programme panels contracted by the NAB, of the curriculum and relevant facilities including human resources, necessary for the operation of an institution, as a tertiary educational facility.

The L.I. 1700 dated 2002, a copy of which is attached, serves as general regulations for both the accreditation process and accredited institutions for their operations. Among the relevant conditions for operating as a tertiary institution in Ghana is the requirement that at least for the first four (4) years of its operation, an accredited institution is required to be affiliated to an existing Chartered Institution. This is for mentoring purposes and also for the mentor institution to award its qualifications to the mentored institution for that stated period. This situation would however continue until the mentored institution is adjudged by the NAB to be sufficiently mature to merit a Presidential Charter that would enable it (the mentored institution) to award its own qualifications - Certificates, Degrees, Diplomas, etc. institutions adjudged as such are recommended to the President, who awards the Charter Certificate.

In a nutshell, this is a bird's eye view of the accreditation process.

We will now address the issues raised by the said St. Luke's School of Medicine in their suit paragraph by paragraph:


We have no comments on paragraphs 1 – 6, which are statements of facts.

1

Exhibit C page 109

**Paragraph 7**

This is not entirely correct, applications received by the Board are examined to find out how serious proponents of such ventures are.
The initial visit referred to, was only meant to ascertain the state of preparedness of the institution to commence operation and also offer advice to the institution on how and what to do to quicken the process of accreditation.
Obviously, if there had been any delays, the fault did not come from the Board.
The application from SLSM was attended to promptly in the circumstances, the school seemed ill-prepared at the time the application was submitted.

**Paragraph 8**

The authorization phase of the accreditation process is meant to assist an institution to raise both physical and human resources necessary to commence operations. An institution is not expected to advertise for nor admit students at this stage. A certificate of authorization is provided to institutions at this phase to assist them raise the stated resources

**Paragraph 9**

Authorization is normally valid for three (3) years and it is renewable for another three (3) years. It is the responsibility of the institution to inform the board when it has adequately assembled the relevant resources to begin the accreditation process.

**Paragraphs 10, 11, 12**
No comments

**Paragraph 13**

Note should be taken of the fact that assessment panels for programme accreditation are carefully chosen from academia, relevant professional bodies and practitioners.
The panel that assessed St. Luke's programme did its work meticulously and had not shown any traces of bias in its work. However, due to the vehement protestations by SLSM after the panel had submitted its report, the Board appointed a second panel from among its members, whose function was not to reverse the first panel's report but to seek to understand the hundred and eight-seven (187) page rebuttal issued by SLSM and also to assist SLSM to comply with specific recommendations and requirements necessary to merit accreditation.

2

**Exhibit C page 110**

**Paragraph 14**

Obviously, if the Board had been satisfied with the preparations of SLSM in terms of its human, physical and financial resources, it would have gone ahead and granted accreditation to the institution without any condition.

Indeed, strictly speaking, the Board should have rejected SLSM's application as unmeritorious, based upon both reports submitted by the original assessment panel and the review panel.

Mindful of the investments made by SLSM, however, the Board chose a softer option, to request the institution to fulfill specific requirements in order to put the school in a better stead to merit accreditation.

**Paragraph 15**

From paragraph 14, this is palpably untrue. SLSM failed to fulfill the requirements specified which were:

- To seek affiliation with an accredited institution in Ghana or elsewhere who will offer its qualifications to graduands of SLSM

- Seek a medical facility where students or proposed students of SLSM would have their clinical rotation, and

- Obtain a letter of consent from the Medical and Dental Council which is not only the licensing authority (by legislation) of Medical Practitioners in Ghana. The council is also the accrediting body for medical facilities, where medical students could be trained in clinicals.

One wonders how SLSM expected the NAB to accredit the institution and its programmes to enable them enroll students, who can neither be recognized nor practice in the country by the appropriate authority upon graduation.

**Paragraph 16**

It is interesting to note that SLSM had all along accepted the three pre-conditions recounted elsewhere without question, until the Medical and Dental Council (which we are being told) finally wrote to them of their inability to grant them permission for medical training in Ghana.

