# EXHIBIT A

"A G6"

# An Analysis of the Practices and Policies of The St. Luke School of Medicine in Recent Years

George Gollin[1]
Professor of Physics
University of Illinois at Urbana-Champaign

November 5, 2009

Filed on 15-12-2009  2:55 pm
Registrar Court of Appeal

Introduction ............................................................................................................. 4

   Immediate disqualifications ................................................................................ 5

   Past practices as predictors of future conduct .................................................... 6

   The international stake in quality assurance and postsecondary oversight ........ 6

   The St. Luke School of Medicine's approach to Ghana gives cause for concern .......... 7

The current presentation of the St. Luke School of Medicine ................................ 8

   An overview of the current St. Luke School of Medicine .................................. 8

   Jerroll Dolphin and Susana Dolphin are SLSOM's California-based principals ........... 9

   The Dolphins' request for Ghanaian accreditation of SLSOM and their history of claiming SLSOM is accredited ........................................................................ 11

   Jerroll Dolphin, MD is unlicensed ..................................................................... 12

   Jerroll Dolphin is the primary provider of curriculum and training ................. 12

   The ongoing award of MD degrees to previously matriculated SLSOM students? ..... 15

   SLSOM is a California entity, operating in the jurisdiction of the State of California ... 15

   SLSOM is not registered as a California corporation ........................................ 16

   The St. Luke Medical Foundation is associated with SLSOM and the Dolphins .......... 17

   The internet domain registration for SLSOM specifies a Ghanaian postal address ..... 19

   The physical location of SLSOM in Ghana ....................................................... 20

---

[1] G-gollin@illinois.edu

<6>
Case 2:11-cv-06322-RGK-SH Document 139-2 Filed 07/02/12 Page 3 of 18 Page ID #:1985
</6>

2

<3>
| Section | Page |
|---|---|
| Summary: SLSOM now | 21 |
| Vital International Foundation and its connection to SLSOM | 22 |
| An overview of the Vital International Foundation | 22 |
| Susana Mitchell Dolphin heads VIF and Jerroll Dolphin runs its training programs | 23 |
| Medical/clinical/instructional tourism run by VIF | 24 |
| Corporate and nonprofit registrations of VIF in California | 25 |
| The Vital International Foundation shares infrastructure and personnel with SLSOM | 26 |
| VIF's California and Ghana addresses | 27 |
| Is there a VIF – SLSOM – Earthcare International connection? | 29 |
| Other VIF personnel | 31 |
| Summary: the Vital International Foundation | 31 |
| The St. Luke School of Medicine, from 2000 to the present | 32 |
| The St. Luke School of Medicine appears to have been created in 1999 or 2000 | 32 |
| The troubling rosters of SLSOM faculty and administration | 33 |
| June 2001 SLSOM faculty | 33 |
| More about Professor Taliaferro Harris, MD: connection to Jerroll Dolphin | 34 |
| More about Professor Taliaferro Harris, MD: practicing medicine without a license in Ghana in collaboration with Jerroll Dolphin | 36 |
| More about Professor Taliaferro Harris, MD: conviction for felony medical fraud in 2009 for his activities in 2005 and earlier | 39 |
| June 2002 SLSOM faculty | 40 |
| Professor Egbert Phipps runs unsavory degree providers widely described as diploma mills | 40 |
| Steve Arnett is unlicensed and has significant involvement with other medical diploma mills | 40 |
| Early registrations of the SLSOM internet domain used a California postal address | 41 |
| Internet domain registration history | 42 |
</3>

2

Last saved 10/31/2009 9:31 AM

The changing SLSOM faculty and administration .................................................. 42
  Glory Dolphin was SLSOM "CEO" and "Chief Business Development Officer" in 2001 .................................................. 42
  Self-presentation: brochure with Dogliotti school photo (mention author property); course catalog .................................................. 44
  Glory Dolphin is named in a 2001 SLSOM brochure's "properties" as the document's author .................................................. 44
Physical locations associated with SLSOM infrastructure .................................................. 46
  Inglewood, California .................................................. 46
  SLSOM identifies a Ghanaian address for its finance and admissions officers ........ 46
  David Karam's El Paso, Texas address received surface mail for SLSOM in 2006 .... 47
Outcomes in medical education: the SLSOM classes of 2002 .................................................. 48
  The standard for comparison: U.S. medical education .................................................. 48
  The classes .................................................. 49
  David W. Karam .................................................. 49
    Karam operates the "Institute for Adaptogenic Science" .................................................. 49
    David Karam claims an SLSOM MD and also a LaSalle University diploma mill degree .................................................. 50
Personnel of the St. Luke School of Medicine faculty and administration .................................................. 51
  "Students" who immediately assumed leadership roles in SLSOM .................................................. 51
  Dolphin and Harris appear to arrange medical tours of western Africa .................................................. 51
Disturbing connections to other organizations .................................................. 53
  Southern Graduate Institute .................................................. 53
  University of Science Arts and Technology Medical College of London .................................................. 53
  Lady Malina Memorial Medical College .................................................. 53
The St. Luke School of Medicine in November 2009, and before .................................................. 53
St. Luke School of Medicine students .................................................. 59

