Larry Walls, Esq. SBN 64696
The Walls ~ Fox Firm
City National Plaza
515 S. Flower St., 36th Floor
Los Angeles, CA 90071
Telephone:  (213) 236-3796
Facsimile:   (888) 637-4515

Attorney for
Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISON

JERROLL DOLPHIN, ET AL,

PLAINTIFFS,

v.

REPUBLIC OF LIBERIA, et al,

DEFENDANTS.

CASE NO.
11-CV-06322 RGK (SHX)

**TRIAL BRIEF IN SUPPORT OF REQUEST FOR CLERK DEFAULT**

## SUMMARY OF CASE

A.    INTRODUCTION

The primary case (i.e. the St. Luke School of Medicine, Class and Dolphin Complaint) is an action in Law to recover damages for the destruction of a Medical School (business opportunity) and personal injuries to Dr. Jerroll Dolphin. The acts that violated the rights of the parties took place in the Country of Liberia.

/ / /

/ / /

/ / /

/ / /

**TRIAL BRIEF**

As discussed in detail below, Dr. Dolphin and others chartered a medical school in the country of Liberia. This just happened to be during the time this country was involved in a civil war. Thereafter, at all relevant times, Mr. Mohammed Shariff, a resident of Monrovia, Liberia, was a member of the National Transitional Legislative Assembly of the Republic of Liberia, Chairman of the Health and Social Welfare committee and Chairman of the National Transitional Executive Committee. In order to get money, Mr. Shariff used his position to demand bribes and attempted to extort money from Dr. Dolphin to allow him to operate St. Luke School of Medicine in Liberia. When Dr. Dolphin refused to pay the extortion money, Mr. Shariff set about destroying the Medical School, putting it out of business, defaming and slandering Dr. Dolphin publicly and privately, and falsely imprisoning him to get his money.

The actions of Mr. Shariff were in violation of the laws of Liberia and a violation of the "Friendship Treaty" of the Country of Liberia and the United States of America, entered into force November 21, 1939. 54 Stat. 1739;TS 956; 201 LNTS 163. Specifically, Article 1, in part, "The Nationals of each of the High Contracting Parties shall be permitted to enter, to travel and reside in the territories of the other; to exercise liberty of conscience and freedom of worship; to engage in professional, scientific, religious, philanthropic, manufacturing and commercial work of every kind without interference; to carry on every form of commercial activity which is not forbidden by the local law;…". Mr. Shariff is liable to the Plaintiffs for his wrongful conduct.

B.     SUMMARY OF FACTS

On August 1, 2000, The Republic of Liberia, Ministry of Health and Social Welfare, accredited the St. Luke School of Medicine to operate in the Republic of Liberia. Exhibit 1.

On September 17, 2002, the National Commission of Higher Education, Republic of Liberia, issued St. Luke School of Medicine a permit to operate a

Medical School in Liberia. Exhibit 2.

On August 7, 2003, the president of the Republic of Liberia, the Honorable Charles Taylor, signed the legislation incorporating St. Luke School of Medicine, granting it a charter. Exhibit 3.

On or about February 22, 2005, Mohammed Shariff demanded from Dr. Dolphin a bribe of "$6000 a month" while at the Liberian Capitol building, to allow St. Luke School of Medicine to continue to operate in Liberia..

On or about February 25, 2005 Shariff demanded a bribe of $6,000 US per month before leaving the SLSOM campus in Gaye Town.

On or about March 15, 2005, The National Security Agency, NSA, arrested and detained Dolphin at his room at the behest of Shariff. The NSA Director stated that Shariff called him about a "fake" medical school in Liberia. The NSA Director released Dolphin in the presence of his attorney and US Embassy Deputy C'harge de Affaires.

On or about March 16, 2005, Shariff and his co-conspirators caused the following newspaper article to be published in Monrovia media, and on the internet, "Another Degree Granting Medical College in Liberia", The Inquirer, Monrovia, Liberia March 16, 2005. The newspaper article was replete with false statements, and was also published on the Internet.

On or about Thursday, March 17, 2005, the Liberian Federal Bureau of Investigation ("FBI") questioned Dolphin in the presence of his lawyer for 2 hours. Dolphin was questioned by the Director of the FBI who also stated that Shariff called him about a "fake" medical school in Liberia. Dolphin was released after Dolphin's lawyer presented SLSOM's official Liberian documentation.