**Paragraph 17**

The issue raised here can only be described as bogus, as the deponents' own letter marked "SL 9" and the attachment from our office dated January 2008 clearly show.

3

Exhibit C page 111

**Paragraph 18**

From the issues raised, it can only be described as an act of desperation for the deponent to raise the issue of deadline within which the accreditation process was expected to be completed. This has clearly been shown in the earlier paragraph.

Concluding, it must be realized that the applicant's aim is to establish a specialized tertiary institution that deals with human beings. It would therefore be irresponsible on the part of the Board to treat such an application, like it would do to other tertiary institutions.

St. Luke's School of Medicine must be advised to go back to the drawing board to put its act together and realize that no investment is too great as to allow businessmen to experiment with the lives of human beings for no other reason than the profit motive.

4

Exhibit C page 112

EXH: "AG 2"

IN THE HIGH COURT OF JUSTICE, GHANA, AUTOMATED COURT 2, HELD IN ACCRA ON MONDAY THE 19TH DAY OF OCTOBER 2009 BEFORE HIS LORDSHIP, THE HONOURABLE MR. JUSTICE K. A. OFORI ATTA, J

SUIT NO. AP 12/2009

IN THE MATTER OF AN APPLICATION FOR JUDICIAL REVIEW BY ST LUKE SCHOOL OF MEDICINE GHANA LTD

AND

IN THE MATTER OF THE REPUBLIC

VS.

NATIONAL ACCREDITATION BOARD & ANOR.

EXPARTE: ST LUKE SCHOOL OF MEDICINE GHANA LTD.

PARTIES:

APPLICANT REPRESENTED BY SUSUANA MITCHELL DOLPHIN — — — PRESENT

KWAME DARTEY OPOKU REPRESENTING 1ST RESPONDENT

2ND RESPONDENT — — — ABSENT

THADEUS SORY WITH THERESA TALATA KUNLIS FOR APPLICANT — — — PRESENT

HELENA FRENCH FOR RESPONDENTS — — — PRESENT

BY COURT:

# RULING

In this application for judicial review, the Applicant is praying for an order directed at the Respondents to grant it an accreditation to set up and run a medical school in Ghana.

The facts upon which the application is based are not disputed. The Applicant is a body corporate registered to carry on business as an educational institution.

In pursuance of it objects, Applicant set up facilities and infrastructure at its registered offices with a view to establishing an institution for the training of medical practitioners. To be able to do so, it required accreditation from the 1st Respondent hereinafter referred to as the Board, which is the body established by law for that purpose. The rules on accreditation are set out in the National Accreditation Board Act 2007, Act 744 hereinafter simply referred to as the Act and the regulations thereunder known as the Tertiary Institutions [Establishment and Accreditation] Regulations 2002, LI 1700 hereafter referred to simply as the Regulations.

The Applicant applied to the Board for interim authorization which was granted. The said grant was made after the Board had considered an evaluation report by its team of inspectors.

By granting the authorization, the Board was thus expressing its satisfaction that the institution when established was likely to attain and maintain high academic standards and discipline. Again, it was evidence that Applicant was following a realistic plan to achieve the aims for which the institution was being established within the purview of Regulation 6 [1] of the Regulations.

Further, the grant entitled the Applicant to set up its governing body and commence or continue with the following: mobilization of the needed financial resources; development of physical facilities and assembling of academic facilities.

The above go to show that the interim authorization is a giant step towards the process of accreditation.

In the present case, the Board granted the Applicant a three year authorization effective 18th April 2005. Exhibit SL2 is the certificate of authorization issued to the Applicant after it had paid the sum of US$ 1500 or its equivalent as demanded for in Exhibit SL1 both attached to the supporting affidavit.

Having been granted the interim authorization, the Applicant could by Regulation 3[1] of the Regulations apply for accreditation within a period of three years of the grant.

Subsequently, Applicant applied for accreditation and provided the information required by the panel set up by the Board to make the necessary recommendations to it for consideration. In its report, the panel made some adverse comments in respect of the readiness of the Applicant for accreditation. A copy was referred to the Applicant for its comments, which it did and demanded that it be accredited.