4

Larry Lammers ................................................................................................. 59
Connected organizations .................................................................................. 59
   St. Luke Medical Foundation ......................................................................... 59
   Project Africa 2000 ......................................................................................... 61
   The Economic Development Fund Foundation ............................................. 62
   Edwin Muniz .................................................................................................. 63
   Herbert W. Winstead ...................................................................................... 65
Early version of SLSOM on pacbell.net ........................................................... 68
Medical tourism ................................................................................................ 68

## Introduction

The insufficient capacity of postsecondary institutions in the developing world to place students in local facilities, in combination with the economic advantage afforded to those who obtain university degrees, generates an attractive market for foreign degree providers.[2] Most of these foreign schools create legitimate programs featuring instruction by qualified faculty who teach college-level material to engaged students. But government oversight of universities that are international in extent is a challenging task, even when all the stakeholders—students, the university faculty and administration, and the governmental oversight agency—share the common goal of providing students with a quality education. When one of the participants is not acting in good faith, it can be fiercely difficult to detect and suppress the activity. Sometimes there is a dishonest degree provider. Sometimes an accreditor lacks the skill to detect misrepresentations.[3] Sometimes there are structural problems that prevent an agency from responding, even when it is aware that it appears to bestow legitimacy on an entirely fraudulent entity posing as a university.[4] Quality assurance is not a simple matter.

---

[2] This subject has been discussed extensively in the higher education literature. See, for example, "The Private Nature of Cross-Border Higher Education," Jason E. Lane and Kevin Kinser, *International Higher Education*, 53, Fall 2008.

[3] For example, "Accreditation of College in Former Soviet Republic Raises Questions of Oversight," Burton Bollag, *Chronicle of Higher Education*, September 8, 2006. See also "When Criminals Control the Ministry of Education," George D. Gollin, *International Higher Education*, 53, Fall 2008.

[4] "Wolves in Chancellors' Clothing," George D. Gollin, *International Higher Education*, 55, Spring 2009.

5

*Immediate disqualifications*

Central to any effort at suppression of bogus schools is the accumulation of clear, irrefutable evidence documenting the unsavory practices and willful misrepresentations of an illegitimate degree provider. Some of the attributes that are warning flags are discussed in the best practices document *Toward Effective Practice: Discouraging Degree Mills in Higher Education* released by the Council for Higher Education Accreditation (CHEA) and the United Nations Educational, Scientific and Cultural Organization (UNESCO).[5]

The list of findings that should immediately disqualify a degree provider from receiving an operating license is long. A single determination of any of the following is likely to provide adequate grounds for immediate rejection of a school's application for licensure:

- The school's catalog misrepresents its physical facilities, either through inaccurate descriptions in text, or deliberately misleading photographs of buildings and grounds that could reasonably be thought to represent a campus, but do not;

- A significant number of the school's instructors or administrators do not hold the academic credentials appropriate for successful discharge of their responsibilities, or claim bogus credentials from unrecognized degree providers;

- The school operates, or has a history of operating, without legal authority from the appropriate government agency in its home jurisdiction;

- In the case of the licensed professions, the school's graduates fail to obtain licenses, or fail to thrive as practitioners, with unusually large probability;

- A significant portion of the school's graduates use their credentials for commercially deceptive or criminally fraudulent activities, indicating that the school is complicit in their deceptions;

- The school awards academic credit without requiring demonstration of mastery of the subject matter for which the credits are awarded;

- The school's articulation agreements with other schools reveal that the school awards transfer credits regardless of the level of mastery of the subject matter associated with the transferred credits;

- The school masks its internet domain registration information behind a privacy service, hiding the identities of its administrative officers;

---

[5] *Toward Effective Practice: Discouraging Degree Mills in Higher Education*, Council for Higher Education Accreditation and the United Nations Educational, Scientific and Cultural Organization, 2009, http://www.chea.org/pdf/degree_mills_effective_practice.pdf.