On Friday morning, March 25, 2005, as Dr. Dolphin was about to board the airplane, several Immigration agents approached him, took him under arrest, took his passport, telephone, and boarding pass. Then, the Immigration officials called Shariff and the Minister of Justice, Kabinah Janeh, former leader of LURD

("Liberians United for Reconciliation and Democracy"), one of the rebel coalitions that fought the civil war in 2002 and 2003 in Liberia, and told them of Dolphin's arrest. Shariff was also a known member of LURD.

On April 11, 2005, at the behest of Shariff, the NCHE issued a letter to Madame Carole Bede, which stated SLSOM "does not exist" and was a "computer school." Upon receipt of this letter, the ECFMG-IMED without corroboration of the evidence or claims stated in this letter immediately withdrew SLSOM from the IMED, and canceled the USMLE test results for all of the Class, past and present. Exhibit 11.

On April 12, 2005, Dolphin, SLSOM, and the class, in the presence of dozens of Liberian newspaper reporters were slandered at the Capitol Building in the office of Shariff.  Shariff had a line of more than a dozen LURD members to falsely testify against the plaintiff, all of who ended their statements with the phrase SLSOM "does not exist in Liberia." Dolphin was also threatened with prosecution and imprisonment at this time.

On April 12, 2005, after Shariff adjourned the hearing, he imprisoned Dr. Dolphin and took his passport at Shariff's office in the Capitol building for approximately 4 hours before. A US Embassy official ordered Shariff to release Dr. Dolphin and return his passport.  Dolphin was, also, threatened with prosecution and imprisonment.

On or about Tuesday, April 26, 2005, a hearing was held in Shariff's office at the Capitol Building in the presence of dozens of newspaper reporters and photographers. Shariff did slander Dr. Dolphin, SLSOM, and the class, calling SLSOM a "diploma mill" and other false phrases that sold medical diplomas to more than 700 Indians off of the streets.  Frank Teah and Sen. Beatrice Sherman, his wife, loudly told the audience that Shariff had asked for a bribe of "$6,000 United States Dollars a month" in 2002. At this time, Dr. Dolphin told the audience that "Shariff demanded $6000 a month bribe and Benson Barh wanted a bribe, too."

To this date, Dr. Dolphin, nor SLSOM, nor any of its officials were ever investigated or charged for any crime by the Justice Ministry; however, because of the threats of Shariff, Benson Barh, and other Liberian government officials, Dolphin had lived in fear, and still lives in fear.  It wasn't until October 2005; Dr. Dolphin was allowed to leave Liberia, constantly under threat, public and private, by Shariff.

On Friday, July 15, 2005, through the Ministry of Information, Shariff and his conspirators caused an announcement to be broadcast on radio and television throughout Liberia that SLSOM was a fake school and Dr. Dolphin was a fraud. It was also published in the newspapers on Tuesday, July 19, 2005: "Gov't Finally Closes St. Luke, Monrovia, Liberia" The Inquirer, July 19, 2005.  The newspaper article was replete with false statements and was published on the internet.

On July 21, 2005, SLSOM filed a "Writ of Prohibition" in Liberia's Supreme Court against the Liberian Government seeking redress against the false claims made by Liberian government officials that SLSOM "does not exist" and to prohibit further actions against SLSOM by the government. The defendants named were the Minister of Justice, the Minister of Education, The Five-Member Committee chaired by the Justice Minister, and any other Liberian agency.  See Exhibit "12".

On or about, July 21, 2005, simultaneously to SLSOM filing a "Writ of Prohibition" in Liberia's Supreme Court against the Liberian Government, the Minister of Justice, the Minister of Information, and Mr. Shariff accompanied by more than 2-dozen members of the Liberia National Police illegally raided the SLSOM campus, declared "non-existent" by select Liberian government officials, and arrested an innocent SLSOM employee, Jessie Sackie, who was held illegally for 24 hours.  This forced Dr. Dolphin into hiding for more than 24 hours.

On July 22, 2005, the Supreme Court issued an Order to Show Cause that prohibited the Liberian government from taking action against SLSOM.  The "show cause" hearing was scheduled for Monday, July 24, 2005.  A Supreme Court justice

ordered the Minister of Justice by telephone to release the SLSOM employee, Jessie Sackie.  See Exhibit "14".