The Board did not grant the accreditation. It rather gave three conditions the fulfillment of which was stated to be the basis for the grant of the accreditation, namely:

i.      to seek affiliation with an accredited institution in Ghana who will offer its qualifications to the graduates o the Applicant; and

ii.     to seek a medical facility where students of the Applicant would do their clinical rotations; and

iii.    obtain a consent from the Medical and Dental Council [MDC] which is the licensing authority of medical practitioners in Ghana and also the accrediting body for medical facilities where medical students would do their clinical rotations.

It appears from Exhibit SL8 that the MDC inspected the facilities at the Applicants institution and informed the Applicant that it was *"unable to grant you any form of accreditation for medical training in Ghana"*. The reason being that the documents submitted and facilities inspected did not meet its minimum requirements.

Aggrieved by the Respondents conduct, the Applicant has filed the present application praying for a declaration that

3

having duly satisfied all the statutory conditions for accreditation, it is entitled to be so accredited by the Board; that the refusal to accredit the Applicant was unfair and unreasonable; an order compelling the Board to grant the accreditation; and loss of earnings.

The Board has denied acting unreasonably and contends that rather it is the Applicant which has not complied with the concerns raised in order to be granted the accreditation.

The remedy of judicial review is concerned with reviewing not the merits of the decision in respect of which the application for judicial review has been made but the decision-making itself.  Until the coming into force of the High Court [Civil Procedure] Rules 2004 CI 47, what used to be known as the prerogative orders namely, certiorari prohibition ad mandamus could be applied for separately or in combination with each other.  Now, the remedy of judicial review has replaced the application for any of the prerogative orders.  By Order 54 rule 3[1], on the application for judicial review, the Court may make any of the following orders namely, certiorari, mandamus, prohibition, an order of injunction, a declaration or payment of damages.

To qualify for judicial review, the decision or discretion complained against, must affect some person either by altering his rights or obligations or by depriving him of some advantage or benefit.  The decision maker or body must be so empowered by public law with power to make the decision or exercise discretion with the results referred to above.

In the celebrated case of Council of Civil Service Union vs. Minister for Civil Service [1984] 3 All ER 935, Lord Diplock said:

*"To qualify as a subject for judicial review the decision must have consequences which affect some person or body of persons other than the decision maker; although it may affect him too.  It must affect such other person either (a) by altering rights or obligations of that person which are enforceable by or against him in public law or (b) by depriving him of some benefit or advantage which (i) he has in the past been permitted by the decision maker to enjoy and which he can legitimately expect to be permitted*

3

*to continue to do until there has been communicated to him some rational ground for withdrawing it on which he has been given an opportunity to comment or [ii] he has received assurance from the decision maker will not be withdrawn without giving him first an opportunity of advancing reasons for contending that they should not be withdrawn ... For a decision to be susceptible to judicial review the decision maker must be empowered by public law [and not merely as in arbitration by agreement between the parties] to make decisions that if validly made will lead to administrative action or abstention form action by an authority endowed by law with executive powers which have one or other of the consequences mentioned in the preceding paragraphs"...*

In the instant case, the Board has been established by public law, that is The Act and the Regulations. By Section 2[1] of the Act, the Board is *"responsible for the accreditation of both public and private institutions as regards the contents and standards of their programmes"*.

In the exercise of its mandate, the Board has wide discretionary powers which discretion must be exercised within the law.

Before an application for accreditation is made, an Applicant must have been granted an authorization by the Board.

And on applying for authorization, a team of inspectors is constituted by the Board which inspects the premises of the Applicant if any and the facilities available as provided for under Regulation 5 of the Regulations. When the report of the team of inspectors is considered, the Board may grant an interim authorization within the provisions of Regulation 6. By granting the interim authorization, the Board would thus be expressing itself to be satisfied with the matters enumerated in Regulation 6 1[a] – [o] thereof. Among others, the Board would then be expressing its opinion that the information in the application is accurate and meets standards set by the Board for the establishment of a tertiary institution of the type proposed to be set up; the resources declared are available or likely to be available and the Applicant is following a realistic plan to achieve the aims for which the institution was to be established.