6

- The school will not reveal the names of its instructors or the identities of its senior administrators;
- The school shares a significant number of instructors or administrators with other schools known to hold any of the attributes listed above.

*Past practices as predictors of future conduct*

Recent history shows that the past practices of the principals of a degree provider can be good predictors of how they will operate a new school. The owners of the "St. Regis group" of diploma mills repeatedly claimed they were revamping their practices and policies. In spite of this, they continued to sell degrees to unqualified customers without providing meaningful instruction or portfolio evaluation. Over time the owners of St. Regis ran through 66 differently named "universities" of their own invention, only stopping when their computers and supplies used in fabricating diplomas were seized by U.S. federal authorities.[6] James Kirk, the owner of the Louisiana-based "LaSalle University" diploma mill was imprisoned for his LaSalle business. Within weeks of the start of his prison term, Kirk and his wife had launched a new diploma mill named "Edison University" whose promotional material was mailed to customers from the city in which Kirk was incarcerated.[7]

*The international stake in quality assurance and postsecondary oversight*

It is becoming increasingly common for academic credentials earned in one country to be used in seeking employment in another country. In the European Union the Bologna Accords are intended to facilitate this by easing the transfer of academic credentials across national boundaries.[8] In the case of foreign medical credentials to be used inside the United States, one avenue for cross-border acceptance is provided by the Foundation for Advancement of International Medical Education and Research:

> The Foundation for Advancement of International Medical Education and Research maintains the barrier between the United States Medical Licensing Exam and students from non-US medical schools. Only graduates from schools in the foundation's International Medical Education Directory can take the exam. The directory is compiled from information provided by national ministries of health.[9]

But there is a fundamental structural problem in the FAIMER wall at the border of the United States, with examples of its breach discussed in the higher education literature:

---

[6] See the large volume of material associated with *United States of America vs. Dixie Ellen Randock et al.*, some of which is available online at http://www.hep.uiuc.edu/home/g-gollin/pigeons/#sru_usag.
[7] *Degree Mills: the Billion Dollar Industry That Has Sold Over a Million Fake Diplomas*, Allen Ezell and John Bear, Prometheus Books, Amherst, New York, 2005, page 52.
[8] A great deal of material discussing the Bologna Accords can be found in articles carried by *International Higher Education*, available online at http://www.bc.edu/bc_org/avp/soe/cihe/newsletter/.
[9] Op. cit., "Wolves in Chancellors' Clothing."

# EXHIBIT B

In Case of reply the
number and date of this
letter should be quoted

TEL: 664951-3/664970/663750/
676765/664650/675027
FAX: 665363/667823

My Ref. No. **SCR. PO/USA**

Your Ref. No. ...........................



REPUBLIC OF GHANA

MINISTRY OF FOREIGN AFFAIRS
AND REGIONAL INTEGRATION,
P. O. BOX M 53,
ACCRA, GHANA.

DATE: **20TH NOVEMBER, 2009.**

## CAUTION AGAINST GRANTING OF APPROVAL/ACCREDITATION TO ST. LUKE SCHOOL OF MEDICINE TO ISSUE MEDICAL DEGRESS IN GHANA

I have been directed to forward, herewith, for your attention and urgent action, letter reference No. WA/INF/4 dated 17th November, 2009 and its attachment received from our Mission in Washington DC.

2. The Oregon Student Assistance Commission Office of Degree Authorization is by the letter cautioning the National Accreditation Board, (NAB) of Ghana against granting approval to St. Luke "School of Medicine", to enable the latter to issue medical degrees to Ghanaians due to the fact that the activities the school do not confirm with foreign degrees accreditation practices of the U.S.A.

3. It would be most appreciated if the National Accreditation Board (NAB) could take urgent action to avert possible sanction against Ghanaian educational institutions.

For: MINISTER FOR FOREIGN AFFAIRS
& REGIONAL INTEGRATION
**GLORIA POKU (MRS)**
DEPUTY DIRECTOR/AMERICAS BUREAU

MR. KWAME DATTEY,
NATIONAL ACCREDITATION BOARD (NAB),
NO. 6 BAMAKO STREET, EAST LEGON,
P. O. BOX CT 3256,
ACCRA.

Encl.