On July 24, 2005, only SLSOM attorneys and officials showed for the "show cause" hearing. The order to prohibit Liberian government action against SLSOM was extended. Another hearing on the "Writ of Prohibition" was scheduled for August 4, 2005.

On August 4, 2005, only SLSOM attorneys and officials showed for the "Writ of Prohibition" hearing. The order to prohibit Liberian government action against St. Luke School of Medicine was extended, and another hearing on the "Writ of Prohibition" was scheduled for August 10, 2005 to which all defendants were duly served notices to appear by the Colonel Amos Dixon of the Court Marshall's Office. See Exhibit "15".

On August 10, 2005, only SLSOM attorneys and officials showed for the "Writ of Prohibition" hearing. The Supreme Court granted relief to SLSOM, ordering all agencies of the Liberian government to restore SLSOM to "status quo ante", that being an accredited medical school, complete with a charter, and an attestation. Additionally, the Supreme Court permanently ordered to "prohibit Liberian government action against SLSOM".

A final Supreme Court hearing was scheduled on August 20, 2005 to which all defendants were duly served notices to appear by the Colonel Amos Dixon of the Court Marshall's Office.

On August 20, 2005, only St. Luke School of Medicine attorneys and officials showed for the "Writ of Prohibition" hearings. On August 22, 2005, the Supreme Court granted SLSOM a "Clerk's Certificate", a default certificate indicating that Liberian government failed to respond or petition against SLSOM's "Writ of Prohibition." See Exhibit "17".

On September 18, 2006, St. Luke School of Medicine filed a lawsuit against the Republic of Liberia in Liberia Civil Court, in Monseratto County, Liberia, at the

- 6 -

Temple of Justice in Monrovia. The lawsuit named the Ministry of Education, the Ministry of Health, and all those working under the scope and authority of the Republic of Liberia.  See Exhibit "21 - 30", and on October 30, 2006, SLSOM obtained a "Default Certificate" against the Republic of Liberia, clearly demonstrating that allegations made by Shariff and other Liberian officials were completely false.

## C. SUMMARY OF APPLICABLE LAW

### 1.     Plaintiff's Authority

The instant action is brought pursuant to the Plaintiff's authority to sue to redress a violation of his civil rights. The "Friendship Treaty" between the United States of America and the Nation of Liberia subjects the officials and persons of Liberia to provide civil liberties and due process to United States citizens in its country. Therefore, the following United States laws apply: Title 42, Chapter 21, Subchapter I, § 1983, Civil action for deprivation of rights under; Title 42, Chapter 21, Subchapter I, § 1985, Conspiracy to interfere with civil rights; Title 42, Chapter 21, Subchapter I, § 1988(a), Proceedings in vindication of civil rights; Title 18, Part I, Chapter 13, § 242, Deprivation of rights under color of law; Title 18, Part I, Chapter 41 § 878, Threats and extortion against foreign officials, official guests, or internationally protected persons; and, 18 USC $ 245(b)(2), The 1964 Federal Civil Rights Law.

A.     Title 18, Part I, chapter 13 § 242, Deprivation of rights under color of law. basically states, "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, commonwealth, Possession, or district to the Deprivation of any rights, privileges, or immunities secured or protected by the constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an

alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both…".

B.    The Friendship Treaty provides: "No person shall…be deprived of life, liberty, or property, without due process of law and…equal protection of the laws." "…The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law."

C.    Title 42 U.S.C. $1985(3) (1976 ed. Supp V) provides: …"If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured."

D.    Common Law of Conversion: the Friendship Treaty provides: … [a citizen of either country] "Property shall not be taken without due process of law and without payment of just compensation." "The nationals of each High Contracting Party shall receive with in the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law."

## D.    ANALYSIS OF CAUSES OF ACTION ALLEGED IN COMPLAINT

### 1.    First Cause of Action (Libel)

The California Civil Code and Blacks Law Dictionary defines Libel as New Webster's Dictionary, 1991, pg. 223, para. 14 "a defamatory writing or printed picture …." Statement injurious to a person's character." The facts show that Mr. Dolphin and St. Luke School of Medicine were falsely accused of not being a valid medical school, which it was, and Dr. Dolphin was accused, verbally and in writing, as being a fraud, liar and criminal. All these statements were untrue. Consequently, Defendant Shariff is liable to Plaintiffs and Dr. Dolphin for all lost property and all money lost (past, present and future), which should equal $125,000,000.00 dollars.