When an Interim authorization is granted, the Applicant would then be entitled to take the steps provided for in Regulation 6 [2] [a] – [d] of the Regulations including the setting up of a governing body for the institution, commence or continue with the mobilization of financial resources and commence or continue assembling academic facilities.

I am of the view that the grant of the authorization provides adequate grounds for the Applicant's legitimate expectations that the accreditation would be granted and not be refused on flimsy grounds.

Upon what grounds then will administrative action be subject to judicial review?  In the Council of Civil Service Unions supra Lord Diplock gave three main grounds namely; illegality, irrationality and procedural impropriety.

The above case was cited with approval and the classifications therein applied by our Supreme Court in the case of Tema Development Corporation and Mensah vs. Attu Baffour [2005- 2006] SCC LR 121.  I shall adopt and apply the classifications to the instant case.

The first ground is illegality.  Lord Diplock explained it in the following terms:

*"By illegality as a ground for judicial review I mean that the decision maker must understand correctly, the law that regulates his decision-making power and must give effect to it whether he has or not is per excellence a justiciable question to be decided in the event of a dispute by those persons, the judges by whom judicial power of the state is exercisable".*

Under this head, it has been contended on behalf of the Applicant that the refusal by the Board to grant the accreditation is not in accordance with law and contrary to the board's own roadmap attached to the supporting affidavit as SE 14.

In Ghana where discretionary power is conferred on a person or body of persons, the power is to be exercised fairly and candidly.  In fact a breach of this duty would be unconstitutional.  Article 226 of the 4th Republican Constitution provides that where discretionary power is

7

vested in any person or authority under the constitution or
any other law: [as in the instant case: [a] the discretionary
power shall be deemed to imply a duty to be fair and candid
[b] the exercise of the power shall not be arbitrary,
oppressive or biased either by resentment, prejudice or
personal dislike and shall be in accordance with due
process of law; and [c] where the person or authority is not
a judge or other judicial officer there shall be published by
constitutional instrument or statutory instrument
regulations that are not inconsistent with the provisions of
the constitution or that other law to govern the exercise of
the discretionary power.

The main concern raised by Counsel for the Applicant is
that the Board by referring the application to the Medical
and Dental Council for the accreditation was
'unexplainable and illegal'. For the Board, it has been
urged that it acted within the law and has exercised its
discretion reasonably and fairly. It has further been urged
that the Applicant has not been refused accreditation.
Rather, it is the Applicant who has refused to satisfy the
three requirements supra. It has also been canvassed on
behalf of the Respondent that it saw the wisdom in inviting
the Council to assess the facilities and programmes.

In the instant case, the accreditation process commenced in
November 2007. The first assessment team of the
Applicants facilities was not satisfied: see Exhibits J and
K. The Applicant reacted to the report by way of
comments and another team of experts was constituted to
inspect the physical facilities of the Applicant.

The team recommended that the school should not be
accredited until all identified deficiencies had been
addressed including affiliation with a recognized university
in Ghana.

The second physical facilities report attached to the
supporting affidavit as Exhibit 7 was on the whole, good.

When an Applicant applies for accreditation, the Board
appoints an accreditation panel made up of a chairperson
and members not exceeding eight to examine and assess
whether the Applicant had satisfied the conditions in the
interim authorization. Thereafter, the Board consider the

**Exhibit D page 119**

report of the panel and when satisfied grant the accreditation.

The third requirement of the Board to be satisfied by the Applicant is deposed to in paragraph 29 of the affidavit in opposition. The Applicant was required to:

"obtain a consent from the Medical and Dental Council which is not only the licensing authority by legislation of Medical Practitioners in Ghana but also the accrediting body for medical facilities where medical students could be trained in clinical solutions".

This is also evidenced by Exhibit SL 11. From the exhibit, the Applicant was required to obtain

"a satisfactory note from the Ghana Medical and Dental Council expressing confidence in the initial set up of the SLSOM to start a Medical School".

The exhibit also shows that it was written after all the necessary assessments had been made. It meant therefore that the Board was satisfied with all the preparations made by the Applicant except the said requirements. It appears from Exhibit SL8 that it was in pursuance of the above request that the Applicant wrote to the MDC to assess its facilities. By the exhibit, the Council was "unable to grant any form of accreditation for Medical Training in Ghana". The reason being that "the documents submitted and facilities inspected" did not meet the Medical and Dental Council's minimum requirements".