# EXHIBIT C

In Case of reply the
number and date of this
letter should be quoted

TEL: 664951-3/664970/663750/
676765/664650/675027
FAX: 665363/667823

My Ref. No. SCR. PO/USA

Your Ref. No. ...................



REPUBLIC OF GHANA

MINISTRY OF FOREIGN AFFAIRS
AND REGIONAL INTEGRATION,
P. O. BOX M 53,
ACCRA, GHANA.

DATE: 20TH NOVEMBER, 2009.

## CAUTION AGAINST GRANTING OF APPROVAL/ACCREDITATION TO ST. LUKE SCHOOL OF MEDICINE TO ISSUE MEDICAL DEGRESS IN GHANA

I have been directed to forward, herewith, for your attention and urgent action, letter reference No. WA/INF/4 dated 17th November, 2009 and its attachment received from our Mission in Washington DC.

2. The Oregon Student Assistance Commission Office of Degree Authorization is by the letter cautioning the National Accreditation Board, (NAB) of Ghana against granting approval to St. Luke "School of Medicine", to enable the latter to issue medical degrees to Ghanaians due to the fact that the activities the school do not confirm with foreign degrees accreditation practices of the U.S.A.

3. It would be most appreciated if the National Accreditation Board (NAB) could take urgent action to avert possible sanction against Ghanaian educational institutions.

For: MINISTER FOR FOREIGN AFFAIRS
& REGIONAL INTEGRATION
**GLORIA POKU (MRS)**
DEPUTY DIRECTOR/AMERICAS BUREAU

MR. KWAME DATTEY,
NATIONAL ACCREDITATION BOARD (NAB),
NO. 6 BAMAKO STREET, EAST LEGON,
P. O. BOX CT 3256,
ACCRA.

Encl.

# EXHIBIT D

**Oregon**
Theodore R. Kulongoski, Governor

Oregon Student Assistance Commission
**Office of Degree Authorization**
1500 Valley River Drive, Suite 100, Eugene, OR 97401
(541) 687-7452; Fax: (541) 687-7419
www.osac.state.or.us/ODA

October 30, 2009

Mr. Kwame Dattey
National Accreditation Board (NAB)
No. 6 Bamako Street, East Legon
P. O. Box CT 3256
Accra
GHANA



Dear Mr. Dattey:

It has come to our attention that your agency may be about to issue an approval or accreditation to the notorious entity that does business under the name St. Luke "School of Medicine" or the like. We are concerned that an entity with the unsavory history of the St. Luke business might be allowed to issue so-called "medical degrees" that could be used by unscrupulous people around the world to practice medicine on unsuspecting patients.

We are concerned about what such a decision would mean to the reputation of Ghanaian colleges around the world. Oregon banned the use of St. Luke degrees several years ago, and we would have to ban the use of all Ghanaian degrees if St. Luke is approved. The reason for this is that Oregon law requires us to base acceptance of foreign degrees on the accreditation practices of the nation in question.

If the government of Ghana authorizes St. Luke to issue "medical degrees" we will have no choice but to conclude that Ghana does not have a meaningful postsecondary approval process, in which case degrees issued by the 23 colleges now operating in Ghana would no longer be usable in Oregon.

Oregon is a small state far from Ghana and it may be that a ban on all degrees issued in Ghana would not affect your country very much. However, we urge you to consider the consequences of other states and nations making similar decisions if you issue an approval to grant medical degrees to the entity called St. Luke.

It is possible that decision-makers in Ghana simply did not have all of the information about St. Luke's past practices and its desperate search for a government willing to allow it to sell degrees from a site outside the United States, where it began operating illegally in California some years ago. St. Luke is not and has never been a legitimate provider of medical degrees.

Sincerely,

Alan Contreras
Administrator

cc: Mr. Adolphus K. Arthur, Deputy Chief of Mission, Embassy of Ghana, Washington, D.C.
Akunna Cook, Desk Officer for Ghana, U.S. Department of State, Washington, D.C.
Dr. E. Stephen Hunt, USNEI, International Affairs, U.S. Department of Education, Washington D.C.
Mary Scroll, Public Affairs Officer, Embassy of the United States, Accra, Ghana

# EXHIBIT E

**Oregon**
Theodore R. Kulongoski, Governor

**Oregon Student Assistance Commission**
**Office of Degree Authorization**
1500 Valley River Drive, Suite 100, Eugene, OR 97401
(541) 687-7452; Fax: (541) 687-7419
www.osac.state.or.us/ODA

October 30, 2009

Mr. Kwame Dattey
National Accreditation Board (NAB)
No. 6 Bamako Street, East Legon
P. O. Box CT 3256
Accra
GHANA

Dear Mr. Dattey:

It has come to our attention that your agency may be about to issue an approval or accreditation to the notorious entity that does business under the name St. Luke "School of Medicine" or the like. We are concerned that an entity with the unsavory history of the St. Luke business might be allowed to issue so-called "medical degrees" that could be used by unscrupulous people around the world to practice medicine on unsuspecting patients.