2.     **Second Cause of Action (Trade libel)**

The practice and instruction in the Medical field is a trade that can and was libeled, as delineated in The First Cause of Action.

3.     **Third Cause of Action (Intentional Interference with Prospective Business Advantage and Economic Interference**

Dr. Dolphin owned SLSOM, which had a Charter and an Act of Legislature, making SLSOM a legal and corporate entity with perpetual succession, having the authority to contract, sue and be sued, plead and be impleaded in any court of competent jurisdiction witching the Republic of Liberia; to purchase or otherwise acquire and hold property, real and mixed up to the value of one hundred and fifty million United States Dollars (US$150,000,00); making St. Luke School of Medicine (SLSOM) to be perpetually maintained in the Republic of Liberia for medical education of the people of the Liberian nation, people of the other countries and for those who may otherwise have the capacity to seek medical education.

The false statements made about SLSOM and Dr. Dolphin destroyed the school, the students and reputation of both. Not only in Liberia, but medical

students worldwide, World Health Organizations, Ghana and the United States. Defendant Shariff was fully aware of the legitimate status, the potential and actual profit making ability of the Medical School. That is why he demanded the $6000 bribe and destroyed the school and reputation of Dr. Dolphin when he did not get it. Consequently, pursuant to the value stated in the Chartering documents (US $150,000,000) one hundred and fifty million United States Dollars, Dr. Dolphin is entitled to recover that amount.

/ / /

## 4.    Cause of Action- Conspiracy

This cause of action is covered in causes 1,2,3., in order to do the things that Defendant Shariff did he had to have the cooperation of the dismissed c0-defendants.

## 5.    Fifth Cause of Action- Treaty Violation

This cause of action is covered in causes 1, 2, and 3, in order to violate Dr. Dolphin's civil rights this law had to be violated.

## 7.    Seventh Cause of Action-False Imprisonment

Defendant Shariff, on behalf of the Republic of Liberia, without lawful privilege and without filing criminal charges, held Dr. Dolphin in confinement, at phony investigative hearings, took his passport and prevented him from leaving this country. Also, by trespassing on his property with the police forced him to go into hiding. All these acts confined Dr. Dolphin which he is entitled to compensation. The end result is that in fear for his life he was forced to flea the country and abandon his school. All to his general damage of $150,000,000.00 dollars.

## 8.    Twelfth Cause of Action-Denial of Equal Protection

The Friendship Treaty states; "No state (country) shall…deny to any person

- 10 -

within its jurisdiction the equal protection of the laws." "The nationals of each high Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law." The acts of defendant Shariff deprived Dr. Dolphin of his life, liberty, and property, without due process of law. The defendants held false hearings to discredit Dr. Dolphin and his school, but no presented no evidence to rebut the documents presented by Dr. Dolphin to refute the allegations that he was a liar, fraud and the SLSOM did not exist. The illegal dismantling of SLSOM was deliberate. By doing so, defendants treated Dr. Dolphin and SLSOM differently than A.M. Dogliotti, a similarly situated medical school that suffered none of the harms to which SLSOM was subjected.

The actions of Shariff and his co-conspirators caused SLSOM to be removed from IMED, effectively nullifying Medical Students' degrees and medical licensing examination scores. As a result, Dr. Dolphin and SLSOM medical students and graduates have lost jobs, residencies, livelihoods and other benefits. All to the Damage of the amount of the charter or $150,000,000.

**9.    Thirteenth Cause of Action-conspiracy to commit Civil Rights Violations**

Mohammed Shariff and dismissed co-defendants Dr. Issac Roland, Dr. Evelyn Kondakai, Dr. Horaatious Browne and Dr. Benson Barh each conspired with one another to denigrate SLSOM's and Dr. Dolphin's reputations in an effort to secure bribes, as set forth above. Defendant Shariff used his position at the National Transitional Legislative Assembly to conduct malicious hearings solely to denigrate and discredit SLSOM in the public eye. He, also, used political and other pressures to secure the participation and cooperation of the other conspirators. Drs. Barh and Browne used their position in the Liberian Medical Board to denigrate SLSOM in the public eye at the same hearings conducted by Shariff, as well as the Press Conference of March 29, 2005, and the issuance of the false letter to WHO

- 11 -

and the Republic of Ghana agencies. The National Commission on Higher Education and Isaac Rolland conspired with the above Defendants to mail the false "computer school" letter to the ECFMG, and therefore have SLSOM removed from the IMED. Thus, causing untold damage to the parties, in the sum of $150,000,000 the value of the charter.