From the exhibit, it was not the Board which referred the application to this Council to grant the accreditation to the Applicant as urged on me in learned Counsel for the Applicant's statement of case.

By the Act, it is the Board which has the sole responsibility for granting accreditation to the Applicant. By making the request on the Applicant which body would be taking the decision for the accreditation? I concede that under the law the MDC could advise the Board. In making the accreditation subject to the expression of confidence of the MDC who then became the decision-maker? If the MDC said it was confident the Respondent would grant the

7

application.   And if the MDC refused to express its confidence?

It seems to me that by making the grant of the accreditation subject to the expression of confidence by the MDC, the Board had divested itself of its own decision making authority which a delegate is in law not mandated to do. This makes the decision illegal within the meaning of the classification above.

The second ground is irrationality.  Lord Diplock in the Civil Service Unions case supra explained it in the following words:

"By irrationality, I mean what can now be succinctly referred to as 'Wednesbury unreasonableness' see Associated Provincial Pictures Houses Ltd v. Wednesbury Corporation [1947] 2 All ER 684 [1984] 1 KB 233.  It applies to a decision which is so outrageous in its defiance of logic or of accepted moral standards that no sensible person who had applied his mind to the question to be decided would have arrived at it ...,

It is the contention of the Applicant that the refusal of the Respondent to grant the accreditation is unreasonable. Four main grounds have been canvassed in support.

The first is that the Respondent failed to appoint an accreditation panel within 30 days of the application.  It was done over 60 days later.

Second, the Board failed to grant the accreditation long after the accreditation panel had presented its report.

Third, the Respondent instead of responding directly to the report kept requesting that other or further requirements be met by Applicant each time a concern raised was addressed;  see for example Exhibit SL 13.  It is the contention of the Applicant that those requirements were not required for accreditation.

In reply, it has been argued that in the particular circumstances of this case, it was prudent that quality was not sacrificed for mediocrity or the profit motive. Accordingly under the Act as well as the Regulations, it

was just reasonable that requirements aside those of the Regulations be prescribed.

From the Roadmap, Exhibit SL 14, the various stages in the accreditation process were time bound. No explanation has been offered why in this particular instance, the time schedules were not followed : see Exhibits SL 9, SL 10, SL 12 and SL 13.

The Applicant was granted three years' authorization on 18th April 2005. see Exhibits SL 1 and SL 2. In June 2007 the Applicant applied for accreditation. By Exhibit SL 14, the Respondents own Roadmap, the accreditation should have been completed within 60 days of the accreditation panel's visit in November 2007. As at May 2008 when Exhibit SL 10 was written, praying for a decision the accreditation had not been completed. It was after the receipt of the exhibit that the Board responded by Exhibit SL 11 that it was ONLY certain conditions being met that the accreditation would be granted. These conditions are the three referred to above and in paragraph 29 of the affidavit in opposition.

The Respondent has not denied or explained the delays in this case. I find therefore that the delay in the accreditation of the Applicant is unreasonable. Further, the law is that unnecessary or unreasonable delay might be a ground for judicial review in the nature of mandamus.

In the case of R. v. C. A. Exparte Lands Commission, Vanderpuije Quao-Panies Ltd, Interested party [1999-2000] 1 GLR 75, Acquah JSC as he then was, wrote at page 78 that :

*"A statutory duty should be performed without unreasonable delay... if such delay occurred, mandamus might be employed to enforce the performance of such duty ... In the light of the unreasonable delay by the Appellant to deal with the problem they created, it was imperative for the Respondent to resort to mandamus to compel it to perform its public duty since it was the most effective and beneficial remedy to determine both the validity of the appellants contention and to achieve the restoration of the concurrence in question".*

2

On the ground of unreasonable delay, I would grant the order of mandamus to compel the performance of the duty to grant accreditation to the Applicant.

It has also been urged that the Respondent could in addition to the statutory requirements, request the fulfillment of other demands.

It seems to me that this is in reference to the three conditions referred to above. I have already dealt with the third condition in this delivery.