We are concerned about what such a decision would mean to the reputation of Ghanaian colleges around the world. Oregon banned the use of St. Luke degrees several years ago, and we would have to ban the use of all Ghanaian degrees if St. Luke is approved. The reason for this is that Oregon law requires us to base acceptance of foreign degrees on the accreditation practices of the nation in question.

If the government of Ghana authorizes St. Luke to issue "medical degrees" we will have no choice but to conclude that Ghana does not have a meaningful postsecondary approval process, in which case degrees issued by the 23 colleges now operating in Ghana would no longer be usable in Oregon.

Oregon is a small state far from Ghana and it may be that a ban on all degrees issued in Ghana would not affect your country very much. However, we urge you to consider the consequences of other states and nations making similar decisions if you issue an approval to grant medical degrees to the entity called St. Luke.

It is possible that decision-makers in Ghana simply did not have all of the information about St. Luke's past practices and its desperate search for a government willing to allow it to sell degrees from a site outside the United States, where it began operating illegally in California some years ago. St. Luke is not and has never been a legitimate provider of medical degrees.

Sincerely,

Alan Contreras
Administrator

cc: Mr. Adolphus K. Arthur, Deputy Chief of Mission, Embassy of Ghana, Washington, D.C.
Akunna Cook, Desk Officer for Ghana, U.S. Department of State, Washington, D.C.
Dr. E. Stephen Hunt, USNEI, International Affairs, U.S. Department of Education, Washington D.C.
Mary Scholl, Public Affairs Officer, Embassy of the United States, Accra, Ghana

*Celebrating 50 years of serving students 1959-2009*

# EXHIBIT F

# UNIVERSITY OF ILLINOIS COLLEGE OF MEDICINE

Office of the Regional Dean
at Urbana-Champaign

190 Medical Sciences Building, MC-714
506 South Mathews Avenue
Urbana, IL 61801-3618

November 16, 2009

Mr. Kwame Dattey
National Accreditation Board (NAB)
No. 6 Bamako Street, East Legon
P.O. Box CT 3256
Accra
GHANA

Dear Mr. Dattey:

As the Dean of a medical school that recruits from the most accomplished graduates of non-U.S. medical schools into its residency, I have concerns about the impending accreditation decision for what purports to be the St. Luke School of Medicine. I have had the opportunity to review data in the public domain about this alleged school, and about individuals who claimed to have earned a medical degree from it. There is no evidence whatsoever that this alleged school really exists, or that there are adequate facilities for the most rudimentary components of a medical curriculum. In fact, all evidence says that only a small empty unimproved room is at the location advertised for the St. Luke's School of Medicine.

Understanding that high quality is not absolutely dependent upon physical structures, I took the opportunity to review the publicly available records of individuals who claim to have graduated from this alleged school for evidence of a bona fide education. There are records of twelve individuals who claim to have degrees from St. Luke's. None of these people are licensed to practice medicine, and at least two have been incarcerated for practicing medicine without a license.

I bring this to your attention because accreditation or approval of the alleged St. Luke School of Medicine by officials in Ghana would make medical schools in the United States worry about the quality of any medical school in Ghana. As a result, such approval of St. Luke would put the graduates of legitimate medical schools in your country at a distinct disadvantage when attempting to gain advanced medical training.

Hence, by denying accreditation to St. Luke School of Medicine you will protect the reputations of legitimate medical school graduates from Ghana. Moreover, by denying St. Luke any hint of legitimacy you will protect innocent patients from abuse at the hands of potential pseudo-graduates.

Telephone: (217) 333-5465 / Fax: (217) 333-8868 / Email: comuc@med.uiuc.edu / www.med.uiuc.edu

UIC • Chicago • Peoria • Rockford • Urbana-Champaign

The entity that passes itself off as the St. Luke School of Medicine has never been a legitimate educator of medical practitioners, and I urge you to make the owners of this entity own up to their dishonesty.

Sincerely,

Brad S. Schwartz, M.D.
Dean
Professor of Biochemistry and Medicine