**10.     Fourteenth Cause of Action-conversion**

The Friendship Treaty states: "Their (foreign nationals) property shall not be taken without due process of law and without payment of just compensation." Herein, Defendant Shariff and his co-conspirators destroyed SLSOM and Dr. Dolphin, took the land, school, supplies and equipment without just cause and did not pay any compensation. Entitling Dr. Dolphin to $ 100,000.00.

**11.     Fifteenth Cause of Action-Intentional Infliction of Emotional Distress**

Defendant Shariff and his co-conspirators committed untold acts of cruelty to Dr. Dolphin. Using his power with the Immigration and Naturalization Service (INS), Dr. Dolphin's passport was taken from him, preventing him from leaving the country, on two occasions. This caused him fear for his life, emotional trauma and severe depression. He was forced to be separated from his wife and family. The outright lies and fabrications regarding the integrity of SLSOM, its decertification, and disqualification of its students and doctors had a profound effect upon his psyche and emotional makeup. Dr. Dolphin became gaunt, sickly, depressed, was divorced by his wife, and needed medical care. Consequently, he is entitled to compensation for his mental anguish.

**E.     DR. DOPHIN'S WITNESSES AND EVIDENCE**

Dr. Dolphin's witnesses for the Default Hearing shall be himself, with

- 12 -

declarations from, Mr. Frank Teah and his wife Beatrice Sherman, Dr. Meimei Dukuly, legal counsel Francis Y.S. Garlawolu and Mr. Robert Singleton Farmer. The evidence shall consist of the exhibits filed with the underlying complaint and documents showing the income of SLSOM before it was destroyed. In particular, exhibits, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 13, 14, 15, 16, 17, 18, 19 , 21, 27, 30, 31,32, 33, 34, 35, 37,38, 39, 40, 47, 48, 52.

Need March 16, '05 newspaper article. March 25, '05 detained at airport, March 31, news article, April 1, '05 summons, April 5, '05 news article, April 22, '05 news article, April 27, '05 bebe (?) letter to St. Luke.

May 10, '05 NTLlA ordered SLSOM closed and seized all property, with threat to arrest and seize Dolphin passport at Roberts International Airport, May 10, '05 article, July 19, '05 school closed by Shariff.

## F.    PRAYER FOR RELIEF

WHEREFORE, Dr. Dolphin prays judgment against Defendant Shariff as follows and appropriate to the particular Causes of Action:

1.    For monetary relief as requested in the Causes of Action as appropriate for the particular Causes of Action, in the cumulative, in the amount of $150,000,000 the amount stated in the Charter as the value of SLSOM over it's life time;

2.    For the Out of Pocket cost for defending the actions in the Republic of Liberia;

3.    For the Out of Pocket cost of bringing this action in the United States of America;

4.    For pre-and post-judgment interest;

5.    For the replacement cost of all real and personal property taken;

6.    For Punitive damages, in the sound discretion of this court;

7.    For restoration of St. Luke School of Medicine-Liberia on the International

Medical Education Directory;

8.     For removal of St. Luke School of Medicine from the State of Oregon "diploma mill" list;

9.     For removal of St. Luke School of Medicine from the "diploma mill" list of other states and territories that use the State of Oregon's "Diploma Mill list;

10.     For attorneys' fees and costs of suit pursuant to, inter alia, the common fund and private Attorney General doctrines, California Code of Civil Procedure Section 1021.5 and/or the statutory Causes of Action asserted herein, as may be appropriate.

/ / /

/ / /

/ / /

Dated: January 14, 2013

_____
Larry D. Walls, Esq.
Attorney for Plaintiff
Jerroll Dolphin, M.D.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PROOF OF SERVICE
PROOF OF SERVICE