The first condition is:

"To seek affiliation with an accredited institution in Ghana, who will offer its qualification to graduates of St. Luke School of Medicine".

I find this condition unreasonable. There is evidence on record that potential suitors cannot engage in an affiliation relationship with a non-accredited institution. The Applicant had been in contact with the University of Ghana and the KNUST, Kumasi in that regard: see Exhibit SL 5.

Again by the Roadmap, SL 14, it is stated that where the decision of the Board was positive the Applicant must seek affiliation to operate under the supervision of a degree awarding institution which shall award its degrees. It further states that both the mentor [institution] and mentored [institution] must be accredited or recognized in the countries in which they are established.

Now, the question is, if the Applicant is not accredited how can it affiliate with another accredited institution. It seems to me that without the accreditation the Applicant would find it virtually impossible to obtain the affiliation it requires as a condition for the accreditation. It means the Applicant would never be accredited!

In the same way, I find the second condition not reasonable. It is as follows:

"To seek a medical facility where students of St. Luke School of Medicine would have their clinical rotation".

10

By Exhibit SLS, the Applicant has made it clear that it has plans for using accredited teaching hospitals excluding Korle Bu, KATH and Cape Coast. There is also evidence that the Ghana Health Service [Exhibit SL 4] as well as the Ministry of Health have expressed their support for the efforts of the Applicant. A letter attached to SL 5 from the Kunta Kunte Orthopaedic Hospital, Mampong Akwapim has expressed its interest in working with the Applicant to provide the clinical rotations for its students.

From the evidence on record, I do not think it can be said that Applicant has refused to seek the medical facilities for the clinical rotation. Accordingly, I find that the refusal to grant the accreditation is not reasonable.

The last classification is procedural impropriety about which Lord Diplock said:

*"I have described the third head as 'procedural impropriety' rather than failure to observe basic rules of natural justice or failure to act with procedural fairness towards the person who will be affected by the decision. This is so because susceptibility to judicial review under this head covers also failure by an administrative tribunal to observe procedural rules that are expressly laid down in the legislative instrument by which its jurisdiction, even where such failure does not involve any denial of natural justice".*

Apart from breaching the rules of natural justice, other acts that are procedurally unfair fall within its ambit. It seems to me that the failure to follow the process regarding time, also fall within this classification. Reading the above classifications convinces me that they cannot be placed in watertight compartments. In other words, they overlap each other. I would grant the application on this ground also.

I have read Section 11 of the Act as well as Regulations 12, 13 and 14, I am satisfied that the Respondent has no cause to refuse to grant the accreditation. It has wide powers to among others, vary or even revoke accreditation where necessary. An accredited institution therefore runs the risk of incurring the wrath of the Respondent if it fails or neglects to keep itself within the terms and conditions of its accreditation.

11

In conclusion, I shall grant the reliefs sought by the Applicant. Accordingly, it is declared that [1] Applicant has satisfied all the statutory pre-conditions for being accredited by the Respondent as a tertiary institution for the training of medical practitioners [2] the refusal of the Respondent board to accredit the Applicant is unfair and unreasonable.

Flowing from the above, it is ordered that the 4th Respondent accredit the Applicant for the training of medical practitioners within 30 days from today.

From the evidence before me, there is no basis for awarding general damages for loss of earnings. That relief is accordingly declined.

| | |
|---|---|
| SORY: | My Lord, we ask for costs of Five Thousand Ghana cedis [GH¢5,000.00]. |
| MS. FRENCH: | I want to urge the Court to waive the costs. |
| BY COURT: | Why, what is the basis for waiving costs? |
| MS. FRENCH: | My Lord, given the fact that the Court has granted the application and the Court in its own gave reasons that there was no need for damages so we will also urge the Court to waive the costs. |
| BY COURT: | Not that I waive the damages; there was no evidence on the record for me to award damages. |
| SORY: | Ordinarily, we also would have agreed with her because of the fact that we are fighting a matter that would benefit the Republic of Ghana. But we are a private entity and have incurred some cost; it is entirely in your discretion. |
| BY COURT: | On the basis that you need to work together, I award no costs. |

(sgd.) K. A. OFORI ATTA
JUSTICE OF THE HIGH COURT

CERTIFIED TRUE COPY

-----------------------
REGISTRAR/F.C.
HIGH COURT, ACCRA

ella@

13

EXH: "AG2"

AG1

ATTORNEY GENERAL
P. O. BOX 48
ACCRA

IN THE SUPERIOR COURT OF JUDICATURE
IN THE COURT OF APPEAL
**ACCRA – A.D. 2010**

SUIT NO.

IN THE MATTER OF AN APPLICATION BY ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED FOR ACCREDITATION BY THE NATIONAL ACCEDITATION BOARD

AND

IN THE MATTER OF AN APPLICATION BY ST. LUKE SCHOOL OF MEDICINE GHANA LIMITED FOR JUDICIAL REVIEW

AND

IN THE MATTER OF:

THE REPUBLIC

VRS.

   1.   NATIONAL ACCREDITATION BOARD

   2.   ATTORNEY-GENERAL          RESPONDENTS/APPELLANTS

EX PARTE: ST. LUKE SCHOOL OF MEDICINE
GHANA LIMITED         APPLICANT/RESPONDENTS

NOTICE OF APPEAL

TAKE NOTICE that the Respondents/Appellants herein being dissatisfied with the judgment given by His Lordship Mr. Justice Ofori-Atta sitting at the Fast Track High Court 2 on the 19th day of October, 2009 do hereby appeal to the Court of Appeal upon the grounds set out in paragraph 3 below and will at the hearing of the appeal seek the reliefs set out in paragraph 4.

The Appellants further state that the name and address of the person most directly affected by the appeal is that set out in paragraph 5.

2.  PART OF THE JUDGMENT THE RESPONDENTS COMPLAIN OF:
    The whole of the judgment given on 19th October, 2009.

3.  GROUNDS OF APPEAL
   a.  The judgment is against the weight of evidence.

3.   That I have the consent and authority of the National Accreditation Board (The Board) to depose to this Affidavit in respect of the facts and information that have come to my knowledge in the course of my duty as a Senior Assistant Secretary of the Board.

4.   That at the hearing of this application Counsel will seek leave of this Honourable Court to refer to all processes filed in this matter.

5.   That on the 19th of October, 2009 this Honourable Court granted an order of mandamus to compel the 1st Respondent to grant accreditation to the Applicant.

6.   That being dissatisfied with the said ruling, the Respondents have filed a Notice of Appeal, a copy of which is attached as Exhibit 'AG1'.

7.   That this Honourable Court erred when he indicated in the judgment that the grant of interim authorization provides adequate grounds for the Applicant's legitimate expectation that the accreditation would be granted.

8.   That interim authorization is to enable an applicant continue with preparation to set up an institution but not a *sine qua non* for accreditation.

9.   That an applicant's legitimate expectation for accreditation could only be based on meeting the required standards and not for such standards to be taken for granted.

12.   That the request for the consent from the Medical and Dental Council does not make the Board "... divest itself of its own decision making authority ...."

13.   That the request was legitimate as the Regulations allow the Board to seek information from an applicant.

14.   That medical training, like any other professional training, is a continuum from the academic to the professional, therefore, there is the need for the Board to be satisfied that the products of the Applicant's institution will be recognized by the Medical and Dental Council to take its licensing examination.

15.   Quality assurance, especially in medical training, is not a simple matter and the Board may need to satisfy itself by subjecting all information provided by applicants to verification and proof.

16.   That the Roadmap on accreditation is a general one but given this peculiar case which involves training of professionals, especially medical professionals, the Board has the power under the Regulations to prescribe and ensure that relevant standards are complied with.

17.   That the procedure that Applicant/Respondent was made to go through is the same procedure that all medical schools including public medical schools are taken through before accreditation.

**Exhibit E page 127**

1

## **CERTIFICATE OF SERVICE**

2    I hereby certify that a true and correct copy of the foregoing document was

3  served on counsel of record via ECF Notice of Electronic Filing in accordance with

4  the Federal Rules of Civil Procedure and Local Rule 5-3.3

5

6                         /s/ Juan C. Basombrio
                         Juan C. Basombrio

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28